**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**
**EAST ST. LOUIS DIVISION**

**IN RE SYNGENTA ACTIONS**

**This Document Relates To:**

    *Poletti et al. v. Syngenta AG et al.*,
    No. 3:15-cv-01221-DRH

**Judge David R. Herndon**


**ORAL ARGUMENT REQUESTED**


**SYNGENTA'S MEMORANDUM OF LAW**
**IN SUPPORT OF MOTION TO DISMISS**
**<u>FIRST CONSOLIDATED AMENDED COMPLAINT</u>**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................ v

INTRODUCTION ...................................................................................................... 1

BACKGROUND ........................................................................................................ 5

    A.    Biotechnology And Genetically Modified Crops In The United States ................ 5

    B.    Syngenta's Development Of U.S.-Approved Viptera And Duracade Corn .......... 6

    C.    Syngenta Commercializes Viptera ........................................................................ 7

    D.    Most Grain Elevators And Exporters Treat Viptera As Fungible Corn, Commingle It, And Ship It To China ...................................................................... 9

    E.    The Price Of Corn Drops And China Then Bans U.S. Corn ............................... 10

    F.    Viptera Litigation ................................................................................................ 11

CHOICE OF LAW ................................................................................................... 11

ARGUMENT ........................................................................................................... 13

I.    The Non-Illinois Plaintiffs' Claims Fail For Lack Of Personal Jurisdiction. .................. 13

    A.    Syngenta Is Not Subject To General Personal Jurisdiction In Illinois ................. 13

    B.    Syngenta Defendants Are Not Subject To Specific Personal Jurisdiction In Illinois For Non-Illinois Claims Brought By Non-Illinois Plaintiffs .................... 16

          1.    Claims By Non-Illinois Plaintiffs Allegedly Injured Outside Illinois Do Not Arise From Syngenta Defendants' Contacts With Illinois. ...................................................................................................... 16

          2.    Exercising Jurisdiction Over the Syngenta Defendants Would Offend Traditional Notions Of Fair Play And Substantial Justice. .......... 17

II.    Plaintiffs' Claims Are Barred By The Economic Loss Doctrine ...................................... 19

    A.    Plaintiffs' Claims Are Barred By The Stranger ELD. ........................................ 20

          1.    The Stranger ELD Is The Majority Rule. ................................................. 20

          2.    The Stranger ELD Bars Plaintiffs' Claims. .............................................. 24

          3.    Plaintiffs Cannot Avoid The ELD By Claiming Physical Injury. ........... 26

4.      The Law Does Not Support The MDL Court's Analysis of The ELD.................................................................................... 29

5.      All States Would Bar Plaintiffs' Claims Under The Stranger ELD. ........ 35

B.      To The Extent A Plaintiff Purchased Viptera Or Duracade, That Plaintiff's Claims Are Barred By The Contractual ELD. ....................................... 54

1.      All States At Issue Would Apply The Contractual ELD. ......................... 59

III.    Plaintiffs' Claims Based On A Duty To Ensure The Segregation Or Channeling Of Grain Produced From Viptera Are Preempted By The Grain Standards Act. ............ 60

IV.     Syngenta Did Not Have A Duty To Control The Conduct Of Others To Segregate Viptera From The Corn Supply. .................................................................................... 63

A.      A Manufacturer Has No Duty To Control Post-Sale Use Of Its Product. ............ 63

B.      These Same Principles Foreclose Imposing Duty On Syngenta In This Case. ................................................................................................................ 65

C.      The Only Court To Address Parallel Claims Against A Manufacturer Of An Approved GM Seed Held There Was No Duty As A Matter Of Law. ........... 69

D.      The Component Parts Doctrine Confirms There Is No Duty On Syngenta. ......... 70

E.      The MDL Court Erred In Holding That Syngenta Had A Duty. ......................... 72

F.      Plaintiffs Cannot Manufacture A Duty To Notify Regulatory Agencies And The Public Of Viptera's Presence In The Corn Supply. .............................. 76

G.      Plaintiffs Cannot Create A Duty To Segregate From Unspecified Industry "Stewardship Obligations." .................................................................................. 76

V.      As A Matter Of Law, Syngenta Had No Duty To Refrain From Selling Viptera. ........... 78

A.      There Is No Duty To Refrain From Selling A Safe, Non-Defective Product Based On How Third Parties Might Use It After The Point Of Sale. ................... 78

B.      Plaintiffs Cannot Manufacture A Duty To Refrain From Selling Viptera From Unidentified Industry Standards. ................................................................ 79

VI.     FIFRA Preempts Any Failure-To-Warn Theory Of Liability. ........................................ 79

VII.    All Claims Must Be Dismissed To The Extent They Rely On Event 5307/Duracade. .................................................................................................................. 80

VIII.   Plaintiffs' Strict-Liability And Products-Liability Claims Fail As A Matter Of Law. .................................................................................................................................... 80

A.      Plaintiffs' Strict-Liability Claims Fail As A Matter Of Law. ............................... 81

B.      Plaintiffs' Products-Liability Claims Fail As A Matter Of Law. .......................... 82

    1.      Plaintiffs Fail to Allege Any Defect. ................................................. 82

    2.      Plaintiffs' Claims Fail Under the Component-Parts Doctrine. ................. 83

IX.    Plaintiffs Fail To State A Claim For Tortious Interference. ............................................. 83

A.      Plaintiffs Fail To Allege Specific Prospective Business Relationships. ............... 84

B.      Plaintiffs Fail To Allege The Requisite Injury: That A Third Party Ended
Or Refused To Enter A Business Relationship. ....................................................... 86

C.      Plaintiffs Fail Adequately To Allege Improper Means. ........................................ 87

D.      Plaintiffs Fail Adequately To Allege Intent. .......................................................... 89

X.     Plaintiffs' Private Nuisance Claims Must Be Dismissed As A Matter Of Law. .............. 89

A.      Plaintiffs Fail Adequately To Allege That Syngenta Controlled Or
Substantially Participated In The Activity Constituting The Nuisance. ............... 89

B.      Plaintiffs Fail Adequately To Allege Interference With The Use And
Enjoyment Of Their *Land.* ..................................................................................... 91

C.      Plaintiffs Fail Adequately To Allege Unreasonable Interference. ........................ 92

XI.    Plaintiffs' Public Nuisance Claims Fail As A Matter Of Law. ........................................ 92

A.      Plaintiffs Have Not Identified Any Right Common To The General Public. ........ 93

B.      Plaintiffs Have Not Alleged Any "Special Damage." ........................................... 94

XII.   Plaintiffs' Consumer Protection Claims Must Be Dismissed. .......................................... 95

A.      Illinois Consumer Fraud And Deceptive Business Practices Act ("ICFA") ......... 95

B.      Arkansas Deceptive Trade Practices Act ("ADTPA") ......................................... 96

C.      Florida Deceptive and UnfairTrade Practices Act ("FDUTPA") ......................... 96

D.      California Unfair Competition Law ("UCL") ........................................................ 97

E.      Georgia Uniform Deceptive Trade Practices Act ("GUDTPA") .......................... 98

F.      Idaho Consumer Protection Act ("ICPA") ........................................................... 98

G.      Kentucky Consumer Protection Act ("KCPA") .................................................... 98

H.     Minnesota Deceptive Trade Practices Act ("MDTPA")........................................ 99

I.      New York General Business Law ("NYGBL")...................................................... 99

J.      North Carolina Unfair And Deceptive Trade Practices Act ("NCUTPA") .......... 99

K.     South Carolina Unfair Trade Practices Act ("SCUTPA").................................. 100

CONCLUSION...................................................................................................................... 100

APPENDIX A: FEDERAL AND STATE LEGISLATIVE PROPOSALS TO ADDRESS
      LIABILITY FOR GM CROPS ...................................................................... A-1

APPENDIX B: SAMPLE OF FEDERAL AND STATE LEGISLATIVE PROPOSALS
      TO ADDRESS LABELING FOR GM CROPS ............................................ B-1

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*1324 W. Pratt Condo. Ass'n v. Platt Const. Grp., Inc.*,
  936 N.E.2d 1093 (Ill. App. Ct. 2010) .......................................................................24

*2-J Corp. v. Tice*,
  126 F.3d 539 (3d Cir. 1997)...................................................................................56

*2314 Lincoln Park W. Condo. Ass'n v. Mann, Gin, Ebel & Frazier, Ltd.*,
  555 N.E.2d 346 (Ill. 1990) .........................................................................36, 37, 59

*532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc.*,
  750 N.E.2d 1097 (N.Y. 2001) .........................................................................44, 45

*9 to 5 Fashions, Inc. v. Spurney*,
  538 So. 2d 228 (La. 1989) ....................................................................................84

*Abdo v. Trek Transp. Co.*,
  582 N.E.2d 247 (Ill. App. Ct. 1991) .......................................................................66

*Adcock v. S. Austin Marine, Inc.*,
  No. 2:08-cv-263KS-MTP, 2009 WL 3633335 (S.D. Miss. Oct. 30, 2009)............................58

*Adinolfe v. United Tech. Corp.*,
  768 F.3d 1161 (11th Cir. 2014) .............................................................................90

*Adkins v. Thomas Solvent Co.*,
  487 N.W.2d 715 (Mich. 1992)...............................................................................95

*Aguilar v. RP MRP Wash. Harbour, LLC*,
  98 A.3d 979 (D.C. 2014) ......................................................20, 21, 24, 33, 35

*Aikens v. Baltimore & Ohio R.R.*,
  501 A.2d 277 (Pa. Super. 1985)........................................................................46, 47

*Aikens v. Debow*,
  541 S.E.2d 576 (W. Va. 2000)....................................................................20, 34, 35

*AKA Distrib. Co. v. Whirlpool Corp.*,
  137 F.3d 1083 (8th Cir. 1998) ..............................................................................43

*Ali v. Shaw*,
  481 F.3d 942 (7th Cir. 2007) ................................................................................84

*Am. Petrol. & Transp., Inc. v. N.Y.C.*,
   737 F.3d 185 (2d Cir. 2013)................................................................23, 31

*American United Life Ins. Co. v. Douglas*,
   808 N.E.2d 690 (Ind. Ct. App. 2004)...........................................................52

*Amsouth Erectors, LLC v. Skaggs Iron Works, Inc.*,
   No. W2002-01944-COA-R3-CV, 2003 WL 21878540
   (Tenn. Ct. App. Aug. 5, 2003) ...................................................................48

*Anderson Elec., Inc. v. Ledbetter Erection Corp.*,
   503 N.E.2d 246 (Ill. 1987) .......................................................................54

*Anderson Plasterers v. Meinecke*,
   543 N.W.2d 612 (Iowa 1996) ..............................................................21, 40

*Anderson v. State, Dep't of Nat. Res.*,
   693 N.W.2d 181 (Minn. 2005).....................................................................92

*Annett Holdings, Inc. v. Kum & Go, L.C.*,
   801 N.W.2d 499 (Iowa 2011) ..................................20, 21, 22, 24, 38, 39, 40

*Anthony v. Slaid*,
   52 Mass. 290 (1846) ........................................................................20, 41

*Apperson v. E.I. du Pont de Nemours & Co.*,
   41 F.3d 1103 (7th Cir. 1994) ..........................................................71, 72, 82

*Appletree Square 1 Ltd. P'ship v. W.R. Grace & Co.*,
   815 F. Supp. 1266 (D. Minn. 1993).............................................................90

*Arizona v. United States*,
   132 S. Ct. 2492 (2012)........................................................................62, 63

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)....................................................................82, 86, 94

*Ashley Cty., Ark. v. Pfizer, Inc.*,
   552 F.3d 659 (8th Cir. 2009) ......................................................65, 68, 69, 78, 93

*Ashtabula River Corp. Grp. II v. Conrail, Inc.*,
   549 F. Supp. 2d 981 (N.D. Ohio 2008)..........................................................45

*Assoc. Underwriters of Am. Agency v. McCarthy*,
   826 N.E.2d 1160 (Ill. App. Ct. 2005) ...........................................................86

*B.L. Jet Sales, Inc. v. Alton Packaging Corp.*,
   724 S.W.2d 669 (Mo. Ct. App. 1987)............................................................43

vi

*Bailey Farms, Inc. v. NOR-AM Chem. Co.*,
     27 F.3d 188 (6th Cir. 1994) ...........................................................................58

*Bank One Okla., N.A. v. Trammell Crow Servs., Inc.*,
     No. 03 C 3624, 2003 WL 23019173 (N.D. Ill. Dec. 23, 2003) ...............................38

*Baptist Health v. Murphy*,
     373 S.W.3d 269 (Ark. 2010)......................................................................88, 97

*Barber Lines A/S v. M/V Donau Maru*,
     764 F.2d 50 (1st Cir. 1985).....................................21, 22, 23, 24, 31, 33

*Bates v. Dow Agrosciences LLC*,
     544 U.S. 431 (2005)....................................................................................80

*Bayer CropScience LP v. Schafer*,
     385 S.W.3d 822 (Ark. 2011)....................................................................28, 50

*BCD LLC v. BMW Mfg. Co.*,
     360 F. App'x 428 (4th Cir. 2010) ...............................................................87

*BE&K Constr. Co. v. NLRB*,
     536 U.S. 516 (2002)....................................................................................67

*Beddingfield v. Linam*,
     127 So. 3d 1178 (Ala. 2013) ......................................................................82

*Behrendt v. Gulf Underwriters Ins. Co.*,
     768 N.W.2d 568 (Wis. 2009)......................................................................72

*Belmar Drive-In Theatre Co. v. Ill. State Toll Hwy. Comm'n*,
     216 N.E.2d 788 (Ill. 1966).........................................................................66

*Bennett v. Larsen Co.*,
     348 N.W.2d 540 (Wis. 1984).....................................................................82

*Berger v. Cas' Feed Store, Inc.*,
     543 N.W.2d 597 (Iowa 1996) .....................................................................88

*Berlangieri v. Running Elk Corp.*,
     76 P.3d 1098 (N.M. 2003) .........................................................................44

*Bladen v. C.B. Fleet Hldg Co.*,
     487 F. Supp. 2d 759 (W.D. La. 2007)..........................................................60

*Blagg v. Fred Hunt Co., Inc.*,
     612 S.W.2d 321 (Ark. 1981).......................................................................50

*Bloxham v. Glock, Inc.*,
    53 P.3d 196 (Ariz. Ct. App. 2002) ........................................................64

*Bond v. E.I. DuPont De Nemours & Co.*,
    868 P.2d 1114 (Colo. Ct. App. 1993) ....................................................78

*Brew City Redevelopment Grp., LLC v. Ferchill Grp.*,
    724 N.W.2d 879 (Wis. 2006)................................................................49

*Bridgeway Commc'ns, Inc. v. Trio Broad., Inc. (WBLX Radio Station-93 FM)*,
    562 So. 2d 222 (Ala. 1990)..................................................................89

*Brink v. Wabash Ry. Co.*,
    60 S.W. 1058 (Mo. 1901) ....................................................................43

*Brown v. CVS Pharm., LLC*,
    982 F. Supp. 2d 793 (M.D. Tenn. 2013)...............................................87

*Brown v Lockheed Martin Corp.*,
    814 F.3d 619 (2d Cir. 2016)...........................................................16, 82

*Burcham v. Unison Bancorp, Inc.*,
    77 P.3d 130 (Kan. 2003) ................................................................84, 88

*Busbee v. Chrysler Corp.*,
    524 S.E.2d 539 (Ga. Ct. App. 1999) ....................................................59

*Business Men's Assurance Co. of Am. v. Graham*,
    891 S.W.2d 438 (Mo. Ct. App. 1994)...................................................43

*Byrd v. English*,
    43 S.E. 419 (Ga. 1903)...........................................................21, 38, 39

*Camasta v. Jos. A. Bank Clothiers, Inc.*
    761 F.3d 732 (7th Cir. 2014) .........................................................97, 98

*Camden Cty. Bd. of Chosen Freeholders v. Beretta U.S.A.*,
    273 F.3d 536 (3d Cir. 2001).................................................................93

*Camden Cty. Bd. of Chosen Freeholders v. Beretta U.S.A. Corp.*,
    123 F. Supp. 2d 245 (D.N.J. 2000) ......................................................64

*Cameron v. New Hanover Mem'l Hosp., Inc.*,
    293 S.E.2d 901 (N.C. Ct. App. 1982)...................................................88

*Campbell v. Krupp*,
    961 N.E.2d 205 (Ohio Ct. App. 2011)............................................45, 46

*Cariveau v. Golden Valley Motors, Inc.*,
No. 27CV06-11202, 2006 WL 6252343 (Minn. Dist. Ct. Nov. 28, 2006) ......................41, 42

*Carvin v. Ark. Power & Light Co.*,
Civ. Nos. 90-6055 & 90-6109, 1991 WL 540481 (W.D. Ark. Dec. 2, 1991) ........................50

*Casa Orlando Apts., Ltd. v. Fed. Nat'l Mortg. Ass'n*,
624 F.3d 185 (5th Cir. 2010) ..............................................................................................12

*Catrett v. Landmark Dodge, Inc.*,
560 S.E.2d 101 (Ct. App. Ga. 2002) ...............................................................................98, 99

*Cent. Park Prods., Inc. v. Dorel Juvenile Grp., Inc.*,
No. 07-5012, 2007 WL 1821308 (W.D. Ark. June 25, 2007) ...............................................87

*Center for Food Safety v. Vilsack*,
718 F.3d 829 (9th Cir. 2013) ...............................................................................................28

*In re Chicago Flood Litigation*,
680 N.E.2d 265 (Ill. 1997) .........................................................19, 21, 22, 27, 35, 36, 90, 92

*Chisolm v. Stephens*,
365 N.E.2d 80 (Ill. App. Ct. 1977) .......................................................................................77

*Choate v. Ind. Harbor Belt R.R. Co.*,
980 N.E.2d 58 (Ill. 2012) ....................................................................................................63

*City of Bloomington, Ind. v. Westinghouse Elec. Corp.*,
891 F.2d 611 (7th Cir. 1989) ...................................................................................81, 90, 93

*City of Chicago v. Beretta U.S.A. Corp.*,
821 N.E.2d 1099 (Ill. 2004) ....................................25, 36, 54, 64, 65, 67, 68, 93, 94

*City of Lennox v. Mitek Indus., Inc.*,
519 N.W.2d 330 (S.D. 1994) .....................................................................................54, 56, 58

*City of St. Louis v. Cernicek*,
No. 02CC-1299, 2003 WL 22533578 (Mo. Ct. App. Oct. 15, 2003) .....................................93

*City of St. Louis v. Varahi, Inc.*,
39 S.W.3d 531 (Mo. Ct. App. 2001) .....................................................................................93

*Citylink Grp., Ltd. v. Hyatt Corp.*,
729 N.E.2d 869 (Ill. App. Ct. 2000) .....................................................................................86

*Clapper v. Amnesty Int'l USA*,
133 S. Ct. 1138 (2013) .........................................................................................................80

*Clark v. Int'l Harvester Co.*,
   581 P.2d 784 (Idaho 1978)...........................................................................................59

*Cloverleaf Car Co. v. Philips Petrol. Corp.*,
   540 N.W.2d 297 (Mich. Ct. App. 1995) ...................................................................90

*Cmty. Title Co. v. Roosevelt Fed. Sav. & Loan Ass'n*,
   796 S.W.2d 369 (Mo. 1990) (en banc) .....................................................................88

*Coastal Conduit & Ditching, Inc. v. Noram Energy Corp.*,
   29 S.W.3d 282 (Tex. App. 2000).................................................................................49

*Collins v. Reynard*,
   607 N.E.2d 1185 (Ill. 1992) ..................................................................................24, 54

*Commercial Ventures, Inc. v. Rex M. & Lynn Lea Family Trust*,
   177 P.3d 955 (Idaho 2008)...........................................................................................88

*Companion Prop. v. U.S. Bank Nat'l Assoc.*,
   No. 3:15-cv-01300-JMC, 2015 WL 7568613 (D.S.C. 2015) ...............................101

*Compiano v. Hawkeye Bank & Trust of Des Moines*,
   588 N.W.2d 462 (Iowa 1999) ....................................................................................89

*Conn. Mut. Life Ins. Co. v. N.Y. & N.H. R.R. Co.*,
   25 Conn. 265 (1856) ..............................................................................................21, 41

*Country Corner Food & Drug, Inc. v.*
   *First State Bank & Trust Co. of Conway, Ark.*,
   966 S.W.2d 894 (Ark. 1998)........................................................................................84

*Cty. v. Pfizer, Inc.*,
   534 F. Supp. 2d 882 (E.D. Ark. 2008) .....................................................................93

*Culwell v. Abbott Const. Co., Inc.*,
   506 P.2d 1191 (Kan. 1973) .........................................................................................92

*Custom Underground, Inc. v. Mi-Tech Servs., Inc.*,
   No. 10-CV-222-JPS, 2011 WL 5008343 (E.D. Wis. Oct. 20, 2011).....................49

*Daanen & Janssen, Inc. v. Cedarapids, Inc.*,
   573 N.W.2d 842 (Wis. 1998)................................................................19, 26, 55, 59

*Daimler AG v. Bauman*,
   134 S. Ct. 746 (2014)..............................................................................13, 14, 15

*Damon v. Groteboer*,
   937 F. Supp. 2d 1048 (D. Minn. 2013) ....................................................................99

*Dana Ltd. v. Aon Consulting, Inc.*,
   984 F. Supp. 2d 755 (N.D. Ohio 2013)....................................................................46

*Dannix Painting, LLC v. Sherwin-Williams Co.*,
   No. 4:12 CV 01640 CDP, 2012 WL 6013217 (E.D. Mo. Dec. 3, 2012),
   *aff'd*, 732 F.3d 902 (8th Cir. 2013)..............................................................43, 88

*Daugherty v. Fuller Eng'g Serv. Corp.*,
   615 N.E.2d 476 (Ind. Ct. App. 1993)......................................................................77

*de Kwiatkowski v. Bear, Stearns & Co., Inc.*,
   306 F.3d 1293 (2d Cir. 2002)....................................................................................77

*Deere & Co. v. MTD Prods., Inc.*,
   No. 00 CIV. 5936 (LMM), 2002 WL 1837402 (S.D.N.Y. Aug. 12, 2002)...........12

*Delloma v. Consolidation Coal Co.*,
   996 F.2d 168 (7th Cir. 1993) ..................................................................................84

*Dennis Simmons, D.D.S., P.A. v. Modern Aero, Inc.*,
   603 N.W.2d 336 (Minn. Ct. App. 1999)...................................................................99

*Denton v. Air & Liquid Sys. Corps.*,
   No. 13-CV-1243-SMY-DGW, 2015 WL 682158 (S.D. Ill. Feb. 17, 2015)...........14

*Denton v. Universal Am-Can, Ltd.*,
   26 N.E.3d 448 (Ill. App. Ct. 2015) .........................................................................12

*State ex rel. Detienne v. City of Vandalia*,
   94 S.W. 1009 (Mo. Ct. App. 1906)..........................................................................93

*DiBiasi v. Joe Wheeler Elec. Membership Corp.*,
   988 So. 2d 454 (Ala. 2008)......................................................................................74

*Dickens v. Oxy Vinyls, LP*,
   631 F. Supp. 2d 859 (W.D. Ky. 2009)......................................................................90

*Gieseke ex rel. Diversified Water Diversion, Inc. v. IDCA*,
   844 N.W.2d 210 (Minn. 2014).....................................................................84, 85, 88

*Dixie-Portland Flour Mills, Inc. v. Nation Enters., Inc.*,
   613 F. Supp. 985 (N.D. Ill. 1985) ...........................................................................57

*Dloogatch v. Brincat*,
   920 N.E.2d 1161 (Ill. App. Ct. 2009) ......................................................................77

*Doe v. Hunter Oaks Apts., L.P.*,
   105 So. 3d 422 (Miss. Ct. App. 2013) ......................................................................77

*Dryden v. Cincinnati Bell Tel. Co.*,
    734 N.E.2d 409 (Ohio Ct. App. 1999) .................................................................88

*Du Page Aviation Corp. v. Du Page Airport Auth.*,
    594 N.E.2d 1334 (Ill. App. Ct. 1992) ...............................................................85

*Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*,
    514 F.3d 1063 (10th Cir. 2008) ..........................................................................16

*Dundee Cement Co. v. Chem. Labs., Inc.*,
    712 F.2d 1166 (7th Cir. 1983) ............................................................................36

*Duquesne Light Co. v. Penn. Am. Water Co.*,
    850 A.2d 701 (Pa. Super. 2004) .........................................................................47

*Durkee v. C.H. Robinson Worldwide, Inc.*,
    765 F. Supp. 2d 742 (W.D.N.C. 2011) ..............................................................64

*E. River S.S. Corp. v. Transamerica Delaval, Inc.*,
    476 U.S. 858 (1986) ...........................................................................................55

*E.S. Robbins Corp. v. Eastman Chem. Co.*,
    912 F. Supp. 1476 (N.D. Ala. 1995) ..................................................................90

*Employers Mut. Cas. Co. v. Bartile Roofs, Inc.*,
    618 F.3d 1153 (10th Cir. 2010) ..........................................................................19

*Erickson's Flooring & Supply Co., Inc. v Tembec, Inc.*,
    No. 03-74214, 2006 WL 148759 (E.D. Mich. Jan. 18, 2006),
    *aff'd*, 212 F. App'x 558 (6th Cir. 2007) .............................................................87

*Erickson v. Curtis Inv. Co.*,
    447 N.W.2d 165 (Minn. 1989) ...........................................................................74

*Ethan Allen, Inc. v. Georgetown Manor, Inc.*,
    647 So. 2d 812 (Fla. 1994) .................................................................................86

*Euromarket Designs, Inc. v. Crate & Barrel Ltd.*,
    96 F. Supp. 2d 824 (N.D. Ill. 2000) ...................................................................18

*Everkrisp Vegetables, Inc. v. Tobiason Potato Co.*,
    870 F. Supp. 2d 745 (D.N.D. 2012) ...................................................................57

*Excavation Techs., Inc. v. Columbia Gas Co. of Penn.*,
    985 A.2d 840 (Pa. 2009) .....................................................................................47

*Exclaim Mktg., LLC v. DirecTV, LLC*,
    ___ F. Supp. 2d ___, No. 5:11-cv-684, 2015 WL 5773586
    (E.D.N.C. Sept. 30, 2015) ...........................................................................100, 101

*Farmers' Grain Co. of Embden v. Langer*,
    273 F. 635 (8th Cir. 1921) .................................................................62

*Federal Ins. Co. v. J.K. Mfg. Co.*,
    933 F. Supp. 2d 1065 (N.D. Ill. 2013) .............................................56

*Federated Rural Elec. Ins. Corp. v. Kootenai Elec. Co-op.*,
    812 F. Supp. 1139 (D. Kan. 1993),
    *aff'd*, 17 F.3d 1302 (10th Cir. 1994) ...............................................17

*Felsher v. Univ. of Evansville*,
    755 N.E.2d 589 (Ind. 2001) .............................................................84

*Fencl v. Heidrick*,
    No. 14-C-9102, 2015 WL 1143149 (N.D. Ill. Mar. 11, 2015) ..............89

*Fikes v. Furst*,
    81 P.3d 545 (N.M. 2003) ..................................................................88

*Fireman's Fund Ins. Co. v. SEC Donohue, Inc.*,
    679 N.E.2d 1197 (Ill. 1997) .............................................................59

*First Commercial Trust Co. v. Lorcin Eng'g, Inc.*,
    900 S.W.2d 202 (Ark. 1995) .......................................................64, 65

*First Midwest Bank, N.A. v. Stewart Title Guar. Co.*,
    843 N.E.2d 327 (Ill. 2006) ...............................................................24

*Fla. Fuels, Inc. v. Citgo Petrol. Corp.*,
    6 F.3d 330 (5th Cir. 1993) ...............................................................77

*Florida Power & Light Co. v. Fleitas*,
    488 So. 2d 148 (Fla. Dist. Ct. App. 1986) .......................................38

*Food Lion, Inc. v. Capital Cities/ABC, Inc.*,
    194 F.3d 505 (4th Cir. 1999) ...................................................100, 101

*Forever Green Athletic Fields, Inc. v. Lasiter Constr., Inc.*,
    384 S.W.3d 540 (Ark. Ct. App. 2011) ..............................................85

*Four D, Inc. v. Duthland Plastics Corp.*,
    No. 01-cv-2073, 2002 WL 570655 (D. Minn. Apr. 15, 2002) ..............99

*Freeman v. Grain Processing Corp.*,
    848 N.W.2d 58 (Iowa) .......................................................................93

*Gaylord Entm't Co. v. Thompson*,
    958 P.2d 128 (Okla. 1998) ...............................................................88

*Gen. Elec. Co. v. Lowe's Home Centers, Inc.*,
608 S.E.2d 636 (Ga. 2005) ................................................................39

*Gen. Pub. Utils. v. Glass Kitchens of Lancaster, Inc.*,
542 A.2d 567 (Pa. Super. 1988) ........................................................47

*In re Genetically Modified Rice Litig.*,
No. 4:06-md-1811, 2011 WL 339168 (E.D. Mo. Feb. 1, 2011) ............48

*Getty Refining & Mktg. Co. v. MT FADI B*,
766 F.2d 829 (3d Cir. 1985) ..............................................................23

*Giddings & Lewis, Inc. v. Indus. Risk Ins.*,
348 S.W.3d 729 (Ky. 2011) ...............................................................52

*In re GM Rice Litig.*,
666 F. Supp. 2d 1004 (E.D. Mo. 2009) ..........................6, 28, 41, 70, 95

*In re GM Rice*,
MDL No. 1811, 2007 WL 3027581 (E.D. Mo. Oct. 15, 2007) .............95

*In re GM Rice*,
No. 4:06-md-1811, 2011 WL 5024548 (E.D. Mo. Oct. 21, 2011) .........41

*Goforth v. Smith*,
991 S.W.2d 579 (Ark. 1999) ..............................................................89

*Golf Sci. Consultants, Inc. v. Cheng*,
No. 3:07-CV-152, 2009 WL 1256664 (E.D. Tenn. May 4, 2009)......85, 87

*Goodyear Dunlop Tires Ops., S.A. v. Brown*,
131 S. Ct. 2846 (2011) ......................................................................13

*Gosch v. Juelfs*,
701 N.W.2d 90 (Iowa 2005) ........................................................21, 39

*Gruhlke v. Sioux Empire Fed. Credit Union*,
756 N.W.2d 399 (S.D. 2008) .............................................................84

*Grund v. Donegan*,
700 N.E.2d 157 (Ill. App. Ct. 1998) ..................................................89

*Gunkel v. Renovations, Inc.*,
822 N.E.2d 150 (Ind. 2005) ..........................................................58, 59

*State of La. ex rel. Guste v. M/V TESTBANK*,
752 F.2d 1019 (5th Cir. 1985) (en banc) .....................20, 23, 31, 32, 33

*Haddon View Inv. Co. v. Coopers & Lybrand,*
    436 N.E.2d 212 (Ohio 1982) ..................................................46

*Ham v. Swift Transp. Co., Inc.,*
    694 F. Supp. 2d 915 (W.D. Tenn. 2010)..................................47

*Hamilton v. Accu-tek,*
    935 F. Supp. 1307 (E.D.N.Y. 1996) ........................................81

*Hamilton v. Beretta, U.S.A. Corp.,*
    750 N.E.2d 1055 (N.Y. 2001)............................................64, 65

*Hapka v. Paquin Farms,*
    458 N.W.2d 683 (Minn. 1990)..................................................42

*Haskins v. Symantec Corp.,*
    No. 13-cv-01834-JST, 2014 WL 2450996 (N.D. Cal. June 2, 2014) ......................................98

*Henson v. CSC Credit Servs,*
    29 F.3d 280 (7th Cir. 1994) .......................................................5

*Hoffman v. Monsanto Canada, Inc. (Hoffman I),*
    2005 SKQB 225, 2005 SK.C. LEXIS 330
    (Can. Sask. Q.B. May 11, 2005)......................................4, 28, 29, 69, 70, 74, 78, 93

*Hoffman v. Monsanto Canada, Inc.  (Hoffman II),*
    2007 SKCA 47, 2007 SK.C. LEXIS 194 (Can. Sask. C.A. May 2, 2007) ...................4, 28, 69

*Hoffman v. WCC Equity Partners, LP,*
    899 N.E.2d 756 (Ind. Ct. App. 2008)......................................52

*Hollister v. Dayton Hudson Corp.,*
    201 F.3d 731 (6th Cir. 2000) ....................................................83

*Hoopla Sports & Entm't, Inc. v. Nike, Inc.,*
    947 F. Supp. 347 (N.D. Ill. 1996) ...........................................89

*Hot Rod Hill Mot. Park v. Triolo,*
    293 S.W.3d 788 (Tex. Ct. App. 2009) ....................................92

*Hunt v. Riley,*
    909 S.W.2d 329 (Ark. 1995)....................................................85

*Hutchens v. MP Realty Grp.-Sheffield Sq. Apts.,*
    654 N.E.2d 35 (Ind. Ct. App. 1995).........................................92

*Hutchings v. Bauer,*
    599 N.E.2d 934 (Ill. 1992).......................................................63

*Hyatt Int'l Corp. v. Coco*,
    302 F.3d 707 (7th Cir. 2002) ...................................................................................13

*Iler Grp., Inc. v. Discrete Wireless, Inc.*,
    90 F. Supp. 3d 1329, 1342 (N.D. Ga. 2015) .........................................................98

*Ind. Harbor Belt Ry. Co. v. Am. Cyanamid Co.*,
    916 F.2d 1174 (7th Cir. 1990) .................................................................................81

*Indianapolis-Marion Cty. Pub. Library v. Charlier Clark & Linard, P.C.*,
    929 N.E.2d 722 (Ind. 2010) ............................................................................52, 59

*Instant Tech., LLC v. DeFazio*,
    40 F. Supp. 3d 989, 1020 (N.D. Ill. 2014), *aff'd*, 793 F.3d 748 (7th Cir. 2015) ....................85

*Int'l Flavors & Fragrances, Inc. v. McCormick & Co., Inc.*,
    575 F. Supp. 2d 654 (D.N.J. 2008) .........................................................................57

*J'Aire Corp. v. Gregory*,
    598 P.2d 60 (Cal. 1979) ...................................................................................44, 51

*Jaques v. First Nat'l Bank of Maryland*,
    515 A.2d 756 (Md. 1986) ........................................................................................53

*Jefferson v. Lead Indus. Ass'n*,
    106 F.3d 1245 (5th Cir. 1997) .................................................................................60

*Jordan v. S. Wood Piedmont Co.*,
    805 F. Supp. 1575 (S.D. Ga. 1992) .........................................................................90

*Jorgensen Farms, Inc. v. Country Pride Coop., Inc.*,
    824 N.W.2d 410 (S.D. 2012) ........................................................................56, 57, 71

*Just's, Inc. v. Arrington Construction Co.*,
    583 P.2d 997 (Idaho 1978) ......................................................................................39

*Kahn v. Salomon Bros. Inc.*,
    813 F. Supp. 191 (E.D.N.Y. 1993) ..........................................................87, 88, 89

*KB Home Ind. Inc. v. Rockville TBD Corp.*,
    928 N.E.2d 297 (Ind. Ct. App. 2010).....................................................................52

*Kearns v. Ford Motor Co.*,
    567 F.3d 1120 (9th Cir. 2009) .................................................................................97

*Keeton v. Lexington Truck Sales, Inc.*,
    275 S.W.3d 723 (Ky. Ct. App. 2008) ......................................................................99

*Kelley v. Cairns & Bros., Inc.*,
    626 N.E.2d 986 (Ohio Ct. App. 1993) ...................................................................77

*Kidd v. Bass Hotels & Resorts, Inc.*,
    136 F. Supp. 2d 965 (E.D. Ark. 2000) ..................................................................85

*King v. Hilton-Davis*,
    855 F.2d 1047 (3d Cir. 1988) ................................................................................71

*King v. Sioux City Radiological Grp., P.C.*,
    985 F. Supp. 869 (N.D. Iowa 1997) .......................................................................88

*Kipp v. Ski Enter. Corp. of Wis.*,
    783 F.3d 695 (7th Cir. 2015) ..........................................................................13, 14

*Kirk v. Michael Reese Hosp. & Med. Ctr.*,
    513 N.E.2d 387 (Ill. 1987) .....................................................................................64

*KM Enters., Inc. v. Glob. Traffic Techs., Inc.*,
    725 F.3d 718 (7th Cir. 2013) .................................................................................16

*Knaus v. Guidry*,
    906 N.E.2d 644 (Ill. App. Ct. 2009) ......................................................................12

*Kohler Co. v. Kohler Int'l, Ltd.*,
    196 F. Supp. 2d 690 (N.D. Ill. 2002) ....................................................................19

*Kopfman v. Ensign Ribbon Burners, LLC*,
    803 F. Supp. 2d 914 (N.D. Ill. 2011) ....................................................................18

*Kramer v. Pollock-Krasner Found.*,
    890 F. Supp. 250 (S.D.N.Y. 1995) ........................................................................85

*Kreisers Inc. v. First Dakota Title Ltd. P'ship*,
    852 N.W.2d 413 (S.D. 2014) .................................................................................54

*Kwikset Corp. v. Sup. Ct.*,
    246 P.3d 877 (Cal. 2011) .......................................................................................98

*L'Henri, Inc. v. Vulcan Materials Co.*,
    Civ. No. 2006-177, 2010 WL 924259 (D.V.I. Mar. 11, 2010) ...............................90

*La Tortilleria, Inc. v. Nuestro Queso, LLC*,
    No. 1:12CV408, 2014 WL 1322627 (M.D.N.C. Mar. 31, 2014) .........................101

*Ladd Landing, LLC v. TVA*,
    874 F. Supp. 2d 727 (E.D. Tenn. 2012) ...........................................................47, 48

*LAN/STV v. Martin K. Eby Constr. Co., Inc.*,
   435 S.W.3d 234 (Tex. 2014)..................................................................48

*Leadfree Enters., Inc. v. U.S. Steel Corp.*,
   711 F.2d 805 (7th Cir. 1983) ...............................................................49

*Leno v. K & L Homes, Inc.*,
   803 N.W.2d 543 (N.D. 2011) ...............................................................53

*Lesiak v. Cent. Valley Ag. Co-op, Inc.*,
   808 N.W.2d 67 (Neb. 2012)..................................................................53

*Lethu Inc. v. City of Hous.*,
   23 S.W.3d 482 (Tex. Ct. App. 2000).....................................................89

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*,
   523 U.S. 26 (1998)................................................................................18

*Lexington Ins. Co. v. W. Roofing Co.*,
   316 F. Supp. 2d 1142 (D. Kan. 2004)...................................................56

*Lilly Ind., Inc. v. Health-Chem Corp.*,
   974 F. Supp. 702 (S.D. Ind. 1997)........................................................90

*Linton v. Smith & Wesson*,
   469 N.E.2d 339 (Ill. App. Ct. 1984) .....................................................63

*Lloyd Wood Coal Co. v. Clark Equip. Co.*,
   543 So. 2d 671 (Ala. 1989)...................................................................50

*Local Joint Executive Bd. of Las Vegas, Culinary Workers' Union v. Stern*,
   651 P.2d 637 (Nev. 1982).....................................................................44

*Lodholtz v. York Risk Servs. Grp., Inc.*,
   778 F.3d 635 (7th Cir. 2015) ...............................................................64

*Long Motor Corp. v. SM&P Util. Res., Inc.*,
   214 P.3d 707, No. 100,336, 2009 WL 2595932 (Kan. Ct. App. Aug. 21, 2009) .............26, 52

*Lord v. Customized Consulting Specialty, Inc.*,
   643 S.E.2d 28 (N.C. Ct. App. 2007)......................................................53

*Low v. Lowe's Home Ctrs. Inc.*,
   771 F. Supp. 2d 739 (E.D. Ky. 2011) ....................................................83

*Lyndon Prop. Ins. Co. v. Duke Levy & Assocs., LLC*,
   475 F.3d 268 (5th Cir. 2007) ...............................................................53

*Mangrum v. Pigue*,
 198 S.W.3d 496 (Ark. 2004)...................................................................82

*Mars, Inc. v. Heritage Builders of Effingham, Inc.*,
 763 N.E.2d 428 (Ill. App. Ct. 2002) .....................................................22

*Martin Rispens & Son v. Hall Farms, Inc.*,
 621 N.E.2d 1078 (Ind. 1993) ...........................................................56, 58

*Martin v. Harrington & Richardson, Inc.*,
 743 F.2d 1200 (7th Cir. 1984) ....................................................65, 68, 81

*May v. Countrywide Home Loans, Inc.*,
 No. 4:07-cv-375, 2007 WL 1879781 (E.D. Mo. June 28, 2007)............89

*McCauley v. City of Chicago*,
 671 F.3d 611 (7th Cir. 2011) .............................................................77, 82

*McNeill v. Sec. Benefit Life Ins. Co.*,
 28 F.3d 891 (8th Cir. 1994) ....................................................................86

*Merriman v. Crompton Corp.*,
 282 Kan. 433 (2006) ...............................................................................15

*Metropolitan Water Reclamation Dist. of Greater Chi.*
 *v. Terra Found. for Am. Art*,
 13 N.E.3d 44 (Ill. App. Ct. 2014) ..........................................................37

*Midwest Knitting Mills, Inc. v. U.S.*,
 950 F.2d 1295 (7th Cir. 1991) ................................................................49

*Mink v. Univ. of Chicago*,
 460 F. Supp. 713 (N.D. Ill. 1978) ..........................................................81

*Minneapolis Soc'y of Fine Arts v. Parker-Klein Assocs. Architects, Inc.*,
 354 N.W.2d 816 (Minn. 1984)................................................................56

*Monsanto Co. v. Campuzano*,
 206 F. Supp. 2d 1252 (S.D. Fla. 2002) ..................................................97

*Moore v. Pavex, Inc.*,
 514 A.2d 137 (Pa. Super. 1986)..............................................................47

*Moorman Mfg. Co. v. Nat'l Tank Co.*,
 435 N.E.2d 443 (Ill. 1982)................................................21, 55, 58, 59

*Morton v. Merrillville Toyota, Inc.*,
 562 N.E.2d 781 (Ind. Ct. App. 1990)......................................................52

*Mulch Mfg., Inc. v. Advanced Polymer Sols., LLC*,
   947 F. Supp. 2d 841 (S.D. Ohio 2013) ...............................................46

*MW Mfrs. Inc. v. Friedman*,
   No. 97 C 8319, 1998 WL 417501 (N.D. Ill. July 21, 1998) ...................38

*N. States Contracting Co. v. Oakes*,
   253 N.W. 371 (Minn. 1934)...................................................................41

*Nami Res. Co., LLC v. Asher Land & Mineral, Ltd.*,
   Nos. 2012-CA-762-MR et al., 2015 WL 4776376
   (Ky. Ct. App. Aug. 14, 2015) ...............................................................52

*Nat'l Crane Corp. v. Ohio Steel Tube Co.*,
   332 N.W. 39 (Neb. 1983)......................................................................53

*National Roofing, Inc. v. Alstate Steel, Inc.*,
   366 P.3d 276 (N.M. Ct. App. 2015).....................................................44

*Nationwide Mut. Ins. Co. v. Richards Constr., Inc.*,
   86 Va. Cir. 463 (2013) .........................................................................54

*Neb. Innkeepers, Inc. v. Pittsburgh-Des Moines Corp.*,
   345 N.W.2d 124 (Iowa 1984) .........................................................21, 39

*Nichols v. Progressive N. Ins. Co.*,
   746 N.W.2d 220 (Wis. 2008)................................................................72

*OMI Holdings, Inc. v. Royal Ins. Co. of Can.*,
   149 F.3d 1086 (10th Cir. 1998) ...........................................................19

*Orlando Sports Stadium, Inc. v. State ex rel. Powell*,
   262 So. 2d 881 (Fla. 1972)...................................................................93

*Overnite Transp. Co. v. Teamsters Local Union No. 480*,
   No. M2002-02116-COA-R3-CV, 2004 WL 383313
   (Tenn. Ct. App. Feb. 27, 2004).............................................................85

*PPG Indus., Inc. v. Bean Dredging*,
   447 So. 2d 1058 (La. 1984) .............................................................40, 41

*Patterson v. Rohm Gesellschaft*,
   608 F. Supp. 1206 (N.D. Tex. 1985) ....................................................68

*People Express Airlines, Inc. v. Consol. Rail Corp.*,
   495 A.2d 107 (N.J. 1985)......................................................................30

*Perkins v. Benguet Consol. Mining Co.*,
   342 U.S. 437 (1952)..............................................................................14

*Perkins v. F.I.E. Corp.*,
  762 F.2d 1250 (5th Cir. 1985) ...................................................................68, 81

*Philip I. Mappa Interests, Ltd. v. Kendle*,
  554 N.E.2d 1008 (Ill. App. Ct. 1990) ...................................................................88

*Phillips v. G & H Seed Co.*,
  86 So. 3d 773 (La. Ct. App. 2012).........................................................................40

*Pickett v. Sheridan Health Care Ctr.*,
  664 F.3d 632 (7th Cir. 2011) ...................................................................................9

*Pilgrim v. Universal Health Card, LLC*,
  660 F.3d 943 (6th Cir. 2011) .................................................................................19

*Pisciotta v. Old Nat'l Bancorp*,
  499 F.3d 629 (7th Cir. 2007) .................................................................4, 5, 35, 69

*Playboy Enters., Inc. v. Editorial Caballero, S.A. de C.V.*,
  202 S.W.3d 250 (Tex. App. 2006).........................................................................85

*Pleasant Valley Promenade v. Lechmere, Inc.*,
  464 S.E.2d 47 (N.C. Ct. App. 1995)....................................................................100

*Praktika Design & Projectos Ltda. v. Marvin Lumber & Cedar Co.*,
  No. 06-cv-957, 2007 WL 1582710 (D. Minn. May 30, 2007) ..............................43

*Prescott v. Argen Corp.*,
  No. 13-cv-6147, 2014 WL 4638607 (N.D. Ill. Sept. 17, 2014)............................96

*Ptacek v. Earthsoils, Inc.*,
  844 N.W.2d 535 (Minn. Ct. App. 2014).........................................................42, 60

*Pub. Impact, LLC v. Bos. Consulting Grp., Inc.*,
  117 F. Supp. 3d 732, 739 (M.D.N.C. 2015) .........................................................16

*Public Building Authority of City of Huntsville*
  *v. St. Paul Fire and Marine Insurance Co.*,
  80 So. 3d 171 (Ala. 2010)......................................................................................50

*Pugh v. Tribune*,
  521 F.3d 686 (7th Cir. 2008) .............................................................................9, 10

*Purdue Research Found. v. Sanofi-Synthelabo, S.A.*,
  338 F.3d 773 (7th Cir. 2003) ...................................................................13, 17, 18

*Queen City Terminals, Inc. v. Gen. Am. Transp. Corp.*,
  653 N.E.2d 661 (Ohio 1995) .................................................................................46

*Quest Diagnostics, Inc. v. MCI WorldCom, Inc.*,
   656 N.W.2d 858 (Mich. Ct. App. 2002) ..................................................................53

*The Ratcliff Architects v. Vanir Constr. Mgmt., Inc.*,
   88 Cal. App. 4th 595 (Cal. App. 1st Dist. 2001)...................................................51

*Reali, Giampetro & Scott v. Soc'y Nat'l Bank*,
   729 N.E.2d 1259 (Ohio Ct. App. 1999)...................................................................87

*Redman v. John D. Brush & Co.*,
   111 F.3d 1174 (4th Cir. 1997) ..................................................................................59

*Richardson v. Holland*,
   741 S.W.2d 751 (Mo. Ct. App. 1987)......................................................................81

*Riegel v. Medtronic*,
   552 U.S. 312 (2008)...................................................................................................61

*Rinehart v. Morton Buildings Inc.*,
   305 P.3d 622 (Kan. 2013)..........................................................................................52

*Riordan v. Int'l Arm. Corp.*,
   477 N.E.2d 1293 (Ill. App. Ct. 1985) ......................................................................65

*Robins Dry Dock & Repair Co. v. Flint*,
   275 U.S. 303 (1927).......................................................................................20, 32, 39

*Rodrigue v. Copeland*,
   475 So. 2d 1071 (La. 1985) .......................................................................................90

*Rogers v. Dow Agrosciences, LLC*,
   No. 4:06CV00015, 2006 WL 3147393 (W.D. Va. Oct. 31, 2006)........................54

*Roundtable Theater Co. v. Tishman Realty & Constr.*,
   756 N.Y.S.2d 12 (App. Div. 2003) ..........................................................................45

*Rowe v. N.H. Motor Transp. Ass'n*,
   552 U.S. 364 (2008)..............................................................................................61, 62

*Rural Dev., LLC v. Tucker*,
   No. M2008-00172-COA-R3-CV,
   2009 WL 112541 (Tenn. Ct. App. Jan. 14, 2009) ..................................................48

*Ruscitti v. Atchison, Topeka, & Santa Fe Ry. Co.*,
   987 F. Supp. 1039 (N.D. Ill. 1997) ..........................................................................58

*Russell Corp. v. Sullivan*,
   790 So. 2d 940 (Ala. 2001) .......................................................................................95

*RWP, Inc. v. Fabrizi Trucking & Paving Co., Inc.*,
   No. 87382, 2006 WL 2777159 (Ohio Ct. App. Sept. 28, 2006) ...............................................45

*S K Peightal Eng'rs, LTD v. Mid Valley Real Estate Sols. V, LLC*,
   342 P.3d 868 (Colo. 2015) ...............................................................................................51, 59

*S. Pac. Corp. v. Denton*,
   146 U.S. 202 (1892), and (ii) ................................................................................................16

*Saggio v. Select Portfolio Serv. Inc.*
   No. 15-cv-04300 (JG)(RER), 2015 WL 6760132 (E.D.N.Y. Nov. 5, 2015) .......................100

*Sample v. Monsanto Co.*,
   283 F. Supp. 2d 1088 (E.D. Mo. 2003)...........................................................3, 25, 28, 29, 69

*Sapp v. Ford Motor Co.*,
   687 S.E.2d 47 (S.C. 2009) ...............................................................................................54, 72

*Schoedinger v. United Healthcare of Midwest, Inc.*,
   No. 4:07-CV-904SNLJ, 2011 WL 97735 (E.D. Mo. Jan 12, 2011) .......................................87

*Schuetta v. Aurora Nat'l Life Assurance Co.*,
   No. 13-cv-007-JPS, 2013 WL 6199248 (E.D. Wis. Nov. 27, 2013) ......................................49

*Selle v. Tozser*,
   786 N.W.2d 748 (S.D. 2010) ................................................................................................88

*ServiceMaster of St. Cloud v. GAB Bus. Servs., Inc.*,
   544 N.W.2d 302 (Minn. 1996) ..............................................................................................77

*Shipman v. Jennings Firearms, Inc.*,
   791 F.2d 1532 (11th Cir. 1986) ............................................................................................81

*Shrum v. Big Lots Stores, Inc.*,
   No. 3:14-CV-03135-CSB-DGB, 2014 WL 6888446 (C.D. Ill. Dec. 8, 2014) .......................14

*Simpkins v. CSX Transp.*,
   358 Ill. Dec. 613 (2012).......................................................................................................72

*Sluis v. Nudelman*,
   34 N.E.2d 391 (Ill. 1941).....................................................................................................96

*Southland Constr., Inc. v. Greater Orlando Aviation*,
   860 So. 2d 1031 (Fla. Dist. Ct. App. 2003) ..........................................................................38

*Speakers of Sport, Inc. v. ProServ, Inc.*,
   178 F.3d 862 (7th Cir. 1999) ................................................................................................96

*People ex rel. Spiegel v. Lyons*,
    115 N.E.2d 895 (Ill. 1953) ...............................................................71, 96

*People ex rel. Spitzer v. Sturm, Ruger & Co., Inc.*,
    761 N.Y.S.2d 192 (N.Y. App. Div. 2003) ...........................................65, 68, 69, 78

*Staab v. Diocese of St. Cloud*,
    813 N.W.2d 68 (Minn. 2012)................................................................41

*Stanford v. Wal-Mart Stores, Inc.*,
    600 So. 2d 234 (Ala. 1992) ................................................................78

*In re StarLink Corn Prods. Liab. Litig.*,
    212 F. Supp. 2d 828 (N.D. Ill. 2002) ...........................29, 30, 33, 70, 80, 83, 91, 95

*State Farm Mut. Auto. Ins. Co. v. Ford Mot. Co.*,
    736 So. 2d 384 (Miss. Ct. App. 1999) ....................................................55

*Sterling Chems., Inc. v. Texaco Inc.*,
    259 S.W.3d 793 (Tex. App. 2007)......................................................48, 49

*Stevenson v. E. Ohio Gas Co.*,
    73 N.E.2d 200 (Ohio Ct. App. 1946)..........................................21, 33, 43, 45

*Stonebridge Collection, Inc. v. Carmichael*,
    791 F.3d 811 (8th Cir. 2015) ..........................................................85, 96

*Sullivan v. Sony Music Entm't*,
    No. 14 CV 731, 2014 WL 5473142 (N.D. Ill. Oct. 29, 2014) ..............................15

*Surita v. AM Gen. LLC*,
    No. 1:15-cv-07164, slip op. (N.D. Ill. Nov. 4, 2015) (attached as Ex. G)...............15

*Sykes v. Mortg. Elec. Reg. Sys., Inc.*,
    No. 1:11-cv-377-BLW, 2012 WL 914922 (D. Idaho Mar. 15, 2012) ......................99

*Syngenta Seeds, Inc. v. Bunge N. Am., Inc.*,
    820 F. Supp. 2d 953 (N.D. Iowa 2011)....................................................67

*Taco Bell, Inc. v. Lannon*,
    744 P.2d 43 (Colo. 1987) (en banc)......................................................73

*Taft v. The Dade Cty. Bar Assoc.*,
    No. 1:15-cv-22072-KMM, 2015 WL 5771811 (S.D. Fla. Oct. 2, 2015)....................97

*Tamburo v. Dworkin*,
    601 F.3d 693 (7th Cir. 2010) .........................................................16, 18

*Tara Condo. Ass'n, Inc. v. Marsh & McLennan Cos., Inc.*,
   110 So. 3d 399 (Fla. 2013) .................................................................... 38, 59

*Tasini v. AOL, Inc.*,
   851 F. Supp. 2d 734 (S.D.N.Y. 2012) ........................................................ 100

*Taylor v. McNichols*,
   243 P.3d 642 (Idaho 2010) ...................................................................... 99

*In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.*,
   97 F.3d 1050 (8th Cir. 1996) ......................................................... 71, 72, 83

*Texas Disposal Sys. Landfill, Inc. v. Waste Mgmt. Holdings, Inc.*,
   219 S.W.3d 563 (Tex. App. 2007) .............................................................. 86

*Thrasher-Lyon v. Ill. Farmers Ins. Co.*,
   861 F. Supp. 2d 898 (N.D. Ill. 2012) ......................................................... 96

*Tioga Pub. Sch. Dist. No. 15 v. U.S. Gypsum Co.*,
   984 F.2d 915 (8th Cir. 1993) ............................................................... 90, 92

*In re Tobacco II Cases*,
   46 Cal. 4th 298 (Cal. 2009) ..................................................................... 98

*Trans States Airlines v. Pratt & Whitney Canada, Inc.*,
   682 N.E.2d 45 (1997) ............................................................................. 56

*Trans-Gulf Corp. v. Performance Aircraft Servs., Inc.*,
   82 S.W.3d 691 (Tex. App. 2002) ............................................................... 49

*Trau-Med of Am., Inc. v. Allstate Ins. Co.*,
   71 S.W.3d 691 (Tenn. 2002) .................................................................... 88

*Traube v. Freund*,
   775 N.E.2d 212 (Ill. App. Ct. 2002) .......................................................... 90

*TS&C Invs. LLC v. Beusa Energy, Inc.*,
   637 F. Supp. 2d 370 (W.D. La. 2009) ........................................................ 41

*Tucker v. Blvd. At Piper Glen LLC*,
   564 S.E.2d 248 (N.C. Ct. App. 2002) ....................................................... 101

*Turner v. Fehrs Neb. Tractor & Equip. Co.*,
   609 N.W.2d 652 (Neb. 2000) ................................................................... 66

*U.S. Bank, N.A. v. Integrity Land Title Corp.*,
   929 N.E.2d 742 (Ind. 2010) .................................................................... 51

*U.S. Enercorp, Ltd. v. SDC Montana Bakken Expl., LLC*,
    966 F. Supp. 2d 690 (W.D. Tex. 2013)..................................................................87

*uBID, Inc. v. GoDaddy Grp., Inc.*,
    623 F.3d 421 (7th Cir. 2010) ........................................................................16, 18

*Ultramares Corp. v. Touche*,
    174 N.E. 441 (N.Y. 1931).....................................................................................40

*Union Oil Co. v. Oppen*,
    501 F.2d 558 (9th Cir. 1974) ..........................................................................41, 43

*United Textile Workers of Am. v. Lear Siegler Seating Corp.*,
    825 S.W.2d 83 (Tenn. Ct. App. 1990)...............................................................33, 47

*Van Duyn v. Cook-Teague P'ship*,
    694 N.E.2d 779 (Ind. Ct. App. 1998).....................................................................77

*Van Sickle Constr. Co. v. Wachovia Comm. Mort., Inc.*,
    783 N.W.2d 684 (Iowa 2010) ..........................................................................24, 40

*Vancura v. Katris*,
    939 N.E.2d 328 (Ill. 2010)....................................................................................77

*Vaughn v. Nevill*,
    677 N.E.2d 482 (Ill. App. 1997) ...........................................................................78

*Ventas, Inc. v. HCP, Inc.*,
    647 F.3d 291 (6th Cir. 2011) ................................................................................88

*Venture Assocs. Corp. v. Zenith Data Sys. Corp.*,
    987 F.2d 429 (7th Cir. 1993) ..................................................................................5

*Vie v. Wachovia Bank, N.A.*,
    No. 1:11-CV-3620, 2012 WL 1156387 (N.D. Ga. Apr. 6, 2012)...........................98

*State ex rel. Village of Los Ranchos de Albuquerque v. City of Albuquerque*,
    899 P.2d 185 (N.M. 1994) ....................................................................................93

*Villegas v. Princeton Farms, Inc.*,
    893 F.2d 919 (7th Cir. 1990) ..............................................................4, 69, 72, 94

*Vogel v. Liberty Mut. Ins. Co.*,
    571 N.W.2d 704 (Wis. Ct. App. 1997)...................................................................49

*Waggoner v. Town & Country Mobile Homes, Inc.*,
    808 P.2d 649 (Okla. 1990)....................................................................................53

xxvi

*Wal-Mart Stores, Inc. v. Sturges*,
   52 S.W.3d 711 (Tex. 2001)..............................................................88

*Wallis v. Ford Motor Co.*,
   362 Ark. 317 (2005)........................................................................97

*Walter Energy, Inc. v. Audley Capital Advisors LLP*,
   176 So. 3d 821 (Ala. 2015)............................................................84

*Watters v. TSR, Inc.*,
   904 F.2d 378 (6th Cir. 1990) ........................................................78

*Weisblatt v. Chicago Bar Ass'n*,
   684 N.E.2d 984 (Ill. App. Ct. 1997) ............................................77

*Westfield Ins. Co. v. Birkey's Farm Store, Inc.*,
   924 N.E.2d 1231 (Ill. App. Ct. 2010) ..........................................57

*White Sands Grp., LLC v. PRS II, LLC*,
   32 So. 3d 5 (Ala. 2009)..................................................................88

*Whitfeld v. Tronox Worldwide*,
   No. 1:03-CV-287, 2007 WL 1561807 (N.D. Miss. May 25, 2007)..........82

*Wiebel v. Mid-Continent Bottlers, Inc.*,
   388 N.E.2d 475 (Ill. App. Ct. 1979) ............................................69

*Wilkey v. Hull*,
   366 F. App'x 634 (6th Cir. 2010) ................................................86

*Williams Elecs. Games, Inc. v. Garrity*,
   366 F.3d 569 (7th Cir. 2004) ........................................................96

*Williams v. Charlotte Copy Data, Inc.*,
   No. COA03-332, 2004 WL 193887 (N.C. Ct. App. Feb. 3, 2004)........100

*Williams v. Cingular Wireless*,
   809 N.E.2d 473 (Ind. Ct. App. 2004)....................................64, 78

*Willis v. Georgia N. Ry. Co.*,
   314 S.E.2d 919 (Ga. Ct. App. 1984).............................................39

*Wilson v. Greg Williams Farm, Inc.*,
   436 S.W.3d 485 (Ark. Ct. App. 2014)..........................................82

*Wilson v. Humphreys (Cayman) Ltd.*,
   916 F.2d 1239 (7th Cir. 1990) ......................................................15

*Wiltz v. Bayer CropScience, L.P.*,
    645 F.3d 690 (5th Cir. 2011) ...............................................................22, 34, 40, 41

*Yazdianpour v. Safeblood Techs., Inc.*,
    779 F.3d 530 (8th Cir. 2015) ...............................................................96

## Statutes and Regulations

7 C.F.R. § 340.1 ...............................................................6, 28

7 C.F.R. § 340.3 ...............................................................76

7 C.F.R. § 340.4 ...............................................................76

7 C.F.R. § 810.103 ...............................................................62

7 C.F.R. § 810.401 *et seq.* ...............................................................62

7 C.F.R. § 810.402 ...............................................................7

7 U.S.C. § 74 ...............................................................62

7 U.S.C. § 75 ...............................................................61

7 U.S.C. § 76 ...............................................................62

7 U.S.C. § 87g ...............................................................61, 62

7 U.S.C. § 136 ...............................................................80

7 U.S.C. § 136a ...............................................................7

7 U.S.C. § 136w ...............................................................7

7 U.S.C. § 7702 ...............................................................28

7 U.S.C. § 7711 ...............................................................6

28 U.S.C. § 1407 ...............................................................18

Ark. Code § 4-88-113 ...............................................................96

Idaho Code § 52-101 ...............................................................90

Idaho Code § 52-111 ...............................................................93

815 Ill. Comp. Stat. 505/1 ...............................................................96

Ky. Rev. Stat. § 367.220 ...............................................................99

La. R.S. § 9:2800.52 ..................................................................................................60

Minn. Stat. § 325D.45 ................................................................................................99

Minn. Stat. § 604.10 ...........................................................................................42, 43

Minn. Stat. § 604.101 .............................................................................41, 42, 43, 60

USDA APHIS, *Syngenta Biotechnology, Inc.; Determination of Nonregulated
    Status for Corn Genetically Engineered for Insect Resistance*,
    75 Fed. Reg. 20560 (Apr. 20, 2010) ......................................................................6

**Rules**

Fed. R. Civ. P. 9(b) ............................................................................................97, 101

**Proposed Legislation**

A.B. 1359, 216th Leg. (N.J. 2014).......................................................................B-4

A.B. 2955, 215th Leg. (N.J. 2012).......................................................................B-4

A.B. 3165, 228th Leg. Sess. (N.Y. 2005) .............................................................B-4

A.B. 3192, 215th Leg. (N.J. 2012).......................................................................B-4

A.B. 330, 77th Reg. Sess. (Nev. 2013) ................................................................B-3

A.B. 4206, 226th Leg. Sess. (N.Y. 2003) .............................................................B-4

A.B. 500, 232d Leg. Sess. (N.Y. 2009) ................................................................B-4

A.B. 6075, 230th Leg. Sess. (N.Y. 2008) .............................................................B-4

A.B. 6778, 224th Leg. Sess. (N.Y. 2001) .............................................................B-4

A.B. 874, 101st Leg. Sess. (Wis. 2013) ................................................................B-5

A.B. 88, 2011-2012 Reg. Sess. (Cal. 2011)..........................................................B-2

A.R. 239, 216th Leg. 2d Reg. Sess. (N.J. 2015) ..................................................B-4

Assemb. B. 6509 § 1, 236th Leg. Sess. (N.Y. 2013) ............................................ A-2

Assemb. B. 984, 2005 Leg., Reg. Sess. (Cal. 2005) ............................................. A-1

CA S.B. 1381, 2013-2014 Reg. Sess. (Cal. 2014) ................................................B-2

CO H.B. 1192, 69th Gen. Assemb. (Colo. 2013) .................................................B-2

GA H.B. 1152, 152nd Gen. Assemb., Reg. Sess. (Ga. 2014)......................................B-2

H.B. 1041, 105th Gen. Assemb. (Tenn. 2007) ...........................................................B-5

H.B. 1168, 108th Gen. Assemb. (Tenn. 2013) ...........................................................B-5

H.B. 1191, Reg. Sess. (Md. 2014) ..............................................................................B-3

H.B. 147, 79th Gen. Assemb., 1st Sess. (Iowa 2001) ................................................B-3

H.B. 1591, 2015 Sess. (Va. 2015)...............................................................................B-5

H.B. 1928, 107th Gen. Assemb. (Tenn. 2011) ...........................................................B-5

H.B. 205, 60th Leg. Gen. Sess. (Utah 2014) ..............................................................B-5

H.B. 2098, 106th Gen. Assemb. (Tenn. 2009) ...........................................................B-5

H.B. 215, 28th Leg., 2d Reg. Sess. (Alaska 2014) .....................................................B-1

H.B. 219, 28th Leg. 2d Reg. Sess. (Alaska 2014) ......................................................B-1

H.B. 2207, 81st Reg. Sess. (W. Va. 2013)..................................................................A-2

H.B. 257, 79th Gen. Assemb., 1st Sess. (Iowa 2001) ................................................B-3

H.B. 2736, 77th Leg. Assemb. (Or. 2013)..................................................................A-2

H.B. 3276, 187th Cen. Ct., Reg. Sess. (Mass. 2011) .................................................B-3

H.B. 3678, 107th  Gen. Assemb. (Tenn. 2012) ..........................................................B-5

H.B. 375, 84th Gen. Assemb., 1st Sess. (Iowa 2011) ................................................B-3

H.B. 441, Reg. Sess. (Ky. 2014).................................................................................B-3

H.B. 446, Gen. Assemb. Sess. (N.C. 2011) ................................................................B-4

H.B. 660, 163d Sess. Gen. Ct., 1st Year (N.H. 2013).................................................B-3

H.B. 733, 27th Leg. (Haw. 2013) ...............................................................................B-2

H.B. 808, 188th Gen. Ct., Reg. Sess. (Mass. 2013)...................................................B-3

H.B. 903, Reg. Sess. (Md. 2013) ................................................................................B-3

H.B. 984, 96th Gen. Assemb. 1st Reg. Sess. (Mo. 2011)...........................................B-3

H.C.R. 141, 81st Leg., 2d Sess. (W. Va. 2014) ..........................................................B-5

xxx

H.R. 149, 27th Leg. (Haw. 2013) ...................................................................B-2

H.R. 913, 114th Cong. 1st (2015) ..................................................................B-1

H.R. 1699, 113th Cong. 1st (2013) ................................................................B-1

H.R. 2169, 103d Cong. 1st (1993) .................................................................B-1

H.R. 2916, 108th Cong. 1st (2003) ................................................................B-1

H.R. 2919, 108th Cong. 1st (2003) ................................................................A-1

H.R. 3377, 106th Cong. 1st (1999) ................................................................B-1

H.R. 3553, 112th Cong. 1st (2011) ................................................................B-1

H.R. 3555 § 203(a), 112th Cong. 1st (2011) ..................................................A-1

H.R. 4432, 113th Cong. 2d (2014) .................................................................B-1

H.R. 4814, 107th Cong. 2d (2002) .................................................................B-1

H.R. 4816, 107th Cong. 2d (2002) .................................................................A-1

H.R. 5269, 109th Cong. 2d (2006) .................................................................B-1

H.R. 5271, 109th Cong. 2d (2005) .................................................................A-1

H.R. 5577, 111th Cong. 2d (2010) .................................................................B-1

H.R. 5579, 111 Cong. 2d (2010) ....................................................................A-1

H.R. 6325, 111th Cong. 2d (2010) .................................................................B-1

H.R. 6636, 110th Cong. 2d (2008) .................................................................B-1

H.R. 6637, 110th Cong. 2d (2008) .................................................................A-1

HF 3820, 81st Leg. (Minn. 2000) ...................................................................A-1

L.B. 959, 96th Leg., 2d Reg. Sess. (Neb. 2000) ............................................A-2

S. 18, 2006 Leg., Reg. Sess. (Vt. 2006) .........................................................A-2

S. 511, 114th Cong. 1st (2015) ......................................................................B-1

S. 809, 113th Cong. 1st (2013) ......................................................................B-1

S. 2080, 106th Cong. 2d (2000) .....................................................................B-1

S.B. 1275, 51st Leg., 2d Reg. Sess. (Ariz. 2014) ..................................................B-2

S.B. 1279, 105th Gen. Assemb. (Tenn. 2007) ......................................................B-5

S.B. 1290, 27th Leg. (Haw. 2013) ..........................................................................B-2

S.B. 1367, 215th Leg. (N.J. 2012) ..........................................................................B-4

S.B. 146, Gen. Assemb., 1st Reg. Sess. (Colo. 2001) ...........................................B-2

S.B. 158, 28th Leg., 2d Reg. Sess. (Alaska. 2014) ...............................................B-1

S.B. 1637, 228th Leg. Sess. (N.Y. 2005) ..............................................................B-4

S.B. 1666, 98th Gen. Assemb. (Ill. 2013) .............................................................B-2

S.B. 1789 (Mass. 2001) ..........................................................................................A-1

S.B. 18, 51st Leg., 1st Reg. Sess. (N.M. 2013) .....................................................B-4

S.B. 1834, 226th Leg. Sess. (N.Y. 2003) ..............................................................B-4

S.B. 1912 (Mass. 2003) ..........................................................................................A-1

S.B. 2052, 232d Leg. Sess. (N.Y. 2009) ...............................................................B-4

S.B. 218, 2005 Leg. Reg. Sess. (Mon. 2005) .........................................................A-1

S.B. 2235, 2005 Leg. Reg. Sess. (N.D. 2005) .......................................................A-2

S.B. 2563, 87th Reg. Sess. (Minn. 2011) ..............................................................B-3

S.B. 2576, 27th Leg. (Haw. 2014) ..........................................................................B-2

S.B. 2737, 27th Leg. Sess. (Haw. 2014) ................................................................A-1

S.B. 3084, 27th Leg. (Haw. 2014) ..........................................................................B-2

S.B. 3348, 224th Leg. Sess. (N.Y. 2001) ..............................................................B-4

S.B. 3525, 230th Leg. Sess. (N.Y. 2007) ..............................................................B-4

S.B. 3908, 234th Leg. Sess. (N.Y. 2011) ..............................................................B-4

S.B. 411, 163d Sess. Gen. Ct., 2d Year (N.H. 2014) ............................................B-3

S.B. 778, Reg. Sess. (Md. 2014) ............................................................................B-3

S.B. 894, 108th Gen. Assemb. (Tenn. 2013) .........................................................B-5

S.B. 906, 47th Leg., 1st Reg. Sess. (N.M. 2005) ........................................................B-4

S.B. 91, 216th Leg. (N.J. 2014) ...............................................................................B-4

S.B. 991, 106th Gen. Assemb. (Tenn. 2006) ...........................................................B-5

S.M. 62, 46th Leg., 1st Reg. Sess. (N.M. 2003) ......................................................B-4

S.R. 133, 216th Leg. 2d Reg. Sess. (N.J. 2015)........................................................B-4

**Other Authorities**

1A Callman on Unfair Competition, Trademarks &
    Monopolies §§ 9:11, 9:16 (4th ed.)................................................................85, 87

2007 USDA Census of Agriculture,
    http://www.nass.usda.gov/Statistics_by_State/Oklahoma/Publications/Media_
    Resources/Soybean_Factsheet.pdf..........................................................................26

27 Minn. Practice: Prods. Liab. Law § 13.15 (2015 ed.).............................................42

Abby Wendle, *Pain From The Grain: Corn Belt Towns Languish As Prices Drop*,
    NPR (Mar. 18, 2015),
    http://www.npr.org/sections/thesalt/2015/03/18/393841311/pain-from-the-
    grain-corn-belt-towns-languish-as-prices-drop......................................................25

Blake A. Biles, *Agricultural Biotechnology: The U.S. Perspective*,
    18 Nat. Resources & Env't 12 (2003)........................................................................5

Chinese Ministry of Agriculture, Implementation Regulations on the Safety of
    Import of Agricultural Genetically Modified Organisms, arts. 18-19
    (Jan. 5, 2002), http://bch.biodiv/database/attachedfile.aspx?id=561; ..............73

Corilyn Shropshire, *Falling Soybean, Corn Prices Hurt Farmland Values*,
    Chicago Tribune (Feb. 12, 2015)............................................................................25

Dan B. Dobbs et al., The Law of Torts (2d ed. 2011)
    § 255.................................................................................................................73, 74
    § 399.......................................................................................................................92
    § 449.......................................................................................................................57
    § 452.......................................................................................................................82
    § 606.......................................................................................................................24
    § 647.......................................................................................................................21
    § 647.......................................................................................................................21
    § 648.......................................................................................................................45

David B. Gaebler, *Negligence, Economic Loss, and the U.C.C.*,
    61 Ind. L.J. 593 (1986)...........................................................................................41

*Economic Loss Doctrine*, Bench & Bar of Minn. (Sept. 2000),
   http://www2.mnbar.org/benchandbar/2000/sep00/econ-loss.htm ...........................................42

EPA, *Notice of Pesticide Registration, 5307 Corn* (July 31, 2012),
   http://www3.epa.gov/pesticides/chem_search/ppls/067979-00022-
   20120731.pdf .................................................................................................................7

EPA, *Notice of Pesticide Registration, MIR162 Maize* (Nov. 26, 2008),
   http://www3.epa.gov/pesticides/chem_search/ppls/067979-00014-
   20081126.pdf .................................................................................................................7

FDA, *Biotechnology Consultation Note to the File BNF No. 000113,*
   *Maize Event MIR162* (Dec. 1, 2008),
   http://www.fda.gov/Food/FoodScienceResearch/GEPlants/Submissions/ucm1
   55598.htm; .................................................................................................................7

FDA, *Biotechnology Consultation Note to the File BNF No. 000128,*
   *Maize Event 5307* (Jan. 30, 2012),
   http://www.fda.gov/Food/FoodScienceResearch/GEPlants/Submissions/ucm3
   04082.htm .................................................................................................................7

Food and Ag. Org. of the U.N. Statistics Division Data,
   http://faostat3.fao.org/browse/Q/QC/E ...........................................................................11

Monthly Commodity Futures Price Chart—Corn (CBOT),
   http://futures.tradingcharts.com/prairielinks/CN/M ...........................................................10

Restatement (Second) of Torts
   § 315...................................................................................................................................64
   § 323...................................................................................................................................77
   § 388...................................................................................................................................80
   §§ 519-20.................................................................................................................80, 81, 82
   § 766B.................................................................................................................................87
   § 766C.................................................................................................................................38
   § 821B.................................................................................................................................93
   § 821D.................................................................................................................................89
   § 821F.................................................................................................................................92
   § 834...................................................................................................................................90

Restatement (Third) of Torts: Liab. for Phys. & Emot. Harm
   § 6...................................................................................................................................73
   § 7...................................................................................................................................73

Restatement (Third) of Torts: Prods. Liab. § 2 ....................................................................82

Restatement (Third) of Torts: Liab. for Econ. Harm
  §§ 5-6 ..................................................................................................... 35
  § 7 .................................................................................. 21, 22, 24, 30, 33, 34, 44
  § 1 ........................................................................................................... 19

Robert Holly, *Growing Pains or Gains*, The News-Gazette (Oct. 11, 2015),
  http://www.news-gazette.com/news/business/2015-10-11/growing-pains-or-
  gains.html ..................................................................................................... 74

State Council of the People's Republic of China, Regulations on the Safety
  Administration of Agricultural GMOs arts. 34-38 (Jan. 8, 2011),
  http://apps.fas.usda.gov/gainfiles/200106/110681034.pdf ................................................. 73

U.S. Trade Rep., 2012 Rep. to Congress on China's WTO Compliance
  (Dec. 2012),
  https://ustr.gov/sites/default/files/uploads/2012%20Report%20to%20Congres
  s%20-%20Dec%2021%20Final.pdf ......................................................................... 10

USDA, *Adoption of Gen. Eng'd Crops in the U.S.* (2014),
  http://www.ers.usda.gov/amber-waves/2014-march/adoption-of-genetically-
  engineered-crops-by-us-farmers-has-increased-steadily-for-over-15-
  years.aspx#.VkDLy7erTGg .................................................................................... 5

USDA Background on Soybeans & Oil Crops,
  http://www.ers.usda.gov/topics/crops/soybeans-oil-crops/background.aspx ......................... 26

USDA, Biotechnology FAQs,
  http://www.usda.gov/wps/portal/usda/usdahome?navid=
  AGRICULTURE&contentid=BiotechnologyFAQs.xml ........................................................ 5

USDA, *Determination of Nonregulated Status for Event 5307 Corn*
  (Jan. 29, 2013), http://www.aphis.usda.gov/brs/aphisdocs/10_33601p_det.pdf ...................... 7

USDA Economic Research Service Feed Grains Database,
  http://www.ers.usda.gov/data-products/feed-grains-database/feed-grains-
  custom-query.aspx .............................................................................................. 8

USDA, *Economic Research Service Feed Outlook, Record Feed Grain
  Production Projected for 2013/14* (May 14, 2013),
  http://usda.mannlib.cornell.edu/usda/ers/FDS/2010s/2013/FDS-05-14-
  2013.pdf ....................................................................................................... 10

USDA, *Finding of No Significant Impact for Syngenta Seeds, Inc. Alpha-Amylase
  Maize Event 3272*,
  http://www.aphis.usda.gov/brs/aphisdocs/05_28001p_fonsi_rtc.pdf ................................... 67

USDA Foreign Agr. Serv., GAIN Report No. CH12046 (July 13, 2012)
http://gain.fas.usda.gov/Recent%20GAIN%20Publications/Agricultural%20Bi
otechnology%20Annual_Beijing_China%20-
%20Peoples%20Republic%20of_7-13-2012.pdf ...................................................................8

USDA Foreign Agricultural Service GAIN Report Number 14032 (Dec. 31,
2014),
http://gain.fas.usda.gov/Recent%20GAIN%20Publications/Agricultural%20Bi
otechnology%20Annual_Beijing_China%20-
%20Peoples%20Republic%20of_12-31-2014.pdf ................................................................10

USDA, *Nat'l Envt'l Policy Act Decision & Finding of No Significant Impact for
Syngenta Seeds, Inc. Alpha-Amylase Maize Event 3272*,
http://www.aphis.usda.gov/brs/aphisdocs/05_28001p_fonsi_rtc.pdf ....................................66

USDA, *Nat'l Envt'l Policy Act Decision & Finding of No Significant Impact*,
*MIR162 Maize* (April 12, 2010),
http://www.aphis.usda.gov/brs/aphisdocs2/07_25301p_com.pdf ............................................6

USDA National Agricultural Statistics Service, *Quick Stats for Corn*,
http://quickstats.nass.usda.gov/data/printable/84286845-EA4D-3EA6-A1C6-
4D88693AE168 ...................................................................................................................11

USDA National Organic Program, Policy Memorandum From Miles McEvoy,
Deputy Administrator, to stakeholders and interested parties re: Genetically
Modified Organisms (Apr. 15, 2011),
http://www.ams.usda.gov/sites/default/files/media/OrganicGMOPolicy.pdf .......................67

USDA, *USDA's Biotechnology Deregulation Process* (June 28, 2011),
http://blogs.usda.gov/2011/06/28/usda%E2%80%99s-biotechnology-
deregulation-process/ .............................................................................................................6

USDA, *USDA's Response to Public Comments on Syngenta SYN-05307-1 Corn*,
http://www.aphis.usda.gov/brs/aphisdocs/10_33601_rtc.pdf ................................................67

W. Prosser, *The Law of Torts*, § 87 (4th ed. 1971) .......................................................................66

## <u>INTRODUCTION</u>

Plaintiffs' unprecedented theories contend that it was a *tort* for Syngenta to sell a U.S.-approved, genetically modified (GM) corn seed called Viptera in the U.S. simply because that biotechnology had not yet been approved by China.  In their view, absent Chinese approval, the law imposed a duty on Syngenta either (i) to control the way *everyone else* handled corn grown with the new technology to keep it separate, or (ii) to prevent American farmers from using the technology *at all*.  Plaintiffs do not claim the seed caused any physical harm.  There is no dispute that the U.S. government allowed corn grown from Viptera to be treated like any other yellow corn and thus that it could be harvested, processed, and consumed without any requirement to keep it separate.  Instead, Plaintiffs claim only *economic* injury, asserting that because corn is typically treated as a fungible commodity crop, and because others mixed Viptera corn into the U.S. corn supply, China eventually decided to block all U.S. corn shipments (supposedly due to the presence of Viptera), so as to cause a drop in the price of all U.S. corn.  In their view, Syngenta should be liable in tort for that entire extended chain of events, including actions taken by *others* entirely outside Syngenta's control.  That theory should be recognized for what it is: an attempt to use tort law to allow Plaintiffs to avoid the costs of adapting their businesses to the advent of new technology and to turn a biotechnology manufacturer into an insurer paying out on a policy that Plaintiffs never bought to protect themselves from market drops in the price of corn.

At the heart of this case lies an inescapable fact: when the U.S. approves biotechnology before foreign countries (like China), players in the U.S. corn industry, including farmers, grain elevators, and exporters, face a choice.  They can continue to treat all corn as fungible and mix it together, in which case they risk losing the ability to export to a market where a U.S.-approved technology is not yet approved.  Or they can take steps to separate corn to serve the special demands of export markets.  The premise of Plaintiffs' case is that tort law eliminates the need

for Plaintiffs to face that choice by requiring GM manufacturers to hold others harmless from costs that the advent of new technology might place on their way of doing business.  In their view, tort law dictates that American manufacturers must either *suppress* innovative technology until it is approved overseas, or else absorb the costs that others incur when they fail to take steps to adapt—all because it is a tort to market technology that others find economically inconvenient.  Plaintiffs' unprecedented theory should be rejected as a matter of law.

There is no dispute that when Syngenta began selling Viptera in 2010, it had been found safe and was fully approved by the U.S. Government.  It was also well known in the industry that China had not yet approved Viptera.  As a result, some grain elevators—like Bunge—chose to change the way they did business to address the advent of this new technology.  To preserve their ability to meet the standards of the Chinese export market, they refused to accept Viptera corn at their grain elevators.  Other grain elevators and exporters took a different approach.  They chose not to segregate corn grown from Viptera from other corn and mixed corn without distinction in their facilities.  Corn producers (like Plaintiffs here) similarly made no effort to require the grain elevators to whom they sold their corn to segregate it to ensure that it could be exported to China.  Seeking to profit from high prices driven by corn shortages in 2011 and 2012, exporters decided to ship this commingled corn—which they knew contained Viptera corn—to China, even though they also knew that Viptera had not yet been approved for import.  That approach continued for two years, until China began turning away U.S. corn shipments in November 2013.

In addition to individual defects, Plaintiffs' claims are foreclosed by two broad principles.

*First*, Plaintiffs' claims are barred by the economic loss doctrine ("ELD").  Under settled law in Illinois and other States, purely economic losses are not recoverable in actions for unintentional torts.  The ELD is a bedrock principle prohibiting the use of tort claims to recover for purely economic losses like those alleged here.  Significantly, until the Viptera litigation, the

only American court to consider identical claims based on the loss of a foreign market due to the spread of an approved GM trait *rejected* those claims by applying the ELD under Illinois and Iowa law.  *See Sample v. Monsanto Co.*, 283 F. Supp. 2d 1088, 1093 (E.D. Mo. 2003).

The District of Kansas (the "MDL Court")—which is presiding over several hundred cases raising similar claims—recently held that the ELD did not apply.  That court, however, did not even acknowledge *Sample*, much less distinguish it.  Instead, the MDL decision created a novel exception to the ELD based on a case-by-case policy assessment to determine when the ELD should apply.  That approach misstates the law: the very reason for the ELD is to provide a bright-line rule barring recovery of economic losses in tort absent physical injury.  Illinois and other courts have thus squarely *foreclosed* precisely the case-by-case approach the MDL Court adopted and which, if anything, resembles a *minority* approach followed by only three States and rejected by the Restatement and every other State to have considered it.

*Second*, Plaintiffs' suggestion that Syngenta had a duty to reorganize the entire industry framework for corn—by controlling the actions of growers, elevators, and exporters to segregate Viptera—is literally unprecedented.  The standard rule is that there is no duty to control the conduct of another, and courts regularly reject the idea that manufacturers of safe, non-defective products have a duty to control others' handling of their products after the point of sale.  Such a duty would also undermine the policy behind the regulatory framework under which, once approved by the USDA, EPA, and FDA, GM crops are treated the same as non-GM crops.

The theory that Syngenta had a duty not to sell Viptera *at all* without Chinese approval, is even more far-fetched.  State tort law does not require the suppression of new technology that market participants find inconvenient, nor does it give foreign governments a veto over which new technologies—*already approved by the U.S. government*—can be sold in the United States.

The MDL Court's holding that Syngenta had a duty to operate its business "for the

3

mutual benefit of all" in the industry to avoid economic disruptions, MDL Order 10,[1] is equally unprecedented.  The MDL Court cited no prior case recognizing such a duty, and it is wholly counter to the usual rule that, absent specifically defined economic torts (such as intentional interference with contractual relations or antitrust violations), market participants are free to pursue their advantage in the market, including by introducing disruptive new technologies.

Prior decisions involving *unapproved* GM traits are irrelevant.  Those cases involved traits wrongly released into the food supply *before being approved for human consumption.* Before the Viptera litigation, only two courts had addressed claims like the ones here—claims that the *lawful* sale of an *approved* GM seed harmed farmers or exporters by foreclosing their ability to serve an export market.  Both courts rejected those claims as a matter of law.  *Sample* barred such claims under the ELD.  In the second case, a Canadian court applied the same common-law principles applicable here and held as a matter of law that the plaintiffs could not show duty *and* that the claims were barred by the ELD as well.  *See Hoffman v. Monsanto Canada, Inc. (Hoffman I)*, 2005 SKQB 225, 2005 SK.C. LEXIS 330 (Can. Sask. Q.B. May 11, 2005) (Ex. A), *aff'd*, *Hoffman v. Monsanto Canada, Inc.  (Hoffman II)*, 2007 SKCA 47, 2007 SK.C. LEXIS 194 (Can. Sask. C.A. May 2, 2007) (Ex. B).  Those decisions provide the proper approach here, and this Court should similarly dismiss Plaintiffs' claims.

The Seventh Circuit has repeatedly made clear that the "limited role" of a federal court "in the evolution of state law *requires [it] to decline to recognize a novel application of [a]. . . state law tort*," *Villegas v. Princeton Farms, Inc.*, 893 F.2d 919, 922, 925 (7th Cir. 1990) (emphasis added), and thus "district courts are *encouraged to dismiss actions based on novel state law claims*," *Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 635-36 (7th Cir. 2007).

---

[1]   "MDL Order" refers to Mem. & Order, Dkt. 1016, *In re Syngenta AG MIR162 Corn Litig.*, No. 2:14-md-2591 (D. Kan. Sept. 11, 2015) (attached as Ex. C).  Exhibits are attached to the Declaration of Michael J. Nester.

"[A]bsent some authority" indicating approval from the highest court of a state, this Court may not "adopt a substantive innovation in state law." *Id.* The MDL Court's novel creation of a policy-based exception to the ELD and its unprecedented creation of a duty to operate one's business for the mutual benefit of others in an "inter-connected market" are innovations wholly unsupported by any precedent approving these inventive approaches from the highest courts of any of the *22 States* at issue in the MDL. Because adopting novel approaches under state law is reversible error in this Circuit, this Court should not follow the MDL Court's decision.

## BACKGROUND

A.     **Biotechnology And Genetically Modified Crops In The United States[2]**

The USDA has recognized that genetic engineering "has resulted in benefits to farmers, producers, and consumers" by "mak[ing] both insect pest control and weed management safer and easier," including "allow[ing] for a significant reduction" in pesticide use.[3] These benefits have prompted a dramatic increase in the use of GM seeds over the past two decades. For corn, there is near-universal usage across the U.S., with GM corn making up 92% of all corn planted.[4] For these reasons, the U.S. Government long ago adopted the policy of treating approved GM products the same as conventionally bred crops.[5]

Manufacturers are statutorily restricted from launching GM traits, however, until they

---

[2]     The facts relevant to this motion come from the complaint, documents cited in the complaint central to the claims, *see Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993), and matters of government and public record cited in the Argument section, which are subject to judicial notice, *Henson v. CSC Credit Servs*, 29 F.3d 280, 284 (7th Cir. 1994). Other publicly available information is provided only for background and is not necessary to resolve this motion.

[3]     USDA,       Biotechnology       FAQs,       http://www.usda.gov/wps/portal/usda/usdahome?navid=AGRICULTURE&contentid=BiotechnologyFAQs.xml.

[4]     USDA, *Adoption of Gen. Eng'd Crops in the U.S.* (2014), http://www.ers.usda.gov/amber-waves/2014-march/adoption-of-genetically-engineered-crops-by-us-farmers-has-increased-steadily-for-over-15-years.aspx#.VkDLy7erTGg.

[5]     *E.g.*, Blake A. Biles, *Agricultural Biotechnology: The U.S. Perspective*, 18 Nat. Resources & Env't 12, 43 (2003) (under the 1986 Coordinated Framework, GM products "are presumed to be as safe (concerning both public health and the environment) as their conventional counterparts unless evidence indicates otherwise.").

have been vetted and approved by the USDA, the EPA, and the FDA.[6]  Through its "complex method of evaluation"[7] and testing, the USDA may determine that the GM trait is safe and remove any statutory restrictions by "deregulating" the GM trait, either in whole or in part.

### B.  Syngenta's Development Of U.S.-Approved Viptera And Duracade Corn

Syngenta has developed, manufactured, and sold GM seeds for decades, and its advances include two corn seed traits called MIR162 and Event 5307.  Each trait protects corn crops from insects and pests, thus increasing crop yields and reducing the need for pesticides.  MIR162 was incorporated into Syngenta's Viptera corn seed, making it resistant to above-ground pests like Lepidoptera (caterpillars).  Several years after Viptera was launched, Syngenta developed Event 5307, which controls pests like rootworm and is found in a corn seed product called Duracade.

The complaints acknowledge that Syngenta field tested Viptera and Duracade under permits from the USDA, *see* First Consol. Am. Compl. ("CAC") ¶ 3011, and do not allege any unapproved releases of MIR162 or Event 5307 during field testing.  Once testing established that Viptera was safe, Syngenta petitioned the USDA in 2007 to deregulate MIR162.  In 2010, the USDA determined that MIR162 did not pose risks to humans, animals, or the environment[8] and approved MIR162 for deregulation without any restrictions on how it was to be sold, grown, or handled, rejecting alternatives (including partial deregulation) that would have restricted where Viptera could be planted.[9]  By deregulating a GM trait like MIR162, the USDA "allow[s] it to be sold commercially."  *In re GM Rice Litig.*, 666 F. Supp. 2d 1004, 1015 n.2 (E.D. Mo. 2009).  Unrestricted approval made Viptera a lawful and integral part of the U.S. corn supply under the

---

6   The USDA regulates GM organisms as "plant pests" until approved.  7 C.F.R. § 340.1; 7 U.S.C. § 7711(a).

7   USDA, *USDA's Biotechnology Deregulation Process* (June 28, 2011), http://blogs.usda.gov/2011/06/28/usda%E2%80%99s-biotechnology-deregulation-process/

8   *See* USDA, *Nat'l Envt'l Policy Act Decision & Finding of No Significant Impact*, *MIR162 Maize*, 5 (April 12, 2010), http://www.aphis.usda.gov/brs/aphisdocs2/07_25301p_com.pdf.

9   *See* USDA APHIS, *Syngenta Biotechnology, Inc.; Determination of Nonregulated Status for Corn Genetically Engineered for Insect Resistance*, 75 Fed. Reg. 20560 (Apr. 20, 2010).

USDA's broad definition of "yellow corn."[10]  Syngenta petitioned for deregulation of Event 5307 in April 2011.  In 2013, the USDA fully deregulated Event 5307 without any restrictions.[11]

MIR162 and Event 5307 not only received USDA approval, but also were approved by the EPA and the FDA.  The EPA regulates the use, sale, and labeling of pesticides, including those in GM traits such as MIR162, under the Federal Insecticide, Fungicide, and Rodenticide Act.  7 U.S.C. §§ 136a, 136w.  Syngenta secured EPA approval of MIR162 in November 2008[12] and Event 5307 in July 2012.[13]  The FDA, which oversees food and feed safety of GM plants, was satisfied with Syngenta's conclusion that "food and feed derived from . . . MIR162 are as safe and nutritious as food and feed derived from conventional maize" (and likewise with respect to Event 5307).[14]  Thus, it is undisputed that Viptera had received all approvals necessary to be sold without restriction in the United States by April 20, 2010 (and Duracade by January 29, 2013).  There is no dispute in this case about the safety or efficacy of Viptera and Duracade.

### C.    Syngenta Commercializes Viptera

Given the increasingly globalized market for commodity crops, a new GM trait typically will not secure regulatory approval in different countries all at the same time.  Thus, a trait may be approved in an exporting country before it has been approved for import in other countries.  Because of this asynchronous approval, various players in the biotechnology and grain industries have suggested "stewardship" guidelines for developers to consider in deciding when to

---

[10]    *See* 7 C.F.R. § 810.402(c)(1) ("yellow corn" is "[c]orn that is yellow-kerneled and contains not more than 5.0 percent of corn of other colors," with "kernels of corn with a slight tinge of red [being] considered yellow corn").

[11]    USDA, *Determination of Nonregulated Status for Event 5307 Corn* (Jan. 29, 2013), http://www.aphis.usda.gov/brs/aphisdocs/10_33601p_det.pdf.

[12]    EPA, *Notice of Pesticide Registration, MIR162 Maize* (Nov. 26, 2008), http://www3.epa.gov/pesticides/chem_search/ppls/067979-00014-20081126.pdf.

[13]    EPA, *Notice of Pesticide Registration, 5307 Corn* (July 31, 2012), http://www3.epa.gov/pesticides/chem_search/ppls/067979-00022-20120731.pdf.

[14]    FDA, *Biotechnology Consultation Note to the File BNF No. 000113, Maize Event MIR162* (Dec. 1, 2008), http://www.fda.gov/Food/FoodScienceResearch/GEPlants/Submissions/ucm155598.htm;  FDA, *Biotechnology Consultation Note to the File BNF No. 000128, Maize Event 5307* (Jan. 30, 2012), http://www.fda.gov/Food/FoodScienceResearch/GEPlants/Submissions/ucm304082.htm.

commercialize a new GM product.  The Biotechnology Industry Organization ("BIO") "Product Launch Stewardship Policy" sets out recommendations for member companies but expressly refuses to create any binding obligations.  *See* 2009 BIO Policy, at 1 n.2 (Ex. D).  The BIO Policy suggests that member companies should assess which countries are "key import markets," which requires, among other things, assessing the trade volume for the crop at issue, although the Policy provides no specific metrics.  *Id.* at 4.  The BIO Policy suggests that, before launching a new trait, manufacturers consider obtaining import approval from those "key export markets" with "functioning regulatory systems."  *Id.  **The BIO Policy has never listed China as a key export market or a country from which approval should be secured before commercialization.***  In fact, the 2009 BIO Policy listed only the U.S., Canada, and Japan as "key markets," *id.*

In late 2009, Syngenta decided to begin commercialization upon securing deregulation of MIR162 from the U.S. and import approval in the markets named by BIO.  Consistent with the BIO Policy, Syngenta obtained approval from the U.S., Canada, and Japan before Viptera was launched.  Indeed, even before commercial planting began in 2011, many additional countries, including Brazil, Korea, Taiwan, the Philippines, and Mexico, had approved Viptera.

China does not permit an application for approval to be filed until a trait has been approved for cultivation in another country.[15]  Syngenta filed in China as soon as it was permitted to do so in March 2010.  At the time Syngenta launched Viptera in the U.S. in 2010, about one-third of 1% of annual U.S. corn production was exported to China.[16]

---

[15]  *See*  USDA  Foreign  Agr.  Serv.,  GAIN  Report  No.  CH12046  (July  13,  2012) http://gain.fas.usda.gov/Recent%20GAIN%20Publications/Agricultural%20Biotechnology%20Annual_Beijing_China%20-%20Peoples%20Republic%20of_7-13-2012.pdf.

[16]  Plaintiffs' efforts to tout China's significance to the U.S. corn market are belied by the USDA's own statistics in the public record and by Plaintiffs' own allegations.  *E.g.*, CAC. ¶ 3099 (alleging volume of Chinese corn imports from 2009 to 2014 based on USDA statistics).  In 2010, there were 12,425,330,000 bushels of corn produced in the U.S. and 1,025,396 metric tons exported to China.  *See* USDA Economic Research Service Feed Grains Database, http://www.ers.usda.gov/data-products/feed-grains-database/feed-grains-custom-query.aspx (Ex. F).  Converting the latter data point to bushels (39.368 bushels per metric ton, *see* Ex. F, or about 40,367,790 bushels) and dividing by

**D.     Most Grain Elevators And Exporters Treat Viptera As Fungible Corn, Commingle It, And Ship It To China**

With approvals in hand, Syngenta sold Viptera seeds in the U.S. for the 2011 growing season.  *E.g.*, CAC ¶ 3072.  Plaintiffs allege that the farmers planting Viptera did so in a way that permitted cross-pollination with neighboring fields.  *E.g.*, *id.* ¶ 3091.  At the time, however, it was well known that China had not yet approved Viptera.  As Plaintiffs concede, industry organizations (such as NGFA and NAEGA) and non-producers who actually accomplish the commingling of U.S. corn (such as elevators and exporters) were well aware of that fact.  *See id.* ¶¶ 3046, 3092-93.  A few elevators and exporters, including Bunge, refused to accept Viptera corn because they wanted to preserve their ability to export to China.  *Id.* ¶¶ 3092-93, 3097.[17]

Unlike Bunge and others, many elevators and exporters accepted Viptera corn without distinction from non-Viptera corn.  They did not refuse Viptera corn or secure contractual assurances from growers about the seed they used.  Nor did they test for or try to segregate Viptera to ensure compliance with Chinese standards.  That made sense because the Chinese market accounted for only about one-third of 1% of U.S. corn production.  *Supra* note 16.

During this time, Syngenta kept market analysts and its investors updated on the status of Chinese approval.  For example, in April 2012, Syngenta hosted an earnings call for investors.  Plaintiffs seize on a statement from then-Syngenta AG CEO Michael Mack that, as to "outstanding approval for China" "we *expect* to have [it] quite frankly within the matter of a couple of days," and try to portray it as misleading.[18]  But Mr. Mack cautioned listeners that "the

---

total U.S. production shows that only 0.32% of U.S. corn produced in 2010 was exported to China.  *See Pickett v. Sheridan Health Care Ctr.*, 664 F.3d 632, 648 (7th Cir. 2011) (recognizing authority to "take judicial notice of government websites"); *Pugh v. Tribune*, 521 F.3d 686, 691 n.2 (7th Cir. 2008) (judicial notice of stock prices).

[17]     As Plaintiffs note, Syngenta Seeds sued Bunge seeking an injunction requiring Bunge to accept Viptera corn.  In refusing that request, the court established that Bunge (and other grain elevators) remained free to protect their economic interests in exporting to China by refusing to accept Viptera corn.  Bunge is not a plaintiff here.

[18]     *See* Tr. of Q1 2012 Earnings Call, at 12, http://www.syngenta.com/global/corporate/SiteCollection Documents /pdf/transcripts/q1-2012-transcript-syngenta.pdf (Ex. E) (emphasis added).  Although the complaint alleges that Mr.

regulatory authorities are not something that we can handicap definitively," and the entire call was preceded by the "usual cautionary statement" that the "presentation contains forward-looking statements, which can be identified by terminology such as" the word "*expect*." *Id.*

If anything, Mr. Mack's statement about the uncertainty of the Chinese regulatory process was prescient. As it turned out, it was anything but functional. Under Chinese law, the application for Viptera should have been addressed within 270 days.[19] By April 2012, it had been pending for more than 700 days. In December 2012, the U.S. Trade Representative acknowledged China's "apparent slow-down in issuing approvals" for biotechnology products.[20] Indeed, due in part to public backlash in China over GM products and trade disputes between the U.S. and China, the Ministry of Agriculture did not approve a single application for importing new GM crops from June 2013 until December 11, 2014 (when Viptera was approved).[21]

### E.     The Price Of Corn Drops And China Then Bans U.S. Corn

Plaintiffs allege that China did not reject any corn shipments until late 2013. As the 2013-2014 corn season approached, USDA analysts projected a "record" U.S. corn crop and significantly "[l]ower prices" due to "higher production, moderately higher use, and record global supplies"[22]—issues having nothing to do with Viptera. Corn futures reflected the same expectations.[23] That year's bumper crop was a record U.S. corn harvest (after several years of

---

Mack stated "[t]here *isn't* outstanding approval for China." That misquotes the transcript, which makes clear that Mr. Mack stated: "There *is* an outstanding approval for China . . . ." *Id.*

[19]   USDA Foreign Agricultural Service GAIN Report Number 14032, 8 (Dec. 31, 2014), http://gain.fas.usda.gov/Recent%20GAIN%20Publications/Agricultural%20Biotechnology%20Annual_Beijing_China%20-%20Peoples%20Republic%20of_12-31-2014.pdf.

[20]   U.S. Trade Rep., 2012 Rep. to Congress on China's WTO Compliance, 89 (Dec. 2012), https://ustr.gov/sites/default/files/uploads/2012%20Report%20to%20Congress%20-%20Dec%2021%20Final%20.pdf.

[21]   USDA Foreign Ag. Serv. GAIN Rep. No. 14032, *supra* note 19, at 8.

[22]   USDA, *Economic Research Service Feed Outlook, Record Feed Grain Production Projected for 2013/14*, 3 (May 14, 2013), http://usda.mannlib.cornell.edu/usda/ers/FDS/2010s/2013/FDS-05-14-2013.pdf.

[23]   *See* Monthly Commodity Futures Price Chart—Corn (CBOT) http://futures.tradingcharts.com/prairielinks/CN/M.

decreasing production) and the world's largest corn harvest in more than 50 years.[24]  As predicted, U.S. corn prices dropped significantly in 2013, decreasing from $7.04 per bushel in February to $4.63 per bushel in October.[25]

According to Plaintiffs' allegations, it was not until late November 2013, *after* that 34% price drop, that China rejected shipments of U.S. corn that allegedly tested positive for the presence of MIR162.  CAC ¶ 3045.  By rejecting shipments, Beijing gave Chinese buyers a way out of millions of dollars of corn contracts that had been locked in at higher prices before the bumper crop.  *See id.* ¶ 3113.  China approved Viptera for import in December 2014.  *Id.* ¶ 3075.

### F.   Viptera Litigation

After China rejected corn shipments, grain elevators and exporters—the same ones that made no effort to turn away Viptera corn—sued Syngenta in Louisiana state courts beginning in September 2014.  Those suits were followed by waves of additional lawsuits brought by farmers of non-Viptera corn, Viptera farmers, other grain handlers, and by producers of other products alleging their economic interests were injured by the alleged drop in corn prices, including milo farmers, soybean farmers, and, recently, ethanol producers.  Over 700 cases have been centralized in a federal MDL proceeding in the District of Kansas, and that court has granted in part and denied in part Syngenta's motion to dismiss similar claims.  *See* MDL Order (Ex. C).  Over 2,600 cases are centralized in the Fourth Judicial District Court of Minnesota.[26]  Over 200 actions filed in Illinois state courts are consolidated in the Williamson County Circuit Court.

### CHOICE OF LAW

This Motion cites exemplar cases for principles of law that apply across the relevant

---

[24]   *See* Food and Ag. Org. of the U.N. Statistics Division Data, http://faostat3.fao.org/browse/Q/QC/E.
[25]   *See* USDA National Agricultural Statistics Service, *Quick Stats for Corn*, http://quickstats.nass.usda.gov/data/printable/84286845-EA4D-3EA6-A1C6-4D88693AE168.
[26]   In a recent ruling on Syngenta's motion to dismiss, the Minnesota court largely followed the MDL Order.  *See* Apr. 7, 2016 Order, *In re Syngenta Litig.*, No. 27-CV-15-3785 (4th Jud. Dist. Ct., Minn. consolidated May 22, 2015) ("Minn. MTD Order").  The same analysis showing errors in the MDL Order also applies to the Minnesota decision.

jurisdictions.  In the event of a conflict of laws, under Illinois' most significant relationship test, each plaintiff's claim would be governed by the law of the State where that plaintiff grew corn.

Four factors determine the applicable law: "(1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation, and place of business of the parties; (4) the place where the relationship, if any, between the parties is centered."  *Denton v. Universal Am-Can, Ltd.*, 26 N.E.3d 448, 454 (Ill. App. Ct. 2015).  First, Plaintiffs allege damage to their "farmland and entire farming operations," an injury that occurs where the farms are located.  CAC ¶ 3034.  Plaintiffs also allege "economic damage," *see, e.g.*, *id.* ¶ 3057, and the place of an economic injury is where the plaintiff "sustains the economic impact of the loss."  *Knaus v. Guidry*, 906 N.E.2d 644, 663 (Ill. App. Ct. 2009).  Although that usually means the plaintiff's state of residence, *id.*, the economic impact of a business-related injury is felt in the State where the plaintiff conducts business operations—here, where the Plaintiffs' farms are.[27]  Second, the place where the alleged tortious *conduct* occurred does not favor any individual State.  Plaintiffs allege that Viptera was sold throughout the United States.  Third, each Plaintiff's place of business is where its farming operations are located, and Syngenta does business in every State, *see* CAC ¶ 3014, so this factor points to the location of Plaintiffs' farms.  Fourth, Plaintiffs do not allege that they purchased Viptera or Duracade and therefore have no relationship with Syngenta.  To the extent any of the Plaintiffs did purchase products from Syngenta, such purchases presumably occurred in the State where they farm.  Given these factors, the law of the State where each Plaintiff farms should apply.  And because no Plaintiff alleges that he farms in Arizona, New Jersey, or Vermont,

---

[27]   *See Deere & Co. v. MTD Prods., Inc.*, No. 00 CIV. 5936 (LMM), 2002 WL 1837402, at *4 (S.D.N.Y. Aug. 12, 2002), *adhered to on reconsideration*, No. 00 CIV.5936 (LMM), 2002 WL 31357692 (S.D.N.Y. Oct. 17, 2002); *cf. Casa Orlando Apts., Ltd. v. Fed. Nat'l Mortg. Ass'n*, 624 F.3d 185, 191 (5th Cir. 2010) ("[F]inancial injuries occur[] in the states where plaintiffs maintain their principal places of business.").

claims brought under those States' laws should be dismissed.  *See* CAC ¶¶ 237, 263, 1020.

## ARGUMENT

### I.    The Non-Illinois Plaintiffs' Claims Fail For Lack Of Personal Jurisdiction.

This Court lacks personal jurisdiction over the Syngenta Defendants for claims by those who do not allege that they farmed corn in Illinois ("Non-Illinois Plaintiffs").  The Due Process Clause does not allow farmers who planted, harvested, and sold corn *outside* Illinois and suffered any injury *outside* Illinois to drag Syngenta into court in Illinois to answer claims that have nothing to do with conduct, events, or injuries in Illinois.

Because Illinois authorizes jurisdiction to the limits of due process, jurisdictional analysis collapses into two-part federal due process analysis, *see, e.g.*, *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 715 (7th Cir. 2002), which consists of two parts.  *First*, the court must consider whether "the defendant has certain minimum contacts with the state." *Kipp v. Ski Enter. Corp. of Wis.*, 783 F.3d 695, 697 (7th Cir. 2015) (alterations omitted).  That standard may be met in two ways: by contacts sufficient for *general* jurisdiction or for *specific* jurisdiction. *Id.* at 697-98.  *Second*, even if there are minimum contacts, the court considers "whether the exercise of jurisdiction would be compatible with fair play and substantial justice." *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 781 (7th Cir. 2003).  The Non-Illinois Plaintiffs bear the burden of establishing jurisdiction, *Kipp*, 783 F.3d at 697, and they cannot carry that burden here.

### A.    Syngenta Is Not Subject To General Personal Jurisdiction In Illinois.

No Syngenta Defendant is subject to general jurisdiction in Illinois because none has contacts that are "so 'continuous and systematic' as to render [it] essentially at home" here. *Daimler AG v. Bauman*, 134 S. Ct. 746, 761 (2014); *Goodyear Dunlop Tires Ops., S.A. v. Brown*, 131 S. Ct. 2846, 2851 (2011).  The "paradigm . . . bases for general jurisdiction" for a corporation are the state of incorporation and the principal place of business. *Daimler*, 134 S. Ct.

at 760.  Absent "exceptional" circumstances, corporations are not "at home" elsewhere.  *Id.* at 761 & n.19.  As the complaint and attached declaration show, no Syngenta Defendant is incorporated in or has its principal place of business in Illinois.  *See* Quain Decl. ¶¶ 3-9; CAC ¶¶ 3007-08.  Nor is this an "exceptional case" justifying general jurisdiction elsewhere.  *Daimler,* 134 S. Ct. at 761 n.19.[28]

Instead, Plaintiffs allege nothing more than that Syngenta sells seeds, uses seed advisors, maintains facilities, and has agents for service of process in Illinois—without any allegation that these contacts were different from its contacts in numerous other States.  *E.g.*, CAC ¶ 6.  In fact, these activities are carried out solely by Syngenta Seeds, LLC and Syngenta Crop Protection, LLC.  *See* Quain Decl. ¶¶ 13, 16.  Even if the Syngenta Defendants were treated as one entity, such contacts would be legally insufficient for general jurisdiction.  *Daimler* made clear that a corporation is not subject to "general jurisdiction in every State in which [it] engages in a substantial, continuous, and systematic course of business."  134 S. Ct. at 761.[29]

*Daimler* also made clear that forum contacts must be assessed *in comparison to* the "corporation's activities in their entirety, nationwide and worldwide."  *Daimler*, 134 S. Ct. 762 n.20.[30]  Here, Syngenta Seeds, LLC and Syngenta Crop Protection, LLC had combined annual sales in Illinois from 2011 to 2014 averaging 9.56% of their total annual sales.  *See* Quain Decl.

---

[28]    The only example of such a case ever provided by the Supreme Court is *Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437 (1952), in which a Philippines company ceased operations during World War II and its president moved to Ohio, where he maintained the corporation's files.  *Id.*  General jurisdiction applied because "Ohio was the corporation's principal, if temporary, place of business."  *Daimler*, 134 S. Ct. at 756.  Nothing similar is present here.  No Syngenta entity has ever had its center of operations in Illinois.  *See* Quain Decl. ¶ 9; *Kipp*, 783 F.3d at 698 (exceptional circumstances "would have to meet the stringent criteria laid out in *Goodyear* and *Daimler*").

[29]    *See also, e.g.*, *Kipp*, 783 F.3d at 698 (*Daimler* and *Goodyear* "require more than the 'substantial, continuous, and systematic course of business' that was once thought to suffice"); *Shrum v. Big Lots Stores, Inc.*, No. 3:14-CV-03135-CSB-DGB, 2014 WL 6888446, at *7 (C.D. Ill. Dec. 8, 2014) (allegations of substantial business insufficient to confer general jurisdiction); *Denton v. Air & Liquid Sys. Corps.*, No. 13-CV-1243-SMY-DGW, 2015 WL 682158, at *2 (S.D. Ill. Feb. 17, 2015) ("DuPont undoubtedly has several facilities in Illinois; however, the Supreme Court has made it clear that the mere presence of a defendant in the forum does not subject it to all-purpose jurisdiction in that forum." (citing *Daimler*, 134 S. Ct. at 752, 762)).

[30]    *See also, e.g.*, *Shrum*, 2014 WL 6888446, at *7 ("[T]his court must assess the entirety of [defendant's] activities—not just the magnitude of its contacts with Illinois—in determining general jurisdiction.").

¶ 13.  They have four offices and approximately 197 employees in Illinois, while overall they have at least 70 offices and approximately 3,952 employees.  *Id.*  These minor contacts are insufficient to make them "at home" in Illinois.  It follows *a fortiori* that Plaintiffs cannot manufacture general jurisdiction over the foreign Syngenta entities by attributing the contacts of the U.S. entities to the Swiss parent, Syngenta AG, under an agency or alter ego theory.[31]  Even assuming attribution of contacts, the combined Illinois sales of the subsidiaries from 2011-2014 amounted to only about 2.24% of Syngenta AG's worldwide sales.  Quain Decl. ¶¶ 10, 13.[32]

The fact that Syngenta Crop Protection, LLC and Syngenta Seeds, LLC are registered to do business in Illinois, *see* Quain Decl. ¶ 13, is not enough for general jurisdiction.  Illinois' business registration statute "does *not* contain a provision with jurisdictional consent language" and has not been interpreted as requiring consent to general jurisdiction.  Order, ECF No. 118, *Surita v. AM Gen. LLC*, No. 1:15-cv-07164, slip op. at 6 & n.1 (N.D. Ill. Nov. 4, 2015) (attached as Ex. G).  Courts have thus held that a foreign corporation is not subject to general jurisdiction in Illinois simply "because it is registered to do business in Illinois [and] maintains a registered agent for service of process in the state."  *Sullivan v. Sony Music Entm't*, No. 14 CV 731, 2014 WL 5473142, at *3 (N.D. Ill. Oct. 29, 2014); *Surita*, slip op. at 5 (Ex. G); *see also Wilson v. Humphreys (Cayman) Ltd.*, 916 F.2d 1239, 1245 (7th Cir. 1990) (registering to do business "cannot satisfy . . . standing alone . . . the demands of due process" for general jurisdiction).[33]

---

[31]  Plaintiffs have not even alleged an alter ego theory, and they have not made any factual allegations to support a plausible inference of an agency relationship.  *See, e.g.*, CAC ¶ 6 (conclusorily alleging agency).  An agency theory also fails as a matter of law, because it cannot be used for *general* jurisdiction.  *Daimler*, 134 S. Ct. at 759 & n.13.

[32]  *See, e.g.*, *Daimler*, 134 S. Ct. at 752, 761-62 (no general jurisdiction on assumption that subsidiary's contacts could be attributed to parent where subsidiary's sales amounted to only 2.4% of parent's worldwide sales).

[33]  The MDL Court recently held that by registering to do business in Kansas, two Syngenta entities consented to general personal jurisdiction there.  *See* Mar. 11, 2016 Mem., Dkt. 1679, *In re Syngenta AG MIR 162 Corn Litig.*, No. 2:14-md-2591-JWL-JPO (D. Kan. 2016).  That holding was premised on the Kansas registration statute's requirement that out-of-state corporations execute a consent to service of process that the Kansas Supreme Court has construed as consent to general personal jurisdiction.  *Id.* at 3 (relying on *Merriman v. Crompton Corp.*, 282 Kan. 433, 443-45 (2006)).  That reasoning is inapplicable here, because Illinois has not placed a similar construction on its registration statute.  Moreover, the consent-by-registration theory of general jurisdiction is constitutionally

**B.     Syngenta Defendants Are Not Subject To Specific Personal Jurisdiction In Illinois For Non-Illinois Claims Brought By Non-Illinois Plaintiffs.**

**1.     *Claims By Non-Illinois Plaintiffs Allegedly Injured Outside Illinois Do Not Arise From Syngenta Defendants' Contacts With Illinois.***

Specific jurisdiction is lacking because the Non-Illinois Plaintiffs' claims do not "arise from" any contacts of Syngenta Defendants with Illinois.[34]  The "arising from" test "requires that the plaintiff's cause of action relate to the defendant's contacts with the forum."  *KM Enters., Inc. v. Glob. Traffic Techs., Inc.*, 725 F.3d 718, 732-33 (7th Cir. 2013).  The Seventh Circuit has rejected "but-for" causation as "vastly overinclusive" in assessing whether claims arise from forum contacts.  *uBID, Inc. v. GoDaddy Grp., Inc.*, 623 F.3d 421, 430 (7th Cir. 2010).  Instead, "[t]he causal connection can be somewhat looser than the tort concept of proximate causation, but it must nonetheless be intimate enough to keep the quid pro quo proportional and personal jurisdiction reasonably foreseeable."  *Tamburo v. Dworkin*, 601 F.3d 693, 709 (7th Cir. 2010).[35]

Here, even under the over-inclusive but-for test, Non-Illinois Plaintiffs' claims do not arise from Syngenta's contacts with Illinois because Syngenta's forum contacts are not part of the causal chain leading to the alleged injuries—that is, it cannot be said that the injuries would not have happened "but for" Syngenta's activities in Illinois.  *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1078 (10th Cir. 2008).  The complaints allege merely that Syngenta Seeds[36] sold and promoted products, used seed advisors, maintained facilities, and had

---

infirm.  *See Brown v Lockheed Martin Corp.*, 814 F.3d 619, 636-40 (2d Cir. 2016); *Pub. Impact, LLC v. Bos. Consulting Grp., Inc.*, 117 F. Supp. 3d 732, 739 (M.D.N.C. 2015).  A registration statute purporting to require consent to general jurisdiction as a condition for doing business in a State would violate (i) the unconstitutional conditions doctrine, *cf. S. Pac. Corp. v. Denton*, 146 U.S. 202 (1892), and (ii) the Dormant Commerce Clause.  *See Genuine Parts Co. v. Cepec*, No. 528, 2015, slip op. (Del. Apr. 18, 2016) (reaching this conclusion).

[34]     Even if the Court were to hold that Plaintiffs' alleged injuries arose in their States of residence (not where they farm), the injuries still would not arise out of any Syngenta contacts with *Illinois*.  Almost all Non-Illinois Plaintiffs have alleged that they *both* reside *and* farm outside Illinois.  Only twelve Non-Illinois Plaintiffs allege that they *reside* in Illinois, but farm elsewhere, CAC ¶¶ 155, 173, 199, 203, 206, 1498-1502.

[35]     The Seventh Circuit holds that "personal jurisdiction can be conceptualized as a quid pro quo by which the defendant submits to the forum's jurisdiction in exchange for the benefit of its laws."  *Tamburo*, 601 F.3d at 708-09.

[36]     Syngenta Seeds is the only Syngenta entity that sold Viptera or Duracade in the U.S.  *See* Quain Decl. ¶ 16.

16

agents for service of process in Illinois.  *E.g.*, CAC ¶ 6.[37]  But they draw no connection to suggest how Non-Illinois Plaintiffs who purchased corn seed, planted seed, and grew, harvested, and sold corn all *outside* Illinois were somehow harmed by sales of Viptera *in* Illinois.  To the contrary, the complaint alleges that those acts were "directed by [Syngenta] to *farmers in Illinois*," CAC ¶ 6—not outside the State.  And bald assertions about contamination of "farmland, farming equipment, storage facilities, [and] harvesting equipment," *id.* ¶ 3153, all refer to alleged injuries on Plaintiffs' farms—not in Illinois.

Indeed, Non-Illinois Plaintiffs themselves allege that their causes of action did *not* arise in Illinois but instead "arose in the states where [the Plaintiffs] *reside*."  CAC ¶ 3031 (emphasis added).  As explained above, *see supra* p.12, any injury actually was incurred where Plaintiffs *farm*.[38]  But the point here is that Plaintiffs themselves *concede* that their injuries did *not* arise in Illinois or from conduct in Illinois.  In fact, it is obvious that Syngenta's actions in Illinois make no difference to the Non-Illinois Plaintiffs' claims, because they still would have filed their cases even if Viptera had never been sold in Illinois.[39]

### 2.    *Exercising Jurisdiction Over the Syngenta Defendants Would Offend Traditional Notions Of Fair Play And Substantial Justice.*

Exercising jurisdiction over Non-Illinois Plaintiffs' claims would also offend traditional notions of fair play and substantial justice.  The five factors in the analysis, *see, e.g.*, *Purdue Research Found.*, 338 F.3d at 781, all weigh against jurisdiction here.

*First*, jurisdiction would impose a significant burden on Syngenta by forcing thousands

---

[37]   Plaintiffs' additional allegation that Syngenta conducted some of its many field tests in Illinois, CAC ¶ 6, is irrelevant.  Plaintiffs do not allege that field tests in Illinois or anywhere else have anything to do with their claims, nor could they.  *Cf.* MDL Order 54 (agreeing that plaintiffs have not plausibly alleged "that each plaintiff's corn was contaminated specifically by Viptera corn grown by Syngenta").

[38]   Although the MDL Court held that any economic injuries were sustained in a plaintiff's home State, all plaintiffs in that case had alleged that they farmed and resided in the *same* State.  *See* MDL Order 7, 92.

[39]   *See, e.g., Fed. Rural Elec. Ins. Corp. v. Kootenai Elec. Co-op.*, 812 F. Supp. 1139, 1146 (D. Kan. 1993), *aff'd*, 17 F.3d 1302 (10th Cir. 1994) (claims did not "arise from" the sale of bonds in Kansas where "this case would still have been filed if bonds were never sold in Kansas, but in other states").

of claims into a forum that has nothing to do with those claims.  The Non-Illinois Plaintiffs are transparently attempting to avoid the federal MDL.  Had they filed where they suffered their injuries (where they farm), there would have been complete diversity in most cases, and the cases would have been removed and transferred to the MDL.  That process also would have preserved Syngenta's right to return to the original federal forum for trial, if necessary.  *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach,* 523 U.S. 26, 34 (1998) (citing 28 U.S.C. § 1407(a))**.**  Permitting plaintiffs to hand-pick a forum for thousands of cases from around the country would impair the Syngenta's interests in fair process.  It would also undermine the implicit quid pro quo underpinning the link between forum contacts and personal jurisdiction.  *Tamburo*, 601 F.3d at 709.  Nothing about Syngenta's limited conduct in Illinois justifies making Illinois an all-purpose forum for all claims about Viptera arising across the United States.

*Second*, Illinois has no interest in resolving claims arising under other States' laws brought by out-of-state plaintiffs based on out-of-state injuries allegedly caused by out-of-state defendants.  A State has an interest in providing a forum where its resident can seek redress and in applying its law.  *uBID, Inc.*, 623 F.3d at 432; *Tamburo*, 601 F.3d at 709.  Neither interest applies here.  By definition, for Non-Illinois Plaintiffs' claims, any alleged injury occurred on farms outside Illinois, and the law of the States where the farms are located applies, not Illinois law.  *See supra* p.12; *see also* MDL Order 7 (applying law of each plaintiff's home state).

*Third*, the Non-Illinois Plaintiffs can "obtain[] convenient and effective relief," *Purdue Research Found.*, 338 F.3d at 781, in another forum—the courts in the States where they farm.

*Fourth*, "judicial economy is served by adjudicating the case where the injury occurred, given the likely availability of evidence and witnesses."  *Kopfman v. Ensign Ribbon Burners, LLC*, 803 F. Supp. 2d 914, 919 (N.D. Ill. 2011); *accord Euromarket Designs, Inc. v. Crate & Barrel Ltd.*, 96 F. Supp. 2d 824, 840 (N.D. Ill. 2000).  Syngenta does not know of any personnel

in Illinois who would be relevant here, *see* Quain Decl. ¶ 17, and witnesses who can address Plaintiffs' alleged injuries will most likely be found where the farms are located.

*Fifth*, exercising jurisdiction would "affect[] the substantive social policy interests of other states," *OMI Holdings, Inc. v. Royal Ins. Co. of Can.*, 149 F.3d 1086, 1097 (10th Cir. 1998), because it will require applying other States' laws.[40] That concern particularly applies here, given the claims under consumer-protection statutes, because States have a strong interest in protecting consumers within their borders under such laws.[41]

Given that all of these factors weigh against jurisdiction, it would not be consistent with notions of fair play and substantial justice to exercise personal jurisdiction here.[42]

## II.    Plaintiffs' Claims Are Barred By The Economic Loss Doctrine.

Plaintiffs' unintentional tort claims[43] are foreclosed by the economic loss doctrine ("ELD"), which broadly provides that "solely economic losses are generally not recoverable in tort actions." *Chi. Flood*, 680 N.E.2d 265, 274 (Ill. 1997). "An actor has no general duty to avoid the unintentional infliction of economic loss on another." Restatement (Third) of Torts: Liab. for Econ. Harm § 1(a) (Tent. Draft No. 1 2012). That general rule reflects tort law's main function of protecting against physical "harm to person or property" and the fact that the duty to "refrain from acts unreasonably threatening *physical harm* is not paralleled by any comparable duty when the harm threatened is merely *economic*." *Daanen & Janssen, Inc. v. Cedarapids, Inc.*, 573 N.W.2d 842, 846, 847 (Wis. 1998) (emphases added).

Two strands of the doctrine are relevant. The "stranger" ELD applies between

---

[40]    *See Employers Mut. Cas. Co. v. Bartile Roofs, Inc.*, 618 F.3d 1153, 1164 (10th Cir. 2010); *Kohler Co. v. Kohler Int'l, Ltd.*, 196 F. Supp. 2d 690, 700 (N.D. Ill. 2002).

[41]    *See, e.g.*, *Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943, 946 (6th Cir. 2011) ("[T]he State with the strongest interest in regulating such conduct is the State where the consumers . . . are harmed by it.").

[42]    If the Court concludes (1) that Non-Illinois Plaintiffs' claims arise from the Illinois contacts of Syngenta Seeds and Syngenta Crop Protection and (2) that jurisdiction is consistent with notions of fair play and substantial justice, the Syngenta Defendants will not contest specific personal jurisdiction over the remaining Syngenta Defendants.

[43]    The ELD bars claims for negligence, nuisance, products liability, and strict liability (ultrahazardous activity).

contractual strangers—like the Plaintiff corn growers and Syngenta.  The "contractual" ELD applies to parties connected by contract, particularly those in the chain of distribution for a product.  Plaintiffs nowhere allege that they purchased Syngenta's products.  Nevertheless, given assertions that they somehow "relied" on statements concerning Viptera, Syngenta addresses claims based on the view that some Plaintiffs may assert that they purchased Viptera or Duracade.  Those Plaintiffs are in the classic position of purchasers of a product that has disappointed their commercial expectations, and their claims are barred by the contractual ELD.

A.    **Plaintiffs' Claims Are Barred By The Stranger ELD.**

1.    *The Stranger ELD Is The Majority Rule.*

The stranger rule is the historical core of the ELD.  "For well over a century it has been a settled feature of American and English tort law that in a variety of situations there is no recovery in negligence for pure economic loss," *Annett Holdings, Inc. v. Kum & Go, L.C.*, 801 N.W.2d 499, 503 (Iowa 2011)—known as the stranger ELD.  Under American law, the rule can be traced to *Anthony v. Slaid*, 52 Mass. 290 (1846), and the most-cited seminal decision is Justice Holmes' opinion in *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303 (1927).  There, a ship charterer sued in negligence when a dry dock damaged the ship during repairs and thus delayed the ship's return to service.  The plaintiff and defendant had no contractual relationship because the ship's owner had contracted for the repairs.  The Supreme Court held that because the charterer sought solely economic damage (for loss of the use of the ship) and did not allege any physical injury to its own property, no negligence claim would lie.  *Id.* at 309-10; *see also State of La. ex rel. Guste v. M/V TESTBANK*, 752 F.2d 1019, 1023 (5th Cir. 1985) (en banc).

The stranger ELD is followed by the "majority of jurisdictions" in the U.S.  *Aguilar v. RP MRP Wash. Harbour, LLC*, 98 A.3d 979, 982 (D.C. 2014); *see also Aikens v. Debow*, 541 S.E.2d 576, 583, 587 (W. Va. 2000) (American jurisdictions have followed *Robins Dry Dock* "almost

without exception").  "The economic loss rule, as a general proposition, is the prevailing rule in America, and is supported by the vast majority of commentators and cases."  *Chi. Flood*, 680 N.E.2d at 274.  Only three States not at issue here have rejected the rule, and those decisions "have garnered almost no lasting support outside their home states."  Dan B. Dobbs *et al.*, *The Law of Torts* (2d ed. 2011) ("Dobbs") §§ 647, 655; *see also* Restatement (Third) of Torts: Liab. for Econ. Harm § 7 (Tent. Draft No. 2 2014) (Reporter's Note) ("Contrary positions have been taken only occasionally in the case law.").

The stranger ELD applies in a variety of situations where the defendant's negligence has disrupted the plaintiff's ability to carry on business, including where the defendant has, for example, injured plaintiff's employee[44] or where the defendant has damaged a common resource, such as a bridge or wharf, disrupting business for many others.[45]  Absent physical injury to their own property, "claimants are barred from recovering lost profits or lost wages due to the negligent interruption of commerce caused by a third-party."  *Aguilar*, 98 A.3d at 982-83.

Multiple policies underpin the doctrine.  As the *Chicago Flood* decision explained, "[o]ne of the policies behind the economic loss rule is the recognition that the economic consequences of any single accident are virtually limitless."  680 N.E.2d at 274.  Unlike physical injuries, "economic reverberations travel quickly and widely, resulting in potentially limitless liability. *Annett*, 801 N.W.2d at 504; *see also Barber Lines A/S v. M/V Donau Maru*, 764 F.2d 50, 54 (1st Cir. 1985) (same); *see also Moorman Mfg. Co. v. Nat'l Tank Co.*, 435 N.E.2d 443, 448 (Ill.

---

[44]   *See, e.g.*, *Gosch v. Juelfs*, 701 N.W.2d 90, 91 (Iowa 2005) (defendant injured plaintiff's employee); *Anderson Plasterers v. Meinecke*, 543 N.W.2d 612, 613 (Iowa 1996) (same); *Annett*, 801 N.W.2d at 504 (explaining that *Anderson Plasterers* is a "stranger economic loss rule" case); *see also Conn. Mut. Life Ins. Co. v. N.Y. & N.H. R.R. Co.*, 25 Conn. 265 (1856) (denying recovery for economic loss where defendant had injured plaintiff's insured); Dobbs § 647 (collecting similar cases)

[45]   *See, e.g.*, *Neb. Innkeepers, Inc. v. Pittsburgh-Des Moines Corp.*, 345 N.W.2d 124 (Iowa 1984) (damage and closure of bridge reduced access to plaintiffs' businesses); *Barber Lines A/S v. M/V Donau Maru*, 764 F.2d 50, 50-51 (1st Cir. 1985) (Breyer, J.) (oil spill closed wharf to other shipping traffic); *Byrd v. English*, 43 S.E. 419 (Ga. 1903) (negligent severing of power line shut down printing business); *Stevenson v. E. Ohio Gas Co.*, 73 N.E.2d 200 (Ohio Ct. App. 1946) (damage closed factory so workers could not earn wages).

1982) (permitting liability for purely economic losses in tort could make a defendant "liable for damages of unknown and unlimited scope").  Thus, financial harm that could "prove[] vast, cumulative and inherently unknowable in amount, could create incentives that are perverse," deterring worthwhile activity.  *Barber Lines*, 764 F.2d at 55.  In other words, "[i]f defendants were held liable for every economic effect of their negligence, they would face virtually uninsurable risks far out of proportion to their culpability, and far greater than is necessary to encourage potential tort defendants to exercise care in their endeavors.  The economic loss rule avoids the consequences of open-ended tort liability."  *Chi. Flood*, 680 N.E.2d at 274.

The rule also reflects the view that, while tort law protects against physical harm, economic losses are better addressed through contract law—including through insurance or through contracts guaranteeing access to business inputs.  *Barber Lines*, 764 F.2d at 54; *see also Annett*, 801 N.W.2d at 504 (the stranger ELD "encourages parties to enter into contracts").  The Restatement, for example, explains that the stranger ELD is "justified by several considerations," one of which is that "contractual lines of protection against economic loss"—including "first-party insurance"—are "considered preferable to judicial assignments of liability in tort." Restatement (Third) of Torts: Liab. for Econ. Harm § 7 cmt. b.[46]  The stranger ELD thus "encourages the party with the best information (that is, the party with knowledge of its own risk of loss) to decide whether to assume, allocate, avoid, or insure against its risk of loss."  *Wiltz v. Bayer CropScience, L.P.*, 645 F.3d 690, 697 (5th Cir. 2011).

Multiple courts and the Restatement have explained that a central purpose of the stranger ELD is to set a bright-line rule foreclosing recovery of economic losses absent physical injury

---

[46]   *See also, e.g.*, *Mars, Inc. v. Heritage Builders of Effingham, Inc.*, 763 N.E.2d 428, 434 (Ill. App. Ct. 2002) (noting that the "policy" behind the ELD "stems from the theory that tort law affords a remedy for losses occasioned by personal injuries or damage to one's property, but contract law and the Uniform Commercial Code . . . offer the appropriate remedy for economic losses occasioned by diminished commercial expectations").

and thereby eliminate the need for a case-by-case assessment of factors such as foreseeability to cut off liability for economic losses. In *Barber Lines,* then-Judge Breyer explained that the rationales for the ELD "are highly general and abstract," 764 F.2d at 53, and that, even though they are "unlikely to apply with equal strength to every sort of 'financial harm' claim," nevertheless, "*courts cannot weigh or apply them case by case,*" *id.* at 55 (emphasis added). Case-by-case application of concepts like foreseeability, for example, can be problematic because economic ripple effects are often foreseeable.[47] Using foreseeability to cut off liability would inevitably distort the concept of foreseeability itself. *Id.* at 54. *Barber Lines* also made clear that the policies behind the ELD derive force based on *cumulative effects* across cases and that part of the ELD's purpose is to avoid distortions that would result if courts used case-specific line drawing "to separate the financially injured allowed to sue from the financially injured not allowed to sue." *Id.*

Similarly, in *M/V TESTBANK*, the Fifth Circuit explained that the ELD applies a "bright-line rule," 752 F.2d at 1029, and rejected calls from the dissent for a "case-by-case approach," *id.* at 1026, to applying the doctrine. A case-specific analysis for deciding who could recover economic losses would prove "arbitrary" and "much less the product[] of a determinable rule of law" than adhering to a bright line. *Id.* at 1028-29; *accord Am. Petrol. & Transp., Inc. v. N.Y.C.*, 737 F.3d 185, 196-97 (2d Cir. 2013) (even where economic injury was "surely foreseeable" and limited such that recovery would *not* create "unbounded exposure," the court nevertheless barred recovery due to the "benefits of adhering to the general rule"); *Getty Refining & Mktg. Co. v. MT FADI B*, 766 F.2d 829, 832-33 (3d Cir. 1985) (similarly rejecting a case-by-case approach).

The Restatement (Third) similarly explains that even though the rationales behind the

---

[47]    *Barber Lines*, 764 F.2d at 54 (explaining that an oil spill "foreseeably harms not only ships, docks, piers, beaches, wildlife, and the like, that are covered with oil, but also harms blockaded ships, marina merchants, suppliers of those firms, the employees of marina businesses and suppliers, the suppliers' suppliers, and so forth").

ELD "do not apply equally to every claim," "most courts *reject such claims categorically*." Restatement (Third) of Torts: Liab. for Econ. Harm § 7 cmt. b (emphasis added). The majority rule is that "distinctions allowing some plaintiffs to recover but not others, based on a case-by-case inquiry into the policies at issue, cannot be made in a sufficiently principled manner." *Id.*

There are defined exceptions to the ELD. It does not bar claims for intentional torts, such as fraud. *See* Dobbs § 606; *see also 1324 W. Pratt Condo. Ass'n v. Platt Const. Grp., Inc.*, 936 N.E.2d 1093, 1100 (Ill. App. Ct. 2010). Many States, including Illinois, also hold that the ELD does not apply to negligent misrepresentation, which allows recovery for economic loss where a professional (*e.g.*, an accountant) has been negligent in providing information intended to be relied upon by a known, limited group of third parties.[48] Most States also hold that it does not bar malpractice claims against certain professionals. *See, e.g.*, *Collins v. Reynard*, 607 N.E.2d 1185, 1187 (Ill. 1992); *Annett*, 801 N.W.2d at 504; *Barber Lines*, 764 F.2d at 56.

### 2. The Stranger ELD Bars Plaintiffs' Claims.

Plaintiffs' claims are barred by the stranger ELD. The essence of their claim is that the distribution and exporting facilities for commodity corn were affected by the pervasive presence of Viptera, making it impossible to export U.S. corn to China. *See, e.g.*, CAC ¶ 3184 (complaining of "contamination of the U.S. *corn supply*") (emphasis added). They claim solely economic loss in the form of lower corn prices. Conceptually, those claims are indistinguishable from claims that access to some other shared resource (a bridge, a wharf, etc.) was disrupted. They seek exactly what is barred by the stranger ELD: "lost profits . . . due to the negligent interruption of commerce caused by a third-party." *Aguilar*, 98 A.3d at 982-83.

Until the Viptera litigation, only one American case addressed parallel claims alleging

---

[48] *See generally First Midwest Bank, N.A. v. Stewart Title Guar. Co.*, 843 N.E.2d 327, 334-35 (Ill. 2006) (discussing negligent misrepresentation exception to ELD); *Van Sickle Constr. Co. v. Wachovia Comm. Mort., Inc.*, 783 N.W.2d 684, 690-91 (Iowa 2010) (same).

24

"contamination" of crops with a U.S.-approved GM trait, and that case applied the ELD under Illinois and Iowa law to bar farmers' tort claims. *See Sample v. Monsanto Co.*, 283 F. Supp. 2d 1088 (E.D. Mo. 2003). *Sample* involved GM corn and soybeans that, like Viptera, were fully U.S. approved. The plaintiffs abandoned allegations that their own crops were damaged by cross-pollination or commingling to avoid individual issues dooming a class. *See id.* at 1091. Instead, they argued—like Plaintiffs here—that "non-GM farmers lost revenue because the European community rejected Monsanto's genetically modified products and boycotted all American corn and soy." *Id.* Applying Illinois and Iowa law, the court held that "the economic loss doctrine preclude[d] recovery" because the farmers did not allege "physical 'contamination' or injury to their property." *Id*. at 1093. Likewise, *see infra* p.36, the Illinois Supreme Court in *Beretta U.S.A* applied the stranger ELD to bar parallel claims alleging that a manufacturer's negligent sale of a safe, non-defective product caused economic losses. 821 N.E.2d at 1143.

Because Plaintiffs here assert the same theory of market-wide price effects from a foreign boycott (not physical injury to *their* corn), *see infra* Part II.A.3, the analysis from *Sample* and *Beretta* applies and Plaintiffs' claims are barred by the ELD.

This case also highlights the policies behind the ELD. In particular, it shows how alleged economic effects can expand virtually without limit. If farmers could bring claims for economic losses based on an alleged drop in the price of corn, then anyone allegedly affected by the price of the largest commodity crop in the U.S.—such as landowners wanting to sell farm land[49] or farm equipment dealers[50]—could assert some "inter-connectivity" between their economic

---

[49]    *See, e.g.*, Corilyn Shropshire, *Falling Soybean, Corn Prices Hurt Farmland Values*, Chicago Tribune (Feb. 12, 2015),      http://www.chicagotribune.com/business/breaking/ct-farmland-prices-0213-biz-20150212-story.html ("[F]armland values fell 3 percent in 2014, due in large part to the drop in soybean and corn prices[.]").

[50]    *See, e.g.*, Abby Wendle, *Pain From The Grain: Corn Belt Towns Languish As Prices Drop*, NPR (Mar. 18, 2015), http://www.npr.org/sections/thesalt/2015/03/18/393841311/pain-from-the-grain-corn-belt-towns-languish-as-prices-drop ("When corn prices peaked, Hofreiter sold close to $11 million worth of shiny blue tractors in a single year. He says he doesn't expect to crack $3 million in 2015.").

interests and the price of corn and turn Syngenta and other GM manufacturers "into insurers with seemingly unlimited tort liability." *Daanen*, 573 N.W.2d at 850. Indeed, the Viptera litigation provides a case study showing why the ELD exists. Viptera litigation has *already* spawned claims by layers of plaintiffs asserting ripple effects from the alleged drop in the price of corn. The plaintiffs in more than 2,600 cases in Minnesota include both growers of milo—who claim that the price of milo is pegged to the price of corn—and growers of soybeans—who claim that corn is a substitute for soybeans and that lower corn prices reduce demand for soybeans. *See* First Am. Non-Class Compl. ¶¶ 298-99, *In re: Syngenta Litig.*, No. 27-CV-15-3785 (4th Jud. Dist. Ct. of Hennepin Cty., Minn. filed Nov. 5, 2015). Soybean farmers almost *double* the size of the plaintiff pool, expanding it to more than 650,000 farmers.[51] And within the past few months, the pool expanded yet again as ethanol producers began suing Syngenta.[52] As such claims show, the inherent problem with permitting *any* claims for purely economic loss is that "[t]he chain of events leading to economic losses is only limited by one's imagination," and as a result "permitting recovery for purely economic loss . . . could expand the potential pool of plaintiffs beyond reason." *Long Motor Corp. v. SM&P Util. Res., Inc.*, 214 P.3d 707, No. 100,336, 2009 WL 2595932, at *2-3 (Kan. Ct. App. Aug. 21, 2009).

### 3. Plaintiffs Cannot Avoid The ELD By Claiming Physical Injury.

Plaintiffs cannot sidestep the ELD by arguing that they have alleged physical injury.

*First*, the complaints do not even allege that each Plaintiff had his corn, while it was his property, mixed with or cross-pollinated by Viptera corn. Instead, the complaints make vague

---

[51]    *See*    2007    USDA    Census    of    Agriculture    2 http://www.nass.usda.gov/Statistics_by_State/Oklahoma/Publications/Media_Resources/Soybean_Factsheet.pdf (number of soybean farmers); USDA Background on Soybeans & Oil Crops, http://www.ers.usda.gov/topics/crops/soybeans-oil-crops/background.aspx (soybeans are second most planted crop).

[52]    *See TCE, LLC d/b/a Poet Biorefining-Coon Rapids*, No. EQCV039491 (Carroll Cty. Dist. Ct., Iowa served Mar. 8, 2016); *Ultimate Ethanol, LLC d/b/a Poet Biorefining-Alexandria v. Syngenta Seeds, Inc.*, No. 48C05-1512-CI-184 (Madison Cty. Cir. Ct., Ind. filed Dec. 11, 2015); *Fostoria Ethanol, LLC d/b/a Poet Biorefining-Fostoria*, No. 15-CV-323 (Seneca Cty. Ct. of Comm. Pleas, Ohio filed Dec. 11, 2015).

assertions about "contamination of the entire U.S. corn supply."  CAC ¶ 3032; *see also id.* ¶¶ 3056(a), 3091.  That is not the same as an allegation that each Plaintiff experienced some effect on *his* corn on *his* farm.[53]  Indeed, Plaintiffs say even less to suggest injury to property than the allegations in the Federal MDL.  The MDL complaint alleged "pervasive contamination of the U.S. corn supply, including fields, grain elevators and other facilities of storage and transport, causing physical harm to plaintiffs' corn, harvested corn, equipment, storage facilities, and land."  Producers' Am. Compl. ¶ 319, *In re Syngenta AG MIR162 Corn Litig.*, No. 2:14-md-2591 (D. Kan. May 29, 2015).  And the MDL Court held that even those allegations *failed* to assert physical injury to each plaintiff's property.  *See* MDL Order 19-20.[54]

*Second*, allegations of physical harm are irrelevant in any event because Plaintiffs' theory of injury does not depend on harm to *their* corn.  Their theory is that Viptera in the U.S. corn supply and China's actions reduced the price for *all* U.S. corn—even corn that might be Viptera-free.  *E.g.*, CAC ¶ 3243(c) (alleging that loss of the Chinese export market "caused a drop in the price for *all* U.S. corn").  As the MDL Court held, because the alleged damages "are not derived from the physical harm alleged," physical harm is no basis for evading the ELD.  MDL Order 20.

*Third*, to the extent Plaintiffs point to commingling of corn in grain elevators and storage facilities *after* they had sold their corn, they offer no factual allegations whatsoever establishing that they still had a property interest in the corn after it had been sold.

*Fourth*, even if Plaintiffs had alleged that Viptera cross-pollinated or commingled with *their* corn, that would not qualify as *damage* to their property because Viptera was fully

---

[53]   Plaintiffs refrained from making such an allegation for good reason.  They know that cross pollination or commingling did not happen on every Plaintiff's farm, and they know that they cannot prove that it happened.

[54]   The conclusory assertion that Plaintiffs "sustained damage to their farmland and entire farming operation," CAC ¶ 3034, unsupported by any factual allegations, is not sufficient to salvage a claim of physical injury.  *See, e.g.*, *Chi. Flood*, 680 N.E.2d at 276 ("[P]laintiffs must plead facts identifying the type of property damage that they incurred.  The conclusory allegation of unspecified property damage is insufficient . . . and cannot withstand a motion to dismiss.").  It is no more specific than the vague assertions that failed in the federal MDL.

approved in the U.S.  Viptera corn could be sold at the same price as all other fungible corn.

Plaintiffs' only complaint is that they hypothetically could have secured a higher price if there

had been no Viptera.  That is the paradigm of economic loss, not physical injury.  As *Sample*

held in identical circumstances, there was "no evidence to demonstrate that the physical injury

requirement would be met *even if* GM seeds were 'commingled' with non-GM seeds" precisely

because commingling did not render the crop unfit for human consumption.  283 F. Supp. 2d at

1093 & n.2 (emphasis added).  *Hoffman* similarly held that, where a GM seed has been approved

for human consumption, "the alleged damage [from commingling] is not of physical harm . . . ,

but arises from the alleged inability to meet the requirements of organic certifiers or of foreign

markets."  *Hoffman I*, 2005 SK.C. LEXIS 330 ¶ 72 (Ex. A), *aff'd*, *Hoffman II*, 2007 SK.C.

LEXIS 194 (Ex. B).  The "harm" of receiving a different price does not suffice to avoid the ELD.

Indeed, the USDA's decision deregulating a GM trait like Viptera is itself a

determination that the trait "cross-pollinat[ing] with and alter[ing] the genetic structure of other

plants . . . [is not] a plant pest harm" because it does "not constitute physical damage or injury to

other plants."  *Center for Food Safety v. Vilsack*, 718 F.3d 829, 840 (9th Cir. 2013); *cf. id.* at 835

(explaining that USDA regulates "organisms that cause physical harm to plants through injury,

damage, or disease"); *see also* 7 U.S.C. § 7702(14); 7 C.F.R. § 340.1.  In approving Viptera, the

USDA concluded that Viptera did not pose a risk of physical harm.  *See also Center for Food

Safety*, 718 F.3d at 841 (economic losses due to cross-pollination of GM crops with non-GM

crops "are not the result of plant pest harms" because they are not the result of physical injury).

Cases analyzing the ELD in the context of *unapproved* GM traits are irrelevant.[55]  As

*StarLink* explained, crops are "damaged when they are pollinated" by corn with an unapproved

trait (like StarLink) because it "renders what would otherwise be a valuable food crop unfit for

---

[55]   *Bayer CropScience LP v. Schafer*, 385 S.W.3d 822, 833 (Ark. 2011); *In re GM Rice*, 666 F. Supp. 2d at 1013.

human consumption." 212 F. Supp. 2d 828, 841 (N.D. Ill. 2002). As the court explained, such physical injury is the *sine qua non* for avoiding the ELD: "*Absent a physical injury*, plaintiffs cannot recover for drops in market prices." *Id.* at 842 (emphasis added). The fact that rendering crops unfit for human consumption may constitute physical "harm" says nothing about the situation here, in which MIR162 was fully approved. In fact, *Sample* distinguished *StarLink* on exactly that basis, *see* 283 F. Supp. 2d at 1093 n.2, and the trial court in the Minnesota Viptera litigation similarly recognized that cases involving *unapproved* GM traits have "a significant distinguishing factor" that makes them inapplicable here, Minn. MTD Order 21. Indeed, there is not a *single case* holding that an *approved* GM trait somehow "damages" a crop sufficiently to avoid the ELD. The only cases addressing the issue (*Sample* and *Hoffman*) say the opposite.

### 4. The Law Does Not Support The MDL Court's Analysis of The ELD.

The MDL Court's analysis of the ELD suffers from numerous fatal flaws.

#### a. The MDL Court Mistakenly Applied A Case-By-Case Policy Analysis To Permit Recovery Of Economic Losses.

*First*, the MDL Court disregarded settled law holding that the ELD provides a bright-line rule and does *not* use a case-by-case policy assessment for determining whether economic losses can be recovered in tort. The court adopted a "case-specific approach," MDL Order 25, to assess whether "the rationales supporting the [doctrine] would necessarily be furthered by application" in a given case, *id.* at 24; *see also id.* at 24 n.10 (States would apply the ELD "only . . . when the doctrine's purposes would be served"). Thus, the MDL Order held that, because the plaintiffs constituted "discrete classes" in an "inter-connected market" whose losses were "actually fores[een]," allowing their claims would not give rise to "completely open-ended" liability. *Id.* at 24. That approach is flatly counter to the majority rule, under which courts hold that "distinctions allowing some plaintiffs to recover but not others, based on a case-by-case inquiry

into the policies at issue, cannot be made in a sufficiently principled manner."   Restatement (Third) of Torts: Liab. for Econ. Harm § 7 cmt. b; *see also supra* pp.22-24.

Indeed, the MDL Court's approach is functionally indistinguishable from the *minority* approach that rejects applying the ELD as a bright-line rule.   Three jurisdictions use an "analysis of *underlying policies* to determine whether a particular defendant may be liable for a plaintiff's economic losses."   *People Expr. Airlines*, 495 A.2d at 111 (emphasis added).   Such jurisdictions permit recovery in tort for economic losses where there is "[a]n identifiable class of plaintiffs" that is "particularly foreseeable."   *Id.* at 116.   But that is functionally the *same* analysis that the MDL Court applied.   The MDL Court's focus on "inter-connected relationships," MDL Order 23, defining a "discrete" plaintiff group and "actually foreseen" harm, *id.* at 24, is simply another way of applying the *minority*-approach focus on "[a]n identifiable class of plaintiffs" that is "particularly foreseeable in terms of the type of persons or entities comprising" the group "as well as the type of economic expectations disrupted."   *People Express Airlines, Inc. v. Consol. Rail Corp.,* 495 A.2d 107, 116 (N.J. 1985).

Tellingly, moreover, the MDL Order does not cite a *single decision* using a similar "case-specific approach" to apply the ELD.   *StarLink* provides no support.   *StarLink* held that the ELD did not apply because the plaintiffs had alleged *physical injury* from an *unapproved* GM trait.   212 F. Supp. 2d at 841-43.   The *StarLink* court noted the "finite number of potential plaintiffs," *id.* at 842, only as additional support for a holding based on physical injury.   As the court put it: "Absent a physical injury, plaintiffs cannot recover for drops in market prices."   *Id.*

The MDL Order dismisses the majority bright-line rule in a footnote with the observation that there are exceptions to the ELD and that each one must have been adopted in a first case. *See* MDL Order 23 n.10.   The problem with that assertion is that the MDL Court's new exception is *different in kind* from existing ones.   Existing exceptions apply to "broad categories

30

of cases," *Barber Lines*, 764 F.2d at 56, usually defined by a type of legal claim (*e.g.*, intentional torts, negligent misrepresentation, malpractice claims against professionals).  Here, by contrast, the new exception rests on a *factual* circumstance in which the interrelatedness of the industry supposedly (i) limits plaintiffs to a "discrete" group (still numbering in the hundreds of thousands) and (ii) makes economic losses particularly "foreseeable and foreseen."  MDL Order 24-25.  The whole point of the majority rule set out in *Barber Lines*, *M/V TESTBANK*, and the Restatement, however, is to foreclose exactly such case-specific assessments based on foreseeability and whether the policies behind the doctrine apply in a particular case.

The MDL Court's focus on "inter-connectedness" also exposes exactly the problems with line-drawing that the majority rule avoids.  Simply put, this new "inter-connected industry" exception supplies no clear rule of decision.  The grain industry does not have greater "inter-connected relationships" than many others.  In the maritime industry, for example, vessels operating in a confined waterway depend on one another for continued operations.  It is readily foreseeable that one vessel's negligence will cause economic losses to others, and the scope of potential plaintiffs is, as here, limited to "discrete classes."  MDL Order 24; *cf. M/V TESTBANK*, 752 F.2d at 1049 (Wisdom, J., dissenting) (noting the "great interdependence of the elements in the maritime industry").  Nevertheless, the ELD consistently applies. S*ee, e.g.*, *Am. Petrol. & Transp.,* 737 F.3d at 196 (applying the ELD); *Barber Lines*, 764 F.2d at 55 (same).  As that example shows, the MDL Court's new test provides no clear principle.  Applying it would embroil courts in endless fact-based inquiries into whether industry A is more "inter-connected" than industry B, or whether party X is sufficiently "interrelated" with party Y, with no legal rule to guide them, thus producing "arbitrary" results that are not "the product[] of a determinable rule of law"—exactly as the Fifth Circuit predicted.  *M/V TESTBANK*, 752 F.2d at 1028-29.

The Minnesota Viptera litigation highlights that problem, as the plaintiffs there even

include soybean farmers who allege that lower prices for corn made soybeans comparatively less popular for use as feed, and that Syngenta is liable as a result. Once a court adopts the MDL Court's radical analysis about interconnected relationships permitting claims for economic loss, the line distinguishing the "inter-connectedness" of corn and milo from the "inter-connectedness" of corn and soybeans (or corn and whatever other related market the next complaint raises) is not at all clear, and the line making that distinction certainly will not be based on a clear *legal* rule. Instead, it will be driven by exactly the exercise in *ad hoc*, fact-based line drawing that the Fifth Circuit and other courts have warned against.

> **b.    *The MDL Court Applied A Mistaken View Of The Policy Rationales Supporting The ELD.***

*Second*, the MDL Order rested on an overly narrow understanding of the policies behind the ELD. The MDL Order focused on preventing a risk of indeterminate liability and reasoned that this risk was primarily at issue in "access cases" or "public nuisance" cases in which "any member of the public could potentially assert a claim" thus producing "completely open-ended" liability. MDL Order 24. The court reasoned that the policies behind the ELD were not implicated in the Viptera suits because they were not "access" cases and involved a more "discrete" tranche of plaintiffs—albeit one numbering in the hundreds of thousands. *See id.* Every step in that analysis is contrary to precedent.

First, the ELD is not limited to cases involving an indeterminate number of first-tier plaintiffs. It applies where there is only *one* first-tier plaintiff, as in *Robins Dry Dock*. *See* 275 U.S. at 308-09; *see also supra* p.21 & note 44. The critical policy concern animating the doctrine is not simply the size of the *first* tier of plaintiffs. Instead, the doctrine is based on the inherent unpredictability of permitting *any* recovery of pure economic losses because such losses spread outwards indefinitely to second- and third-tier plaintiffs. For example, a charterer as in

*Robins Dry Dock* suffers economic losses because a damaged ship is unable to sail; as a result, a shipper suffers losses because his cargo is delayed; as a result, a shopkeeper expecting a shipment suffers losses, and so on. *See, e.g.*, *Barber Lines*, 764 F.2d at 54; *M/V TESTBANK*, 752 F.2d at 1028; Restatement (Third) of Torts: Liab. for Econ. Harm § 7 cmt. b. By focusing solely on the size of the initial tranche of plaintiffs, the MDL Court failed to consider the spreading ripple effect of economic losses.[56]

The MDL Court was also mistaken in describing access cases as cases in which "any member of the public could potentially assert a claim." MDL Order 24. *Barber Lines* was an access case involving blocked access to a pier. But the number of ships scheduled to dock at the pier was necessarily smaller than the more than 350,000 corn farmers who are potentially plaintiffs here (not to mention milo and soybean farmers). Similarly, "access" cases involving the closure of a factory or other workplace routinely involve much smaller groups of workers, but the ELD still applies. *See, e.g.*, *Aguilar*, 98 A.3d at 980 n.1; *United Textile Workers of Am. v. Lear Siegler Seating Corp.*, 825 S.W.2d 83, 84 (Tenn. Ct. App. 1990); *Stevenson v. E. Ohio Gas Co.*, 73 N.E.2d 200 (Ohio Ct. App. 1946).[57] As a result, the MDL Court reached the anomalous conclusion that there was no concern for expansive liability in this case even though the first-tier plaintiff group was actually *vastly larger* than in the typical access case.

The MDL Order also fails to consider additional policies behind the ELD, including encouraging the use of contracts to address economic risks. *See, e.g.*, *Barber Lines*, 764 F.2d at

---

[56] To the extent the MDL Order suggests that the "inter-connectedness" of the corn industry provides a natural breaking point to cut off liability, *cf.* MDL Order 14, that rationale cannot reconcile the court's approach with the ELD. Courts could always solve the problem of spreading economic effects by pointing to a factual distinction to arbitrarily cut off liability for economic losses. The point of the ELD is to avoid the need for such fact-based line-drawing and to replace it with a bright-line rule based on physical injury. *See supra* Part II.A.4.a.

[57] The MDL Court's approach is not supported by *StarLink*. While *StarLink* did suggest that "access" cases involve an "unbounded group of potential plaintiffs," *StarLink*, 212 F. Supp. 2d at 840, that generalization is mistaken and was based on a focus on cases involving *bridges*. *See id.* In addition, as explained above, physical injury was the critical factor permitting recovery in *StarLink*. *See id.* at 842; *see also supra* pp.28-30.

55; *Wiltz*, 645 F.3d at 696.  The stranger ELD is "justified by several considerations," including that "contractual lines of protection against economic loss" are "considered preferable to judicial assignments of liability in tort."  Restatement (Third) of Torts: Liab. for Econ. Harm § 7 cmt. b.  That rationale fully applies here.  Plaintiffs concerned about ensuring exportability for their corn could have contracted for guarantees from grain elevators to prohibit commingling of their crops.

> **c.      The MDL Order Does Not Acknowledge, Much Less Address, Directly Contrary Authority From Sample v. Monsanto.**

*Third*, the MDL Court ignored the only American case on all fours with this case. *Sample v. Monsanto* involved exactly parallel claims that an approved GM trait had caused economic losses by triggering the loss of an overseas market, and the court held such claims barred by the ELD under Illinois (and Iowa) law.  *See supra* pp.24-25.  The MDL Order does not discuss or distinguish that precedent,[58] and a decision failing to address the only American authority squarely on point cannot be credited as persuasive precedent.

> **d.      The MDL Order Mistakenly Relies On West Virginia's "Hybrid" "Special Relationship" Exception From The ELD.**

*Fourth*, the MDL Order erred by relying on *Aikens v. Debow*, 541 S.E.2d 576 (W. Va. 2000), to suggest that members of an "inter-connected" industry share a "special relationship" that defeats the ELD.  *See* MDL Order 23.  The relationships identified in *Aikens* all involved people with special expertise who provided information as part of their business and on which they intended others to rely.  *See* 541 S.E.2d at 591 (discussing auditors, surveyors, termite inspectors, engineers, architects, and lawyers).  In most States, parallel exceptions to the ELD are treated under the rubric of negligent misrepresentation and require meeting the elements for that tort, including that the defendant must provide the information as part of his business intending

---

[58]     The assertion that Syngenta had not cited any case in which a court considered and applied the ELD "despite the presence of inter-connected relationships and markets," MDL Order 23, is incorrect.  *Sample* was such a case.

that a known group of persons will rely on it.  *See supra* note 48; *see infra* Part VII.A; *see also* Restatement (Third) of Torts: Liab. for Econ. Harm §§ 5-6.  To the extent *Aikens* adopted a broader principle, it is not the majority approach.  To the contrary, *Aikens* itself described its "special relationship" test as a "hybrid."  541 S.E.2d at 590; *see also id.* at 590 (noting that "minority view" cases "reveal[] reasoning similar to ours"); *id.* at 592 (Starcher, J., concurring) (suggesting that *Aikens* took a "bold step forward" departing from majority rule).

### 5.     *All States Would Bar Plaintiffs' Claims Under The Stranger ELD.*

Although the stranger ELD is the majority rule, some States have never had occasion to address it.  *E.g., Aguilar*, 98 A.3d at 980, 982-85 (adopting stranger ELD as a matter of "first impression" in 2014).  The question is whether the States at issue would apply the stranger ELD, or whether existing state law shows that a State would *reject* the majority rule.  There is no basis for predicting that *any* relevant State would fail to bar Plaintiffs' claims under the stranger ELD. Just because a State's existing caselaw may address the ELD solely in the contractual context does not mean that a State would reject the majority-rule stranger ELD.  The MDL Order does not provide a persuasive rationale for a different result.  By predicting that *all* States would apply the ELD "only . . . when the doctrine's purposes would be served," MDL Order 24 n.10, the court predicted—without any basis—that *all* States would *reject* the majority rule.  This Court is barred from making a similar prediction by binding precedent.  Where state law is unclear, the Seventh Circuit **requires** this Court to choose the "interpretation of [State] law which reasonably restricts liability" and thus predict that the stranger ELD applies.  *Pisciotta*, 499 F.3d at 636.

### a.     *Sixteen States Have Adopted The Stranger ELD.*

**Illinois.**  The Illinois Supreme Court has expressly adopted the stranger ELD.  *In re Chicago Flood Litigation*, 680 N.E.2d 265 (Ill. 1997), involved classic claims under the stranger rule.  When a flood interrupted electrical service, numerous businesses brought claims for "lost

revenues, sales, profits and good will," *id.* at 268, all of which were held barred where they were not accompanied by physical injury to property, *see id.* at 274-75.   Moreover, *Sample v. Monsanto* squarely applied the stranger ELD under Illinois and Iowa law to bar claims identical to those in this case.   *See supra* pp.24-25.   And the Illinois Supreme Court has already applied the stranger ELD to bar parallel claims alleging that a manufacturer's negligent distribution of a safe, non-defective product caused economic losses.   *See Beretta U.S.A. Corp.*, 821 N.E.2d at 1143.   As the Illinois Supreme Court explained the ELD bars claims for "solely economic loss" to avoid the "open-ended tort liability" that would be inherent in the endless "economic consequences of any single accident."   *Id.*   Cases in which "a complete stranger" seeks economic losses involve even "more attenuated economic loss" than cases where the plaintiff and defendant were in a direct relationship, and thus such loss is "not . . . recoverable under Illinois law."   *Dundee Cement Co. v. Chem. Labs., Inc.*, 712 F.2d 1166, 1170 (7th Cir. 1983).

Contrary to the MDL Order, Illinois courts have expressly rejected the case-by-case approach adopted by minority jurisdictions such as New Jersey.   As the Illinois Supreme Court squarely held, "the foreseeability exception to the economic loss doctrine formulated by the New Jersey court in *People Express* **has not been widely adopted**," and was "***implicitly rejected***" by *In re Chicago Flood.   Beretta*, 821 N.E.2d at 1142 ("We are not persuaded to adopt [the New Jersey approach] now.") (emphasis added).

The other Illinois cases cited by the MDL Court also provide no support for applying a case-by-case policy assessment.   In *2314 Lincoln Park W. Condo. Ass'n v. Mann, Gin, Ebel & Frazier, Ltd.*, 555 N.E.2d 346, 352 (Ill. 1990), the *only* exceptions to the ELD the court recognized were for intentional misrepresentation, negligent misrepresentation, intentional interference with contract, and intentional interference with prospective business advantage. That list proves Syngenta's point: those well-established exceptions are all based on defined

legal categories of claims, three of which fall outside the ELD because they are *intentional* torts. In noting that the common principle underlying such exceptions was "that the defendant owes a duty in tort to prevent precisely the type of harm, economic or not, that occurred," *id.*, the court was merely acknowledging that there are some types of torts (fraud, negligent misrepresentation) that are designed to protect against economic losses and to which the ELD simply does not apply. Nothing in *2314 Lincoln Park* supports a case-by-case policy assessment for determining whether to permit recovery of pure economic losses in tort.

Similarly, in *Metropolitan Water Reclamation Dist. of Greater Chi. v. Terra Found. for Am. Art*, 13 N.E.3d 44, 59-60 (Ill. App. Ct. 2014), the court reasoned that the type of conduct before it—"*intentional* interference with an easement"—was "[s]imilar to the torts of *intentional* interference with a contract or with prospective business advantage" because it was an intentional tort involving interference with property rights. In pointing out that the "damages suffered by the [plaintiff] were the very damages the [defendant] *sought to inflict upon it*," the court was indicating that, in contrast to *Chicago Flood*, the case at bar involved an *intentional* tort and thus provided a basis for avoiding the ELD. *Id.* at 61 (emphasis added). Although the court did note that "[t]he considerations behind the economic loss doctrine articulated in *Moorman* are not present here," *id.*, that passing comment from an intermediate appellate court did not flip Illinois from a majority-rule State that applies the ELD as a bright-line rule to a *minority*-view State like New Jersey that applies a case-by-case policy analysis.

Lastly, the MDL Order is incorrect in suggesting that Illinois courts would not apply the ELD in Viptera cases because they do not apply it where "the defendant had a duty to act reasonably to avoid the very harm that occurred" and "this Court has now recognized . . . just such a duty to avoid plaintiffs' financial losses." MDL Order 38. That reasoning is circular. The ELD *precludes* a duty to avoid economic harm. The MDL Court cannot point to its *own*

*decision* recognizing a new duty to "avoid . . . financial losses" *in the case before it* as a reason for holding that the ELD does not apply *in the case before it*.  To keep this exception for independent tort duties from swallowing the ELD, Illinois courts have recognized that it is "quite limited" and has "only been applied successfully to attorney[s] . . . and accountant[s]," *MW Mfrs. Inc. v. Friedman*, No. 97 C 8319, 1998 WL 417501, at *6 (N.D. Ill. July 21, 1998), where there is an "established tradition of tort claims," *Bank One Okla., N.A. v. Trammell Crow Servs., Inc.*, No. 03 C 3624, 2003 WL 23019173, at *3 (N.D. Ill. Dec. 23, 2003) (rejecting theory that real estate service providers owe an independent tort duty that overrides the ELD).

**Florida** has applied the substance of the stranger ELD while not calling it by that name. In *Florida Power & Light Co. v. Fleitas*, 488 So. 2d 148, 151-52 (Fla. Dist. Ct. App. 1986), a power company revoked the access badge of a contractor's employee for suspected drug use, the employee was fired, and the employee sued for negligence in the investigation leading to the loss of his badge.  In rejecting the claim, the court set out the rule of the stranger ELD, explaining that, absent "physical harm," there is no cause of action in tort for negligently disrupting another's business expectations.  *Id.*  Indeed, the court expressly invoked section 766C of the Restatement (Second) of Torts (the stranger ELD provision),[59] Prosser & Keeton's stranger ELD discussion, and cases applying the stranger ELD including *Robins Dry Dock*, *M/V Testbank*, and others.  Similarly, Florida courts have applied the stranger ELD to bar claims against an employer whose negligence caused an employee to incur economic losses.  *See Southland Constr., Inc. v. Greater Orlando Aviation,* 860 So. 2d 1031, 1033-34 (Fla. Dist. Ct. App. 2003).[60]

**Georgia** has long applied the stranger ELD.  *Byrd v. English*, 43 S.E. 419 (Ga. 1903), is

---

[59]   *See, e.g.*, *Annett*, 801 N.W.2d at 503-04.
[60]   In the context of the *contractual* ELD, the Florida Supreme Court recently held that the contractual ELD should be limited to products liability cases.  *Tara Condo. Ass'n, Inc. v. Marsh & McLennan Cos., Inc.*, 110 So. 3d 399, 407 (Fla. 2013).  That case addressed the ELD solely in the context of parties in a contractual relationship and thus is not relevant here.  *See, e.g.*, *id.* at 402 (addressing the "Contractual Privity Economic Loss Rule").

often cited as an early exemplar of a stranger ELD case. *See, e.g.*, *Robins Dry Dock*, 275 U.S. at 309 (citing *Byrd*). Defendants negligently severed power lines and plaintiff sued for economic losses resulting from the loss of power to his printing business. *See* 43 S.E. at 420. The court barred recovery in tort absent "an injury to the person or property of the plaintiff" and outlined the classic rationale for the stranger ELD as it explained that if plaintiff could recover "then a customer of his, who was injured by the delay occasioned by the stopping of his work, could also recover from [defendants], and one who had been damaged through his delay could in turn hold [defendants] liable, and so on without limit to the number of persons who might recover on account of the injury done to the property of the company owning the [power] conduits." *Id.*; *see also, e.g.*, *Gen. Elec. Co. v. Lowe's Home Ctrs., Inc.*, 608 S.E.2d 636, 637-38 (Ga. 2005); *Willis v. Georgia N. Ry. Co.*, 314 S.E.2d 919, 919 (Ga. Ct. App. 1984).

**Idaho** applies the stranger ELD. In *Just's, Inc. v. Arrington Construction Co.*, 583 P.2d 997 (Idaho 1978), the plaintiff retail store sued a construction company renovating a downtown area on the theory that negligence in the renovation project impeded customers' access to the store, resulting in "lost business." *Id.* at 1003. Noting that the plaintiff was "surely not the only person who may have suffered some pecuniary losses" and that other plaintiffs "could conceivably include not only all the other businesses in the area, but also their suppliers, creditors, and so forth, Ad infinitum," *id.* at 1005, the court barred claims for "economic losses allegedly suffered as a result of the . . . diversion of prospective customers," *id.* at 1003.

**Iowa** has also adopted the stranger ELD. *See, e.g.*, *Neb. Innkeepers, Inc. v. Pittsburgh-Des Moines Corp.*, 345 N.W.2d 124, 126 (Iowa 1984) (barring claims resulting from negligent damage closing bridge). Indeed, the Iowa Supreme Court has stated that it follows "the stranger economic loss rule." *Annett*, 801 N.W.2d at 503-04. Contrary to the MDL Order, Iowa has not limited that rule to access cases. *See, e.g.*, *Gosch v. Juelfs*, 701 N.W.2d 90, 91 (Iowa 2005)

(injury to plaintiff's employee); *Anderson Plasterers*, 543 N.W.2d at 613 (same).  In addition, nothing in *Annett* endorses a case-by-case policy analysis.  *Cf.* MDL Order 38-39.  *Annett* merely acknowledged that there were categorical exceptions to the ELD (e.g., professional malpractice) and applied the ELD upon holding that the case before it "does not fall under any of the recognized exceptions or qualifications to the [ELD]."  801 N.W.2d at 504.  *Van Sickle Constr. Co. v. Wachovia Commercial Mortg., Inc.*, 783 N.W.2d 684 (Iowa 2011), simply recognized that negligent misrepresentation claims provide an exception to the ELD because the tort "is, and always has been, an economic tort allowing for recovery of purely economic damages."  *Id.* at 693.  That analysis does not endorse the fact-specific policy assessment used by the MDL Order.

**Louisiana** uses "a slightly modified version of the economic-loss rule," *Wiltz*, 645 F.3d at 697.  The rule is not a *per se* bar, but is applied as part of Louisiana's duty-risk analysis.  *See Phillips v. G & H Seed Co.*, 86 So. 3d 773, 780 (La. Ct. App. 2012).

In *PPG Indus., Inc. v. Bean Dredging*, 447 So. 2d 1058 (La. 1984), the Louisiana Supreme Court faced a classic stranger scenario: a dredging company damaged a gas pipeline and a gas customer sued for economic losses resulting from the interruption in gas supply.  *See id.* at 1060.  Barring recovery, the court explained that liability in tort for economic losses must be restricted to prevent creating "liability 'in an indeterminate amount for an indeterminate time to an indeterminate class.'"  *Id.* at 1061 (quoting *Ultramares Corp. v. Touche*, 174 N.E. 441, 444 (N.Y. 1931) (Cardozo, J.)).  "Because the list of possible victims and the extent of economic damages might be expanded indefinitely, the court necessarily makes a policy decision on the limitation of recovery of damages."  *Id.* at 1061-62.  Based on these considerations, the Louisiana Supreme Court has instructed that it is "*highly unlikely*" that the duty/risk analysis would permit recovery for pure "economic loss" absent injury to property.  *Id.* at 1061 (emphasis added).  Courts have repeatedly applied the duty-risk analysis to yield precisely the same

40

outcome as the stranger ELD.  *See, e.g.*, *id.* at 1061-62; *Wiltz*, 645 F.3d at 697-701; *TS&C Invs. LLC v. Beusa Energy, Inc.*, 637 F. Supp. 2d 370, 381 (W.D. La. 2009) (barring recovery where defendant's negligence closed an interstate highway).[61]

**Minnesota** long ago applied the stranger ELD to hold that an employer cannot recover increased workers' compensation premiums that resulted after the defendant negligently killed an employee.  *See N. States Contracting Co. v. Oakes*, 253 N.W. 371, 372 (Minn. 1934).  The decision placed itself squarely in the line of stranger ELD decisions[62] and has been cited as an example of the rule.[63]  More recently, a Minnesota court applied the stranger ELD to prevent an employer from recovering "lost profits" incurred as a result of the defendant's negligence injuring an employee.  *Cariveau v. Golden Valley Motors, Inc.*, No. 27CV06-11202, 2006 WL 6252343, ¶ 27 (Minn. Dist. Ct. Nov. 28, 2006).

For the sale of goods, Minnesota has codified the ELD by statute.  *See* Minn. Stat. § 604.101.  The statute applies only to claims by "a buyer against a seller" relating to "a defect in the goods sold or leased," *id.* subd. 2, and in that context the statute states that the ELD "applies to claims only as stated in this section," *id.* subd. 5.  The statute is irrelevant here, because Plaintiffs' claims do not arise in the context of a sale of goods.  Contrary to the MDL Order, there is no basis for reading Minn. Stat. § 604.101 to displace the common law ELD *outside* the sale-of-goods context addressed by the statute.  *See* MDL Order 25-27.  *Cf. Staab v. Diocese of St. Cloud*, 813 N.W.2d 68, 73 (Minn. 2012) ("statutes in derogation of the common law are strictly construed," and courts "do not presume that the Legislature intends to abrogate or modify

---

[61]    The decisions from *In re Genetically Modified Rice Litigation* are inapposite.  They involved GM rice that was *not approved for human consumption even in the U.S.*  The duty to prevent release in those cases was founded entirely on federal laws and regulations designed to "prevent harms arising from market disruptions" caused by the spread of *non-approved* crops.  *In re GM Rice*, No. 4:06-md-1811, 2011 WL 5024548, at *4 (E.D. Mo. Oct. 21, 2011); *In re GM Rice*, 666 F. Supp. 2d at 1015, 1020 (federal-law duties to "confine" unapproved GM material).

[62]    *N. States Contracting*, 253 N.W. at 372 (citing *Anthony*, 52 Mass. 290, and *Conn. Mut. Life Ins.*, 25 Conn. 265).

[63]    *See, e.g.*, *Union Oil Co. v. Oppen*, 501 F.2d 558, 563 n.6 (9th Cir. 1974); David B. Gaebler, *Negligence, Economic Loss, and the U.C.C.*, 61 Ind. L.J. 593, 599 n.24 (1986).

a common law rule except to the extent expressly declared or clearly indicated in the statute"),

First, the statute was a legislative response to a specific decision from the Minnesota Supreme Court *in the context of a sale of goods*.  *See* 27 Minn. Practice: Prods. Liab. Law § 13.15 (2015 ed.) (describing *Hapka v. Paquin Farms*, 458 N.W.2d 683 (Minn. 1990)).[64]  The original statute was limited to addressing *sales of goods*.  *See* Minn. Stat. § 604.10.  When difficulties arose in interpreting that statute, the current statute was passed, again limited to *sales of goods*.  *See* 27 Minn. Practice: Prods. Liab. Law § 13.15.  Given the specific purpose for which the legislature acted, there is no basis for concluding that statutory language stating that "[t]he economic loss doctrine applies to claims only as stated in this section," Minn. Stat. § 604.101, subd. 5, was intended to sweep any more broadly than to the types of "claims" actually addressed in the statute—*i.e.*, claims relating to the sale of goods.

Second, the official co-reporters of the statute have explained a more limited reach for the statute, namely that "*[w]here the statute does apply*, it occupies the field," and that the statute "should preempt any common law rules *within its scope*."[65]

Third, courts have treated the exclusive scope of the statute consistent with that description.  For example, *Cariveau* applied the stranger ELD to bar a claim for economic losses brought by an employer against a defendant who had injured an employee.  2006 WL 6252343 ¶ 27.[66]  And the Eighth Circuit has expressly held that the predecessor statute to section 604.101,

---

[64]   *See also* Minn. Stat. § 604.101, Reporter's Note (similarly describing response to *Hapka*); Daniel S. Kleinberger, Linda J. Rusch & Alan I. Silver, *Building a New Foundation: Torts, Contracts, and the Economic Loss Doctrine*, Bench & Bar of Minn. (Sept. 2000), http://www2.mnbar.org/benchandbar/2000/sep00/econ-loss.htm (similarly describing legislative response to *Hapka*) (hereinafter "Kleinberger").

[65]   Kleinberger (under "Drafting Policies Underlying the New Statute") (emphases added).

[66]   *Ptacek v. Earthsoils, Inc.*, 844 N.W.2d 535 (Minn. Ct. App. 2014), does not suggest any broader preemptive scope for the statute.  That case involved a sale of goods.  *See id.* at 536-37.  The court held solely that, where the trial court had held that the plaintiff's negligence claim fell outside the "product defect" claims covered by the statute (a decision that was not appealed), the trial court could not rely on the common law ELD to bar the claim— the statutory rule was exclusive *in that sale-of-goods context.  Id.* at 539.  The decision is irrelevant to the Plaintiffs' claims, which do not arise in a sale-of-goods context.

*see* Minn. Stat. § 604.10(a), did *not* preempt the common law ELD in contexts outside the sale of goods. *See AKA Distrib. Co. v. Whirlpool Corp.*, 137 F.3d 1083, 1086 n.3 (8th Cir. 1998). As the Eighth Circuit explained, the statute "is limited to sales of goods" and there is "no indication that the statute was intended to replace or narrow the scope of the broader common law doctrine." *Id.*; *accord Praktika Design & Projectos Ltda. v. Marvin Lumber & Cedar Co.*, No. 06-cv-957, 2007 WL 1582710, at *3 (D. Minn. May 30, 2007). There is no basis for concluding that the successor statute, section 604.101, was intended to apply more broadly.

**Missouri** adopted the stranger ELD long ago. *See Brink v. Wabash Ry. Co.*, 60 S.W. 1058, 1059-60 (Mo. 1901) (barring parents' claim asserting that railroad's negligence causing death of their son had injured them by preventing the son from keeping his contract to provide for their support).[67] Contrary to the MDL Order, the mere fact that a federal court found a basis for distinguishing *Brink* based on intervening changes in wrongful death law does not undermine the relevance of the opinion here. *See* MDL Order 39. *Brink* shows that the Missouri courts adopted the principles behind the stranger ELD, and the decision has never been disapproved. Similarly, the mere fact that Missouri (like many States) has recognized exceptions to the ELD for actions against architects akin to professional malpractice claims, *see Business Men's Assurance Co. of Am. v. Graham*, 891 S.W.2d 438, 454 (Mo. Ct. App. 1994), and for negligent misrepresentation, *see B.L. Jet Sales, Inc. v. Alton Packaging Corp.*, 724 S.W.2d 669, 673 (Mo. Ct. App. 1987), provides no basis for thinking that Missouri would not apply the ELD here. As another federal court has recognized, *B.L. Jet Sales* falls into one of the "rare exceptions to the economic loss doctrine" recognized in Missouri, and it does not warrant expanding Missouri law to create new ones. *Dannix Painting, LLC v. Sherwin-Williams Co.*, No. 4:12 CV 01640 CDP,

---

[67]    The decision has been cited as an early application of the ELD. *See Union Oil Co.*, 501 F.2d at 563 n.4; *Stevenson*, 73 N.E.2d at 203; *cf. also* Dobbs § 647.

2012 WL 6013217, at *2 (E.D. Mo. Dec. 3, 2012), *aff'd*, 732 F.3d 902 (8th Cir. 2013).

**Nevada.**  In *Local Joint Executive Bd. of Las Vegas, Culinary Workers' Union v. Stern*, 651 P.2d 637 (Nev. 1982), Nevada adopted the stranger ELD and barred claims for lost wages by hotel workers who claimed that an architect's negligence had contributed to a hotel fire that led to a temporary closing of a hotel.  *Id.* at 638.  The court rejected cases from a "small minority of jurisdictions" permitting recovery for some economic losses on the ground that the tests used to determine who could recover for negligent infliction of economic loss "are presently inadequate to guide trial courts to consistent, predictable, and fair results."  *Id.*  The court expressly rejected the "minority view."  *Id.* (citing *J'Aire Corp. v. Gregory*, 598 P.2d 60 (Cal. 1979)).

**New Mexico** applied the stranger ELD in *National Roofing, Inc. v. Alstate Steel, Inc.*, 366 P.3d 276, 278-80 (N.M. Ct. App. 2015), to bar an employer's tort claims for workers injured by the defendant's negligence.  Citing *Robins Dry Dock*, the court applied the rule that "a plaintiff normally cannot recover for economic loss caused by 'unintentional injury to another person, or unintentional injury to property in which the [plaintiff] has no proprietary interest.'"  *Id.* at 278 (quoting Restatement (Third) of Torts: Liab. for Econ. Harms § 7); *see Berlangieri v. Running Elk Corp.*, 76 P.3d 1098, 1106 (N.M. 2003).  The court explained that, to avoid "limitless" liability for "unbounded actual and prospective economic harm flowing from a single negligent act," "public policy has historically—and appropriately—justified a *categorical no duty rule*" for economic loss absent physical injury, *Nat'l Roofing*, 366 P.3d at 279, 281 (emphasis added).

**New York** applies the stranger ELD.  In *532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc.*, 750 N.E.2d 1097, 1100-01 (N.Y. 2001), the court barred claims for economic losses incurred by businesses when two construction accidents closed adjacent streets. As the court explained, there was "no satisfactory way geographically to distinguish among those who have suffered purely economic losses," (*i.e.*, no way to allow recovery for some and not for

others), and held that limiting recovery "to those who have . . . suffered personal injury or property damage—as historically courts have done—" was the only principled approach. *Id.* at 1103; *accord Roundtable Theater Co. v. Tishman Realty & Constr.*, 756 N.Y.S.2d 12, 13 (App. Div. 2003). The Court of Appeals expressly rejected the line-drawing approach used by the New Jersey Supreme Court in *People Express. See 532 Madison Ave.*, 750 N.E.2d at 1003.[68]

**Ohio** applied the stranger ELD long ago to bar workers from recovering lost wages after a defendant negligently caused an explosion that closed a factory. *See Stevenson*, 73 N.E.2d at 203-04. Ohio courts also have applied the rule to bar claims against a defendant that negligently severed telephone cables, *RWP, Inc. v. Fabrizi Trucking & Paving Co., Inc.*, No. 87382, 2006 WL 2777159, at *1 (Ohio Ct. App. Sept. 28, 2006), and to bar an environmental group's effort to recoup remediation costs from a railroad, *see Ashtabula River Corp. Grp. II v. Conrail, Inc.*, 549 F. Supp. 2d 981, 987-88 (N.D. Ohio 2008). *Ashtabula* expressly rejected the theory that the "[ELD] does not bar tort claims that are independent of a contract claim." *Id.*

Nevertheless, the MDL Court mistakenly cited dicta in *Campbell v. Krupp*, 961 N.E.2d 205, 211 (Ohio Ct. App. 2011), to hold that the ELD does not apply for any tort claim independent of a contract. *See* MDL Order 41. That misunderstands the *holding* in *Krupp*. The plaintiff in *Krupp* sued a title insurance company claiming economic losses from a negligent title search. The court held that Ohio law had barred negligence claims against title abstractors (by those not in privity) for over 100 years and thus that the plaintiff's negligence claim *failed* because "no cause of action outside of contract exists against a title abstracter for negligence." *Krupp*, 961 N.E.2d at 213. Of course, the rule that no cause of action for negligence lies against

---

[68]   In noting that "[t]he 'economic loss' rule espoused in *Schiavone Constr. Co. v. Mayo Corp.*, 436 N.E.2d 1322, . . . has no application here," *532 Madison Ave.*, 750 N.E.2d at 1101 n.1 (citation omitted), the court was explaining that the *contractual* ELD used in *Schiavone* did not apply to the stranger case before the court. *532 Madison Ave.* has been cited in treatises as an example of a stranger ELD case. *See, e.g.*, Dobbs § 648 & n.12.

title abstractors is *an application of the ELD*.  Thus, when the court stated in dicta that a plaintiff could "proceed in tort" to recover economic losses "*if* the defendant breached a duty that did not arise from a contract," *id.* at 211 (emphasis added), the court was not announcing a general rule that there *is* a duty in tort to avoid economic losses that would allow negligence claims whenever they arise independently of a contract.  To the contrary, to determine whether a duty in tort existed, the court still applied the ELD—and held that there was *no duty* in that case.  *Id.* at 212-13.  The holding in *Krupp* thus does nothing to upset the "general rule" under Ohio law that "there is no . . . duty to exercise reasonable care to avoid intangible economic loss or losses to others that do not arise from tangible physical harm to persons and tangible things." *Queen City Terminals, Inc. v. Gen. Am. Transp. Corp.*, 653 N.E.2d 661, 667-68 (Ohio 1995).[69]

The other cases cited by the MDL Court reflect the same principles.  *Mulch Mfg., Inc. v. Advanced Polymer Sols., LLC*, 947 F. Supp. 2d 841 (S.D. Ohio 2013), involved claims for fraud, deceptive trade practices in violation of statute, and negligent misrepresentation, *see id.* at 855-56, all of which come within recognized exceptions to the ELD.  *See id.* at 856; *see also* Dobbs §§ 606 & n.1, 666.  *Dana Ltd. v. Aon Consulting, Inc.*, 984 F. Supp. 2d 755 (N.D. Ohio 2013), merely applied the contractual ELD.  *See id.* at 767.  In reality, the MDL Order did not identify a *single* Ohio case allowing a claim for *negligence, nuisance*, or *strict liability* for economic losses to proceed on the theory that the claims arose outside a contractual relationship.

**Pennsylvania** adopted the stranger ELD in *Aikens v. Baltimore & Ohio R.R.*, 501 A.2d 277 (Pa. Super. 1985).  There, a train derailment damaged a factory requiring a temporary closure.  *Id.* at 278.  The court barred a tort suit for lost wages, explaining that it was "adopt[ing]

---

[69]    In suggesting that a plaintiff may recover economic losses in tort "*if* the defendant breached a duty that did not arise solely from a contract," *Krupp*, 961 N.E.2d at 211, *Krupp* was simply contemplating particular situations—like the tort of negligent misrepresentation—where there may be a duty in tort to avoid causing economic losses to others.  *See id.* (discussing the fact that, under *Haddon View Inv. Co. v. Coopers & Lybrand*, 436 N.E.2d 212 (Ohio 1982), the tort of negligent misrepresentation imposes a duty by law on certain parties to avoid economic losses).

the majority rule" that "no cause of action exists for negligence that causes only economic loss." *Id.* at 279; *see also id.* (permitting such claims would "open the door to every person in the economic chain of the negligent person or business to bring a cause of action").[70]

Tennessee has adopted the stranger ELD.  *See, e.g.*, *Lear Siegler*, 825 S.W.2d at 85-87; *Ladd Landing, LLC v. TVA*, 874 F. Supp. 2d 727, 732 (E.D. Tenn. 2012).  *Lear Siegler* barred workers' claims for wages lost when an industrial park was closed due to a negligent propane leak.  825 S.W.2d at 87.  Tennessee cases discussing the ELD in contractual scenarios provide no basis for *restricting* the ELD to that context.  As one court recently noted, there is a "difference between the [ELD] in the context of a case involving contracts and a case in which no contract or privity between the parties is involved—the situation presented in *Lear Siegler* and in this case." *Ladd Landing*, 874 F. Supp. 2d at 732 (applying stranger ELD).

As the MDL Court pointed out, another federal court has suggested that, despite *Lear Siegler*, Tennessee would limit the ELD to the products liability context.  *See Ham v. Swift Transp. Co., Inc.*, 694 F. Supp. 2d 915 (W.D. Tenn. 2010).  But as *Ladd Landing* has explained, "*Ham* did not offer an explanation for why the *Lear Siegler*'s application of the [ELD] to a tort situation was in error or limited to the facts of that case."  *Ladd Landing*, 874 F. Supp. 2d at 731-33 (rejecting *Ham* and following *Lear Siegler* as "controlling authority").  Indeed, the *Ham* court relied on the mistaken premise that the ELD "has its origins in the UCC," *Ham*, 694 F. Supp. 2d at 923, and its holding—limiting the ELD to UCC transactions—cannot be squared with other

---

[70]  *See also, e.g, Excavation Techs., Inc. v. Columbia Gas Co. of Penn.*, 985 A.2d 840, 842-44 (Pa. 2009) (ELD barred claims of contractor that suffered economic loss upon striking a gas line that gas company had negligently failed to mark); *Duquesne Light Co. v. Penn. Am. Water Co.*, 850 A.2d 701, 703-04 (Pa. Super. 2004) (ELD barred claims where chlorine leak at water company caused evacuation of nearby electricity generating plant; *Gen. Pub. Utils. v. Glass Kitchens of Lancaster, Inc.*, 542 A.2d 567, 570-71 (Pa. Super. 1988) (absent showing of physical injury, ELD barred claims of businesses in the tourist industry alleging reduced business volume in wake of Three Mile Island nuclear accident); *Moore v. Pavex, Inc.*, 514 A.2d 137, 138-39 (Pa. Super. 1986) (ELD barred claims for businesses losses from disruption caused by negligent water main break).

Tennessee cases applying the ELD outside the UCC context.[71]  Lastly, as *Ladd Landing* pointed out, "because *Lear Siegler* is a published decision by the Tennessee Court of Appeals that has not been overruled or modified . . ., it is controlling authority."  874 F. Supp. 2d at 733.  *Ham*'s rationale for ignoring *Lear Siegler* is thus wholly unpersuasive.

**Texas** has applied the ELD to contractual strangers.  *See LAN/STV v. Martin K. Eby Constr. Co., Inc.*, 435 S.W.3d 234, 250 (Tex. 2014).  In contrast to most jurisdictions, however, in Texas the "application of the rule depends on an analysis of its rationales in a particular situation."  *Id.* at 245-46.  Contrary to the MDL Order, however, that does not mean that Texas courts would decline to apply the ELD in this case.  *See* MDL Order 44.  The Texas Supreme Court has expressly recognized that the "principal rationale[] for the rule" is that "[e]conomic losses *proliferate* more easily than losses of other kinds" and can result in "indeterminate and disproportionate liability."  *LAN/STV*, 435 S.W.3d at 240 (emphasis added).  "Those liabilities may in turn create an exaggerated pressure to avoid an activity altogether."  *Id.*  Those concerns fully apply here, and there is no basis for holding that Texas would not apply the stranger ELD.

*In re Genetically Modified Rice* provides no persuasive authority to the contrary.  That decision predated *LAN/STV* and misread Texas law by holding that the stranger ELD applied only if "the plaintiff could have recovered for the same injury by a contract action against another."  *In re Genetically Modified Rice Litig.*, No. 4:06-md-1811, 2011 WL 339168, at *3 n.2 (E.D. Mo. Feb. 1, 2011) (citing *Sterling Chems., Inc. v. Texaco Inc.*, 259 S.W.3d 793, 793 (Tex. App. 2007)).  *Sterling Chemicals* did not read the ELD so narrowly, *see* 259 S.W.3d at 799,[72]

---

[71]   *See, e.g., Rural Dev., LLC v. Tucker*, No. M2008-00172-COA-R3-CV, 2009 WL 112541, at *9 (Tenn. Ct. App. Jan. 14, 2009); *Amsouth Erectors, LLC v. Skaggs Iron Works, Inc.*, No. W2002-01944-COA-R3-CV, 2003 WL 21878540, at *4-5 (Tenn. Ct. App. Aug. 5, 2003).

[72]   In observing that the ELD was "particularly appropriate" where the plaintiff had a contract action against another, *Sterling Chemicals* did not suggest that fact was determinative.  *See* 259 S.W.3d at 799.

and other Texas cases have applied the stranger ELD without any such restriction.[73]

**Wisconsin**.  The Seventh Circuit has held that Wisconsin law would apply the stranger ELD to bar claims for economic losses in a bridge closure case, *see Leadfree Enters., Inc. v. U.S. Steel Corp.*, 711 F.2d 805, 806 (7th Cir. 1983), and later explained that "Wisconsin would decline *in all circumstances* to allow a negligence suit for the recovery of only economic damages, even when there is no contractual relationship between the parties." *Midwest Knitting Mills, Inc. v. U.S.*, 950 F.2d 1295, 1300 (7th Cir. 1991) (emphasis added); *see also Custom Underground, Inc. v. Mi-Tech Servs., Inc.*, No. 10-CV-222-JPS, 2011 WL 5008343, at *4 (E.D. Wis. Oct. 20, 2011) (applying ELD to bar contractor's claims for losses caused by engineer's negligent plans where parties were contractual strangers).

Contrary to the MDL Court's suggestion, state cases have not undermined these federal decisions and have not confined the ELD to "the context of contractual relationships."  MDL Order 44-45.  Wisconsin courts have applied the stranger ELD (although not invoking it by name) in a paradigmatic stranger scenario: barring the claims of an employer whose workers' compensation insurance premiums increased after a defendant negligently injured the employer's employee.  *See Vogel v. Liberty Mut. Ins. Co.*, 571 N.W.2d 704, 706-08 (Wis. Ct. App. 1997).

*Brew City Redevelopment Grp., LLC v. Ferchill Grp.*, 724 N.W.2d 879 (Wis. 2006), is not to the contrary.  The court there rejected the ELD on multiple grounds, including that the damages claimed were "non-economic."  *Id.* at 888.  *Schuetta v. Aurora Nat'l Life Assurance Co.*, No. 13-cv-007-JPS, 2013 WL 6199248, at *1 (E.D. Wis. Nov. 27, 2013), involved claims by the beneficiary of an annuity that the insurance company had negligently failed to inform him

---

[73]   *See, e.g.*, *Trans-Gulf Corp. v. Performance Aircraft Servs., Inc.*, 82 S.W.3d 691, 695 (Tex. App. 2002); *Coastal Conduit & Ditching, Inc. v. Noram Energy Corp.*, 29 S.W.3d 282, 288-90 (Tex. App. 2000) (applying ELD to "contractual strangers" where there was no alternative for recovery in contract for excavating company's claims that gas company's negligent marking of its lines had caused economic losses in the form of "additional overhead and expenses" when excavating company struck the improperly marked lines).

of his rights and is best understood as a case in which a defendant in the business of providing professional services or information may be liable for negligence.  *See supra* p.24 & note 48.

    b.  **States That Have Not Expressly Adopted The Stranger ELD Would Apply It Here.**

  **Alabama** has adopted the ELD in the products liability context, *see Lloyd Wood Coal Co. v. Clark Equip. Co.*, 543 So. 2d 671, 674 (Ala. 1989), and nothing in that decision indicates Alabama would reject the majority approach here.  The MDL Court cited *Public Building Authority of City of Huntsville v. St. Paul Fire and Marine Insurance Co.*, 80 So. 3d 171 (Ala. 2010), for the proposition that Alabama has limited the ELD to products liability.  But *Public Building* merely held that the ELD does not apply in "a commercial-construction context" because Alabama has developed a context-specific six-factor test to determine whether "a duty in tort" exists in commercial-construction cases.  *Id.* at 184-85.

  **Arkansas** has held that the ELD does not apply in strict products liability cases, *Blagg v. Fred Hunt Co., Inc.*, 612 S.W.2d 321, 324 (Ark. 1981), and has reserved the question whether to apply the doctrine to negligence cases, *see Bayer CropScience LP*, 385 S.W.3d 822.  The MDL Order reached a contrary conclusion by misstating Arkansas law.  The MDL Order states that the court in *Carvin v. Ark. Power & Light Co.*, Civ. Nos. 90-6055 & 90-6109, 1991 WL 540481, at *4 (W.D. Ark. Dec. 2, 1991), "declined to apply the ELD under Arkansas law in the stranger context."  MDL Order 27.  That is incorrect.  *Carvin* applied the stranger ELD as it held: "We do not believe that the Arkansas courts if faced with the issue would allow plaintiffs to recover from defendants for the purely economic losses stemming from the loss of the bridge."  1991 WL 540481, at *5.  There is no reason to think that *Carvin* does not accurately reflect Arkansas law.

  **California** does not apply the stranger ELD as a bright-line rule.  Instead, California is a minority jurisdiction that applies a set of factors to determine whether a special relationship

between the parties justifies imposing a duty to avoid purely economic losses.  *See J'Aire Corp.*, 24 Cal. 3d at 803-04.  That analysis is "[u]ltimately . . . a question of public policy," *The Ratcliff Architects v. Vanir Constr. Mgmt., Inc.*, 88 Cal. App. 4th 595, 605 (Cal. App. 1st Dist. 2001), and for the same reasons explained below, *see infra* Parts IV-V, California courts would find no duty to prevent Plaintiffs' economic losses here.  California courts emphasize that they are "reluctant to impose duties to prevent economic harm to third parties because as a matter of economic and social policy, third parties should be encouraged to rely on their own prudence, diligence and contracting power" to address economic risks.  *Ratcliff*, 88 Cal. App. 4th at 605. Where (as here) "a defendant's liability rests partially under the control of another party's conduct and the plaintiff is free to contract with the other party, the defendant's 'moral blame' and connection to the plaintiff's alleged injury is too remote to justify imposition of a tort duty." *Id.* at 606-07.  Here, commingling of Viptera resulted from the conduct of elevators that mixed corn together, and Plaintiffs were free to contract with elevators to ensure their corn was not mixed.  California law would thus reject a duty on Syngenta to avoid Plaintiffs' economic losses.

**Colorado** recently held that, where there are "interrelated contracts," the contractual ELD does not apply to tort duties that arise independently of contract duties.  *S K Peightal Eng'rs, LTD v. Mid Valley Real Estate Sols. V, LLC*, 342 P.3d 868, 872 (Colo. 2015).  But the court made clear that it was addressing scenarios involving "a single contract" or "interrelated contracts" and specifically stated that its holding was "narrowly" tailored to "the specific facts of this case."  *Id.* at 868, 877.  The MDL Court erred in relying on that decision to hold that Colorado would reject the majority approach to the *stranger* ELD.

**Indiana** has made clear that the "existence or non-existence of a contract is not the dispositive factor for determining whether a tort action [for economic loss] is allowable," *U.S. Bank, N.A. v. Integrity Land Title Corp.*, 929 N.E.2d 742, 748 (Ind. 2010), and has applied the

ELD absent contractual privity, *Indianapolis-Marion Cty. Pub. Library v. Charlier Clark & Linard, P.C.*, 929 N.E.2d 722, 739 (Ind. 2010).  These decisions, which post-date the state-court decisions erroneously cited by the MDL Court,[74] show that Indiana does not restrict the ELD to contractual scenarios.  In fact, the Indiana Court of Appeals has applied the stranger ELD in the classic scenario of defendant injuring an employee and disrupting plaintiff's business.  *See Morton v. Merrillville Toyota, Inc.*, 562 N.E.2d 781, 786 (Ind. Ct. App. 1990).

**Kansas.**  The MDL Court correctly recognized that the Kansas Supreme Court has held open the possibility that the ELD would apply in the stranger context, *see Rinehart v. Morton Buildings Inc.*, 305 P.3d 622, 632 (Kan. 2013), but erroneously found "no basis" to predict that Kansas courts would apply the doctrine in this case because "Kansas courts have never applied the stranger [ELD]."  MDL Order 31.  That analysis ignores the fact that the stranger ELD is the *majority* approach and should be applied in Kansas absent some indication that Kansas would *reject* the stranger ELD.  Moreover, the Kansas Court of Appeals *has* applied the stranger ELD when an excavator negligently operated its equipment, causing "economic harm due to an interruption in phone and internet service."  *Long Motor Corp.*, 2009 WL 2595932, at *3.

**Kentucky** adopted the ELD in the products liability context in *Giddings & Lewis, Inc. v. Indus. Risk Ins.*, 348 S.W.3d 729 (Ky. 2011), and nothing in that decision restricts the doctrine to that context.  The contractual ELD cases cited by the MDL Court did not address the stranger ELD, *see, e.g.*, *Nami Res. Co., LLC v. Asher Land & Mineral, Ltd.*, Nos. 2012-CA-762-MR et al., 2015 WL 4776376, at *2 (Ky. Ct. App. Aug. 14, 2015) (non-final opinion), and do not remotely show that Kentucky would reject the majority rule.

---

[74]   The three cases relied on by the MDL Court are distinguishable.  Two involved property damage.  *See Hoffman v. WCC Equity Partners, LP*, 899 N.E.2d 756, at *2 (Ind. Ct. App. 2008) (unpublished decision); *KB Home Ind. Inc. v. Rockville TBD Corp.*, 928 N.E.2d 297, 300, 304-05 (Ind. Ct. App. 2010).  The third held the ELD did not apply to a negligence *per se* claim because "it seeks recovery in negligence based upon [a] violation of state statutory and federal regulatory law."  *American United Life Ins. Co. v. Douglas*, 808 N.E.2d 690, 705 (Ind. Ct. App. 2004).

**Maryland** holds that there is no duty in tort to avoid purely economic losses absent a special relationship that amounts to "privity or its equivalent." *Jaques v. First Nat'l Bank of Maryland*, 515 A.2d 756, 759-60 (Md. 1986).  That analysis bars Plaintiffs' claims here given that there is no "intimate nexus," *id.* at 759, between Plaintiffs and Syngenta.

**Michigan.**  Although Michigan courts have said that the ELD applies only where parties could have addressed their risks by contract, they have also held open the possibility that claims for economic losses might be barred in "a mass tort claim with the potential for disproportionate economic exposure," *Quest Diagnostics, Inc. v. MCI WorldCom, Inc*., 656 N.W.2d 858, 866 (Mich. Ct. App. 2002)—such as this case.

**Mississippi** courts have not addressed, let alone rejected, the stranger ELD.  The cases relied on by the MDL Court considered the ELD in the context of contractual relations, *see, e.g.*, *Lyndon Prop. Ins. Co. v. Duke Levy & Assocs., LLC*, 475 F.3d 268, 274 (5th Cir. 2007), and took no position on the rationales underpinning the stranger ELD.

**Nebraska** applies the ELD for products liability, *see Nat'l Crane Corp. v. Ohio Steel Tube Co.*, 332 N.W. 2d 39, 44 (Neb. 1983), and the MDL Court's reliance on *Lesiak v. Cent. Valley Ag. Co-op, Inc.*, 808 N.W.2d 67 (Neb. 2012), to limit the doctrine to that context is misplaced.  In *Lesiak*, the injury "was not purely economic loss," *id.* at 83.  The court did not consider stranger scenarios, and thus *Lesiak* cannot be read as a rejection of the stranger ELD.

**North Carolina, North Dakota, Oklahoma, and South Carolina.**  These States have adopted the ELD in contractual contexts, particularly products liability, and have given no indication that they would not adopt the majority approach in the stranger context.[75]

**South Dakota** "is in agreement with the rationale behind the rule denying economic

---

[75]   *See, e.g.*, *Lord v. Customized Consulting Specialty, Inc.*, 643 S.E.2d 28, 32 (N.C. Ct. App. 2007); *Leno v. K & L Homes, Inc.*, 803 N.W.2d 543, 550 (N.D. 2011); *see Waggoner v. Town & Country Mobile Homes, Inc.*, 808 P.2d 649, 652 (Okla. 1990); *Sapp v. Ford Motor Co.*, 687 S.E.2d 47, 49-50 (S.C. 2009).

damages under tort theories and expressly recognize[d] it." *City of Lennox v. Mitek Indus., Inc.*, 519 N.W.2d 330, 333 (S.D. 1994). In defining the doctrine, the court looks to Illinois—a state that has unquestionably adopted the stranger ELD. *See Kreisers Inc. v. First Dakota Title Ltd. P'ship*, 852 N.W.2d 413 (S.D. 2014) (citing *Collins v. Reynard*, 607 N.E.2d 1185 (Ill. 1992)).

**Virginia** links the ELD to the lack of contractual privity, *see Nationwide Mut. Ins. Co. v. Richards Constr., Inc.*, 86 Va. Cir. 463 (2013), which suggests that Virginia would apply the ELD in a stranger case. In Virginia, the "ELD is most applicable to situations where a party is negligent, but the only damages are economic in nature, and no contract connects the plaintiff and defendant." *Rogers v. Dow Agrosciences, LLC*, No. 4:06-CV-15, 2006 WL 3147393, at *3 (W.D. Va. Oct. 31, 2006). That describes a stranger ELD scenario.

### B.   To The Extent A Plaintiff Purchased Viptera Or Duracade, That Plaintiff's Claims Are Barred By The Contractual ELD.

Out of an abundance of caution, Syngenta addresses the possibility that some Plaintiffs intend to assert claims as purchasers of Viptera or Duracade. Such claims would be barred by the contractual ELD, which precludes tort claims for economic losses arising from the assertion that goods do not have the value or the qualities the purchaser expected. "A buyer's desire to enjoy the benefit of his bargain is not an interest that tort law traditionally protects." *Anderson Elec., Inc. v. Ledbetter Erection Corp.*, 503 N.E.2d 246, 248 (Ill. 1987).

Like the stranger rule, the contractual ELD precludes the open-ended liability that would result if a manufacturer could be held liable for the spreading economic consequences of some failure of its product to meet expectations. *See, e.g.*, *Beretta U.S.A. Corp.*, 821 N.E.2d at 1142-43. It also preserves the distinct roles of tort and contract law. Tort law is concerned with duties to prevent physical harm. By contrast, claims that a "product has not met the customer's expectations" or "that the customer has received 'insufficient product value'" are the concern of

"express and implied warranties."  *E. River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 872 (1986).  The contractual ELD thus reflects a determination that "principles of warranty law remain the appropriate vehicle to redress a purchaser's disappointed expectations when a defect renders a product inferior or unable adequately to perform its intended function." *Moorman Mfg. Co.*, 435 N.E.2d at 450 (citations omitted); *accord Delaval*, 476 U.S. at 867. Restricting parties to their contract remedies prevents tort law from swallowing contract law and preserves the ability of parties to allocate risks by contract.[76]

Here, claims by purchasers of Viptera or Duracade are barred by the contractual ELD. Plaintiffs' fundamental claim is that they were disappointed with the value of corn that could not be exported to China.  *See, e.g.*, CAC ¶ 3056(a) (alleged harm is "diminished corn and corn product prices").  Those are paradigmatic economic losses asserted by a purchaser disappointed that the goods he purchased do not have the qualities and the value he had hoped for.[77]

The policies behind the doctrine also apply with particular force to the claims of any Plaintiffs who purchased Viptera, because they could have protected against their losses through their contracts for purchasing seed, including by seeking warranties that the seed they bought did not contain GM traits that would limit the exportability of grain grown from it.  One purpose of the ELD is to "encourage" the "*commercial purchaser*[] to assume, allocate, or insure against [economic] risk."  *Daanen*, 573 N.W.2d at 846 (emphasis added).  Allowing recovery in tort would allow purchasers of Viptera to avoid the bargain they made (and the limited warranties they received) when purchasing seed.  That would eliminate incentives for them ever to rely on contracts to address risks of export approvals and prevent the system of contracts in the market

---

[76]   *See also Daanen*, 573 N.W.2d at 850 (ELD "is aimed at encouraging commercial parties ex ante to negotiate for warranty protection or to take other steps, such as purchasing insurance, to protect their purely economic interests.").

[77]   *See, e.g., Daanen*, 573 N.W.2d at 845 (ELD bars claims for "loss in value of the product itself" or "insufficient product value"); *State Farm Mut. Auto. Ins. Co. v. Ford Mot. Co.*, 736 So. 2d 384, 387 (Miss. Ct. App. 1999) (ELD bars recovery where "purchases do not live up to the expectations of the consumer").

from ever developing to address such economic risks.  That is exactly what the ELD is designed to avoid.  The ELD is premised on the view that "commercial entities [are] quite capable of bargaining for express warranties" and courts should not permit tort actions to remove incentives to do so.  *Lexington Ins. Co. v. W. Roofing Co.*, 316 F. Supp. 2d 1142, 1149 (D. Kan. 2004).

Like other Plaintiffs, those who purchased Viptera cannot sidestep the ELD by claiming physical injury to property because their allegations are too vague and their theory of market-wide injury is decoupled from any injury to *their* corn.  *See supra* Part II.A.3.

Plaintiffs who purchased Viptera also face an additional hurdle, because physical injury suffices to avoid the contractual ELD only where a purchased good damages *other* property.[78] Here, the claim that the seed they bought yielded corn of inferior value does not involve damage to *other* property.  The seed is merely a component or input used to produce the finished product of harvested corn.  And it is settled law that, where one "component part damages the product into which that component was incorporated, economic losses to the product as a whole are not losses to 'other property' and are therefore not recoverable in tort."  *City of Lennox*, 519 N.W.2d at 333; *see also, e.g.*, *Jorgensen Farms, Inc. v. Country Pride Coop., Inc.*, 824 N.W.2d 410, 419 (S.D. 2012); *Lexington Ins.*, 316 F. Supp. 2d at 1147-49; *Minneapolis Soc'y of Fine Arts*, 354 N.W.2d at 820.  Under this principle, claims that a seed has somehow "damaged" the crop grown from it are regularly rejected under the ELD.  *See, e.g.*, *Martin Rispens & Son v. Hall Farms, Inc.*, 621 N.E.2d 1078, 1089 (Ind. 1993) (claim that defective watermelon seeds damaged crop); *Everkrisp Vegetables, Inc. v. Tobiason Potato Co.*, 870 F. Supp. 2d 745, 750-52 (D.N.D. 2012) (claim that seed potatoes infected crop with ring rot).  Similarly, other inputs into harvested

---

[78]   *See, e.g.*, *Trans States Airlines v. Pratt & Whitney Canada, Inc.*, 682 N.E.2d 45, 53-55 (1997); *Federal Ins. Co. v. J.K. Mfg. Co.*, 933 F. Supp. 2d 1065, 1071-72 (N.D. Ill. 2013); *2-J Corp. v. Tice*, 126 F.3d 539, 542 (3d Cir. 1997) ("An essential aspect of the *East River* economic loss doctrine is that while tort recovery is barred for damage a product causes to itself, such recovery is available for damage the failing product causes to '*other* property.'") (emphasis added).  Indeed, under Illinois law, the exception to the ELD applies solely if other property is damaged *and* it is damaged through a "sudden or dangerous occurrence."  *Trans States Airlines*, 682 N.E.2d at 48.

crops (such as fertilizer) are merely component parts and cannot inflict damage on *other* property if they harm the crop. *See, e.g., Jorgensen*, 824 N.W.2d at 413, 418-19.

Nor can Plaintiffs claim injury to *other* property on the theory that they commingled corn grown from Viptera with other corn (or that they permitted cross pollination). Plaintiffs have alleged that all the commodity corn they grow is mixed together to sell one undifferentiated product: commingled, commodity corn. CAC ¶ 3033. Thus, the same principle noted above applies: corn harvested from Viptera plantings is merely one component that goes into an overall product. Mixing some Viptera corn with other corn to make that final product cannot, as a matter of law, produce injury to "other property." *See* Dobbs § 449.[79]

Indeed, the ELD sweeps even further and "bars tort recovery for any type of damage that one would *reasonably expect* as a direct consequence of, or incidental to, the failure of" the product purchased. *Westfield Ins. Co. v. Birkey's Farm Store, Inc.*, 924 N.E.2d 1231, 1244 (Ill. App. Ct. 2010) (emphasis added). One would certainly expect that, if the Viptera seed purchased by Plaintiffs produced corn with a trait that could not be exported to China, commingling Viptera corn with other corn would mean that *all* the corn could not be exported to China, and thus that result cannot take the Plaintiffs outside the ELD under Illinois law.[80]

The MDL Court wrongly suggested that the contractual ELD applies solely to product-defect claims. MDL Order 47. The policies behind the ELD have nothing to do with whether a claim meets a particular definition of a product "defect." What matters is whether the plaintiff is using tort for a claim that alleges only disappointed commercial expectations. That is why cases describe the contractual ELD as applying to any claim asserting economic "loss resulting from

---

[79]   *See also Int'l Flavors & Fragrances, Inc. v. McCormick & Co., Inc.*, 575 F. Supp. 2d 654, 660-64 (D.N.J. 2008) (no injury to "other property" where paprika infested with cigarette beetles was incorporated in barbeque sauce and the barbeque sauce was ruined).

[80]   *See*, *e.g.*, *Dixie-Portland Flour Mills, Inc. v. Nation Enters., Inc.*, 613 F. Supp. 985, 988-89 (N.D. Ill. 1985) (purchaser of flour contaminated with sand could not recover in tort despite assertion that other ingredients were wasted when mixed with the flour to make dough because the injury was only to "a purchaser's expectations").

the failure of the product to perform to the level expected by the buyer." *City of Lennox*, 519 N.W.2d at 333; *see also, e.g.*, *Martin Rispens & Son*, 621 N.E.2d at 1089 (ELD applies "where a negligence claim is based upon the failure of a product to perform as expected"). Or, as the Illinois Supreme Court explained in *Moorman*, the ELD is designed to prevent claims in tort based on purchasers' complaints that they suffered "business losses" "caused by the failure of the product to meet the specific needs of their business." *Moorman Mfg. Co.*, 435 N.E.2d at 451.

Thus, the Sixth Circuit has expressly rejected the theory that the ELD "extends only to damages caused by *defective products*" and explained that the ELD applies whenever the plaintiff "purchased products which proved inadequate for [his] purposes, causing [him] lost profits." *Bailey Farms, Inc. v. NOR-AM Chem. Co.*, 27 F.3d 188, 191 (6th Cir. 1994). That is why the ELD applies where a plaintiff complains, not that a product was defective, but that he was sent the *wrong* product. *See, e.g.*, *Adcock v. S. Austin Marine, Inc.*, No. 2:08-cv-263KS-MTP, 2009 WL 3633335, at *5 (S.D. Miss. Oct. 30, 2009). Likewise, courts have recognized that the ELD applies even where the plaintiff is not a purchaser, *see, e.g.*, *Ruscitti v. Atchison, Topeka, & Santa Fe Ry. Co.*, 987 F. Supp. 1039, 1044 (N.D. Ill. 1997), where there is no product at issue at all, *see, e.g.*, *id.* ("[C]ourts do not restrict [the ELD's] preclusive effect to products.").

In addition, as the Indiana Supreme Court has explained, the contractual ELD is not limited to "sale of 'goods'" cases, and the "concepts" behind the doctrine "apply equally in other contexts," such as contracts for services. *Gunkel v. Renovations, Inc.*, 822 N.E.2d 150, 155 (Ind. 2005). In Illinois, the ELD similarly applies to claims for economic losses arising from the negligent performance of services.[81] "The central theory underlying 'economic loss' is that the law should permit the parties to a transaction to allocate . . . risk" by contract, and that rationale

---

[81]    *See, e.g.*, *Fireman's Fund Ins. Co. v. SEC Donohue, Inc.*, 679 N.E.2d 1197, 1200-01 (Ill. 1997) (engineering services); *2314 Lincoln Park West Condo. Ass'n*, 555 N.E.2d at 349 (architect's services).

applies whether the contract involves "an item sold or a service performed." *Gunkel*, 822 N.E.2d at 155. Since the contractual ELD is not limited to sale-of-goods cases, it would make no sense to restrict the doctrine to a particular *type of claim* (product defect) arising solely in such cases.

Here, Plaintiffs assert solely disappointed commercial expectations and their claims thus fall in the heart of the ELD. If plaintiffs could escape the ELD simply by avoiding the word "defect," artful pleading would gut the doctrine. In any event, Plaintiffs *have* asserted that Viptera is defective. *See, e.g.*, CAC ¶ 3169 ("defective and unreasonably dangerous"). And the substance of their claims is that Viptera was not fit for its ordinarily intended purpose because the seeds did not produce corn that could be exported to China. That is, in essence, a defect claim. *See, e.g.*, *Moorman Mfg. Co.*, 435 N.E.2d at 448 (ELD bars claims "when a qualitative *defect* is involved, i.e., *when a product is unfit for its intended use*" (emphasis added)).

### 1.   All States At Issue Would Apply The Contractual ELD.

With minor variations, all States at issue apply the contractual ELD[82] and would apply it to bar Plaintiffs' claims. Only a few States require some further comment.

**Arkansas.** As noted, *see supra* p.50, Arkansas has rejected the ELD for strict liability. For other claims, the Court should predict that the contractual ELD would apply.

**Louisiana.** Plaintiffs' claims are barred by the Louisiana Products Liability Act ("LPLA"), which "establishes the exclusive theories of liability for manufacturers for damage caused by their products." La. R.S. § 9:2800.52 (LPLA). The LPLA governs any claim based on a characteristic of a product, *see, e.g.*, *Jefferson v. Lead Indus. Ass'n*, 106 F.3d 1245, 1250-51 (5th Cir. 1997), and precludes "any theory of liability that is not set forth in this Chapter." La.

---

[82]   Syngenta need not cite a case from every State for this universally applied doctrine; exemplars suffice. *See, e.g.*, *S K Peightal Eng'rs, LTD*, 342 P.3d at 872; *Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Cos., Inc.*, 110 So. 3d 399, 400 (Fla. 2013); *Busbee v. Chrysler Corp.*, 524 S.E.2d 539, 541 (Ga. Ct. App. 1999); *Clark v. Int'l Harvester Co.*, 581 P.2d 784, 790-91 (Idaho 1978); *Moorman Mfg. Co.*, 435 N.E.2d at 447-48; *Indianapolis-Marion Cty. Public Library*, 929 N.E.2d at 739; *Daanen*, 573 N.W.2d at 844-46; *Redman v. John D. Brush & Co.*, 111 F.3d 1174, 1182 (4th Cir. 1997) (Virginia law).

R.S. § 9:2800.52; *see also Bladen v. C.B. Fleet Hldg Co.*, 487 F. Supp. 2d 759, 767 (W.D. La. 2007).  To state a claim under the LPLA, the plaintiff must allege that a product is "unreasonably dangerous."  Plaintiffs who purchased Viptera or Duracade have not attempted to bring a claim under the LPLA, and their boilerplate, conclusory assertion that Viptera corn seed was "unreasonably dangerous" fails under *Iqbal/Twombly*, and for the same reasons that Plaintiffs' product-liability claims fail.  *See infra* Part VIII.B.  Their claims are thus barred by the LPLA.

      **Minnesota**.  Minnesota's statutory ELD provides that a "buyer may not bring a product defect tort claim against a seller for compensatory damages unless a defect in the goods . . . caused harm to the buyer's tangible personal property other than the goods."  Minn. Stat. § 604.101 subd. 3.  Plaintiffs' claims fall under that provision, because Plaintiffs are "buyers" of corn seed, Syngenta is a "seller," and Plaintiffs are not alleging damage to *other* property.  Plaintiffs cannot escape the statute on the theory that they are not bringing "product defect tort claims."  *Cf.* MDL Order 46-47.  The statute broadly defines that term to mean "a common law tort claim for damages caused by a defect in the goods," Minn. Stat. § 604.101 subd. 1(e), and the Reporters' Note makes clear that it "encompasses all common law claims for product defects, such as negligence."  *id.* Reporters' Note.  Here, as noted, the substance of Plaintiffs' claim is that Viptera is not fit for its ordinarily intended purpose, which is a defect claim (failure to meet implied warranty of merchantability).[83]

### III. Plaintiffs' Claims Based On A Duty To Ensure The Segregation Or Channeling Of Grain Produced From Viptera Are Preempted By The Grain Standards Act.

      Any theory that Syngenta had a duty to ensure the segregation of Viptera corn is preempted by the U.S. Grain Standards Act.  *Cf.* CAC ¶ 3159(b)-(d).  That statute expressly

---

[83]    *Ptacek*, 844 N.W.2d 535, is not to the contrary.  As noted, *see supra* note 66, in *Ptacek*, a trial court holding that there was no "product defect" claim in the case was not explained, not appealed, and not even addressed by the court of appeals.  Instead, taking that ruling as a given, the court merely held that, where a claim fell outside the statute in the context of a sale of goods, there was no residual common law ELD to apply.  *See Ptacek*, 844 N.W.2d at 539. That decision provides no guidance as to what qualifies as a "product defect tort claim" under the statute.

preempts any attempt by state law to "require the inspection or description in accordance with any standards of kind, class, quality, condition, or other characteristics of grain as a condition of shipment, or sale, of such grain in interstate or foreign commerce." 7 U.S.C. § 87g(a); *id.* § 75(g) ("grain" includes "corn"). As the MDL Court recently held, state tort law[84] cannot require anyone to inspect or test grain for the presence of Viptera or to segregate or channel grain containing Viptera, because that would necessarily require both "inspection" and "description" of corn according to standards based on genetic "characteristics"—i.e., it would require determining and representing to others whether the corn contains Viptera.[85]

Nor can state law place a duty on Syngenta to contractually force *others* to test for or treat corn differently based on the presence of Viptera. A State cannot accomplish regulation indirectly if direct regulation would be preempted. The Supreme Court has squarely held that if a State regulation of Party A (grain handlers) is preempted, then a State cannot try to accomplish the same result by requiring Party B (Syngenta) to impose the same substantive requirements through its contracts with Party A. *Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 372 (2008). In *Rowe*, federal law preempted States from "enact[ing] or enforc[ing] a law . . . related to a price, route, or service of any motor carrier." *Id.* at 368. Unable to regulate motor carriers directly, Maine tried to circumvent federal preemption by imposing legal requirements on the *shippers* who used motor carriers, requiring shippers of tobacco to contract only with carriers that promised to provide "a special kind of recipient-verification service." *Id.* at 368-69, 371. Even though Maine's law told "shippers what to choose rather than carriers what to do," the Supreme Court held it preempted, explaining that Maine could not indirectly regulate motor

---

[84]   This express preemption provision plainly applies to state common law. *See Riegel v. Medtronic*, 552 U.S. 312, 324 (2008) ("Absent other indication, reference to a State's 'requirements' includes its common-law duties.").

[85]   Mem. & Order on Third-Party Claims, ECF No. 1803 at 4, *In re Syngenta AG MIR162 Corn Litig.*, No. 2:14-md-2591-JWL-JPO  (D. Kan. Apr. 4, 2016) (Exhibit H).

61

carriers by regulating the contracts that shippers must use in hiring motor carriers. *Id.* at 372-73.

Similarly here, States cannot effectively impose requirements for inspecting, describing, and channeling grain by requiring a seed seller (Syngenta) to create a regime of inspecting, describing, and channeling through its own agreements with Viptera purchasers and flow-down contract provisions that would require grain elevators and exporters to segregate Viptera.

Plaintiffs' theory of liability based on a duty to ensure channeling is also impliedly preempted. "[S]tate law is preempted where it stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona v. United States*, 132 S. Ct. 2492, 2505 (2012). Congress enacted the Grain Standards Act to "establish a uniform system for the inspection and grading of . . . grain moving in interstate commerce." *Farmers' Grain Co. of Embden v. Langer*, 273 F. 635, 651 (8th Cir. 1921); *see* 7 U.S.C. § 74(a) (congressional purpose to "establish[] official United States standards for grain, [and] to promote the uniform application thereof"). Congress accomplished that goal by centralizing exclusive authority in the Secretary of Agriculture "to fix and establish [] standards of kind, class, quality, and condition for corn," 7 U.S.C. § 76(a), and by eliminating all State authority to establish inspection or description requirements based on *any* other characteristics, *id.* § 87g. The Secretary has exercised that power by establishing standards for inspecting and describing corn that do *not* include genetic content. *See generally* 7 C.F.R. §§ 810.103, 810.401 *et seq.* Federal regulations thus deliberately permit handling of grain without testing, segregation, or channeling requirements based on genetic content and a state-imposed requirement to create such a testing and channeling regime would frustrate Congress's manifest objective in having uniform federal standards, and only those standards, control. *Arizona*, 132 S. Ct. at 2505 (finding obstacle preemption "[w]here a comprehensive federal scheme intentionally leaves a portion of the regulated field without controls" and state law attempts to regulate what is permitted by federal law).

The only theory that is not preempted is Plaintiffs' unprecedented claim that Syngenta should have refrained from selling Viptera *at all* without Chinese approval.  CAC ¶ 3121.

## IV.   Syngenta Did Not Have A Duty To Control The Conduct Of Others To Segregate Viptera From The Corn Supply.

Plaintiffs' negligence claims also fail because Syngenta owes no duty to control the way third parties handle a U.S.-approved product simply because it has not been approved in China.

### A.   A Manufacturer Has No Duty To Control Post-Sale Use Of Its Product.

Plaintiffs' negligence claims rest on the premise that Syngenta had a duty to control the conduct of everyone else in the industry to ensure that corn would be segregated so that Plaintiffs could produce a product for export based on the *laws of China* rather than simply following U.S. standards for fungible U.S. corn.   Courts have consistently rejected similar claims that manufacturers should be liable for controlling the way third parties handle their safe, non-defective products after sale.  "No Illinois decision has imposed a duty upon the manufacturer of a non-defective [product] to control the distribution of that product to the general public."  *Linton v. Smith & Wesson*, 469 N.E.2d 339, 340 (Ill. App. Ct. 1984).

Whether a duty exists "is a question of law for the court to decide," *Choate v. Ind. Harbor Belt R.R. Co.*, 980 N.E.2d 58, 64 (Ill. 2012), and it is well settled that merely alleging that the commingling of Viptera (and the supposed economic consequences) were "foreseeable" is not enough.  "[D]uty is not to be bottomed on the factor of foreseeability alone," but instead requires "balanc[ing] the foreseeability of the harm against the burdens and consequences that would result from the recognition of a duty."  *Hutchings v. Bauer*, 599 N.E.2d 934, 935 (Ill. 1992).[86]  Thus, duty "turns largely on public policy considerations."  *Beretta U.S.A.*, 821 N.E.2d

---

[86]   *See also, e.g.*, *Lodholtz v. York Risk Servs. Grp., Inc.*, 778 F.3d 635, 644-45 (7th Cir. 2015); *Williams v. Cingular Wireless*, 809 N.E.2d 473, 478 (Ind. Ct. App. 2004) ("Simply because an action may have some degree of foreseeability does not make it sound public policy to impose a duty.").

at 1125.   Particularly relevant here is the settled "general proposition that there is no duty to control conduct of a third person to prevent him from causing harm to another" absent certain special relationships with the third party or injured party.   *Kirk v. Michael Reese Hosp. & Med. Ctr.*, 513 N.E.2d 387, 398 (Ill. 1987); *see* Restatement (Second) of Torts § 315.   Plaintiffs themselves allege that their injury does not arise directly from Syngenta's conduct in making and selling seeds, but instead from the actions of others (growers, grain elevators, and exporters) that allegedly dispersed Viptera corn throughout the corn supply.   *E.g.*, CAC ¶¶ 3033, 3061.

Making a product, however, does *not* create a relationship giving rise to a duty to control the conduct of others using the product.[87]   In rejecting duties on manufacturers to control others, courts have explained that "judicial resistance to the expansion of duty grows out of practical concerns both about potentially limitless liability and about the unfairness of imposing liability for the acts of another."   *Beretta U.S.A. Corp.*, 821 N.E.2d at 1119.   Based on these principles, courts routinely reject efforts to hold manufacturers liable for injuries resulting from third parties' post-sale use of safe, non-defective products.   For example, courts reject the theory that a cell-phone retailer can be liable for injuries caused by a buyer using a cell phone while driving. The retailer "cannot control what people do with the [product] after they purchase [it]," and thus "[i]mposing a duty on [a retailer] to prevent car accidents . . . would effectively require the companies to stop selling cellular phones entirely."   *Williams*, 809 N.E.2d at 478-79; *see also Durkee v. C.H. Robinson Worldwide, Inc.*, 765 F. Supp. 2d 742, 749 (W.D.N.C. 2011).

Similarly, when municipalities tried to hold makers of cold medicine liable for damages resulting from third parties' use of the medicine in making methamphetamine, the Eighth Circuit

---

[87]   *E.g.*, *Hamilton v. Beretta, U.S.A. Corp.*, 750 N.E.2d 1055, 1061 (N.Y. 2001) (rejecting claim for negligent distribution of firearms because "[a] defendant generally has no duty to control the conduct of third persons"); *Camden Cty. Bd. of Chosen Freeholders v. Beretta U.S.A. Corp.*, 123 F. Supp. 2d 245, 266-67 (D.N.J. 2000) (same); *First Commercial Trust Co. v. Lorcin Eng'g, Inc.*, 900 S.W.2d 202, 204-05 (Ark. 1995) (same); *Bloxham v. Glock, Inc.*, 53 P.3d 196, 199 (Ariz. Ct. App. 2002) (same).

dismissed all claims for lack of proximate cause, based on the same policy factors that limit duty. *Ashley Cty., Ark. v. Pfizer, Inc.*, 552 F.3d 659, 663 (8th Cir. 2009).  Plaintiffs argued that, despite FDA approval, the manufacturer should have "restrict[ed] access to the products," by controlling the way retailers sold the medicine (*e.g.*, keeping it behind the pharmacy counter).  *Id.* at 669 (emphasis added).  The Eighth Circuit rejected the idea that the manufacturer could be liable based on others' use of the product—"*even if the manufacturers knew* that cooks purchased their products to use in manufacturing methamphetamine."  *Id.* at 670 (emphasis added).  Imposing such a duty would open a "Pandora's box to [an] avalanche of actions that would follow" against all sorts of manufacturers for injuries caused by those using the products.  *Id.* at 671.

Courts have repeatedly applied identical principles to reject similar tort claims against gun makers: "no common law duty exists upon the manufacturer of a nondefective handgun to control the distribution of that product to the general public" so as to limit injuries from guns. *Riordan v. Int'l Arm. Corp.*, 477 N.E.2d 1293, 1295 (Ill. App. Ct. 1985); *Martin v. Harrington & Richardson, Inc.*, 743 F.2d 1200, 1204 (7th Cir. 1984) (rejecting same duty in part because it would "in practice drive manufacturers out of business" and impose a "ban by judicial fiat" shutting down the sale of an otherwise lawful product).[88]  As the Illinois Supreme Court has explained in rejecting parallel claims for negligent distribution of non-defective firearms, "the magnitude of the burden that plaintiffs seek to impose on the manufacturer and distributor defendants by altering their business practices is immense."  *Beretta U.S.A.*, 821 N.E.2d at 1126.

### B.      These Same Principles Foreclose Imposing Duty On Syngenta In This Case.

*First*, it makes no sense to impose a duty on a GM seed manufacturer like Syngenta to

---

[88]      *See also, e.g.*, *Hamilton*, 750 N.E.2d at 1061 (rejecting duty under settled rule that a "defendant generally has no duty to control the conduct of third persons so as to prevent them from harming others, even where as a practical matter defendant can exercise such control"); *Lorcin Eng'g, Inc.*, 900 S.W.2d at 204-05 (rejecting duty because a manufacturer has "no control over its retailers[,]" and even where it does, that control does not give rise to a duty); *People ex rel. Spitzer v. Sturm, Ruger & Co., Inc.*, 761 N.Y.S.2d 192, 196 (N.Y. App. Div. 2003) (similar).

control the conduct of all those who grow, harvest, process, store, ship, and export corn, because seed manufacturers simply do not control those third parties.  Duty is placed "on the person in the best position to avoid the loss."  *Turner v. Fehrs Neb. Tractor & Equip. Co.*, 609 N.W.2d 652, 658 (Neb. 2000).[89]  Here, as in the cases noted above, the manufacturer (Syngenta) has no authority to control how third parties use its product—especially once it is converted to harvested grain.  The complaints make clear that Syngenta has neither the authority nor the expertise to tell those independent parties how to reorganize their *own* facilities to segregate different types of corn.  It is exactly this lack of control that leads courts (including the MDL Court) to reject nuisance and strict liability claims against manufacturers based on post-sale uses of their products.  *See* MDL Order 54, 59 (dismissing such claims and collecting cases).

*Second,* the theory that Syngenta had a duty to ensure that *everyone else* isolated Viptera is especially mistaken given that, once Viptera had been approved, it was permissible *by law* for Viptera to be present in U.S. corn.  If some growers wanted to export corn free of an approved GM trait, that was a specialty product, and the usual rule is those conducting specialized or especially sensitive enterprises bear the burden of establishing protections enabling them to do so.[90]  Thus, the USDA has always taken the view that organic growers have the "responsibility" to protect their products' special identity by "manag[ing] the potential contact of organic products with other substances not approved for use in organic production systems."[91]

---

[89]  *See also, e.g., Abdo v. Trek Transp. Co.*, 582 N.E.2d 247, 252 (Ill. App. Ct. 1991) ("[W]hen a third party is in the best position to prevent a plaintiff's injury, there is no justification for imposing liability upon [the defendant].").

[90]  *See, e.g., Belmar Drive-In Theatre Co. v. Ill. State Toll Hwy. Comm'n*, 216 N.E.2d 788, 791 (Ill. 1966) ("[A] person cannot increase the liability of his neighbor by applying his own property to special and delicate uses."); *see generally* W. Prosser, *The Law of Torts*, § 87, at 579 (4th ed. 1971) (same).

[91]  USDA, *Nat'l Envt'l Policy Act Decision & Finding of No Significant Impact for Syngenta Seeds, Inc. Alpha-Amylase Maize Event 3272*, 39 (Comment 5), http://www.aphis.usda.gov/brs/aphisdocs/05_28001p_fonsi_rtc.pdf. ; *see also* USDA Nat'l Organic Prog., Policy Mem. From Miles McEvoy, Dep. Admin., to stakeholders and interested parties    re:    GM    Organisms    (Apr.    15,    2011), http://www.ams.usda.gov/sites/default/files/media/OrganicGMOPolicy.pdf (explaining that USDA "relies on *organic certifiers* and *producers*"—not GM manufacturers—"to determine preventative practices that most effectively avoid contact with GMOs on an organic operation").

In fact, applying parallel logic, the USDA takes the view that those who want to deal in corn free from approved GM traits should bear the burden of taking the necessary safeguards to enable them to do so: "conventional growers, similar to organic growers who desire to minimize cross pollination from G[M] corn into their plantings, have the same basic options for avoiding pollination from other corn."[92]  Indeed, the USDA has repeatedly addressed concerns that a GM trait has not yet been approved in desired export markets by placing the onus on "US elevators and grain buyers" to avoid the risk of rejection in export markets by "either refus[ing] to purchase the grain, or [by] requir[ing] that it be diverted to elevators that are solely designated as sources for domestic grain sale.[93]  In accord with the USDA's views, Plaintiffs explicitly allege grain elevators and exporters—the ones who actually commingled corn—could have taken steps to keep Viptera corn out of their elevators and out of their exports to China.  *See, e.g.*, CAC ¶ 3092.  They chose not to.  But it would make no sense to conclude that, as a result, Syngenta somehow had a duty to force them to make a different decision.

*Third*, Plaintiffs' theory would impose enormous liability on GM seed manufacturers for effects in the market that have no logical stopping point.  *Cf. Beretta U.S.A.*, 821 N.E.2d at 1126.  Plaintiffs' theories would make GM manufacturers insurers for their products, which the Seventh Circuit and other courts have consistently rejected as at odds with settled principles of tort law.[94]

---

[92]   USDA, *Finding of No Significant Impact for Syngenta Seeds, Inc. Alpha-Amylase Maize Event 3272*, at 41 (Comment 5), http://www.aphis.usda.gov/brs/aphisdocs/05_28001p_fonsi_rtc.pdf.

[93]   *E.g.*, USDA, *USDA's Response to Public Comments on Syngenta SYN-05307-1 Corn*, 24 (Comment 7), http://www.aphis.usda.gov/brs/aphisdocs/10_33601_rtc.pdf (emphasis added).  The decision in *Bunge* does not suggest anything to the contrary.  *See Syngenta Seeds, Inc. v. Bunge N. Am., Inc.*, 820 F. Supp. 2d 953 (N.D. Iowa 2011).  *Bunge's* statement that Syngenta "accepted the risk of commercializing Viptera," *id.* at 990, addressed an entirely different question.  It explained that Syngenta took the risk that some purchasers might make "a legitimate and reasonable business decision not to accept Viptera corn in order to service the Chinese import market."  *Id.*  The court did not face, and did not address, the question whether Syngenta had a duty to police the conduct of others to facilitate the ability of third party grain elevators to purchase and sell a specialized product like "Viptera-free" corn.  The lawsuit itself is constitutionally protected petitioning that cannot serve as the basis for liability.  *See BE&K Constr. Co. v. NLRB*, 536 U.S. 516, 525–26 (2002) (only sham litigation actionable).

[94]   *See, e.g.*, *Martin*, 743 F.2d at 1204; *accord Patterson v. Rohm Gesellschaft*, 608 F. Supp. 1206, 1213 (N.D. Tex. 1985); *Perkins v. F.I.E. Corp.*, 762 F.2d 1250, 1269 (5th Cir. 1985).

*Fourth*, imposing such liability would usurp policy decisions concerning which GM traits can and cannot be used in the U.S. that are better left to the political branches.  Plaintiffs' theory would effectively shut down the sale of any GM seed as long as there was a risk of litigation like this.  Permitting liability thus amounts to a policy determination at odds with the one the USDA made in approving Viptera for unrestricted sale.  But there is no need for the courts to act as super-regulators grafting additional requirements onto GM traits given that three federal agencies already regulate GM crops.  *See, e.g.*, *Beretta U.S.A. Corp.*, 821 N.E.2d at 1120 (benefits and costs of restricting distribution of non-defective, safe firearms "is better suited to legislative fact-finding and policymaking than to judicial assessment" via tort law); *Young v. Bryco Arms*, 821 N.E.2d 1078, 1090 (Ill. 2004) (fact that sale of firearms is already "highly regulated by law" counsels against judicial creation of additional duties); *Ashley Cty., Ark.*, 552 F.3d at 669 (same for pharmaceuticals).  To paraphrase another court, "courts are the least suited, least equipped, and thus the least appropriate branch of government to regulate and micro-manage the manufacturing, marketing, distribution and sale of" GM seeds.  *Spitzer*, 761 N.Y.S.2d at 199.

It would be particularly inappropriate for the courts to take on that role given the attention that Congress and state legislatures have given to the exact subject of this suit—liability of GM seed manufacturers based on the spread of their products.  At least six Congresses have failed to enact bills that would have created such liability, and at least eleven states have refused to enact similar bills.  *See* Appendix A; *see also Patterson*, 608 F. Supp. at 1213-14 (explaining that "[i]t would be *improper for courts to ignore* the fact that legislatures have repeatedly rejected arguments" for novel forms of liability) (emphasis added).

*Fifth*, Plaintiffs' proposed expansion of tort law would foist a flood of litigation on State courts.  Once such a claim is allowed to proceed, the same theories could be brought "against countless other types of commercial enterprises" for supposed harms from lawful, non-defective

products "regardless of the distance between the 'causes' of the 'problems' and their alleged consequences."  *Spitzer*, 761 N.Y.S.2d at 203; *Ashley Cty., Ark.*, 552 F.3d at 671-72.  Courts have repeatedly rejected similar claims out of precisely that concern about expanding liability.  *E.g.*, *Wiebel v. Mid-Continent Bottlers, Inc.*, 388 N.E.2d 475, 479 (Ill. App. Ct. 1979).

That concern is particularly relevant here, because as a federal court applying state common law, this Court lacks authority to be the first to expand tort law for 30-plus States "[a]bsent some authority to suggest that the approval of the Supreme Court of [each State] is forthcoming."  *Pisciotta*, 499 F.3d at 640 (emphasis added).  This Court's "limited role in the evolution of state law *requires [it] to decline to recognize a novel application of [a]. . . state law tort*" like the duty invented by the MDL Order.  *Villegas*, 893 F.2d at 922 (emphasis added).

### C.    The Only Court To Address Parallel Claims Against A Manufacturer Of An Approved GM Seed Held There Was No Duty As A Matter Of Law.

Before the Viptera litigation, only one common law court had addressed the theory that a seed manufacturer could be liable in tort for selling an *approved* GM seed that had not yet been approved abroad.[95]  In *Hoffman*, Canadian courts applying common law principles rejected the same claims raised here.  *See Hoffman I*, 2005 SK.C. LEXIS 330; *Hoffman II*, 2007 SK.C. LEXIS 194.  *Hoffman* involved GM canola seed that had been fully approved in Canada for "unconfined release."  *Hoffman II*, 2007 SK.C. LEXIS 194 ¶ 60.  Alleging cross-pollination, non-GM canola farmers sued to recover losses of (1) organic farmers, whose crops could no longer command a premium organic price, and (2) all farmers due to "loss of the European market for all Canadian canola" because Monsanto launched the product in Canada before getting import approval from the EU.  *Hoffman I*, 2005 SK.C. LEXIS 330 ¶¶ 21-22.

The Canadian court rejected nuisance and negligence claims for lack of duty.  It found

---

[95]    *Sample* did not address duty analysis because it barred claims under the ELD.  283 F. Supp. 2d at 1093-94.

"no existing judicial or legislative authority" imposing a duty on the manufacturer to prevent lawful GM canola seed from cross-pollinating with other crops by regulating farmers' growing practices. *Id.* ¶ 52. In so holding, the court assumed that cross-pollination was foreseeable, *see id.* ¶¶ 61, 63, but recognized that (as in the U.S.) duty was not governed by foreseeability alone, *see id.* ¶¶ 66–67. As the court explained, there was no relationship giving rise to a duty of care between the GM manufacturer and the plaintiffs. *See id.* The court cautioned that the "implications of holding a manufacturer . . . liable in *nuisance* for damage caused by the use of its product . . . by another would be very sweeping indeed." *Id.* ¶ 122 (emphasis added).

Two prior American cases involving GM seeds are irrelevant because both involved *unapproved* traits on facts where the manufacturer had control. In *StarLink*, the USDA conditioned limited approval by imposing on the manufacturer (Aventis) an "affirmative duty to enforce StarLink farmers' compliance with" restrictions, including segregation from other corn. *StarLink*, 212 F. Supp. 2d at 847. This duty created "unique obligations" and gave Aventis "some measure of control over StarLink's use" and was a "critical factor" that "negate[d]" the usual "concerns [that] courts have expressed about holding manufacturers liable for post-sale nuisances." *Id.* There are no similar facts here because Viptera enjoyed unrestricted U.S. approval. *Genetically Modified Rice* is irrelevant because there the manufacturer itself (Bayer) had caused the improper release of the unapproved trait when conducting its own field trials. *In re GM Rice*, 666 F. Supp. 2d at 1022. Nothing similar is alleged here.

### D.     The Component Parts Doctrine Confirms There Is No Duty On Syngenta.

It is well settled under the component-parts doctrine that tort law generally does not impose duties on the manufacturer of a safe, non-defective component or raw material to refrain from selling its product (or take other steps) to prevent harm that may result from the integration of the component into another product by others. *See, e.g., Apperson v. E.I. du Pont de*

*Nemours & Co.*, 41 F.3d 1103, 1106 (7th Cir. 1994) (applying Illinois law).  That is true even where the risk of harm resulting from others' use of the component in their products is entirely foreseeable.  *E.g.*, *id.* at 1108 (collecting cases); *In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.*, 97 F.3d 1050, 1054 n.4 (8th Cir. 1996) ("[F]oreseeability . . . is irrelevant to determining the liability of the component part manufacturer").  Applying this principle, courts hold that raw materials for cultivated plants—including fertilizer and seeds—are component parts.  *Cf. People ex rel. Spiegel v. Lyons*, 115 N.E.2d 895, 898 (Ill. 1953) (holding that the law treats commercially sold seeds as "ingredient[s]" of the crops raised by growers for sale).[96]

Here, that principle confirms that Syngenta does not owe a duty to prevent harm arising from the way others use Viptera seeds in making their products.  Plaintiffs explicitly allege that Syngenta is no different from a manufacturer of inputs.  The complaint alleges that Syngenta made a safe, non-defective component (Viptera seed) and that Plaintiffs suffered economic injuries from the way that component was integrated into other products (harvested corn and, later, supplies of commingled, fungible corn) by later producers (who grew the corn) and non-producers (who commingled the corn and shipped corn grown from Viptera to China).  If growers and grain handlers had not commingled Viptera corn and if exporters had not shipped corn grown from Viptera to China (e.g., by selling Viptera corn domestically or in foreign markets where Viptera was approved for import), Plaintiffs would not have suffered any harm.  This is exactly where the component-parts doctrine applies.  Where the source of the harm is the way the input is integrated into another product, the component maker is not liable.  *E.g.*, *In re TMJ Prods. Liab. Litig.*, 97 F.3d at 1056.  Like integrators of component parts, grain handlers who commingle corn and choose where, when, and how to export U.S. corn "know[] the precise

---

[96]  *See, e.g.*, *Jorgensen Farms*, 824 N.W.2d at 419 (fertilizer was a component part where it allegedly contaminated wheat crop with rye); *King v. Hilton-Davis*, 855 F.2d 1047, 1052-53 (3d Cir. 1988) (no claim against chemical manufacturer where chemical was used to treat a potato crop and was thus a component part of that crop).

use [they] intend[] to make of the raw material" and are "in a far better position than [Syngenta] to determine whether it is safe for that purpose."  *Apperson*, 41 F.3d at 1107.

### E.  The MDL Court Erred In Holding That Syngenta Had A Duty.

The MDL Court (and the Minnesota Court following its lead) are the *only* courts that have ever held that a GM seed manufacturer has a duty in tort to restrict sale of an *approved* GM trait simply because it has not been approved in a foreign country.  The MDL Court announced an unprecedented duty for Syngenta to run its business "at least in part for the mutual benefit" of others so as to prevent solely economic harm to other industry participants who would prefer not to have their methods of handling corn disrupted by the presence of a GM trait with limited exportability.  MDL Order 10, 17.  As a threshold matter, the Seventh Circuit requires this Court to "decline to recognize a novel application of [a]. . . state law tort" like Plaintiffs' theory here.  *Villegas*, 893 F.2d at 922.  In addition, the MDL Order also suffers from additional errors.

*First*, the MDL Court presumed a "default duty rule" under which everyone owes a duty to avoid foreseeable harm to everyone else.  MDL Order 14.  That is not the law.  Presuming a duty to the world is an "alternative" approach proposed in the Restatement (Third) of Torts, which almost all States, including Illinois and Minnesota, have rejected.  *E.g.*, *Ford*, 2013 WL 5254583, at *8 (rejecting claim for negligent sale of safe product because "there is not 'a duty to the world at large'" (quoting *Simpkins v. CSX Transp.*, 358 Ill. Dec. 613, 619 (2012))).[97]

*Second*, the Restatement (Third)'s alternative approach is expressly limited to a duty to avoid *physical harm*.  *See* Restatement (Third) of Torts: Liab. for Phys. & Emot. Harm § 7(a).[98]

---

[97]    *Cf. Behrendt v. Gulf Underwriters Ins. Co.*, 768 N.W.2d 568, 574 (Wis. 2009) ("Wisconsin has long followed the minority view of duty set forth in the dissent of *Palsgraf v. Long Island Railroad*.").  Even jurisdictions like Wisconsin that take the minority view also assess policy factors in ultimately determining whether an actionable duty exists.  *See, e.g.*, *Nichols v. Progressive N. Ins. Co.*, 746 N.W.2d 220, 225 (Wis. 2008).

[98]    *See* Restatement (Third) of Torts: Liab. for Phys. & Emot. Harm § 6 cmt. f ("Liability . . . addressed in this Section applies *only in cases involving physical and emotional harm* . . . . Cases involving negligence that causes *only economic loss . . . are not addressed* in this Restatement . . . .") (emphases added).

It is inapplicable in these cases, which involve solely allegations of *economic* harm.  *See* MDL Order 19-22.  Even if the Court does not apply the ELD here, the economic nature of the alleged injury is relevant in weighing, *inter alia*, the injury at issue, the burden of placing a duty on the defendant, and administrative difficulties that might arise in enforcing the duty.[99]

*Third*, the MDL Court's rationale for distinguishing cases holding that manufacturers do *not* have a duty to control the way third parties use their products is unpersuasive.  The court asserted that such cases involved "more culpable" third party conduct.  MDL Order 13.  But nothing in the analysis in those cases rested on culpability.  And culpability does not even work as a factual distinction.  Grain elevators that commingled Viptera corn are at least as culpable as negligent drivers in the cell-phone cases.  Like the cell-phone users, they used a product as intended, but in circumstances where it happened (allegedly) to cause injury.  In fact, Plaintiffs' allegations suggest that *knowing* it was "*impossible*" to "prevent[] commingling," (and thus knowing that Viptera was in their corn), CAC ¶¶ 3097, 3161 (emphasis added)—exporters shipped corn containing Viptera to China anyway in violation of Chinese law.[100]  Such knowing or reckless violations of law are more culpable than distracted driving while using a cell phone.

*Fourth*, the MDL Court mistakenly stated that *Hoffman* was distinguishable because it rested on Canadian law "that required a sufficiently proximal relationship between the parties" to find a duty.  MDL Order 16.  But that is no different from American law, which also looks at the relationship between the parties in assessing duty.[101]  Moreover, the MDL Court based its entire

---

[99]   *See, e.g.*, *Taco Bell, Inc. v. Lannon*, 744 P.2d 43, 46 (Colo. 1987) (en banc); *see also* Dobbs § 255.

[100]   *See* Chinese Ministry of Agriculture, Implementation Regulations on the Safety of Import of Agricultural Genetically Modified Organisms, arts. 18-19 (Jan. 5, 2002), http://bch.biodiv.org/database/attachedfile.aspx?id=561; *id.* at art. 18 ("Those who import agricultural GMOs for production or as raw materials for processing *shall obtain the safety certificate of agricultural GMOs* issued by the Ministry of Agriculture *before signing the contract*.") (emphases added); State Council of the People's Republic of China, Regulations on Safety Admin. of Agr. GMOs art. 34 (Jan. 8, 2011), http://apps.fas.usda.gov/gainfiles/200106/110681034.pdf (requiring Safety Certificate at the border); *id.* at art. 38 ("[I]f goods arrive without the Safety Certificate . . . the goods will be rejected or destroyed.").

[101]   *See generally* Dobbs § 255; *see, e.g.*, *Erickson v. Curtis Inv. Co.*, 447 N.W.2d 165, 169 (Minn. 1989); *DiBiasi*

73

rationale for finding a duty on the supposed "*relationship between the parties* in an inter-connected market," *id.* at 17 (emphasis added).  It thus based a duty on *exactly* what the *Hoffman* court thought was *lacking* in an identical agricultural market.

The MDL Court thus created a novel economic tort—"tortious commercialization of a product."  Under the MDL Court's approach, businesses in "an inter-connected market," MDL Order 13, can have a duty to operate for the "mutual benefit," *id.* at 10, of others.  That duty may require a manufacturer to delay new products, or to alter the *way* they are introduced, solely because innovations might undermine the *economic* interests of others.  The essence of Plaintiffs' complaint is that they have an established way of doing business that involves treating corn as fungible.  They want to suppress new products (like GM traits) that have not been approved overseas, because such products force them to a choice: either spend money to alter their methods so that they can keep track of different types of corn (or secure contracts with grain elevators to keep track of different types of corn), or risk foregoing an export market.  This lawsuit is their effort to force Syngenta (and other GM manufacturers) either not to sell seeds with GM traits or to shoulder the cost of creating a system for segregating corn in order to hold Plaintiffs harmless from their own refusal to adapt to technological change.  Plaintiffs' theory would equally mean that a manufacturer may be liable in "negligence" for marketing a GM seed that increases crop yields and thus causes corn prices to drop because of increased supply.[102]

The MDL Court's duty decision is wholly unprecedented.  The ordinary rule is that, apart from specific economic torts (fraud, tortious interference, negligent misrepresentation, etc.) or violations of statutory antitrust or unfair competition laws, businesses are free to pursue their

---

*v. Joe Wheeler Elec. Membership Corp.*, 988 So. 2d 454, 463 (Ala. 2008).  Indeed, the MDL Court itself noted that the "relationship of the parties" is routinely considered as a factor relevant to duty.  MDL Order 9.

[102] *Cf.* Robert Holly, *Growing Pains or Gains*, The News-Gazette (Oct. 11, 2015), http://www.news-gazette.com/news/business/2015-10-11/growing-pains-or-gains.html (describing Monsanto's GM seed that would increase the size of corn ears, with some economists cautioning that "increase in yield at the farm level could actually end up reducing producer income because the drop in price may be larger than the increasing quantity").

advantage in the marketplace—including by introducing disruptive products that others may find inconvenient for their business plans—without regard for *economic* effects on others. [103] Tellingly, the MDL Court did not cite a *single* case finding a duty to operate one's business for the economic benefit of others or to constrain innovation so as to avoid economic disruptions.

The MDL Court also failed to acknowledge the implications of its novel duty. The claim that this duty "does not involve the possibility of an endless stream of claims by strangers further and further removed," MDL Order 14, has already been proved wrong—by the subsequent claims of soybean farmers and ethanol producers. *See supra* pp.25-26.

In addition, this novel duty is broad enough to apply—and to turn settled law upside down—in dozens of industries where businesses have "inter-connected relationships" in which they rely on one another for their products to succeed. In the mobile "ecosystem" where network operators, device manufacturers, app developers, social-media platforms, and other participants rely on one another of the interoperability of their products, the MDL Court's novel duty would allow app developers to hold phone manufacturers liable in *tort* for changing their operating software and causing apps to cease functioning properly (until they adapted their products with new programming). Like Plaintiffs here, app developers could complain that a manufacturer like Apple should have delayed rollout of the new operating system or done more to assist them so they could adapt to the new product. But Apple does not commit a tort when it changes from OS 9 to OS 9.1. Instead, the way for businesses that rely on inputs from others in an inter-connected market to protect their interests is to use *contracts* to minimize the risks inherent in changes in the marketplace—not to use tort law to ossify the market by turning the status quo a vested right and to make courts arbiters of which products can and cannot be sold based on whether others in

---

[103]   Indeed, that is the view reflected in the USDA's determination that grain handlers and growers who do not grow GM corn—not GM seed manufacturers—are responsible for implementing measures to minimize the risk that corn grown from a GM seed will be exported to countries where the trait is not yet approved. *See supra* pp.66-67.

the market find the technology inconvenient for their way of doing business.

**F.    Plaintiffs Cannot Manufacture A Duty To Notify Regulatory Agencies And The Public Of Viptera's Presence In The Corn Supply.**

Plaintiffs' bald assertion that Syngenta is liable for "failing to notify the appropriate regulatory bodies and the public" about "contamination" of the corn supply with MIR162, CAC ¶ 3160, rests on an unprecedented duty that makes no sense.  The USDA, FDA, and EPA were necessarily aware that Viptera would enter the U.S. corn supply because the whole point of the unrestricted deregulation approved by those agencies (and published in the Federal Register) was to allow Viptera to be sold without limitation.  *See supra* pp.68-70.  The federal regulatory regime cuts against any such novel duty because it imposes a duty to notify the USDA solely of the release of *regulated* traits, not deregulated traits.  *See* 7 C.F.R. § 340.3; *id.* § 340.4(f)(10).  Plaintiffs, moreover, offer no allegations plausibly supporting causation.  The federal agencies had already approved adding MIR162 to the corn supply, and Plaintiffs allege that the entire industry was aware of Viptera's sale, that China had not approved it, and that it was "impossible" to prevent cross-pollination and commingling.  *E.g.*, CAC ¶ 3056(b), (d)-(g); *id.* ¶¶ 3124, 3131-32.  Plaintiffs do not allege how anything would have changed if Syngenta had "notified" others about the launch of a product that the government and marketplace were already aware of.

**G.    Plaintiffs Cannot Create A Duty To Segregate From Unspecified Industry "Stewardship Obligations."**

Plaintiffs also cannot manufacture a duty with the passing and unexplained assertion that Syngenta "violated industry recognized stewardship obligations."  CAC ¶ 3243(a).  They offer no allegations at all to identify the source or content of any industry "obligations."  That alone is fatal.  In addition, industry customs "may not be used to establish a duty in the first place," but instead are only "relevant evidence of the standard of care after the law has already recognized a

duty." *Van Duyn v. Cook-Teague P'ship*, 694 N.E.2d 779, 782 (Ind. Ct. App. 1998).[104]

Plaintiffs also cannot concoct a duty to segregate Viptera under the theory that Syngenta voluntarily undertook such a duty by adopting some unidentified industry standard.[105] *First*, "there can be no recovery under the voluntary undertaking doctrine unless physical injury or damage has occurred," which is not asserted here. *Weisblatt v. Chicago Bar Ass'n*, 684 N.E.2d 984, 987-88 (Ill. App. Ct. 1997); *Vancura v. Katris*, 939 N.E.2d 328, 347 & n.6 (Ill. 2010); *see* Restatement (Second) of Torts § 323. *Second*, claims based on a voluntarily undertaken duty require reasonable detrimental *reliance*. *Chisolm v. Stephens*, 365 N.E.2d 80, 86 (Ill. App. Ct. 1977).[106] But Plaintiffs nowhere allege any facts showing that they detrimentally relied on any statement by Syngenta about an undertaking to segregate Viptera. *E.g.*, *Dloogatch v. Brincat*, 920 N.E.2d 1161, 1168 (Ill. App. Ct. 2009) (dismissing claim because "[t]he allegation that plaintiffs 'relied' without more is simply a conclusory statement"); *McCauley v. City of Chi.*, 671 F.3d 611, 617-18 (7th Cir. 2011); *see infra* Part XII.D. Nor *could* they, because the complaints make clear that, far from being "unaware of the actual circumstances" (as required for reasonable reliance), *Chisolm*, 365 N.E.2d at 86, Plaintiffs knew about allegedly inevitable cross-pollination and commingling, knew that China had not approved Viptera, and knew that no one was isolating Viptera corn. CAC ¶¶ 3046, 3056, 3097, 3161. As *Hoffman* explained in rejecting a parallel argument that Monsanto had undertaken a duty to channel its GM seed, "no duty . . . arises from a gratuitous undertaking in the absence of some element of detrimental reliance." *Hoffman I*, 2005 SK.C. LEXIS 330 ¶¶ 84-88. The same analysis applies here.

---

[104]   *Accord, e.g.*, *de Kwiatkowski v. Bear, Stearns & Co., Inc.*, 306 F.3d 1293, 1311 (2d Cir. 2002); *Fla. Fuels, Inc. v. Citgo Petrol. Corp.*, 6 F.3d 330, 334 (5th Cir. 1993); *ServiceMaster of St. Cloud v. GAB Bus. Servs., Inc.*, 544 N.W.2d 302, 307 (Minn. 1996); *Kelley v. Cairns & Bros., Inc.*, 626 N.E.2d 986, 995 (Ohio Ct. App. 1993).

[105]   The only potentially relevant statement from Syngenta that Plaintiffs even identify is a BIO Product Launch Policy stating that Syngenta would "conduct market and trade assessments to identify key import markets" prior to selling new GM traits. *E.g.*, CAC ¶ 3049. That says nothing about segregating traits from the corn supply.

[106]   *See also, e.g.*, *Doe v. Hunter Oaks Apts., L.P.*, 105 So. 3d 422, 427 (Miss. Ct. App. 2013); *Daugherty v. Fuller Eng'g Serv. Corp.*, 615 N.E.2d 476, 480 (Ind. Ct. App. 1993).

## V.     As A Matter Of Law, Syngenta Had No Duty To Refrain From Selling Viptera.

### A.     There Is No Duty To Refrain From Selling A Safe, Non-Defective Product Based On How Third Parties Might Use It After The Point Of Sale.

Any claim that Syngenta had a duty to refrain from selling Viptera *at all* is also meritless. *See, e.g.*, CAC. ¶ 3054 (complaining of "premature release" of Viptera).  For many of the same reasons outlined above, Illinois and other courts also refuse to impose a duty to refrain from selling safe, non-defective products altogether.  *See, e.g.*, *Vaughn v. Nevill*, 677 N.E.2d 482, 485 (Ill. App. 1997) (rejecting negligence claims as a matter of law because there is "no duty to refrain from selling" a slingshot, which is "not dangerous unless improperly used").[107]  Indeed, in an exactly parallel case, Canadian courts in *Hoffman* rejected any duty on a GM manufacturer to refrain from selling a GM seed that is fully approved in the country where it is sold.  *See Hoffman I*, 2005 SK.C. LEXIS 330, ¶ 71.

A duty-not-to-sell rule would also thrust the judiciary even more clearly into the role of usurping policy decisions belonging to the political branches.  It would directly conflict with the USDA's determination that Viptera *could* be sold in the U.S. without restriction.  It would also give China a veto over which GM traits can appear in U.S. corn (thereby giving China the ability to deny biotechnology benefits not only to U.S. consumers, but also to much of the rest of the world where U.S. corn is exported).  Given that China imported *only about one-third of 1%* of U.S. corn production when Viptera was launched, *see supra* note 16, Plaintiffs' theory would mean giving such a biotechnology veto to every country that imported a comparable percentage

---

[107]    *See also, e.g.*, *Ashley Cty., Ark.*, 552 F.3d at 673; *Spitzer*, 761 N.Y.S.2d at 200 (no "duty upon a manufacturer to refrain from the lawful distribution of a non-defective product"); *Williams*, 809 N.E.2d at 478 (no duty on cellphone retailer for harm from distracted drivers because such a duty "would be akin to making a car manufacturer stop selling otherwise safe cars because the car might be negligently used in such a way that it causes an accident"); *Stanford v. Wal-Mart Stores, Inc.*, 600 So. 2d 234, 240 (Ala. 1992) (no duty to refrain from selling a product that was not "inherently dangerous"); *Bond v. E.I. DuPont De Nemours & Co.*, 868 P.2d 1114, 1120 (Colo. Ct. App. 1993) (similar); *Watters v. TSR, Inc.*, 904 F.2d 378, 381 (6th Cir. 1990) ("[C]ourts of Kentucky would never permit a jury to say that simply by marketing a parlor game, the defendant violated its duty to exercise ordinary care.").

of any given crop.  The common law of tort, however, does not give the courts a mechanism for taking over the USDA's role in determining which biotechnology products can and cannot be sold in the U.S. and effectively transferring that decision to foreign sovereigns.

Plaintiffs' theory of duty would also embroil the judiciary in an ongoing flood of policy choices as they would have to decide for every significant export crop (1) how to define "key" markets that should be given a veto over new biotechnology in the U.S.; (2) how to assess which governments have "functioning regulatory systems" such that they are worthy of being granted that veto power by American courts; and (3) whether circumstances have caused a country to lose (or gain) status as a "key" market or a "functioning regulatory system."[108]  Courts simply do not have the expertise to micromanage such a parallel regulatory system.  *See supra* Part IV.B.

### B. Plaintiffs Cannot Manufacture A Duty To Refrain From Selling Viptera From Unidentified Industry Standards.

For the same reasons outlined above with respect to a supposed duty to *segregate* Viptera, Plaintiffs cannot invoke industry standards to create a duty to refrain from selling Viptera at all.  *See supra* Part IV.F.  Nor do Plaintiffs allege that Syngenta somehow voluntarily undertook such a duty, and any such claim would fail as explained above.  *See supra* Part IV.G.

### VI. FIFRA Preempts Any Failure-To-Warn Theory Of Liability.

The Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA") expressly preempts any claims to the extent they are based on failure to warn farmers concerning risk of the loss of the Chinese market.  FIFRA preempts any state rule—including a common law duty—that (1) is "a requirement 'for labeling or packaging'" that (2) "is in addition to or different from those required under [FIFRA]."  *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 444 n.17 (2005); *see also* 7 U.S.C. § 136v(b).  Both criteria are met by failure to warn claims here.  *First*, failure-to-

---

[108]  *Cf.* Nov. 27, 2012 BIO Policy at 4 n.5, https://www.bio.org/sites/default/files/Product-Launch-Stewardship-11272012.pdf (regulatory systems "continue to evolve" and thus "may become functional or dysfunctional").

warn claims qualify as seeking to impose "requirements for labeling or packaging," because they purport to "set a standard for a product's labeling."  *Bates*, 544 U.S. at 446.  *Second*, any requirement that labels must warn of potential economic loss due to trade disruptions is plainly "in addition to or different from" FIFRA's requirement that the label need only contain a warning "adequate to protect health and the environment."  7 U.S.C. § 136(q)(1)(G).  Thus, as the MDL Court correctly held, any theory that Syngenta failed to warn Viptera farmers is preempted.  MDL Order 49; *see Bates*, 544 U.S. at 452; *StarLink*, 212 F. Supp. 2d at 836.

**VII.    All Claims Must Be Dismissed To The Extent They Rely On Event 5307/Duracade.**

Plaintiffs fail to state any claim regarding Event 5307/Duracade because they do not and cannot allege any injuries from the sale of Duracade.  *See Clapper v. Amnesty Int'l USA*, 133 S. Ct.  1138, 1151 (2013) (no standing "based on [] fears of hypothetical future harm that is not certainly impending").  Plaintiffs' injuries allegedly began in November 2013 when China rejected shipments that "test[ed] positive for *Viptera* corn."  CAC ¶ 3109 (emphasis added).  Plaintiffs' sole alleged injury thus started many months before Duracade "was released, sold and distributed for planting in 2014."  *Id.* ¶ 3036.  Because Plaintiffs do not allege that U.S. corn containing Event 5307/Duracade has ever been rejected by China or has caused any trade disruption, economic losses, or other injury, any claims based on that product must be dismissed.

**VIII.   Plaintiffs' Strict-Liability And Products-Liability Claims Fail As A Matter Of Law.**

In addition to being barred by the ELD here, *see supra* Part II, strict-liability and products-liability claims are independently limited to claims for *physical* harm.  *See* Restatement (Second) of Torts § 388; *id.* § 520 cmt. f (abnormally dangerous activity requires "a danger of physical harm"); *Mink v. Univ. of Chi.*, 460 F. Supp. 713, 719 (N.D. Ill. 1978) (an "essential element[] in a claim for strict liability is physical injury").  These claims fail here because Plaintiffs allege solely economic injury.  They also suffer from further claim-specific defects.

## A.   Plaintiffs' Strict-Liability Claims Fail As A Matter Of Law.

The attempt to treat the sale of Viptera as an "abnormally dangerous" or "ultrahazardous" activity, *see* Restatement (Second) of Torts §§ 519-20, fails for three reasons.[109]

*First*, courts uniformly hold "there can be no liability for merely manufacturing" and marketing products, even "dangerous products," as a matter of law.  *City of Bloomington, Ind. v. Westinghouse Elec. Corp.*, 891 F.2d 611, 615-16 (7th Cir. 1989).   Rather, courts "impose liability for the ultrahazardous activity as a result of the *use* of the product," *Martin*, 743 F.2d at 1204, and strict liability requires that the defendant was "engaged directly in the injury-producing activity," *Perkins*, 762 F.2d at 1267.[110]   Here, for example, it is farmers' actions supposedly permitting cross-pollination, farmers' and grain elevators' commingling of corn, and exporters' sale of corn containing Viptera to China that produced any supposed injury.

*Second*, ultrahazardous activities always "have . . . involved land-related activities that caused damage to neighbors," *Perkins*, 762 F.2d at 1257, 1267, and courts have consistently held that marketing and selling a product is not an ultrahazardous "activity."  *Id.*; *Shipman v. Jennings Firearms, Inc.*, 791 F.2d 1532, 1534 (11th Cir. 1986); *Richardson v. Holland*, 741 S.W.2d 751, 755 (Mo. Ct. App. 1987); *Hamilton v. Accu-tek*, 935 F. Supp. 1307, 1324 (E.D.N.Y. 1996).

*Third*, selling a product that three federal agencies have approved as safe does not remotely approach the type of activity that courts find ultrahazardous.[111]   Courts have limited ultrahazardous activities to things such as blasting in a residential area, pile driving under certain

---

[109]   The relevant States follow the Restatement (Second) of Torts §§ 519-520 or apply a materially same standard.

[110]   *See also, e.g.*, *Ind. Harbor Belt Ry. Co. v. Am. Cyanamid Co.*, 916 F.2d 1174, 1181 (7th Cir. 1990) (a manufacturer "is not considered to be engaged in an abnormally dangerous activity merely because the product becomes dangerous when it is handled or used in some way after it leaves his premises, even if the danger is foreseeable"); *Perkins*, 762 F.2d at 1268 ("[T]he injuries of which the plaintiffs complain were not caused by the marketing itself, but rather result[] only when there is substandard conduct on the part of third parties.").

[111]   Under the Restatement, six factors are considered: (1) a high degree of risk of harm to person, land, or chattels; (2) the likelihood for great resulting harm; (3) inability for reasonable care to eliminate the risk; (4) whether the activity is common; (5) inappropriateness of the activity where it is carried on; and (6) whether its dangerousness outweighs its value to the community.  Restatement (Second) of Torts § 520.

81

circumstances, or releasing poisonous substances.[112]  *See generally* Restatement (Second) of Torts § 520 reporter's note; *Martin*, 743 F.2d at 120.[113]  Indeed, given that crop-dusting with herbicides and pesticides (which can *kill* plants or animals) is *not* ultrahazardous*, see supra* note 113, there is no plausible claim that selling approved seeds somehow crosses the line.

### B.    Plaintiffs' Products-Liability Claims Fail As A Matter Of Law.

#### 1.    *Plaintiffs Fail to Allege Any Defect.*

Products-liability claims are limited to three types of defects—defects in manufacturing, design, or warnings/instructions.  *See generally* Dobbs § 452; Restatement (Third) of Torts: Prods. Liab. § 2; *Apperson v. E.I. du Pont Nemours & Co.*, 41 F.3d 1103, 1106 (7th Cir. 1994). Other than a conclusory assertion that Viptera was "defective and unreasonably dangerous," *e.g.*, CAC ¶ 3169—which the Court should properly ignore, *see, e.g.*, *Iqbal*, 556 U.S. at 678; *McCauley*, 671 F.3d at 617-18—Plaintiffs make no effort to identify any defect in Viptera seeds at the time of sale.  At best, the allegations suggest the theory that Viptera is defective because (i) corn from the seed will inevitably be subject to cross-pollination and commingling and (ii) China had not yet approved the GM traits.  Those theories do not allege any cognizable defect.

*First*, Plaintiffs make no attempt to assert a failure *to warn or instruct*.

*Second*, Plaintiffs do not assert any *manufacturing* defect because they do not allege that any Syngenta seed was "substandard when compared to other identical units off of the assembly line."  *E.g.*, *In re TMJ Implants Prods. Liab. Litig.*, 97 F.3d at 1054 n.4.

*Third*, the ability of corn grown from Viptera and Duracade seed to cross-pollinate and

---

[112]   *Whitfeld v. Tronox Worldwide*, No. 1:03-CV-287, 2007 WL 1561807, at *2 (N.D. Miss. May 25, 2007) (strict liability applies only for "the transport and use of explosives in populated areas").

[113]   *E.g.*, *Beddingfield v. Linam*, 127 So. 3d 1178, 1190 (Ala. 2013) (no liability because "[a]mong other things, the fireworks that caused [plaintiff's] injury are commonly used"); *Mangrum v. Pigue*, 198 S.W.3d 496, 500 (Ark. 2004) ("[A]s a matter of law, [] the spraying of the widely used herbicide, Roundup Ultra, was not an ultrahazardous activity."); *Wilson v. Greg Williams Farm, Inc.*, 436 S.W.3d 485, 489 (Ark. Ct. App. 2014) ("[A]viation is now so commonplace that [crop dusting] cannot be considered to be . . . ultrahazardous."); *Bennett v. Larsen Co.*, 348 N.W.2d 540, 553 (Wis. 1984) ("[P]esticide application is not an ultrahazardous activity[.]").

commingle also cannot be cast as a *design* defect.  A design defect requires "that the design itself selected by the manufacturer—*the plan, structure, choice of materials, and specifications*—was unreasonably dangerous."  *Low v. Lowe's Home Ctrs. Inc.*, 771 F. Supp. 2d 739, 741 (E.D. Ky. 2011) (emphasis added).  Plaintiffs cannot point to anything about specifications chosen by Syngenta that could have (i) changed the fact that corn reproduces by pollination or (ii) altered the way unrelated actors commingle harvested corn.[114]  Any design-defect theory amounts to the unprecedented claim that Syngenta was obligated to develop corn that does not pollinate in the air.  The only court to consider that outlandish theory rejected it.[115]

Nor is lack of Chinese approval a design defect.  Foreign approval does not reflect something inherent about the seed.  Even ignoring that *foreign* regulators do not determine defects in the U.S., Plaintiffs' approach would make a seed "defective" before Chinese approval, but suddenly non-defective once China approved it (as China did for Viptera in December 2014).

### 2.    *Plaintiffs' Claims Fail Under the Component-Parts Doctrine.*

Plaintiffs' claims also fail because Syngenta is a raw-materials supplier that cannot be held liable as a matter of law for harm resulting from the way growers used Syngenta's seeds or the way grain elevators commingled corn.  As explained above, under the raw-materials or component-parts doctrine, a manufacturer of a safe, non-defective input is not liable for harm resulting from the integration of the input into another product by others.  *See supra* Part IV.D. That principle applies bars Plaintiffs' strict liability claim as well as their negligence claim.

## IX.    Plaintiffs Fail To State A Claim For Tortious Interference.

Plaintiffs fail to allege any facts whatsoever to support multiple elements of their claim for tortious interference with prospective business relations.  Specifically, they fail: (1) to

---

[114]    *Cf. Hollister v. Dayton Hudson Corp.*, 201 F.3d 731, 740 (6th Cir. 2000) ("[A] prima facie case of design defect requires that the plaintiff propose a reasonable alternative design.").
[115]    *See StarLink*, 212 F. Supp. 2d at 837-38 (rejecting claim that StarLink is "defective" because "it will inevitably commingle and cross-pollinate," explaining that these characteristics have "nothing to do with StarLink's design").

identify any specific business relationships that are the subject of the claim; (2) to allege the requisite injury: that third parties stopped doing business (or refused to do business) with Plaintiffs; (3) to identify any *improper means* supposedly used by Syngenta; and (4) to provide any allegations plausibly suggesting that Syngenta acted with the requisite *intent*.[116]

### A.    Plaintiffs Fail To Allege Specific Prospective Business Relationships.

Plaintiffs' tortious interference claims fail because they do not identify any "precise business expectancy" sufficiently concrete to warrant legal protection.  *Country Corner Food & Drug, Inc. v. First State Bank & Tr. Co. of Conway, Ark.*, 966 S.W.2d 894, 898 (Ark. 1998).  "A plaintiff states a cause of action only if he alleges a business expectancy with a specific third party."  *Ali v. Shaw*, 481 F.3d 942, 945-46 (7th Cir. 2007).  ThusPlaintiffs "must specifically identify a third party with whom [they had] a reasonable probability of a future economic relationship."  *Gieseke ex rel. Diversified Water Diversion, Inc. v. IDCA*, 844 N.W.2d 210, 221-22 (Minn. 2014); *Gruhlke v. Sioux Empire Fed. Credit Union*, 756 N.W.2d 399, 404 (S.D. 2008) (requiring "an identifiable third party who wished to deal with the plaintiff").  Merely projecting "future business with unidentified customers, without more, is insufficient," as is asserting a general expectation for the "level of business to continue."  *Gieseke*, 844 N.W.2d at 221-22.[117]

To the extent a plaintiff relies on the assertion that existing relationships will continue, moreover, the plaintiff must identify specific parties in those relationships,[118] and identify

---

[116]   Each State at issue here except Louisiana requires the four elements noted in text.  *See e.g.*, *Walter Energy, Inc. v. Audley Capital Advisors LLP*, 176 So. 3d 821, 828 (Ala. 2015); *Delloma v. Consolidation Coal Co.*, 996 F.2d 168, 170-71 (7th Cir. 1993) (Illinois law); *Burcham v. Unison Bancorp, Inc.*, 77 P.3d 130, 152 (Kan. 2003); *Felsher v. Univ. of Evansville*, 755 N.E.2d 589, 598 n.21 (Ind. 2001).  Louisiana does not recognize this tort.  *See 9 to 5 Fashions, Inc. v. Spurney*, 538 So. 2d 228, 234 (La. 1989).

[117]   *See also Forever Green Athletic Fields, Inc. v. Lasiter Constr., Inc.*, 384 S.W.3d 540, 552 (Ark. Ct. App. 2011) (allegations that "are nothing more than a general desire to be able to contract" for business "do not show a specific relationship or expectancy"); *Gieseke*, 844 N.W.2d at 221 ("[T]he majority of state courts that have considered the issue require the plaintiff to demonstrate the existence of a prospective economic advantage with at least one specific, identifiable third party with which the defendant interfered.") (collecting cases).

[118]   *See, e.g.*, *Golf Sci. Consultants, Inc. v. Cheng*, No. 3:07-CV-152, 2009 WL 1256664, at *10 (E.D. Tenn. May 4, 2009) ("Generalized references to third parties simply fail[] to meet the specificity need for this element."); *accord*

particular reasons for concluding that business with the same customers will continue.[119]

Plaintiffs fail to state a claim on these standards. They merely assert "business relationships whereby Plaintiffs would sell their corn to [unspecified] grain purchasers" and an unexplained (and wholly subjective) "expectation that such business relationships would continue." CAC ¶¶ 3173-74. That "bald and conclusory assertion that [plaintiff] had . . . a business expectancy" fails as a matter of law. *Hunt v. Riley*, 909 S.W.2d 329, 332 (Ark. 1995).

Contrary to the MDL Court's suggestion, *see* MDL Order 68, it is not sufficient for a plaintiff merely to identify a class of third parties with whom it expects to do business. That amounts to no more than a "projection of future business with unidentified customers," which is "insufficient as a matter of law." *Gieseke*, 844 N.W.2d at 221-22. A complaint fails where "there are no specific third parties named in the complaint, only general categories of persons." *Overnite Transp. Co. v. Teamsters Local Union No. 480*, No. M2002-02116-COA-R3-CV, 2004 WL 383313, at *13 (Tenn. Ct. App. Feb. 27, 2004); *see also Kramer v. Pollock-Krasner Found.*, 890 F. Supp. 250, 258 (S.D.N.Y. 1995) (claim "must specify some particular, existing business relationship through which plaintiff would have done business").

Moreover, even if identifying a class of prospective customers were sufficient, Plaintiffs would still have to allege *facts* showing that a "clearly identified group was contemplating prospective contractual arrangements." *Citylink Grp., Ltd. v. Hyatt Corp.*, 729 N.E.2d 869, 877 (Ill. App. Ct. 2000); *see also Iqbal*, 556 U.S. at 678. Plaintiffs, however, allege nothing more

---

*Playboy Enters., Inc. v. Editorial Caballero, S.A. de C.V.*, 202 S.W.3d 250, 265 (Tex. App. 2006); *Du Page Aviation Corp. v. Du Page Airport Auth.*, 594 N.E.2d 1334, 1340 (Ill. App. Ct. 1992).

[119] *Stonebridge Collection, Inc. v. Carmichael*, 791 F.3d 811, 820 (8th Cir. 2015) (no claim where plaintiff failed to state "how many reorders a customer typically would place" or "whether its relationship with the reordering customers was long-term"); *Kidd v. Bass Hotels & Resorts, Inc.*, 136 F. Supp. 2d 965, 970 (E.D. Ark. 2000) ("[P]ast business relationships with former customers [are] not sufficiently certain, concrete and definite . . . ."); *Instant Tech., LLC v. DeFazio*, 40 F. Supp. 3d 989, 1020 (N.D. Ill. 2014) ("[P]roof of a past customer relationship is not sufficient to prove a 'reasonable expectation' of a business relationship in the future."), *aff'd*, 793 F.3d 748 (7th Cir. 2015); 1A Callmann on Unfair Competition, Trademarks, and Monopolies § 9:11 (4th ed.) ("Past business relationships with former customers are usually not sufficient to establish a cognizable prospective relationship.").

than that they have previously sold corn to unspecified "grain purchasers" and that they have "a consistent course of sales."  *E.g.* CAC ¶ 3173.  But "[t]he mere hope that some of [Plaintiffs'] past customers may choose to buy again cannot be the basis for a tortious interference claim." *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 815 (Fla. 1994); *supra* note 119.

### B. Plaintiffs Fail To Allege The Requisite Injury: That A Third Party Ended Or Refused To Enter A Business Relationship.

Plaintiffs also fail to allege any facts showing the requisite injury—that the defendant "induc[ed] or caus[ed] a breach or termination of the relationship or expectancy."  *McNeill v. Sec. Benefit Life Ins. Co.*, 28 F.3d 891, 893 (8th Cir. 1994) (Arkansas law). Where a plaintiff asserts interference with a *prospective* relationship, he must allege "that the defendant's actions *prevented the relationship from occurring.*"  *Texas Disposal Sys. Landfill, Inc. v. Waste Mgmt. Holdings, Inc.*, 219 S.W.3d 563, 590 (Tex. App. 2007); *accord Wilkey v. Hull*, 366 F. App'x 634, 638 (6th Cir. 2010) ("Absent some factual allegation that [defendant's] actions *ended or prevented a business relationship*," a plaintiff "does not state a claim.") (emphasis added); *Assoc. Underwriters of Am. Agency v. McCarthy*, 826 N.E.2d 1160, 1169 (Ill. App. Ct. 2005) (plaintiff must allege that "defendant intentionally interfered with the expectancy and *prevented it from ripening into a valid business relationship*") (emphasis added).  In other words, a plaintiff states a claim "*only* when the interference causes a third person to *discontinue* a business relationship or to *refrain from entering* into" a relationship."  *Brown v. CVS Pharm., LLC*, 982 F. Supp. 2d 793, 805 (M.D. Tenn. 2013) (emphases added).[120]  That rule is reflected in the black-letter of the Restatement, which allows liability only for "(a) inducing or otherwise causing a third person *not*

---

[120]   This rule is applied across jurisdictions.  *See, e.g.*, *Schoedinger v. United Healthcare of Midwest, Inc.*, No. 4:07-CV-904SNLJ, 2011 WL 97735, at *7 (E.D. Mo. Jan 12, 2011); *Golf Sci. Consult.*, 2009 WL 1256664, at *11; *Cent. Park Prods., Inc. v. Dorel Juvenile Grp., Inc.*, No. 07-5012, 2007 WL 1821308, at *2 (W.D. Ark. June 25, 2007); *Erickson's Flooring & Supply Co., Inc. v Tembec, Inc.*, No. 03-74214, 2006 WL 148759, at *8 (E.D. Mich. Jan. 18, 2006), *aff'd*, 212 F. App'x 558, 566 (6th Cir. 2007); *Reali, Giampetro & Scott v. Soc'y Nat'l Bank*, 729 N.E.2d 1259, 1265 (Ohio Ct. App. 1999); *Kahn v. Salomon Bros. Inc.*, 813 F. Supp. 191, 195 (E.D.N.Y. 1993).

*to enter into* or *continue* the prospective relation or (b) *preventing* the other from *acquiring* or *continuing* the prospective relation."  Restatement (Second) of Torts § 766B (emphases added).

Plaintiffs fail to allege that Syngenta prevented an expectancy from being realized.  They do not allege that buyers of corn stopped doing business with them.  Instead, they allege solely that they "have been unable to sell their corn . . . at the *price* they reasonably expected to receive."  CAC ¶ 3178 (emphasis added).  But "merely claiming that [a] contract would have been more advantageous to [Plaintiff] in the absence of Defendants' interference—pleading, in other words, that a contract did not end up being as beneficial as the plaintiff had hoped—does not satisfy the requirement that a business relationship be *prevented*."  *U.S. Enercorp, Ltd. v. SDC Montana Bakken Expl., LLC,* 966 F. Supp. 2d 690, 704 (W.D. Tex. 2013).[121]  The MDL Court's assertion that "interference with the expectation of sales *at certain market prices*" can suffice, MDL Order 72 (emphasis added), contradicts settled law, and the MDL Court notably did not cite a *single case* in support.  This Court should not follow the MDL Court by expanding tortious interference in thirty-three States without a single precedent to support that approach.

### C.    Plaintiffs Fail Adequately To Allege Improper Means.

Plaintiffs also fail to allege any facts showing "improper means"—means that are "independently tortious or unlawful."  *Gieseke*, 844 N.W.2d at 218.[122]  They do not assert

---

[121]  *See also Enercorp*, 966 F. Supp. 2d at 703 ("The Court is unaware of . . . any Texas case in which a contract was consummated but the plaintiff was nevertheless successful on a claim for tortious interference . . . ."); *accord BCD LLC v. BMW Mfg. Co.,* 360 F. App'x 428, 436 (4th Cir. 2010) (South Carolina law); 1A Callman on Unfair Competition, Trademarks & Monopolies § 9:16 ("There is no liability where the plaintiff is able to consummate a contract with another party but could have realized a better deal but for the actions of the defendant . . . .").

[122]  States use one of three standards for evaluating improper means.  Idaho, Texas, Minnesota, Missouri, New York, North Dakota, and Oklahoma require that the alleged interfering act be actionable under a recognized tort or independently wrongful.  *Gieseke*, 844 N.W.2d at 219-20; *Commercial Ventures, Inc. v. Rex M. & Lynn Lea Family Trust*, 177 P.3d 955, 964 (Idaho 2008); *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 726 (Tex. 2001); *Trade 'N Post, LLC*, 628 N.W.2d at 720; *Cmty. Title Co. v. Roosevelt Fed. Sav. & Loan Ass'n*, 796 S.W.2d 369, 373 (Mo. 1990) (en banc); *Gaylord Entm't Co. v. Thompson*, 958 P.2d 128, 150 (Okla. 1998); *Kahn*, 813 F. Supp. at 195.

Arkansas, Alabama, Kansas, Kentucky, Ohio, and South Dakota look to a multifactor test.  *See Ventas, Inc. v. HCP, Inc.*, 647 F.3d 291, 306 (6th Cir. 2011); *Baptist Health v. Murphy*, 373 S.W.3d 269, 281-82 (Ark. 2010); *Selle v. Tozser*, 786 N.W.2d 748, 753 (S.D. 2010); *White Sands Grp., LLC v. PRS II, LLC*, 32 So. 3d 5, 13 (Ala. 2009);

specific torts in their tortious interference claims, and for the reasons above, their other efforts to cast Syngenta's conduct as tortious fail.  Pointing to supposed misrepresentations about "whether grain elevators and other supply companies would accept MIR 162 corn," CAC ¶ 3176, also cannot support their claims.  Plaintiffs do not and cannot allege that statements supposedly overstating acceptance of Viptera by grain elevators were somehow intended to (or could) *prevent* those grain elevators from doing business with Plaintiffs.

At bottom, Plaintiffs are trying to treat the lawful sale of a U.S.-approved product as if it were "improper means," and to penalize Syngenta for pursuing its own economic interests in the marketplace.  That is insupportable as a matter of law.  "Improper means" is required as an element of the tort to preserve the ability of actors in a free market to pursue their own economic advantage—that is, to "ensure that fair competition is not chilled."  *Gieseke*, 844 N.W.2d at 218.[123]  Treating the lawful sale of an approved product as "improper means" would upend the policy objectives of the law and impair the robust operation of free markets.

In addition, the plaintiff must "allege some conduct *directed toward a third party* through which defendants purposely cause *that third party* not to enter into or continue a prospective relationship."  *Hoopla Sports & Entm't, Inc. v. Nike, Inc.*, 947 F. Supp. 347, 357 (N.D. Ill. 1996)

---

*Burcham*, 77 P.3d at 152; *Dryden v. Cincinnati Bell Tel. Co.*, 734 N.E.2d 409, 414 (Ohio Ct. App. 1999).

    Georgia, Iowa, New Mexico, North Carolina, and Tennessee require malice, which Plaintiffs in this case do not even claim to meet.  *See Meadow Springs, LLC*, 747 S.E.2d at 50; *Sioux City Radiological Grp., P.C.*, 985 F. Supp. at 882; *Fikes v. Furst*, 81 P.3d 545, 552 (N.M. 2003); *Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 n.5 (Tenn. 2002); *Cameron v. New Hanover Mem'l Hosp., Inc.*, 293 S.E.2d 901 (N.C. Ct. App. 1982).  Where, as here, the complaint shows that the defendant's actions pursued its own economic interests, Illinois also requires malice.  *Philip I. Mappa Interests, Ltd. v. Kendle*, 554 N.E.2d 1008, 1011-12 (Ill. App. Ct. 1990); *see, e.g.*, CAC ¶ 3048 (alleging that "Syngenta's motivation in prematurely releasing VIPTERA corn is purely profit driven").

[123]  *See also, e.g.*, *Berger v. Cas' Feed Store, Inc.*, 543 N.W.2d 597, 599 (Iowa 1996) ("A party does not improperly interfere with another's contract by exercising its own legal rights in protection of its own financial interests."); *accord Compiano v. Hawkeye Bank & Trust of Des Moines*, 588 N.W.2d 462, 466 (Iowa 1999); *Bridgeway Commc'ns, Inc. v. Trio Broad., Inc. (WBLX Radio Station-93 FM)*, 562 So. 2d 222, 223 (Ala. 1990); *Kahn*, 813 F. Supp. at 195 ("Under New York law where a defendant's conduct is intended even partially to advance its own interests, the misconduct must rise to the level of fraudulent or criminal acts.").

(emphasis added).[124]   Plaintiffs allege no such conduct directed at the (unidentified) "grain purchasers" with whom Plaintiffs allegedly plan to do business.

### D.   Plaintiffs Fail Adequately To Allege Intent.

Finally, Plaintiffs fail sufficiently to allege intent, which requires "alleg[ing] *facts which indicate that the defendants acted with the purpose of injuring plaintiff's expectancies*."  *Hoopla Sports*, 947 F. Supp. at 357 (emphasis added); *see also supra* note 122 (some States require allegations of malice).  Plaintiffs fail to allege any facts suggesting such an intent.

Even if intent required only knowledge "to a substantial certainty" that interference with expectancies would result,[125] Plaintiffs fail to meet that standard as well.  "Interference" means preventing a business relationship from being realized at all.  Plaintiffs do not (and cannot) allege that Syngenta *knew* that would happen; they do not even allege that it *did* happen.

## X.   Plaintiffs' Private Nuisance Claims Must Be Dismissed As A Matter Of Law.

A claim for private nuisance requires that (1) the defendant control or substantially participate in an activity that (2) unreasonably interferes (3) with another's interest in the private use and enjoyment of his land.  *See* Restatement (Second) of Torts § 821D; *see also, e.g., Lethu Inc. v. City of Hous.*, 23 S.W.3d 482, 489 (Tex. Ct. App. 2000); *Goforth v. Smith*, 991 S.W.2d 579, 587 (Ark. 1999).[126]   Plaintiffs fail adequately to allege each element.

### A.   Plaintiffs Fail Adequately To Allege That Syngenta Controlled Or Substantially Participated In The Activity Constituting The Nuisance.

Plaintiffs have not alleged any facts suggesting that Syngenta controlled or substantially

---

[124]   *See also Fencl v. Heidrick*, No. 14-C-9102, 2015 WL 1143149, at *3 (N.D. Ill. Mar. 11, 2015) (citing *Grund v. Donegan*, 700 N.E.2d 157, 161 (Ill. App. Ct. 1998)).

[125]   *May v. Countrywide Home Loans, Inc.*, No. 4:07-cv-375, 2007 WL 1879781, at *4 (E.D. Mo. June 28, 2007).

[126]   Almost every State analyzes nuisance relying on the Restatement (Second) of Torts.  *E.g.*, *Adinolfe v. United Tech. Corp.*, 768 F.3d 1161, 1177 (11th Cir. 2014); *Lilly Ind., Inc. v. Health-Chem Corp.*, 974 F. Supp. 702, 706 (S.D. Ind. 1997); *Chi. Flood*, 680 N.E.2d at 277.  States that do not rely on the Restatement apply statutes with materially the same standard.  *See* Idaho Code § 52-101; *Dickens v. Oxy Vinyls, LP*, 631 F. Supp. 2d 859, 865 (W.D. Ky. 2009); LSA-C.C. 667-669; *Rodrigue v. Copeland*, 475 So. 2d 1071, 1077 (La. 1985).

participated in carrying on the activity that amounted to the alleged nuisance—namely, dispersing Viptera in the U.S. corn supply.  It is settled in similar situations that, because a "seller in a commercial transaction [like Syngenta] relinquishes ownership and control of its products when they are sold," it *cannot*, as a matter of law, be liable for post-sale nuisances allegedly caused by others' use of its products.  *See, e.g.*, *City of Bloomington, Ind.*, 891 F.2d at 614; *Cloverleaf Car Co. v. Philips Petrol. Corp.*, 540 N.W.2d 297, 300-01 (Mich. Ct. App. 1995).[127]  The general rule is that "the absence of a manufacturer's control over a product at the time [an alleged] nuisance is created generally is fatal to any . . . claim" based on post-sale uses of the manufacturer's product.  *Traube v. Freund*, 775 N.E.2d 212, 216 (Ill. App. Ct. 2002).

Plaintiffs cannot salvage their claim by arguing that Syngenta participated in activities giving rise to the nuisance, *cf.* Restatement (Second) of Torts § 834, because they have not alleged facts to support that theory.  The complaints affirmatively allege that *others* took actions leading to cross-pollination and commingling of harvested corn.  Plaintiffs allege that "local, regional, and terminal grain elevators" "gather[], commingle[], and ship[] corn from hundreds of thousands of farmers."  CAC ¶ 3061.  While Plaintiffs make conclusory assertions that Syngenta supposedly "encouraged farmers to disregard practices designed to prevent commingling" or "encouraged farmers to plant Viptera in a way that promoted cross-pollination,"  *Id.* ¶¶ 3080, 3091, the only thing approaching a *factual* allegation is the assertion that Syngenta encouraged farmers to grow Viptera with other corn "side-by-side."  *Id.* ¶ 3080.  While that might have facilitated cross-pollination *on a single farm*, it suggests nothing about Syngenta having a role in cross-pollination *between* farms, much less a role in commingling harvested corn.

---

[127]  *See also*, *e.g.*, *L'Henri, Inc. v. Vulcan Materials Co.*, Civ. No. 2006-177, 2010 WL 924259, at *6 (D.V.I. Mar. 11, 2010) (finding "no support" for holding that a manufacturer participated in carrying on a nuisance where it, "after the time of manufacture and sale, no longer had the power to abate the nuisance"); *accord E.S. Robbins Corp. v. Eastman Chem. Co.*, 912 F. Supp. 1476, 1494 (N.D. Ala. 1995); *Jordan v. S. Wood Piedmont Co.*, 805 F. Supp. 1575, 1583 (S.D. Ga. 1992); *Tioga Pub. Sch. Dist. No. 15 v. U.S. Gypsum Co.*, 984 F.2d 915, 920 (8th Cir. 1993); *Appletree Square 1 Ltd. P'ship v. W.R. Grace & Co.*, 815 F. Supp. 1266, 1274 n.13 (D. Minn. 1993).

*StarLink* also provides no support for nuisance here.  *StarLink* rested on the "critical" fact that the "*unique obligations* imposed by the limited [USDA] registration" of StarLink imposed "an affirmative duty to enforce StarLink farmers' compliance with the Grower Agreements" and thus "arguably put Aventis in a position *to control the nuisance*."  *StarLink*, 212 F. Supp. 2d at 847 (emphases added).  There are no similar regulatory duties here and *StarLink* is inapposite.

The MDL Court correctly rejected similar nuisance claims because "a seller of a product is not liable for a private nuisance caused by the use of that product after it has left the seller's control."  MDL Order 59, 61.  There is no basis for a different outcome here.

### B.      Plaintiffs Fail To Allege Interference With Their *Land.*

Nuisance claims are also fatally flawed because Plaintiffs have not alleged facts showing interference with the use and enjoyment of their *land*.  Plaintiffs complain about effects on the "corn supply," but they do not allege those effects took place on every plaintiff's property, *see supra* Part II.A.3.  Instead, they theorize that the nuisance was "contaminat[ing] . . . the entire U.S. corn supply."  *E.g.*, CAC ¶ 3032.  In other words, they think that they can claim a nuisance even if Viptera seed, Viptera pollen, and harvested Viptera corn never came near their *land*.

That is incorrect as a matter of law.  Private nuisance unequivocally requires interference with the use and enjoyment of *Plaintiffs' land*.  *See, e.g.*, *Anderson v. State, Dep't of Nat. Res.*, 693 N.W.2d 181, 184, 192 (Minn. 2005) (nuisance requires the "requisite property interest" in the affected land).[128]  That requires allegations of tangible effects on the land.  *See, e.g.*, *Chi. Flood*, 680 N.E.2d at 278 (nuisance requires "invasion by something perceptible to the senses.").  Courts routinely reject attempts to decouple nuisance from effects on a plaintiff's *land*, because that approach would result in nuisance "becom[ing] a monster that would devour in one gulp the

---

[128]   *See also Hutchens v. MP Realty Grp.-Sheffield Sq. Apts.*, 654 N.E.2d 35, 38 (Ind. Ct. App. 1995) (nuisance requires a "proprietary interest in the land on which . . . injuries occur"); *accord Hot Rod Hill Mot. Park v. Triolo*, 293 S.W.3d 788, 791 (Tex. Ct. App. 2009); *Culwell v. Abbott Const. Co., Inc.*, 506 P.2d 1191, 1196 (Kan. 1973).

entire law of tort." *Tioga Pub. Sch. Dist. v. U.S. Gypsum Co.*, 984 F.2d 915, 920-21 (8th Cir. 1993).  There is no basis for this Court to adopt such a radical expansion of the law.  The MDL Court correctly rejected a nuisance claim, because allowing it would mean that "any conduct causing fluctuation in a market for crops would give rise to a nuisance claim."  MDL Order 65.

### C.   Plaintiffs Fail Adequately To Allege Unreasonable Interference.

Lastly, Plaintiffs cannot claim *unreasonable* interference with land, given that Viptera had unrestricted federal approval to be part of the corn supply and does nothing inherently harmful.  Plaintiffs' claim that they wanted to produce "Viptera-free corn" means that they wanted to devote their land to producing a *specialty* product.  But an alleged interference "is not a nuisance if it interferes only with especially sensitive . . . uses" of land.  Dobbs § 399; Restatement (Second) of Torts § 821F cmt. d & illus. 2.  Growing exclusively corn that satisfies *Chinese import standards* rather than U.S. standards constitutes a specially sensitive use.

Plaintiffs here are no different from the canola farmers in *Hoffman I*, in that they claim that they wanted to grow a crop with specialty characteristics for export.  *Cf. Hoffman I*, 2005 SK.C. LEXIS 330 ¶ 121.  *Hoffman* rejected a nuisance claim where it was not alleged that the GM trait at issue "is harmful per se or that it renders the . . . crops unfit for consumption or otherwise harmful."  *Id*.  The same reasoning applies here.

## XI.   Plaintiffs' Public Nuisance Claims Fail As A Matter Of Law.

Plaintiffs' public nuisance claims similarly fail because Syngenta lacked control over its seeds after the point of sale.  *See, e.g.*, *City of St. Louis v. Cernicek*, No. 02CC-1299, 2003 WL 22533578, at *2 (Mo. Ct. App. Oct. 15, 2003).[129]  The claims also fail because Plaintiffs fail to identify any public right at issue and fail to allege facts showing "special damage."

---

[129]   *Ashley Cty.*, 552 F.3d at 663; *Camden Cty. Bd. of Chosen Freeholders v. Beretta U.S.A.*, 273 F.3d 536, 541 (3d Cir. 2001); *City of Bloomington*, 891 F.2d at 614; *Young*, 821 N.E.2d at 1089; *Beretta U.S.A.*, 821 N.E.2d at 1126.

### A.      Plaintiffs Have Not Identified Any Right Common To The General Public.

Public nuisance requires an "unreasonable interference with a right common to the general public," which generally means rights related to health, safety, peace, and convenience. Restatement (Second) of Torts § 821B(1)-(2); *City of St. Louis v. Varahi, Inc.*, 39 S.W.3d 531, 536 (Mo. Ct. App. 2001).[130]  Public nuisances include obstructing roads, streams, and public places; facilitating the spread of disease; and creating obnoxious sounds and odors that interfere with public peace and comfort.[131]  Plaintiffs assert three "rights" that cannot support a claim because none exists and none relates to public health and convenience.  As the Illinois Supreme Court has held, there is no "public right to be free from the threat that some individuals may use an otherwise legal product (be it a gun, liquor, a car, a cell phone, or some other instrumentality) in a manner that create[s] a risk of harm to another." *Beretta U.S.A.*, 821 N.E.2d at 1116.

First, Plaintiffs assert interference with the "right to expect compliance with the federal laws governing" the sale of Viptera.  CAC ¶ 3147.  But Plaintiffs cite no law that Syngenta supposedly violated, nor do they allege any *facts* showing a violation.  That alone dooms this claim.  *See Iqbal*, 556 U.S. at 678.  Moreover, Plaintiffs concede that "VIPTERA was deregulated" in 2010," CAC ¶ 3071, which means it could lawfully be sold without restriction.

Second, Plaintiffs assert a violation of the "right" for corn sold to the general public to be "free from contamination with VIPTERA corn."  CAC ¶ 3174.  There is no such right.  Once Viptera had been deregulated, it was *fully approved to be sold as part of the U.S. corn supply*

---

[130]   Almost every State at issue here relies on the public nuisance definition in the Restatement (Second) of Torts.  *See, e.g.*, *Freeman v. Grain Processing Corp.*, 848 N.W.2d 58, 66 (Iowa), *cert. denied*, 135 S. Ct. 712 (2014); *Beretta U.S.A.*, 821 N.E.2d at 1127.  Arkansas requires interference with plaintiffs' "use and enjoyment of the[ir] land."  *Indep.endence Cty. v. Pfizer, Inc.*, 534 F. Supp. 2d 882, 890 (E.D. Ark. 2008).  Florida law holds that "[a] public nuisance violates public rights, subverts public order, decency or morals, or causes inconvenience or damage to the public generally."  *Orlando Sports Stadium, Inc. v. State ex rel. Powell*, 262 So. 2d 881, 884 (Fla. 1972).  Several states also have public nuisance statutes that are materially similar to the Restatement.  *See, e.g.*, Idaho Code § 52-111; *State ex rel. Village of Los Ranchos de Albuquerque v. City of Albuquerque*, 899 P.2d 185, 198 (N.M. 1994) ("[C]ommon law public nuisance is similar to the New Mexico public nuisance statute[.]").

[131]   *See generally* Restatement (Second) of Torts § 821B cmt. a; *see, e.g.*, *State ex rel. Detienne v. City of Vandalia*, 94 S.W. 1009, 1009 (Mo. Ct. App. 1906) (erecting obstruction on a public highway).

under applicable USDA regulations for "yellow corn."  *See supra* pp.6-7 & note 10.

Third, Plaintiffs claim that Syngenta violated "the public's right to be notified of whether the corn sold to the public is contaminated with genetically-modified organisms."  CAC ¶ 3174.  Plaintiffs cite no authority for this "right" because there is none.  GM crops and foods have been a topic of public debate for decades, but the federal government and over a dozen States have repeatedly rejected GM labeling.  *See* Appendix B.  At a minimum, GM labeling is a topic of policy debate within the political branches that the judiciary should not preempt.  *Cf. supra* p.68 & note 94.  It is certainly not the role of a *federal* court to create out of whole cloth a new "right" to GM labeling under state law.  *See Villegas*, 893 F.2d at 925.

Plaintiffs' supposed "rights" also cannot support a public nuisance claim because they do not implicate the type of concerns about health or safety that underpin public nuisance theory.  Plaintiffs do not allege that Viptera is harmful to health.  The FDA has expressly found it is not.  *See supra* p.7 & note 14.  For that reason, other courts have rejected similar public-nuisance claims about *approved* GM traits.  In *GM Rice*, for example, given the USDA approval while the case was pending, there was no contention "that the rice is harmful to the entire community or the general public," and that was fatal for public nuisance.  *See In re GM Rice*, 666 F. Supp. 2d at 1018; *In re GM Rice*, MDL No. 1811, 2007 WL 3027581, at *3 (E.D. Mo. Oct. 15, 2007).  Assertions that farmers' "own economic interests have been harmed" cannot support a public nuisance claim.  *In re GM Rice*, 2007 WL 3027581, at *3.[132]

### B. Plaintiffs Have Not Alleged Any "Special Damage."

Plaintiffs' claims also fail because Plaintiffs have not alleged any facts plausibly showing "'special damage' that is different in 'kind and degree from [that] suffered by the public.'"

---

[132]   *Starlink* is distinguishable because the GM trait was unapproved, and the court reasoned that "[c]ontamination of the food supply" with something *not* approved for human consumption "implicates health, safety, comfort and convenience."  212 F. Supp. 2d at 848; *see also In re GM Rice*, 2007 WL 3027581, at *3 (distinguishing *Starlink*).

*Russell Corp. v. Sullivan*, 790 So. 2d 940, 951 (Ala. 2001); *see also Adkins v. Thomas Solvent Co.*, 487 N.W.2d 715, 721 n.11 (Mich. 1992).  Indeed, Plaintiffs do not allege *facts* showing that they were injured by violation of the supposed "rights" they identify *at all*.  Plaintiffs claim "business losses in the form of . . . the rejection of the crops by certain export markets, namely China."  *E.g.*, CAC ¶ 3149.  But there is no way to link that injury to an imaginary violation of federal laws that Plaintiffs have not even described, and it plainly does not result from any violation of a purported right for *consumers* to have the benefit of GM labeling.

## XII.   Plaintiffs' Consumer Protection Claims Must Be Dismissed.

### A.   Illinois Consumer Fraud And Deceptive Business Practices Act ("ICFA")

As "non-consumer[s]" of Syngenta's products, Plaintiffs lack standing under the ICFA because they have not alleged a "consumer nexus," which requires showing how the action "involve[s] consumer protection concerns; and . . . how the requested relief would serve the interests of consumers."  *Thrasher-Lyon v. Ill. Farmers Ins. Co.*, 861 F. Supp. 2d 898, 912 (N.D. Ill. 2012).  *First*, Plaintiffs have not alleged that they purchased Viptera or Duracade, nor could they claim to be consumers in any event, because "consumer" in the ICFA means "any person who purchases . . . merchandise not for resale," 815 Ill. Comp. Stat. 505/1(e)—that is, "the ultimate buyers of the finished product," *Williams Elecs. Games, Inc. v. Garrity*, 366 F.3d 569, 579 (7th Cir. 2004).  A farmer purchasing seed is not a consumer because he uses seed "as an input into the making of a product that he sells."  *Id*.  *Second*, Plaintiffs' claims are particularly inapt for the ICFA because their theory is that "the ultimate buyers" (*i.e.*, consumers of corn) paid *less* than they would have absent Syngenta's actions.  *See Speakers of Sport, Inc. v. ProServ, Inc.*, 178 F.3d 862, 868 (7th Cir. 1999) (no ICFA claim "when no consumer has been hurt").  *Third*, Plaintiffs' requested relief (damages for themselves and attorneys' fees) would not aid consumers.  *See, e.g.*, *Prescott v. Argen Corp.*, No. 13-cv-6147, 2014 WL 4638607, at *7

(N.D. Ill. Sept. 17, 2014) (no standing where relief requested benefits only business plaintiff).[133]

### B.    Arkansas Deceptive Trade Practices Act ("ADTPA")

Plaintiffs' ADTPA claims fail.  *First,* they have not alleged any actual damage other than a diminution in value of the product they purchased.  That is insufficient as a matter of law. ADTPA requires (1) a deceptive consumer-oriented act and (2) injury.  *Stonebridge Collection, Inc. v. Carmichael*, 791 F.3d 811, 822 (8th Cir. 2015).  It provides a private right of action solely for a "person who suffers *actual damage or injury*."  Ark. Code § 4-88-113(f) (emphasis added); *Yazdianpour v. Safeblood Techs., Inc.*, 779 F.3d 530, 537-38 (8th Cir. 2015).  Where, as here, the only alleged injury is diminution in value of a product, a private action is not cognizable.  *Wallis v. Ford Motor Co.*, 362 Ark. 317, 328-29 (2005).  Such claims can be pursued solely by the Attorney General.  *Id*.  Plaintiffs' request for injunctive relief must also be dismissed, because the ADTPA does not provide an action for injunctive relief.  *Baptist Health*, 373 S.W.3d at 288.

### C.    Florida Deceptive and UnfairTrade Practices Act ("FDUTPA")

A private damages action under FDUTPA "cannot be maintained unless the alleged unfair or deceptive acts or practices complained of involved a consumer transaction."  *Monsanto Co. v. Campuzano*, 206 F. Supp. 2d 1252, 1268-69 (S.D. Fla. 2002).  Plaintiffs fail to allege any consumer transactions.  *First*, Plaintiffs nowhere allege that they ever purchased any product from Syngenta and therefore lack standing under FDUTPA.  *See, e.g.*, *Taft v. The Dade Cty. Bar Assoc.*, No. 1:15-cv-22072-KMM, 2015 WL 5771811, at *4-5 (S.D. Fla. Oct. 2, 2015).

*Second*, even if Plaintiffs had allegedly purchased Viptera, they have not alleged a "consumer transaction," which requires a purchase by "an individual for purposes that are

---

[133]   The MDL Court wrongly held that farmers qualify as consumers of seeds by analogy to a tax decision (*Sluis v. Nudelman*, 34 N.E.2d 391, 392 (Ill. 1941)) that treated seeds as property transferred "for use or consumption and not for resale" because farmers sell vegetables, not seeds.  *See* MDL Order 107-08.  A more recent version of the tax statute clarified that when "property as an ingredient or constituent goes into and forms a part" of a product that is later sold, the property is transferred for resale.  *Lyons*, 115 N.E.2d at 898.  To the extent any analogy is relevant, the newer law clarifies that seeds are transferred for resale, *not* "for use or consumption."  *See id.*

primarily personal, family, or household or that relate to a business opportunity that requires both his expenditure of money or property and his personal services on a continuing basis *and in which he has not been previously engaged.*"   *Campuzano,* 206 F. Supp. 2d at 1269.  Given the absence of any supporting factual allegations, Plaintiffs' FDUTPA claims fail as a matter of law.

### D.    California Unfair Competition Law ("UCL")

Plaintiffs' claims under the UCL must be dismissed both because Plaintiffs' allegations concerning misrepresentations fail to meet the standards of Rule 9(b) and because Plaintiffs fail to plead facts showing reliance.  *See, e.g.*, *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124-25 (9th Cir. 2009) (Rule 9(b) applies to UCL claims); *cf. Camasta v. Jos. A. Bank Clothiers, Inc.* 761 F.3d 732, 736 (7th Cir. 2014) (Rule 9(b) applies to deception under Illinois' consumer protection statutes).  Rule 9(b) requires a plaintiff to state "the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff."   *Camasta*, 761 F.3d at 737. Plaintiffs provide none of those details.  The only supposedly deceptive statement they even identify appeared in a form used for requesting Bio-Safety Certificates for importing Viptera. *See* CAC ¶ 3044.  They provide no details as to when or how any Plaintiffs viewed these forms, and the circumstances under which Plaintiffs could have seen those forms in a context inviting their reliance is all the murkier given that (as the MDL Court has explained) the forms were designed for use by *exporters*, not corn growers such as Plaintiffs.  *See* MDL Order 86-87.

In addition, a plaintiff asserting a misrepresentation "must demonstrate actual reliance." *Kwikset Corp. v. Sup. Ct.*, 246 P.3d 877, 888 & n.9 (Cal. 2011); *see also Haskins v. Symantec Corp.*, No. 13-cv-01834-JST, 2014 WL 2450996, at *1-2 (N.D. Cal. June 2, 2014).  Plaintiffs make conclusory assertions with no facts to describe any reliance.  They merely assert that "Plaintiffs . . . relied upon the statement and did not know it was untrue."  CAC ¶¶ 3044, 3054.

They fail even to allege that they bought Syngenta seed.  Such conclusory assertions of reliance fail as a matter of law.  *In re Tobacco II Cases*, 46 Cal. 4th 298, 328 (Cal. 2009).

### E.      Georgia Uniform Deceptive Trade Practices Act ("GUDTPA")

GUDTPA provides solely injunctive relief to protect against *future* harm, not damages for *past* harm.  *Iler Grp., Inc. v. Discrete Wireless, Inc.*, 90 F. Supp. 3d 1329, 1342 (N.D. Ga. 2015).  Standing under GUDTPA requires allegations of likely future damage.  *Catrett v. Landmark Dodge, Inc.*, 560 S.E.2d 101, 106 (Ga. Ct. App. 2002).  Plaintiffs' claims rely solely on past conduct.  *E.g.*, CAC ¶ 3231 (statements "*were* likely to and *did in fact* deceive reasonable consumers") (emphases added); *id.* ¶ 3236 (alleging that Georgia plaintiffs *suffered* losses *caused* by Syngenta).  The claims must be dismissed.  *See Vie v. Wachovia Bank, N.A.*, No. 1:11-CV-3620, 2012 WL 1156387, at *3 (N.D. Ga. Apr. 6, 2012); *Catrett*, 560 S.E.2d at 106.

### F.      Idaho Consumer Protection Act ("ICPA")

Plaintiffs lack standing under ICPA, which is limited to those who were in a contractual relationship with the party alleged to have acted unfairly or deceptively.  *Sykes v. Mortg. Elec. Reg. Sys., Inc.*, No. 1:11-cv-377-BLW, 2012 WL 914922, at *8 (D. Idaho Mar. 15, 2012); *Taylor v. McNichols*, 243 P.3d 642, 662 (Idaho 2010).  Plaintiffs have not alleged that they purchased Viptera or Duracade seed, or that they have any contract whatsoever with Syngenta.

### G.      Kentucky Consumer Protection Act ("KCPA")

Plaintiffs seek actual damages and an injunction under Section 367.220 of the KCPA.  CAC ¶ 3273.  Section 367.220 provides an action for "[a]ny person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act or practice declared unlawful by KRS 367.170."  Ky. Rev. Stat. § 367.220(a).  Purchases for commercial purposes are not covered by Section 367.220.  *Keeton v.*

*Lexington Truck Sales, Inc.*, 275 S.W.3d 723, 726 (Ky. Ct. App. 2008).  Plaintiffs' claims fail because they have not alleged (i) that they purchased any goods from Syngenta at all and (ii) that their complaints arise from transactions made for personal, family or household purposes.

### H.    Minnesota Deceptive Trade Practices Act ("MDTPA")

Plaintiffs' claims under the MDTPA fail because the MDTPA "provides only injunctive relief" "limited to those persons 'likely to be damaged by a deceptive trade practice.'"  *Dennis Simmons, D.D.S., P.A. v. Modern Aero, Inc.*, 603 N.W.2d 336, 339 (Minn. Ct. App. 1999) (quoting Minn. Stat. § 325D.45, subd. 1).  MDTPA claims thus require allegations of "*future* damage, *not* past damage.*"  *Damon v. Groteboer*, 937 F. Supp. 2d 1048, 1070 (D. Minn. 2013); *see also Four D, Inc. v. Duthland Plastics Corp.*, No. 01-cv-2073, 2002 WL 570655, at *4 (D. Minn. Apr. 15, 2002).  Plaintiffs' claims refer only to past conduct.  *See, e.g.*, CAC ¶ 3277 (alleging misrepresentations "*were* likely and/or *did* cause confusion or mistake") (emphases added); *id.* ¶ 3278 (alleging Syngenta "*caused*, and/or *were* likely to cause c[u]st[o]mer confusion") (emphases added).  Plaintiffs do not seek injunctive relief to prevent future harm.

### I.    New York General Business Law ("NYGBL")

Section 349 requires: (1) acts directed at *consumers* that (2) mislead in a material way; and (3) injury.  *Saggio v. Select Portfolio Serv. Inc.* No. 15-cv-04300 (JG)(RER), 2015 WL 6760132, at *11 (E.D.N.Y. Nov. 5, 2015).  Plaintiffs' claims fail because they have not alleged deceptive acts directed at *consumers—i.e.*, "those who purchase goods and services for personal, family or household use."  *Tasini v. AOL, Inc.*, 851 F. Supp. 2d 734, 742 (S.D.N.Y. 2012).  Plaintiffs also fail the requirement that "the gravamen of the complaint must be consumer injury or harm to the public interest," *Id.* at 742, because they allege harm only to commercial farmers.

### J.    North Carolina Unfair And Deceptive Trade Practices Act ("NCUTPA")

Plaintiffs lack standing under NCUTPA, which only "extend[s] to businesses in

appropriate contexts." *Williams v. Charlotte Copy Data, Inc.*, No. COA03-332, 2004 WL 193887, at *2 (N.C. Ct. App. Feb. 3, 2004).   "[O]ne business is permitted to assert an [NCUTPA] claim against another business only when the businesses are competitors (or potential competitors) or are engaged in commercial dealings with each other" or the conduct giving rise to the suit has a negative effect on the consuming public.[134]  The MDL Court wrongly rejected these restrictions.  *See* MDL Order 111.  But a month later, a federal court reaffirmed them.  *See Exclaim Mktg., LLC v. DirecTV, LLC*, No. 5:11-CV-684, 2015 WL 5773586, at *6 (E.D.N.C. Sept. 30, 2015).  NCUTPA does not apply here, because Syngenta does not compete with or deal with Plaintiffs, and Plaintiffs have not alleged *harm* to consumers.  *Id.* at *7 (no claim where there was a "net positive effect" for consumers); *Food Lion*, 194 F.3d at 520.

Claims based on alleged misrepresentations fail because they do not adequately allege reliance, *see Tucker v. Blvd. At Piper Glen LLC*, 564 S.E.2d 248, 251 (N.C. Ct. App. 2002); MDL Order 115, and also fail under Rule 9(b).  *La Tortilleria, Inc. v. Nuestro Queso, LLC*, No. 1:12CV408, 2014 WL 1322627, at *6 (M.D.N.C. Mar. 31, 2014); *see also supra* Part XII.D.

### K.     South Carolina Unfair Trade Practices Act ("SCUTPA")

"[A] claim under SCUTPA is inadequate where it 'fails to allege any specific procedures or business practices that create the potential for repetition.'"  *Companion Prop. v. U.S. Bank Nat'l Assoc.*, No. 3:15-cv-01300-JMC, 2015 WL 7568613, at *8 (D.S.C. Nov. 24, 2015).  Plaintiffs' claims fail because they allege solely discrete misrepresentations related to a single product in the past and fail to show any practice portending repetition.

### <u>CONCLUSION</u>

For the foregoing reasons, the complaint should be dismissed with prejudice.

---

[134]   *Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505, 520 (4th Cir. 1999); *see Williams*, 2004 WL 193887, at *3; *Pleasant Valley Promenade v. Lechmere, Inc.*, 464 S.E.2d 47, 54 (N.C. Ct. App. 1995).

Dated:  April 18, 2016                    Respectfully submitted,


                                          */s/ Jordan M. Heinz*
                                          Michael J. Nester (ARDC #0203211)
                                          DONOVAN ROSE NESTER P.C.
                                          201 South Illinois Street
                                          Belleville, IL 62220
                                          Telephone: (618) 212-6500
                                          Fax: (618) 212-6501
                                          Email: MNester@drnpc.com

                                          Jordan M. Heinz (ARDC #6286377)
                                          KIRKLAND & ELLIS LLP
                                          300 North LaSalle
                                          Chicago, Illinois  60654
                                          Telephone: (312) 862-2000
                                          Facsimile: (312) 862-2200
                                          Email: jheinz@kirkland.com

                                          Michael D. Jones (*pro hac vice*)
                                          Edwin John U (*pro hac vice*)
                                          Patrick F. Philbin (*pro hac vice*)
                                          Ragan Naresh (*pro hac vice*)
                                          KIRKLAND & ELLIS LLP
                                          655 Fifteenth Street, N.W.
                                          Washington, DC  20005-5793
                                          Telephone: 202-879-5000
                                          Facsimile: 202-879-5200
                                          Email: mjones@kirkland.com
                                                 eu@kirkland.com
                                                 pphilbin@kirkland.com
                                                 ragan.naresh@kirkland.com

                                          *Attorneys for Syngenta AG; Syngenta Crop
                                          Protection AG; Syngenta Corporation;
                                          Syngenta Crop Protection, LLC; Syngenta
                                          Biotechnology, Inc.; and Syngenta Seeds, Inc.
                                          (now known as Syngenta Seeds, LLC)*

**APPENDIX A:**
**FEDERAL AND STATE LEGISLATIVE PROPOSALS**
**TO ADDRESS LIABILITY FOR GM CROPS**

| Jurisdiction | Year(s) | Legislation |
|---|---|---|
| Federal (U.S. Congress) | 2002 2003 2005 2008 2010 2011 | Genetically Engineered Organism Liability Act, H.R. 4816, 107th Cong. 2d (2002), H.R. 2919, 108th Cong. 1st (2003), H.R. 5271, 109th Cong. 2d (2005), H.R. 6637 § 203(a), 110th Cong. 2d (2008), H.R. 5579 § 203(a), 111 Cong. 2d (2010), H.R. 3555 § 203(a), 112th Cong. 1st (2011) (failed bills that would have made "biotech compan[ies] [] liable to any party injured by the release of a genetically engineered organism into the environment if that injury results from that genetic engineering") |
| California | 2005 | Assemb. B. 984, 2005 Leg., Reg. Sess. (Cal. 2005) (eliminated bill provision that would have made "the manufacturer of a genetically engineered plant . . . liable to any producer, grain and seed cleaner, handler, or processor injured by the release of that plant into California") |
| Hawaii | 2014 | S.B. 2737 § 2, 27th Leg. Sess. (Haw. 2014) (bill that would have required GM manufacturer to provide certain minimum notice to purchasers of the "possible legal and environmental risks") |
| Massachusetts | 2001 | S.B. 1789 (Mass. 2001) (similar) |
| | 2003 | S.B. 1912 (Mass. 2003) (voted-down bill that would have held GMO manufacturers liable in tort for damages caused by use of their products) |
| Minnesota | 2000 | HF 3820, 81st Leg. (Minn. 2000) (failed bill to make manufacturers liable for "[a]ny transfer of genetic material from a growing crop of an agriculturally related GMO to a growing crop of nongenetically modified plant organisms, whether by cross pollination or other means" that results in "diminishe[d] value" of the crops) |
| Montana | 2005 | S.B. 218, 2005 Leg. Reg. Sess. (Mon. 2005) (failed proposal to make "manufacturer[s] liable for injury suffered by any party because of the release of genetically engineered wheat into Montana") |

| Jurisdiction | Year(s) | Legislation |
|---|---|---|
| Nebraska | 2000 | L.B. 959 § 3, 96th Leg., 2d Reg. Sess. (Neb. 2000) (failed bill that would have established liability for "[t]he transfer of a genetically engineered trait from a genetically engineered growing crop, by cross pollination or other means, to a growing crop which is not genetically engineered") |
| New York | 2013 | Assemb. B. 6509 § 1, 236th Leg. Sess. (N.Y. 2013) (failed bill that would have made "[a] manufacturer of genetically engineered plants, planting stocks, or seeds . . . liable to any person for any damages . . . due to cross-contamination caused by the manufacturer's products," including "market price reductions incurred by farmers resulting from loss of crop exports, including foreign and domestic markets") |
| North Dakota | 2005 | S.B. 2235, 2005 Leg. Reg. Sess. (N.D. 2005) (voted-down bill "to establish liability related to the planting of genetically engineered wheat") |
| Oregon | 2013 | H.B. 2736 § 3, 77th Leg. Assemb. (Or. 2013) (failed bill that would have made GM manufacturers liable in "private nuisance if the release causes the presence of the plant on property owned or occupied by a person who did not intend for the plant to be present on the property" ) |
| Vermont | 2006 | S. 18, 2006 Leg., Reg. Sess. (Vt. 2006) (vetoed bill that would have allowed farmers to sue GMO seed manufacturers for economic damage caused by cross-contamination) |
| West Virginia | 2013 | H.B. 2207, 81st Reg. Sess. (W. Va. 2013) (failed bill that would have made a "biotech company [] liable to any party injured by the release of a genetically engineered organism into the environment if that injury results from that genetic engineering") |

**APPENDIX B:**
**SAMPLE OF FEDERAL AND STATE LEGISLATIVE PROPOSALS**
**TO ADDRESS LABELING FOR GM CROPS**

| Jurisdiction | Year(s) | Legislation |
|---|---|---|
| Federal (U.S. Congress) | 1993 | Amendment to the Federal Food, Drug, and Cosmetic Act H.R. 2169, 103d Cong. 1st (1993) (failed bill requiring "foods derived from plant varieties developed by methods of genetic modification be labeled to identify their derivation") |
| | 1999 2000 2002 2003 2006 2008 2010 2011 | Genetically Engineered Food Right To Know Act H.R. 3377, 106th Cong. 1st (1999), S. 2080, 106th Cong. 2d (2000), H.R. 4814, 107th Cong. 2d (2002), H.R. 2916, 108th Cong. 1st (2003), H.R. 5269, 109th Cong. 2d (2006), H.R. 6636, 110th Cong. 2d (2008), H.R. 5577, 111th Cong. 2d (2010), H.R. 3553, 112th Cong. 1st (2011), S. 809, 113th Cong. 1st (2013), H.R. 1699, 113th Cong. 1st (2013), S. 511, 114th Cong. 1st (2015), H.R. 913, 114th Cong. 1st (2015) (failed bill requiring "that food that contains a genetically engineered material, or that is produced with a genetically engineered material, be labeled accordingly" |
| Federal (U.S. Congress) | 2010 | Consumer Right to Know Food Labeling Act of 2010 H.R. 6325, 111th Cong. 2d (2010) (failed bill "to require that food that contains bioengineered products be labeled accordingly") |
| Federal (U.S. Congress) | 2014 | Safe and Accurate Food Labeling Act of 2014 H.R. 4432, 113th Cong. 2d (2014) (failed bill regarding various labeling requirements) |
| Alaska | 2014 | H.B. 215, 28th Leg., 2d Reg. Sess. (Alaska 2014); H.B. 219, 28th Leg. 2d Reg. Sess. (Alaska 2014); S.B. 158, 28th Leg., 2d Reg. Sess. (Alaska. 2014); ("An Act . . . requiring labeling of food produced with genetic engineering . . .") |

| Jurisdiction | Year(s) | Legislation |
|---|---|---|
| Arizona | 2014 | S.B. 1275, 51st Leg., 2d Reg. Sess. (Ariz. 2014)<br>(Act "relating to nongentically engineered food") |
| California | 2011<br>2014 | A.B. 88, 2011-2012 Reg. Sess. (Cal. 2011)<br>(Act regarding "Food labeling: genetically engineered food")<br>CA S.B. 1381, 2013-2014 Reg. Sess. (Cal. 2014)<br>(An act "relating to genetically engineered food") |
| Colorado | 2001<br>2013 | S.B. 146, Gen. Assemb., 1st Reg. Sess. (Colo. 2001)<br>("A bill for an Act . . . requiring that genetically engineered foods be labeled.")<br>CO H.B. 1192, 69th Gen. Assemb. (Colo. 2013)<br>(bill requiring genetically engineered food or food produced with genetically engineered material to label the food as "This product contains genetically engineered  material or was produced with genetically engineered material"); |
| Georgia | 2014 | GA H.B. 1152, 152nd Gen. Assemb., Reg. Sess. (Ga. 2014)<br>(a bill "so as to require the labeling of genetically engineered food") |
| Hawaii | 2013<br>2014 | H.B. 733, 27th Leg. (Haw. 2013);<br>S.B. 1290, 27th Leg. (Haw. 2013)<br>("A bill for an Act relating to labeling of genetically engineered whole food");<br>H.R. 149, 27th Leg. (Haw. 2013)<br>(A resolution "requesting the United States Congress to support legislation requiring . . . labeling of all whole and processed genetically engineered foods");<br>S.B. 2576, 27th Leg. (Haw. 2014)<br>("Genetically Engineered Food Labeling Act");<br>S.B. 3084, 27th Leg. (Haw. 2014)<br>(a bill that "[p]rohibits food retailers from selling genetically modified food if not properly labeled") |
| Illinois | 2013 | S.B. 1666, 98th Gen. Assemb. (Ill. 2013)<br>("Genetically Engineered Food Labeling Act") |

| Jurisdiction | Year(s) | Legislation |
|---|---|---|
| Iowa | 2001 2011 | H.B. 147, 79th Gen. Assemb., 1st Sess. (Iowa 2001) (a bill for an "Act relating to genetically modified seeds by providing labeling requirements . . ."); H.B. 257, 79th Gen. Assemb., 1st Sess. (Iowa 2001) (a bill for an "Act providing for labeling requirements for genetically modified seeds . . ."); H.B. 375, 84th Gen. Assemb., 1st Sess. (Iowa 2011) ("An Act providing labeling requirements for certain genetically modified agricultural commodities and products . . .") |
| Kentucky | 2014 | H.B. 441, Reg. Sess. (Ky. 2014) ("An Act relating to the labeling of genetically engineered food") |
| Maryland | 2013 2014 | H.B. 903, Reg. Sess. (Md. 2013) (bill "establishing that certain foods offered for retail sale in the State and produced with genetic engineering are misbranded if certain disclosure or labeling requirements are not met") H.B. 1191, Reg. Sess. (Md. 2014); S.B. 778, Reg. Sess. (Md. 2014) (a bill "requiring certain foods that are entirely or partially produced with genetic engineering to display a certain label"); |
| Massachusetts | 2011 2013 | H.B. 3276, 187th Cen. Ct., Reg. Sess. (Mass. 2011) ("An Act relative to the labeling of genetically engineered food"); H.B. 808, 188th Gen. Ct., Reg. Sess. (Mass. 2013) |
| Minnesota | 2011 | S.B. 2563, 87th Reg. Sess. (Minn. 2011) (A bill "requiring labeling of genetically engineered food") |
| Missouri | 2011 | H.B. 984, 96th Gen. Assemb. 1st Reg. Sess. (Mo. 2011) (a bill "relating to labeling of genetically modified food and food products") |
| Nevada | 2013 | A.B. 330, 77th Reg. Sess. (Nev. 2013) (bill "requiring a person who produces or sells certain genetically engineered foods or agricultural products to place a label . . .") |
| New Hampshire | 2013 2014 | H.B. 660, 163d Sess. Gen. Ct., 1st Year (N.H. 2013) ("An Act requiring the labeling of genetically engineered foods and agricultural commodities"); S.B. 411, 163d Sess. Gen. Ct., 2d Year (N.H. 2014) ("An Act relative to the labeling of genetically engineered foods") |

| Jurisdiction | Year(s) | Legislation |
|---|---|---|
| New Jersey | 2012 2014 2015 | A.B. 2955, 215th Leg. (N.J. 2012); A.B. 3192, 215th Leg. (N.J. 2012); S.B. 1367, 215th Leg. (N.J. 2012); ("An Act requiring labeling of all foods that contain genetically modified material . . ."); A.B. 1359, 216th Leg. (N.J. 2014); S.B. 91, 216th Leg. (N.J. 2014); S.R. 133, 216th Leg. 2d Reg. Sess. (N.J. 2015); A.R. 239, 216th Leg. 2d Reg. Sess. (N.J. 2015) (resolution "urging the enactment of the federal 'Safe and Accurate Food Labeling Act of 2015'") |
| New Mexico | 2003 2005 2013 | S.M. 62, 46th Leg., 1st Reg. Sess. (N.M. 2003) (A memorial requesting "a study of the feasibility and effects of requiring labeling of food containing genetically engineered and genetically modified ingredients"); S.B. 906, 47th Leg., 1st Reg. Sess. (N.M. 2005) (An Act "requiring labels on food indicating when the food has been genetically engineered"); S.B. 18, 51st Leg., 1st Reg. Sess. (N.M. 2013) (Act "to require the labeling of food and commercial feed that contains genetically modified material") |
| New York | 2001 2003 2005 2007 2008 2009 2011 | A.B. 6778, 224th Leg. Sess. (N.Y. 2001); S.B. 3348, 224th Leg. Sess. (N.Y. 2001) ("An Act to amend the general business law and the agriculture and markets law, in relation to the labeling of genetically modified foods"); A.B. 4206, 226th Leg. Sess. (N.Y. 2003); S.B. 1834, 226th Leg. Sess. (N.Y. 2003); A.B. 3165, 228th Leg. Sess. (N.Y. 2005); S.B. 1637, 228th Leg. Sess. (N.Y. 2005); S.B. 3525, 230th Leg. Sess. (N.Y. 2007); A.B. 6075, 230th Leg. Sess. (N.Y. 2008); A.B. 500, 232d Leg. Sess. (N.Y. 2009); S.B. 2052, 232d Leg. Sess. (N.Y. 2009); S.B. 3908, 234th Leg. Sess. (N.Y. 2011) |
| North Carolina | 2011 | H.B. 446, Gen. Assemb. Sess. (N.C. 2011) ("An Act to require labeling of food and milk products sold in this state that are or that contain genetically modified food . . .") |

| Jurisdiction | Year(s) | Legislation |
|---|---|---|
| Tennessee | 2006 2007 2009 2011 2012 2013 | S.B. 991, 106th Gen. Assemb. (Tenn. 2006) (An Act "relative to food labeling requirements"); S.B. 1279, 105th Gen. Assemb. (Tenn. 2007); H.B. 1041, 105th Gen. Assemb. (Tenn. 2007); H.B. 2098, 106th Gen. Assemb. (Tenn. 2009); H.B. 1928, 107th Gen. Assemb. (Tenn. 2011); H.B. 3678, 107th Gen. Assemb. (Tenn. 2012); H.B. 1168, 108th Gen. Assemb. (Tenn. 2013); S.B. 894, 108th Gen. Assemb. (Tenn. 2013) |
| Utah | 2014 | H.B. 205, 60th Leg. Gen. Sess. (Utah 2014) (Act "providing for the appointment of legislative members to participate in multistate discussions involving agreements to label genetically modified food") |
| Virginia | 2015 | H.B. 1591, 2015 Sess. (Va. 2015) (An Act "relating to genetically engineered foods") |
| West Virginia | 2014 | H.C.R. 141, 81st Leg., 2d Sess. (W. Va. 2014) (requesting study of "the appropriate labeling of genetically modified foods") |
| Wisconsin | 2013 | A.B. 874, 101st Leg. Sess. (Wis. 2013) (bill "relating to: labeling of genetically engineered food") |