## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

----------------------------------------------------------------

**IN RE SYNGENTA MASS TORT ACTIONS**

----------------------------------------------------------------

**Judge David R. Herndon**

**This Document Relates to:**
*Poletti, et al. v. Syngenta AG, et al.*
No. 3:15-cv-01221-DRH

## MEMORANDUM AND ORDER

Before the Court is Syngenta's motion to dismiss plaintiffs' First Consolidated Amended Complaint [Doc. 59] for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2), and failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), [Doc. 115]. Plaintiffs oppose the motion [Doc. 133]. Based on the following, the Court **GRANTS in part** Syngenta's motion to dismiss and **DENIES in part** Syngenta's motion to dismiss and request for oral argument.

## I. BACKGROUND

### A. Introduction

In March 2016, Roland Poletti, et al.[1] ("plaintiffs") filed their First Consolidated and Amended Complaint against Syngenta,[2] under the Class Action

---

[1] In February 2016, the Court ordered the consolidation of all existing plaintiffs in *Poletti, et al. v. Syngenta Corp., et al.*, No. 3:15-cv-1221-DRH; *Brase Farms, Inc., et al. v. Syngenta Corp., et al.*, No. 3:15-cv-1374-DRH; and *Wiemers Farms, Inc., et al. v. Syngenta Corp., et al.*, No. 3:15-cv-01379-DRH. The Court directed the plaintiffs to file an amended consolidated complaint in the

Fairness Act ("CAFA"), 28 U.S.C. § 1332(d).[3]   Plaintiffs alleged that Syngenta prematurely commercialized the genetically modified corn trait "MIR162,"[4] and in doing so, acted negligently, recklessly, and deceptively, causing harm to plaintiffs *and* contaminating the entire United States corn supply. Plaintiffs further contend that — at the time of the alleged acts — Syngenta knew of and foresaw the risk to plaintiffs, and thereby breached the duty owed in preventing the harm alleged [Doc. 59].

## B.  MIR162 & VIPTERA™ Controversy

Plaintiffs note that United States exportation of corn amounts to billions of dollars annually, and because the U.S. corn marketing system is commodity-based,[5] the highest standards of purity are required to be maintained.   *Id.* at

---

lead case, *Poletti. See* Case Management Order, at 1, Brase Farms, Inc., et al., Syngenta Corp., et al., No. 3:15-cv-1374 (S.D. Ill. Mar. 10, 2016), ECF No. 62.

[2] Defendants Syngenta AG, Syngenta Crop Protection AG, Syngenta Corporation, Syngenta Crop Protection, LLC, Syngenta Biotechnology, Inc., and Syngenta Seeds, Inc., will be collectively known as "Syngenta" or "defendants" for purposes of brevity.

[3] The original state-court actions were removed by Syngenta pursuant to 28 U.S.C. § 1453 from the Third Judicial Circuit of Madison County, Illinois, case no. 15-L-1219.   *See* Doc. 1.

[4] The Environmental Protection Agency ("EPA") Fact Sheet for Event MIR162 Maize describes MIR162 maize as a new plant-incorporated protectant product that produces its own insecticidal protein within the corn plant which is derived from the naturally occurring soil bacterium Bacillus thuringiensis (Bt).   The insecticidal protein Vip3Aa20 expressed in MIR162 controls certain lepidopteran pests of corn.   MIR162 target pests include: corn earworm, fall armyworm, armyworm, beet armyworm, black cutworm, and western bean cutworm. *https://www3.epa.gov/pesticides/chem_search/reg.../fs_PC-006599_26-Dec-08.pdf*

[5] Corn grown by farmers throughout the U.S. is commingled, consolidated, and transported from several thousand farms before it is hauled to distribution centers and shipped overseas.

282.[6]  Moreover, plaintiffs point to the premature release of Agrisure VIPTERA™ as the sole cause of foreign export-market refusal to import U.S. grown corn, and further maintain that heavy financial losses have been incurred.  *Id.*

In 2009, Syngenta introduced and sold the genetically modified ("GMO") corn trait MIR162 to U.S. farmers under the trade name Agrisure VIPTERA™; at the time, MIR162 was barred for sale in several countries, including China— where it was not yet approved for purchase or consumption.  *Id.*  Agrisure VIPTERA™ and its variant DURACADE™ ("genetically-modified products"), were licensed and marketed by Syngenta; and, both products contained multiple genetically enhanced modified traits and were sold for their insect-resistant capabilities.  *Id.* at 283.  Syngenta's corn modification process used biotechnology to insert genetic substances into corn seeds from the bacterium *Bacillus thuringiensis ("Bt")*, in order to produce certain proteins that have insecticidal properties.  One of the produced proteins, Vip3A, binds to the pest insects' midgut and forms pores, which kill the insects before crop damage takes place. VIPTERA™'s bio-engineered origin required foreign regulatory approval before it was able to be cultivated or imported outside of the United States.  *Id.* at 290-91.

Plaintiffs vie that Syngenta intentionally and recklessly released VIPTERA™ and DURACADE™ into the U.S. corn market before gaining MIR162 GMO approval.  *Id.* at 283.  Allegations begin in the spring of 2010, when plaintiffs charge that Syngenta decided to release VIPTERA™ for the 2010-2011 corn

---

[6] All citations to plaintiffs' First Consolidated Amended Complaint are in reference to page numbers, unless otherwise noted with a paragraph symbol.

season; all while lacking the necessary approval for import into foreign markets, namely China—who, in 2009-2010, imported 1,296 thousand metric tons of U.S. corn. *Id.* at 291-92.[7] Plaintiffs claim that at the time of VIPTERA™'s release, Syngenta assured consumers that import approval in Japan and European Union countries was pending—but made no mention in regard to China. *Id.* Plaintiffs alleged that in 2012 Syngenta misinformed U.S. corn farmers, grain elevators, grain exporters, landowners, the general public, and even Syngenta's own investors, by directing all to believe that MIR162 GMO approval from China was forthcoming. *Id.* at 284. The statements, plaintiffs' claim, were followed by Syngenta's creation of documentation that implicitly established the belief that MIR162 had been accepted by Chinese importers. U.S. corn farmers immediately began to plant corn containing MIR162; however, China did not approve MIR162 until 2014. *Id.*

## C.  U.S. Corn Crop Contamination

Factual evidence suggests that planting, harvesting, and transporting assorted corn varieties together creates a risk of contamination, commingling, and cross pollination from one corn plant to another, resulting in an exchange of genetic traits. *Id.* at 292-94. Plaintiffs allege that notwithstanding this risk, Syngenta offered "a 'side-by-side program' which encouraged farmers to plant VIPTERA corn side-by-side with other corn seed." This encouragement of side-by-

---

[7] *See* World Agricultural Supply and Demand Estimates Report
http://www.usda.gov/oce/commodity/wasde/

side planting of VIPTERA™ and non-VIPTERA™ corn led to the comingling of VIPTERA™ GMO corn with the wide-ranging U.S. corn supply.  *Id.*

In November 2013, the first shipments of MIR162-infused GMO corn arriving in China were not approved for import and were subsequently rejected. *Id.* at 297.  Refusal continued until December of 2014; and plaintiffs claim that Syngenta's actions "shut down, for all intents and purposes" the 2014 U.S. corn market to China, "causing billions of dollars of damages to U.S. exporters, including farmers, farm landowners, and farming entities."  *Id.* at 285.  In fact, plaintiffs point to a National Grain and Feed Association ("NGFA") statement indicating that Syngenta's premature release of VIPTERA™ corn cost the U.S. corn market between $1 Billion and $3 billion dollars due to rejection and seizures of containers and cargo ships transporting MIR162 GMO corn to China alone.  *Id.* at 286.

**D.  Request to Stop DURACADE™ Release**

Plaintiffs suggest that Syngenta continued "irreparable damage to U.S. exports of corn to China" by releasing a second version of MIR162 GMO corn— without Chinese approval—under the trade name DURACADE™.  *Id.* at 286-87. In anticipation of its release, the NGFA and North American Export Grain Association ("NAEGA") released a joint statement requesting that Syngenta halt its release of DURACADE™.  *Id.* at 287.  The statement explained that both organizations were gravely concerned about the serious economic harm resulting

from Syngenta's current approach to VIPTERA™ management.[8]   *Id.* at 287. Plaintiffs contend that regardless of NGFA and NAEGA requests to halt production, Syngenta nevertheless released DURACADE™, further jeopardizing the Chinese import market.   *Id.*

**E.  Claims Asserted/Causes of Action**

Plaintiffs assert claims—against Syngenta—of public nuisance, private nuisance, negligence, products liability, tortious interference with business actions, strict liability as to certain classes of plaintiffs, and the violation of various state deceptive trade practices and consumer protection acts.   *Id.* at 302-30.[9]   Causes of action for damages include: the premature release of VIPTERA™ and DURACADE™ into the U.S. corn and corn seed supply; the failure to disclose the material fact that MIR162 was not approved for import into China; and the continuing and future MIR162 contamination of the U.S. corn and seed supply. *Id.* at 288-89.  Plaintiffs seek compensatory, consequential, and punitive damages, and injunctive relief.   *Id.* at 331-33.

## **II. LEGAL STANDARDS**

**A.  Personal Jurisdiction under 12(b)(2)**

---

[8] The joint NGFA and NAEGA statement expressed, in part, "[T]he same concerns now transcend to Syngenta's intended product launch plans for DURACADE, which risk repeating and extending the damage.  Immediate action is required by Syngenta to halt such damage."  Doc. 59 at 287.
[9] Plaintiffs' Count VI, Strict Liability, against Syngenta is in reference to plaintiffs from: AL, AZ, AR, CA, CO, FL, ID, IL, IN, IA, KS, KY, MN, MS, MO, NE, NV, NY, ND, OH, OK, OR, PA, SC, SD, TN, TX, and WI.  Counts VII-XIX relate to deceptive trade practices and/or consumer protection acts from the following states: AR, CA, CO, FL, GA, ID, IL, KY, MN, NY, NC, OR, and SC.  Doc. 59 at 309-330.

When personal jurisdiction is challenged pursuant to Fed. R. Civ. P. 12(b)(2), plaintiffs bear the burden of establishing personal jurisdiction over defendants. *N. Grain Mktg., LLC v. Greving*, 743 F.3d 487, 491 (7th Cir. 2014) (citing *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773 (7th Cir. 2003). If the issue of personal jurisdiction is raised by a motion to dismiss and decided on written material rather than an evidentiary hearing, the plaintiff need only make a prima facie showing of jurisdictional facts. *Id.* The Court must take as true all well-pleaded facts alleged and resolve any factual disputes in favor of the plaintiff. *Tamburo v. Dworkin*, 601 F.3d 693, 700 (7th Cir. 2010).

Illinois' long-arm statute enables personal jurisdiction over a party to the extent allowed under the due process provisions of the Illinois and United States Constitutions. *See* 735 Ill. Comp. Stat. 5/2-209(c) (2016) (courts may exercise jurisdiction on any other basis now or hereafter permitted by Illinois Constitution and Constitution of United States); *see also Kipp v. Ski Enterprise Corp. of Wisc., Inc.*, 783 F.3d 695, 697 (7th Cir. 2015) (stating governing Illinois statute permits courts to exercise personal jurisdiction up to limits of Due Process Clause of Fourteenth Amendment). The Illinois Constitution's due process and equal protection guarantee—Ill. Const. art. I, § 2—permits the assertion of personal jurisdiction "when it is fair, just, and reasonable to require a nonresident defendant to defend an action in Illinois, considering the quality and nature of the defendant's acts which occur in Illinois or which affect interests located in Illinois." *Rollins v. Ellwood*, 141 Ill. 2d 244, 275 (Ill. 1990). When interpreting

these principles, a court may look to the construction and application of the federal due process clause. *Id.* The Seventh Circuit Court of Appeals has suggested that there is no operative difference between Illinois and federal due process limits on the exercise of personal jurisdiction. *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 715 (7th Cir. 2002). Therefore, if the contacts between the defendant and Illinois are sufficient to satisfy the requirements of federal due process, then the requirements of both the Illinois long-arm statute and the Illinois Constitution have also been met, and no other inquiry is necessary.

The Due Process Clause of the Fourteenth Amendment limits when a state may assert personal jurisdiction over nonresident individuals and corporations. *See Pennoyer v. Neff*, 95 U.S. 714, 733 (1877), *overruled on other grounds by Shaffer v. Heitner*, 433 U.S. 186 (1977). Under federal due process standards, a court can have personal jurisdiction over a defendant only if the defendant has "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. State of Wash.*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)); *uBID, Inc. v. GoDaddy Group, Inc.*, 623 F.3d 421, 425 (7th Cir. 2010) (quoting *Int'l Shoe*, 326 U.S. at 316). The defendant must have purposefully established such minimum contacts with the forum state such that it "should reasonably anticipate being haled into court there," *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S 286, 297 (1980), because it has "purposefully avail[ed] itself of the privilege of conducting activities within the

forum State, thus invoking the benefits and protections of its laws," *Hanson v. Denckla*, 357 U.S. 235, 253 (1958).  In deciding whether exercising jurisdiction offends traditional notions of fair play and substantial justice, the Court may also consider "the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief."  A*sahi Metal Indus. Co., Ltd. V. Super. Ct. of Cal., Solano Cty.*, 480 U.S. 102, 113 (1987).

What personal jurisdiction means in a particular case depends on whether the plaintiff asserts "general" or "specific" jurisdiction.  Specific jurisdiction refers to jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum.  *Hyatt*, 302 F.3d at 716 (citing *Helecopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 nn. 8, 9 (1984)).  General jurisdiction, on the other hand, may exist even in suits that do not rise out of or relate to the defendant's contacts so long as the defendant has "continuous and systematic" contacts with the forum state.  *Hyatt*, 302 F.3d at 713; *Helicopteros Nacionales*, 466 U.S. at 416.

**B.  Failure to State a Claim under 12(b)(6)**

Rule 12(b)(6) permits a motion to dismiss a complaint for failure to state a claim upon which relief can be granted.  *Hallinan v. Fraternal Order of Police Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009).  The Supreme Court explained in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), that Rule 12(6)(b) dismissal is warranted if the complaint fails to set forth "enough facts to state a claim to relief that is plausible on its face."  Notice pleading remains all that is

required in a complaint, even though federal pleading standards were overhauled by *Twombly* and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  "A plaintiff still must provide only 'enough detail to give the defendant fair notice of what the claim is and the grounds upon which it rests and, through his allegations, show that it is plausible, rather than merely speculative, that he is entitled to relief.' "  *Tamayo v. Blagojevich*, 526 F.3d 1074, 1083 (7th Cir. 2008) (citation omitted).

The Seventh Circuit offers further instruction on what a civil action must allege to endure 12(b)(6) dismissal.  In *Pugh v. Tribune Co.*, 521 F.3d 686, 699 (7th Cir. 2008), the Court reiterated the standard: "surviving a Rule 12(b)(6) motion requires more than labels and conclusions"; the complaint's allegations must "raise a right to relief above the speculative level."  A plaintiff's claim "must be plausible on its face," that is, "the complaint must establish a non-negligible probability that the claim is valid."  *Smith v. Med. Benefit Adm'rs Grp., Inc.*, 639 F.3d 277, 281 (7th Cir. 2011).

### III. ANALYSIS

**A. Choice of Law**

In a diversity case, the Court applies the choice of law rules of the state in which the district court sits.  *Jackson v. Payday Fin., LLC*, 764 F.3d 765, 774 (7th Cir. 2014) (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)).  Under Illinois choice of law rules, litigants can stipulate to which substantive law applies to their case so long as the stipulation is reasonable.  *City of Clinton, Ill. v. Moffitt*, 812 F.2d 341, 342 (7th Cir. 187); *see also Rexford Rand Corp. v. Ancel*, 58 F.3d

1215, 1219 n.6 (7th Cir. 1995).   The parties have cited to Illinois law, thus, Illinois law applies.   To the extent that the Illinois Supreme Court has not yet spoken to any of the issues before the Court, the Court shall apply the law as it would predict the Illinois Supreme Court would if deciding the case.   *Taco Bell Corp. v. Cont'l Cas. Co.*, 388 F.3d 1069, 1077 (7th Cir. 2004) (stating that duty of federal court in diversity suit is to predict what state Supreme Court would do if presented with identical issue).

**B. Personal Jurisdiction is Established Because All of Plaintiffs' Claims Arise Out of and Relate to Syngenta's Minimum Contacts with Illinois**

Syngenta's primary argument for the dismissal of the non-Illinois plaintiffs' claims is that—under the Due Process Clause—the Court lacks personal jurisdiction to adjudicate, *i.e.*, Syngenta is not subject to general personal jurisdiction, nor specific personal jurisdiction in Illinois for non-Illinois claims brought by non-Illinois plaintiffs.   Regarding specific jurisdiction over the non-Illinois plaintiffs, this Court disagrees.   Plaintiffs have sufficiently pled jurisdictional facts showing that the Syngenta defendants purposely availed themselves of the benefits and protections of Illinois laws.   Nonresident defendants who "purposefully direct[]" their activities toward a forum create a legitimate basis to exercise personal jurisdiction.   *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473-74 (1985); *Trade Well Int'l v. United Cent. Bank*, 825 F.3d 854, 859 (7th Cir. 2016) ("Moreover, a district court may exercise personal jurisdiction over any party that purposefully avails itself of the forum.").

As stated above and briefly reiterated here, personal jurisdiction exists only if a defendant has "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co.*, 326 U.S. at 316.  The defendant must have purposefully established such minimum contacts with the forum state such that it "should reasonably anticipate being haled into court there," *World-Wide Volkswagen Corp.*, 444 U.S at 297, because it has "purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws," *Hanson,* 357 U.S. at 253.  Here, Syngenta has done just that.

In order to commercialize VIPTERA™, the Syngenta defendants availed themselves of Illinois' protections and laws by:

- Promoting and selling seeds in Illinois, including by Syngenta sales agents;
- Using "Syngenta Seed Advisors" to promote defendants' products in Illinois;
- Maintenance of physical facilities in Illinois to make, promote, and sell products inside the state and outside it; and
- Field testing the genetically modified corn in Illinois.

*See* Doc. 133 at 85.

All of the actions listed above directed at, and incurring in, Illinois aided in the development and creation of VIPTERA™.  Additionally, as deemed necessary by the defendants to commercialize MIR 162, 3x more field tests were performed in Illinois than any other state for use in gathering agronomic data necessary to deregulate MIR 162.  *Id.* at 86.  Other such acts needed to create and develop VIPTERA™ were also performed in Illinois, for example, issuance of Experimental

Use permits.   *Id.* at 88-9.   Without these actions, the commercialization of VIPTERA™ would not have taken place.

The commercialization of Viptera corn is the seminal event relating to the claims of all plaintiffs, Illinois and non-Illinois.   The activities performed in Illinois were necessary to produce and promote trait MIR 162, which was then commercialized across the United States, including in the states where plaintiffs were harmed.   Thus, the Court is unpersuaded that the non-Illinois plaintiffs' claims have no connection to Syngenta's contacts in Illinois.   Syngenta purposely availed themselves of the benefits and protections of an Illinois forum in producing Viptera corn and preparing it for market.   Accordingly, specific personal jurisdiction has been established and all claims are properly before the Court.

**C. The Stranger Economic Loss Does Not Prohibit Plaintiffs' Claims**

The economic loss doctrine, in the most general terms, is a rule that prohibits a plaintiff from recovering solely economic damages under tort theories. *Moorman Mfg. Co. v. Nat'l Tank Co.*, 91 Ill. 2d 69 (Ill. 1982).   It is most typically applied in the context of a defective product or a contractual relationship between the parties.   Syngenta argues that plaintiffs' allegations are barred by a discrete form of the economic loss doctrine, the "stranger" economic loss doctrine ("SELD").   The SELD specifically applies when, as here, the parties have no direct or contractual relationship with one another.   "The doctrine stems from the theory that tort law affords a remedy for losses occasioned by personal injuries or

damage to one's property, but contract law and the Uniform Commercial Code . . . offer the appropriate remedy for economic losses occasioned by diminished commercial expectations not coupled with injury to person or property." *Metro. Water Reclamation Dist. of Greater Chicago v. Terra Found. for Am. Art*, 13 N.E.3d 44, 59 (Ill. App. 1st 2014) (internal citations omitted).

Whether the SELD applies to bar plaintiffs' claims was previously brought before the United States District Court for the District of Kansas in the related Syngenta multidistrict litigation ("MDL"). Judge Lungstrum ruled that unless the interpretation of a particular state's law essentially *requires* application of the SELD to bar plaintiffs' claims, then the relevant states would not preclude the claims during the early stages of litigation. *In re Syngenta AG MIR 162 Corn Litig.*, 131 F. Supp. 3d 1177, 1196 (D. Kan. 2015); *see id.* at 1196-1207, for examples of why at motion to dismiss stage, the economic loss doctrine would not be applied with certainty across a wide number of states. This Court agrees with the MDL court. Taken as true, plaintiffs' allegations demonstrate that the policy rationales behind the economic loss doctrine (discussed below) would not be furthered by application here and as such, the pertinent states would not apply the SELD. Syngenta's motion to dismiss is denied on this point.

### a. Policy Concerns Underlying Application of the Economic Loss Doctrine are Not Present Here

Despite Syngenta's arguments, the economic loss doctrine is not a bright line rule applied uniformly across the jurisdictions, nor even across economic loss cases. As case law makes clear, the economic loss doctrine is a continually

evolving concept and the policy concerns underlying application of the doctrine do not apply here.  Succinctly, the main policies behind the doctrine are to close off open-ended or "boundless" tort liability that can arise when solely economic losses are sought and to ensure that liability is not far out of proportion to that of a defendant's culpability.  Here however, and as the MDL court explained, the "scope of liability is not completely open-ended, as plaintiffs represent discrete classes of growers and sellers, all in an inter-connected market." *In re Syngenta AG MIR 162 Corn Litig.*, 131 F. Supp. 3d at 1196.  The unchecked liability defendants are concerned with most often accompanies "loss of access" cases, which is not the type of case dealt with here.

A "loss of access" case is when a public infrastructure or a public resource is damaged as a result of a tortfeasor's misconduct.  Consequently, any member of the public could assert a claim for economic loss, leading to remote and indeterminate liability *disproportionate* to the tortfeasor's culpability.  *See, In re Chicago Flood Litig.*, 176 Ill. 2d 179, 198 (1997).  These "loss of access" cases represent prime examples of when the economic loss doctrine makes sense and furthers the policies behind it.  The Court cannot conclude however, that the rationales behind the doctrine would be furthered by application here.  "If plaintiffs' allegations are accepted as true, Syngenta is not unfairly being made an insurer for all growers; rather, plaintiffs assert claims to hold Syngenta responsible for particular actions having foreseeable and foreseen consequences." *In re Syngenta AG MIR 162 Corn Litig.*, 131 F. Supp. 3d at 1196.

Although Syngenta's potential liability for the wrongful conduct may be large, as the U.S. corn market is a billion dollar market, large damages liability does not equate with boundless liability, as defendants suggest.  The Court agrees with plaintiffs and Judge Lungstrum, that the SELD should only be applied if and when the policies of the doctrine are furthered which they are not here.

**b. Application of the Economic Loss Doctrine in Illinois Case Law**

In *Moorman*, the Illinois Supreme Court articulated three exceptions to the doctrine's general rule that solely economic losses may not be recovered, and following that opinion, more exceptions have been carved out.   *See e.g. 2314 Lincoln Park W. Condo. Ass'n v. Mann, Gin, Ebel & Frazier, Ltd.*, 136 Ill. 2d 302, 315 (1990) (where the Illinois Supreme Court noted other situations distinguishing *Moorman* and allowed tort actions seeking damages for economic losses to proceed).   Specifically, the *2314 Lincoln Park* court noted that in precluding application of the economic loss doctrine, "the principle common to [Illinois] decisions is that the defendant owes a duty in tort to prevent precisely the type of harm, economic or not, that occurred."   *Id.*  Because of this, the Court is unpersuaded that the doctrine applies in the same strict manner across the gamut of case types and claims.

In support of application of the economic loss doctrine, defendants rely heavily on two cases, *In re Chicago Flood Litig.*, 176 Ill. 2d 179 (1997) and *Sample v. Monsanto Co.*, 283 F. Supp. 2d 1088 (E.D. Mo. 2003).  *Chicago Flood* is a "loss of access" case, described above, and is a classic example highlighting

the policy concern of unbounded liability not present here.   In *Chicago Flood*, numerous businesses brought nuisance claims after flooding in an underground freight tunnel interrupted electrical service, and thus affected profits of the surrounding businesses.   *In re Chicago Flood Litig.*, 176 Ill. 2d at 183-5.   The freight tunnel is representative of a public infrastructure open to all the public.   In barring plaintiffs' claims via the economic loss doctrine, the court reasoned that the doctrine applied to avoid the virtually limitless tort liability that could develop in such a situation where any entity affected by the flood could bring a claim, i*d.* at 207, thus stressing the problem with loss of access cases.   Clearly, the plaintiffs in this matter, alleging claims against Syngenta, do not represent the same public policy concerns as those articulated in *Chicago Flood*.   Here, as the MDL court expounded, plaintiffs represent discrete classes of growers and sellers, "all in an interconnected market" and any such injuries resulting to them would not be "disproportionate to Syngenta's specific wrongful conduct."   *In re Syngenta AG MIR 162 Corn Litig.*, 131 F. Supp. 3d at 1196.   Again, large liability is not the same as limitless.

Chicago Flood* is also distinguishable because there, the court did not address whether plaintiffs were owed a duty by the defendant city to prevent the flooding, and whether said duty was breached resulting in the exact damages the duty was designed to prevent.   Unique here, plaintiffs allege that Syngenta owed a duty to prevent the exact losses caused to plaintiffs.   *See* First Consolidated Amended Complaint ("CAC") ¶¶ 3036-46; 3054-56.   The economic loss doctrine

does not typically apply when a duty was owed by the defendant to prevent the precise harm that occurred.  *See generally, Nixon v. United States*, 916 F. Supp. 2d 855, 862 (N.D. Ill. 2013) (the ELD is inapplicable where a duty arises outside of contract and the activity is not typically of the type subject to contract); *2314 Lincoln Park W. Condo. Ass'n*, 136 Ill. 2d at 315 ("The principle common to [whether Illinois] decisions [allow exceptions to the ELD] is that the defendant owes a duty in tort to prevent precisely the type of harm, economic or not, that occurred.").  Here, specifically, it is alleged that Syngenta breached their duty to plaintiff farmers when they intentionally and recklessly released genetically-modified corn seed in to the U.S. market prior to obtaining approval of trait MIR 162 import into China and other countries.  CAC ¶¶ 3037-8.   Thus, *Chicago Flood* is distinguishable from the current facts.

Similarly, *Sample v. Monsanto*, is also distinguishable. In *Sample*, for purposes of this discussion, two farmers who grew non-genetically modified soybeans and corn brought claims against defendant Monsanto, alleging negligence and public nuisance theories as a result of Monsanto's introduction of the genetically modified seeds into the market.  283 F. Supp. 2d at 1091. Particularly, the complaint alleged that crops were contaminated with the genetically modified strands, including by cross pollination and commingling, which ultimately led to the products being boycotted by the European community. *Id.*

As in *Chicago Flood,* the *Sample* plaintiffs did not allege a duty on behalf of Monsanto to prevent the exact type of harm that befell plaintiffs, as the current plaintiffs do.  Here, plaintiffs allege that Syngenta knew of and foresaw the risks of early commercialization of VIPTERA™ and thereby breached the duty owed in preventing the harm alleged from such actions.  This immediately distinguishes the two matters.  Discussed earlier, there are numerous exceptions to the economic loss doctrine and each encompasses the general understanding that the doctrine does not automatically apply if defendant owes a duty in tort and that duty is negligently breached, resulting in the type of harm the duty is meant to prevent.  *See, e.g., Ward Chrysler Ctr., Inc. v. ADP Dealer Servs., Inc.*, No. 12-CV-32-DRH-DGW, 2012 WL 3526757, at *2 (S.D. Ill. Aug. 14, 2012).  Explained in more detail below, the Court finds that Syngenta owed plaintiffs duties in tort when commercializing the genetically-modified products.

Thus, the Court agrees with plaintiffs that the economic loss doctrine is not a bar to their claims.  Many exceptions exist to the doctrine and the Court concurs with the MDL court that the doctrine should only be applied when the policies and rationales underlying it would be furthered.  Consequently, Syngenta's motion to dismiss is denied to the extent it relies on the economic loss doctrine.

**D.  Preemption under the United States Grain Standards Act**

The preemption arguments presented to the Court have largely been addressed by Judge Lungstrum and by this Court itself in the related matter of *Tweet, et al. v. Syngenta AG, et al.*, No. 316-cv-0255-DRH.  In *Tweet*, this Court

held that the United States Grain Standards Act ("GSA") preempts any of plaintiffs' claims as they relate to:

1. Inspection and shipping requirements; and
2. Sourcing and segregating requirements.

Doc. 185 at 7.  For the following reasons, and by the logic applied in *Tweet* and by Judge Lungstrum, the Court rules similarly here.

Pursuant to the Supremacy Clause, Congress has the power to preempt state law.  *Arizona v. United* States, 132 S. Ct. 2492, 2500 (2012).  Such preemption can be accomplished expressly, by enacting a statute containing an express preemption provision.  *Id.*  When determining the scope of a preemption provision, a court must "begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose."  *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) (internal quotations omitted).  Accordingly, if an activity falls within the express language of the GSA, then it is preempted.  The language of the GSA clearly states that:

> No State or subdivision thereof may require the inspection or description in accordance with any standards of kind, class, quality, condition, or other characteristics of grain as a condition of shipment, or sale, of such grain in interstate or foreign commerce, or require any license for, or impose any other restrictions upon the performance of any official inspection or weighing function under this chapter by official inspection personnel. Otherwise nothing in this chapter shall invalidate any law or other provision of any State or subdivision thereof in the absence of a conflict with this chapter.

7 U.S.C.A. § 87(g).

This provision of the GSA, regulating grain and grain transactions, is necessary to 1) *effectively* regulate such transactions and 2) prevent burdens on interstate and foreign commerce.  Under the ordinary meaning of the GSA, MIR 162 counts as a characteristic of corn.

Syngenta argues that under the plain language of the Act, any theory under which it had a duty to ensure the segregation of Viptera corn is preempted. Plaintiffs counter that the GSA is not applicable because they have alleged a general duty of reasonable care against Syngenta, not a specific duty regarding inspection or description of corn that admittedly would be preempted under the federal law.  Additionally, plaintiffs argue that in any respect, the GSA does not apply to Syngenta as Syngenta is a seed manufacturer and the GSA provisions are meant to regulate grains, not seed.  The Court does not agree that the fact Syngenta is a seed manufacturer precludes application of the GSA to claims against it.  Accordingly, the Court hereby adopts the MDL Court's rationale and grants in part and denies in part Syngenta's motion based on preemption under the GSA.

In their Consolidated Amended Complaint, plaintiffs allege, among other things, that Syngenta breached its duty to "utilize its professional expertise" and exercise the "degree of skill and learning ordinarily used" in Syngenta's business by: instituting a careless and ineffective stewardship program, ensuring contamination of U.S. corn supply; failing to enforce or effectively monitor the stewardship program; and by the selling of genetically-modified corn to farmers

with knowledge that they lacked the mechanisms and experience to effectively channel the products.  *See* CAC ¶¶ 3158-3159.  To the extent these allegations rest on a duty to ensure that Viptera corn is kept segregated from other corn, the GSA preempts such claims.   This is true whether the claims impose a requirement to segregate via inspection or description by any entity, not just Syngenta.

As the MDL court recently explained, the "GSA preemption provision does not refer to state-law requirements imposed on any particular actor; thus, the statute preempts any claims based on a requirement of inspection or description by anyone, not just the seeming target of the state law." *In re Syngenta AG MIR 162 Corn Litigation*, 14-md-2591, pg. 22 (Doc. 2426).  *See also*, *American Trucking Ass'ns, Inc. v. City of Los Angeles, Calif.*, 133 S. Ct. 2096, 2104 (2013), and *Engine Mfrs. Ass'n v. South Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 255 (2004).  Thus, the GSA preempts all claims relating to segregation of Viptera corn.  This includes preemption of any and all allegations that Syngenta had a duty to contract with buyers of their product to ensure the inspection, channeling, or other measures to keep Viptera corn isolated.  A state law cannot require a seed seller, like Syngenta, to create a regime or stewardship-type program to inspect, describe, or channel genetically-modified corn via contract provisions or agreements with buyers, like grain elevators.  To do so would violate the plain meaning of the GSA.

The Court acknowledges arguments by plaintiffs that the GSA only applies to transactions involving *grain*, not seeds, and that the ultimate objectives of the GSA are the "orderly and timely" marketing of, and facilitating of trading, in grain. Doc. 133 at 55.  As such, plaintiffs assert that Syngenta, a seed manufacturer, is not entitled to *any* protections or benefits of the federal statute.  That is simply not true.  The GSA applies to Syngenta to the extent plaintiffs' claims apply to corn.  The MDL court distinguished this issue and indicated that "preemption of claims based on such duties turns on whether those [segregation] measures relate to harvested corn or to the seeds sold by Syngenta prior to harvesting."  *In re Syngenta AG MIR 162 Corn Litigation*, 14-md-2591, Doc. 2426 at 25.  Tellingly, the MDL court provided examples of which types of claims would be preempted. For instance, "any claim based on a duty to assist in the channeling or segregation of *corn* (through contract requirements, education, inspection, or tracing the product through the supply chain) is preempted." *Id.*

Similarly, for the reasoning above, any claim that Sygnenta had a duty to control others to segregate Viptera corn from the U.S. corn supply, or to aid others in facilitating a stewardship program, is preempted to the extent the duty relates to corn.  The GSA preempts any requirement of measures to channel or contain genetically-modified corn and the imposition of a duty to limit sales to those who would take such actions, necessarily imposes that inspection or description of the corn take place.  It makes no difference under the provisions of

the GSA if this duty is placed on purchasers or other third-parties, or the manufacturer – all such claims are preempted as they relate to harvested corn.

Therefore, the Court grants in part and denies in part Syngenta's motion to dismiss as it relates to preemption under the GSA.  Any claims that would be preempted under the preceding analysis are dismissed.

## E.  FIFRA Preemption

The parties make short work of their Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA") arguments, and the Court follows suit.  Briefly, Sygnenta argues that any claims asserted by plaintiffs based on alleged risks in growing Viptera corn should reasonably be interpreted to include a claim that Syngenta failed to warn purchasers of the risk of its products, including any risk of the loss of the Chinese market.  Doc. 116 at 79-80.  Plaintiffs counter that they have not directly asserted a failure to warn claim.  Doc. 133 at 60.  The Court agrees with Syngenta.  In addition to any claims preempted under the GSA, certain claims of plaintiffs', to the extent they implicate failure to provide warnings on product labels, are also preempted under FIFRA.[10]

Under FIFRA, labeling requirements extend to any written, printed or graphic matter on, or attached to, the product.  7 U.S.C. § 136(p).  FIFRA preempts any state rule that imposes any requirement for labeling or packaging

---

[10]  The Court acknowledges that unlike the complaint filed in the MDL, plaintiffs here have deleted the subsection under its Negligence allegations that uses the magic words, "failing to adequately warn . . ."  Nonetheless, the Court believes plaintiffs have essentially asserted the same argument throughout the Negligence allegations including that Syngenta instituted a careless stewardship program and that Syngenta knew of the risks of releasing VIPTERA™, including China's zero-tolerance policy for MIR 162 and China's large U.S. corn import market.  Accordingly, the rationale adopted by the MDL court is applicable and incorporated here.

that is in addition to, or different, than those required under the Act.  *See Bates v.*

*Dow Agrosciences LLC*, 544 U.S. 431, 444, n.17 (2005).   Under 7 U.S.C. §

136(q)(1)(G), the only labeling requirements imposed on a manufacturer are

those to adequately "protect health and the environment."   Thus, any implied

claim by plaintiffs that Syngenta should have warned about risks associated with

growing its product, like the risk of loss of the Chinese market, by placing

warning materials on the products' labels, are preempted.  As the MDL court

held, "because such warnings [about risks of growing Viptera corn] might

ordinarily be included in materials accompanying the products, plaintiffs'

complaints do appear to include a claim that seeks to impose a labeling

requirement not found among FIFRA's statutory requirements."  *In re Syngenta*

*AG MIR 162 Corn Litigation*, 14-md-2591, Doc. 2426 at 36, quoting *In re*

*Syngenta AG MIR 162 Corn Litigation,* 131 F. Supp. 3d at 1208.  Even though

plaintiffs disclaim they've made any such allegations, the Court "dismisses any

claim based on an alleged failure to warn to the extent that such claim is based on

a lack of warnings in materials accompanying the products."  *In re Syngenta AG*

*MIR 162 Corn Litig.*, 131 F. Supp. 3d at 1208.

**F.  Syngenta's Arguments That No Duties Existed in Tort are Rejected**

Regarding the enduring claims not preempted under the GSA or FIFRA, the

Court agrees with plaintiffs that the remaining allegations are similar to what were

asserted before the MDL court.   As such, Syngenta's "no duty" argument is

rejected.

Briefly, plaintiffs charge that Syngenta owed plaintiffs a duty of utilizing professional expertise and professional skill and learning in its commercialization of the genetically-modified products.   Defendants allegedly breached that duty when they prematurely commercialized the VIPTERA™ product without effective or adequate safeguards in place.   CAC ¶¶ 3158-3161.   Defendants counter that they cannot be held liable in tort for selling an approved genetically-modified seed within the United States.   Doc. 116 at 69.   In support of their no duty arguments, Syngenta relies primarily on Canadian authority in *Hoffman v. Monsanto Canada, Inc. (Hoffman I)*, 2005 SKQB 225, 2005 SK.C. LEXIS 330 (Can. Sask. Q.B. May 11,2005) *aff'd*, *Hoffman v. Monsanto Canada, Inc.* (*Hoffman II*), 2007 SKCA 47, 2007 SK.C. LEXIS 194 (Can. Sask. C.A. May 2, 2007).

When considering whether a duty exists, policy considerations play an important role, for example, the expectation of the parties, the magnitude of the burden of guarding against injury, and whether allowing recovery would have no sensible or just stopping point.   *In re Syngenta AG MIR 162 Corn Litig.*, 131 F. Supp. 3d at 1189.   The Court is cognizant of Syngenta's concern that plaintiffs' theory of placing a duty on a seed manufacturer could impose great, unchecked liability in the marketplace.   As discussed in subsection B however, and by Judge Lungstrum in distinguishing away *Hoffman,* there is a relationship between the parties here, who share an interconnected market.   *See generally id.* at 1188-93; *id.* at 1189 ("the Court is not persuaded that recognition of a duty in this case would allow for a recovery that is too remote, or would open the door too much to

fraudulent or speculative claims.  Nor is the Court persuaded . . . that other policy considerations preclude the recognition of a duty here.").  Thus, liability stemming from imposing a duty on Syngenta to take reasonable steps in commercializing its genetically-modified seeds, does not create unrestrained liability.

It is important to note again, that any duties Sygnenta has in relation to plaintiffs' claims, only apply as the claims relate to *seeds*.  The claims are preempted under the GSA as they relate to corn.  Thus, the Court concludes that policy considerations do not warrant that Syngenta did not have a duty to exercise reasonable care and judgement in its professional expertise in the commercialization of VIPTERA™ to avoid risk of harm to plaintiffs.  For reasons more fully stated by our sister court in *In re Syngenta AG MIR 162 Corn Litig.*, 131 F. Supp. 3d at 1188-93, (discussing factors influencing when a duty is imposed) and incorporated here, the Court denies Syngenta's motion to dismiss based on plaintiffs' negligence claims for lack of a legal duty.

## G. Syngenta's Motion to Dismiss Is Granted to the Extent it is Based on Plaintiffs' Private and Public Nuisance Claims

### a. Private Nuisance

Plaintiffs' private nuisance claims are subject to dismissal and Syngenta's motion to dismiss is granted on that point.   In reviewing the parties' arguments, it is apparent that the majority of material, case law, and allegations presented to the Court are markedly parallel to what was taken up by the MDL court.  As such, the MDL court's analysis is pertinent here.

All parties agree that a private nuisance is an "invasion of another's interest in the private use and enjoyment of land." *See* Restatement (Second) of Torts § 821D. Plaintiffs argue that Syngenta interfered with their use and enjoyment of land by contaminating the corn supply by the untimely release of VIPTERA™. Syngenta counters generally, that they cannot be liable for post-sale uses of their products and that plaintiffs have not alleged facts showing interference with their own land. *See* Doc. 116 at 89-92. The Court agrees that a seller of a product is not liable for a private nuisance caused by the use of that product after it has left the seller's control. *See, e.g., City of Bloomington, Ind. V. Westinghouse Elec. Corp.*, 892 F.2d 611, 615 (7th Cir. 1989). Plaintiffs have not refuted this general rule to show that liability should follow in "the absence of the seller's continuing control over the product." *In re Syngenta AG MIR 162 Corn Litig.*, 131 F. Supp. 3d at 1214. Here, facts have not been shown that would demonstrate that Syngenta exercised significant control over the Viptera product post-sale. Because the Court finds that Syngenta did not maintain the necessary level of control to support the nuisance claim, further analysis of the parties' other briefing on this topic is null. Plaintiffs' private nuisance claims are dismissed.

**b. Public Nuisance**

Under Illinois law, a public nuisance is properly pled when facts alleged support: (1) the existence of a public right; (2) a substantial and unreasonable interference with that right by the defendant; (3) proximate cause; (4) and, injury. *Burns v. Simon Properties Grp., LLP*, 996 N.E.2d 1208, 1212 (IL App 5th 2013).

Generally, a public nuisance is something that negatively affects the public's health, safety, or morals, or causes substantial annoyance, inconvenience, or injury to the public. *See, Helping Others Maintain Envtl. Standards v. Bos*, 406 Ill. App. 3d 669, 689 (2010). For the same reasoning above, plaintiffs' public nuisance claim must fail because sufficient facts have not been alleged demonstrating that Syngenta maintained continuing significant control of its products post-sale. Additionally, the Court is not persuaded by plaintiffs' public rights arguments and do not believe one exists here.

Plaintiffs list three public rights that Syngenta allegedly interfered with: 1) the public's right to expect compliance with federal laws; 2) the public's right to expect corn free from contamination with Viptera corn, and 3) the public's right to be notified that the corn was sold with genetically-modified organisms. Doc. 133 at 75-6. Plaintiffs cite to *In re StarLink Corn Prod. Liab. Litig.*, 212 F. Supp. 2d 828 (N.D. Ill. 2002) for the proposition that contamination of a food supply implicates the public's health and safety and accordingly is a violation of a "public right." *Starlink* is distinguishable however because in that matter, the seed protein at issue, Cry9C, had only been approved for limited registration by the Environmental Protection Agency, "for such purposes as animal feed, ethanol production and seed increase." *Id.* at 834. Here, plaintiffs have admitted that VIPTERA™ was fully deregulated by the U.S. Department of Agriculture in April 2010, CAC ¶ 3071, meaning that it could be sold without restriction within the United States, including for human consumption. Thus, the Court cannot agree

with plaintiffs' implications that Viptera corn is harmful to health and that its release violates a public right.  Therefore, Syngenta's motion to dismiss is granted as it pertains to public nuisance claims.

**H.  Plaintiffs' Strict Liability Claims are Dismissed**

In their opposition to defendants' motion, plaintiffs do not address Syngenta's arguments to dismiss the strict liability claims.  The Court is not under an obligation to construct the argument for plaintiffs and as such, plaintiffs have provided the Court no opportunity to rule in their favor.  Because defendants' arguments for dismissing the strict liability claims are unchallenged, Syngenta's motion to dismiss is granted as to the strict liability claims.

**H.  All Remaining Claims Survive**

The majority of the remainder of plaintiffs' claims have previously been addressed by the MDL court.  As such, this Court will address each briefly.

**a.  Claims Relying on Event 5307/Duracade**

Syngenta alleges that claims regarding Event 5307/DURACADE™ must be dismissed because plaintiffs do not allege any injury stemming from the sale of DURACADE™.  Doc. 116, p. 80.  The Court rejects this argument.  Plaintiffs clearly allege continuing harm, lasting over time as the "premature release" of DURACADE™ "further jeopardized the Chinese import market."  Doc. 133 at 60; CAC ¶ 3053.  Plaintiffs have "alleged sufficient facts to give rise to a plausible claim that acts relating to Duracade proximately caused injury to plaintiffs."  *In re*

*Syngenta AG MIR 162 Corn Litig.*, 131 F. Supp. 3d  at 1209.  The motion to dismiss as it relates to these claims is denied.

### b.  Tortious Interference

The Court rejects Syngenta's arguments to dismiss the claims of tortious interference.  At this stage, plaintiffs "must provide only 'enough detail to give the defendant fair notice of what the claim is and the grounds upon which it rests and, through his allegations, show that it is plausible, rather than merely speculative, that he is entitled to relief.' " *Tamayo v. Blagojevich*, 526 F.3d at 1083 (citation omitted).  Accordingly, this Court agrees with the MDL Court in denying the motion to dismiss based on claims or tortious interference.

The elements of a tortious interference claim in Illinois are: (1) plaintiffs' reasonable expectancy of entering into a valid business relationship; (2) defendant's knowledge of that expectancy; (3) defendant's intentional and unjustifiable interference that induced or caused a breach or termination of the expectancy; and (4) damages to plaintiff resulting from defendant's conduct.  *F:A J Kikson v. Underwriters Lab., Inc.*, 492 F.3d 794, 800 (7th 2007) (citing *Voyles v. Sandia Mortg. Corp.*, 196 Ill.2d 288, 300-01, 751 N.E.2d 1126, 1133 (Ill. 2001)).

Keeping in mind "[a]ctions that form the basis of a tortious interference claim must be directed at third-party business prospects," *F:A J Kikson*, 492 F.3d at 800 (citing *Galinski v. Kessler*, 134 Ill. App. 3d 602, 608, 480 N.E.2d 1176, 1180 (Ill. App. Ct. 1985) (stating that the tort of interference with

prospective economic advantage requires action by defendant directed toward a third party), one of the core theories of plaintiffs' claim is that Syngenta tortiously interfered with the business relationship between plaintiffs and third-party grain purchasers. Plaintiffs allege business relationships with grain purchasers— memorialized by invoices, receipts, and other documentation—and the reasonable expectation of commencing and continuing to sell grain to the purchasers but for Syngenta's interference. Next, it was alleged that Syngenta knew of business relationships between plaintiff and grain purchasers and that Syngenta's representations deceived grain purchasers as to whether grain elevators and supply companies would accept MIR162 GMO corn. Finally, it was alleged that because MIR162 destroyed the corn import market, plaintiffs were unable to sell their corn to grain purchasers. In taking statements in the complaint as true, plaintiffs have successfully pled allegations of tortious interference against Syngenta.

### c. Product Liability and Consumer Protection Claims

The Court has reviewed the remaining arguments made by Syngenta urging that plaintiffs' Complaint should also be dismissed due to failure as a matter of law of all product liability claims, Doc. 116 at 82-83, and requisite dismissal of all consumer protection claims. *Id.* at 95-100. After a thorough evaluation, the Court finds that plaintiffs' claims survive the 12(b)(6) motion to dismiss standard. Regarding the product liability claims, under the Court's discussion *supra* in subsection E, a failure to warn claim is found even though not stated

directly.  Defendants cannot argue that such a claim exists for purposes of FIFRA preemption then deny its existence when not beneficial to them.  Thus, Syngenta's motion to dismiss is denied as these claims.

## IV.  CONCLUSION

IT IS THEREFORE ORDERED BY THE COURT THAT Syngenta's motion to dismiss, Doc. 116, is hereby **granted in part and denied in part**, as set forth herein.  The motion is granted with respect to claims preempted by the GSA and by FIFRA.  The motion is also granted with respect to all nuisance and strict liability claims and such claims are hereby dismissed.  The motion is otherwise denied.

**IT IS SO ORDERED.**

**DATED:** April 3, 2017

Digitally signed by Judge David R. Herndon
Date: 2017.04.03 12:59:46 -05'00'

UNITED STATES DISTRICT JUDGE