**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

.

**IN RE SYNGENTA MASS TORT ACTIONS**

_____

**This Document Relates to:**

*Tweet et al. v. Syngenta AG et al.,*
No. 3:16-cv-00255-NJR; and

*Poletti et al. v. Syngenta AG et al.,*
No. 3:15-cv-01221-NJR

# MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

This matter is before the Court on the Report and Recommendation of Special

Master Daniel J. Stack on Allocation of Attorney's Fees (*SDIL Case No. 15-1221*, Doc. 368).

For the following reasons, the Report and Recommendation is adopted, in part, and

rejected, in part.

## FACTUAL AND PROCEDURAL BACKGROUND

In 2014, corn farmers around the country filed suit against Syngenta for its

commercialization of genetically-modified corn seed products that contained the trait

MIR 162. *In re: Syngenta AG MIR162 Corn Litig.*, No. 14-md-02591-JWL-JPO, MDL No.

2591 (D. Kan.) (hereinafter "Kansas Case"). The Syngenta litigation consisted of multiple

class actions, mass actions, and individual actions that were litigated primarily in the

United States District Court for the District of Kansas, Minnesota state court, and the

United States District Court for the Southern District of Illinois.

In December 2014, the Multidistrict Litigation ("MDL") Panel centralized the Syngenta litigation in the United States District Court for the District of Kansas (Kansas Case, Doc. 1). United States District Judge John W. Lungstrum has presided over the Syngenta MDL since its inception.

In February 2018, after years of vigorous and complex litigation, the parties executed an agreement that provided for a global settlement of $1.5 billion (*See* Kansas Case, Docs. 3531 & 3532). Judge Lungstrum issued his final approval of the settlement in December 2018 and allocated one-third of the gross settlement ($503,333,333.33) to attorneys' fees (*See* Kansas Case, Doc. 3849). To facilitate distribution of the fees, and in conjunction with the settlement agreement, Judge Lungstrum created three common benefit pools to compensate lawyers whose efforts produced a common benefit to all of the plaintiffs: a Kansas MDL pool; a Minnesota state court pool; and an Illinois federal court pool (*Id*. at Doc. 3882) ("the Fee Allocation Order"). Judge Lungstrum assigned attorneys' fees applicants to one of the three common benefit pools based primarily on where they performed their work (*Id*. at Docs. 3816 & 3882). He then designated a percentage of the fees to each pool, based on the pool's contribution to the settlement (*Id*. at Doc. 3882). Judge Lungstrum also created an individually retained private attorneys ("IRPA") pool.

In sum:

| | |
|---|---|
| **IRPA Pool (12%)** | **$   60,400,000.00** |
| **Kansas MDL Common Benefit Pool (49%)** | **$ 246,633,333.33** |
| **Minnesota State Court Common Benefit Pool (23.5%)** | **$ 118,283,333.33** |
| **Illinois Federal Court Common Benefit Pool (15.5%)** | **$   78,016,666.67** |
| **Total Attorney Fee Award (100%)** | **$ 503,333,333.33** |

Judge Lungstrum ordered the court within each pool's jurisdiction to allocate the fees, subject to the Kansas court's approval. Judge Lungstrum made "a few remarks concerning how the three courts will consider certain types of work in making that allocation, with the intent that such considerations be consistent across the three pools." He instructed,

> First, the courts will consider as common benefit work any work, either in litigating the claims or in pursuing the settlement with Syngenta, that contributed to the settlement and the ultimate recovery by the settlement class, thereby benefitting the entire settlement class. Second, as mentioned above, the courts do not consider work performed in recruiting clients to have inured to the common benefit of the settlement class. Third, work performed for particular individual clients may still be considered common benefit work if that work provided a benefit to the entire settlement class. For instance, . . . work completing a significant number of [plaintiff fact sheets ("PFSs")] that were actually submitted to courts or Syngenta could benefit the entire settlement class. In considering such work (and other work), however, the courts will be mindful that the work would not reasonably have been undertaken at the highest attorney rate, for instance because much of the work could reasonably have been completed by lesser-experienced attorneys or even by paralegals or other staff. The same would be true, for example, for work drafting identical complaints (after drafting the first one) for multiple plaintiffs, or work submitting claims (in light of the ease of doing so). In short, although much work may qualify as common benefit work if sufficiently impactful or if on behalf of a large number of plaintiffs, not all common benefit work will be weighed equally in the allocation from the common benefit pools.

### ILLINOIS ALLOCATION

In December 2018, this Court appointed the Honorable Daniel J. Stack (Ret.) as Special Master to issue a Report and Recommendation on the division of attorneys' fees from the Illinois pool (*SDIL Case No. 15-cv-1221*, Doc. 359). Special Master Stack issued his Report and Recommendation on March 26, 2019 (*Id.* at Doc. 368); he recommends the following allocations:

| Group | Fee Allocation in Dollars | Fee Allocation as Percentage of Illinois Federal Court Pool |
|---|---|---|
| **The Clark/Phipps Group ("Clark/Phipps")** <br> Clark, Love & Hutson, GP; <br> Meyers & Flowers LLC; and <br> Phipps Anderson Deacon LLP | $61,633,166.67 | 79.0% |
| **Conmy Feste, Ltd. ("Conmy Feste")** | $0 | 0.0% |
| **The Law Offices of A. Craig Eiland ("Eiland")** <br> The Law Offices of A. Craig Eiland | $3,120,666.67 | 4.0% |
| **The Garrison Group ("Garrison")** <br> Heninger Garrison Davis, LLC; <br> Burke Harvey, LLC; <br> Crumley Roberts; <br> Hansen, Howell & Wilkie, PLLC; <br> Merkel & Cocke; <br> Law Offices of Wendell Hoskins; <br> Oldfield Myers Apke & Payne; <br> Sam C. Mitchell & Associates; and <br> Tapella & Eberspacher, LLC | $9,674,066.67 | 12.4% |
| **O'Hanlon, Demerath & Castillo ("Demerath")** | $1,560,333.33 | 2.0% |
| **Onder Law, LLC ("Onder")** | $2,028,433.33 | 2.6% |

Several applicants filed objections to Special Master Stack's recommended allocation, which obligates this Court to undertake a *de novo* review of the Report and Recommendation. FED. R. CIV. P. 53(f). After its review, the Court may "adopt or affirm, modify, wholly or partly reject or revere, or resubmit to the master with instructions." *Id.*

## COMMON BENEFIT PRINCIPLES

Under what has been coined the "American rule," each litigant generally pays his or her own attorney's fees. *Baker Botts L.L.P. v. ASARCO LLC*, 135 S.Ct. 2158, 2164 (2015). But in certain circumstances, the American rule results in unjust enrichment because individuals may benefit from a successful party without bearing a fair share of the burden of litigation. *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980). To remedy this problem, courts recognize several judicially-created equitable doctrines, such as the common

benefit doctrine, which is appropriately applied when "the plaintiff's successful litigation confers 'a substantial benefit on the members of an ascertainable class, and where the court's jurisdiction over the subject matter of the suit makes possible an award that will operate to spread the costs proportionately among them.'" *Hall v. Cole*, 412 U.S. 1, 5 (1973) (quoting *Mills v. Electric Auto-Lite*, 396 U.S. 375, 393-94).

Courts generally use one of two methods in determining fee awards in common benefit cases: (1) the percentage method, which awards a fee relative to the benefit that counsel achieved for the class, and (2) the lodestar method, which awards a fee relative to the hours and hourly billing rates. 5 NEWBERG ON CLASS ACTIONS § 15:66 (5th ed.). The Tenth Circuit, under whose law the Fee Allocation Order falls, has explicitly held that courts have discretion as to whether they use the percentage or lodestar approach. *Id.* (citing *Brown v. Phillips Petroleum Co.*, 838 F.2d 451, 454 (10th Cir. 1988) ("We hold . . . that the award of attorneys' fees on a percentage basis in a common fund case is not *per se* an abuse of discretion.")).

## SPECIAL MASTER STACK'S METHODOLOGY

Special Master Stack employed a percentage method as opposed to a lodestar method and conducted both a quantitative and subjective analysis. He stated his subjective analysis was based on his personal experience and observations of the litigation. He also cited the *Johnson* factors, which are routinely applied to common benefit cases. They are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the

customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Johnson v. Georgia Hwy. Expr., Inc.*, 488 F.2d 714, 718-19 (5th Cir. 1974).

### *Quantitative Analysis*

Special Master Stack's quantitative analysis centered on four categories: (1) common benefit hours; (2) common benefit expenses; (3) claimant data; and (4) client acquisition expenses. He constructed a quantitative chart for each category that listed the number of hours, common benefit expenses, claimants, or acquisition expenses each applicant submitted, and assessed that number against the total submissions from the applicants to arrive at a percentage. Then, Special Master Stack averaged the percentages for each applicant group across the categories, and assigned each group a final percentage.

Based on Special Master Stack's calculations, Clark/Phipps submitted 110,337 non-attorney common benefit hours and 31,326 attorney common benefit hours, for a total of 141,663 common benefit hours; Conmy Feste submitted 38 non-attorney hours and 173 attorney hours, for a total of 211 hours; Eiland submitted 5,986 non-attorney hours and 7,268 attorney hours, for a total of 13,254 hours; Garrison submitted 9,593 non-attorney hours and 10,024 attorney hours, for a total of 19,616 hours; Onder submitted 3,274 non-attorney hours and 3,911 attorney hours, for a total of 7,186 hours; and Demerath submitted 3,446 non-attorney hours and 6,060 attorney hours, for a total of

9,506 hours. In sum, when considering the non-attorney and attorney hours combined, Clark/Phipps is responsible for 74% of all hours the Illinois applicants submitted; Conmy Feste is responsible for 0.1%; Eiland is responsible for 6.9%; Garrison is responsible for 10.2%; Onder is responsible for 3.8%; and Demerath is responsible for 5.0%.

Special Master Stack also determined that Clark/Phipps' expenses account for 87.8% of all expenses the Illinois applicants submitted; Eiland's expenses account for 0.6% of all expenses; Garrison's expenses account for 10.1% of all expenses; Onder's expenses account for 0.5% of all expenses; and Demerath's expenses account for 0.9% of all expenses.[1]

Further, Clark/Phipps' claimants make up roughly 85.3% of the claimants represented by the Illinois applicants; the Eiland Group's claimants make up 5.1% of the claimants; Garrison's claimants make up 5.1% of the claimants; and Onder's claimants make up 5.8% of the claimants.[2]

Finally, Special Master Stack calculated that Clark/Phipps' client acquisition expenses are 89.4% of all client acquisition expenses the Illinois applicants reported; Eiland's expenses are 2.3% of all expenses; Garrison's expenses are 1.1% of all expenses; Onder's expenses are 3% of all expenses; and Demerath's expenses are 4.1% of all expenses.[3]

After averaging the percentages from each category, Special Master Stack reported that Clark/Phipps is responsible for 84.2% of the "contributions" to the Illinois litigation;

---

[1] Conmy Feste submitted $629 in expenses, or 0.0% of all expenses submitted by the Illinois applicants.
[2] Conmy Feste and Demerath's claimants are listed as 0.0%.
[3] Conmy Feste's client acquisition expenses are listed as 0.0%.

Conmy Feste is responsible for 0.0%; Eiland is responsible for 3.9%; Garrison is responsible for 6.2%; Onder is responsible for 3.2%; and Demerath is responsible for 2.5%.

*Subjective Analysis*

Special Master Stack also conducted a subject analysis of each applicant. He observed that Clark/Phipps was lead counsel in *Tweet* and *Browning* and "established multiple litigation fronts that increased litigation pressure on Syngenta." Special Master Stack also stated, "Clark/Phipps further established novel litigation theories against Syngenta for ethanol plants and biorefineries that ultimately resulted in the formation of an ethanol producer settlement subclass. Similarly, Clark/Phipps' vigorous prosecution of claims on behalf of grain handling facilities also resulted in a subclass of claimants in the Settlement." The Report and Recommendation also highlighted Clayton Clark's involvement in the Plaintiff's Settlement Negotiation Committee ("PSNC"), and the fact that Syngenta required Clark/Phipps' participation in the settlement as a precondition to the agreement. Special Master Stack stated he gave extra consideration to Clark/Phipps' quantitative analysis because:

> [T]here is a significant difference in the percentage of [common benefit] hours among all of these Groups. In the Clark Group, the 'Attorney Hours' are only 28% of the 'Non'. Whereas all of the other groups/firms have more 'Attorney Hours' than 'Non'. For this group, the Attorney hours are only 28% of the 'Non.' All others are the opposite with the Non-Attorney hours being a percentage of the Attorney hours: Conmy is 22%; Eiland 82%; Garrison 96%; Onder 54% and Demerath 57%.

But Special Master Stack noted that Clark/Phipps "did partake in some activities that [he] found . . . to be less than helpful and actually, at times, potentially detrimental to the process." He concluded, "My assessment of [Clark/Phipps'] actual Common

Benefit value is, therefore, increased by the Settlement Committee and Ethanol Plant efforts while diminished somewhat by the others." All-in-all, the Report and Recommendation suggests awarding the Clark/Phipps Group $61,633,166.67, which is 79% of the Illinois pool.

In regard to Garrison, Special Master Stack noted that Garrison was lead counsel in *Poletti*; obtained an important jurisdictional ruling that Clark/Phipps utilized; assisted with discovery; and cooperatively participated in early settlement discussions. More specifically, Special Master Stack pointed out that Garrison assisted in document review, submitted more than 2,300 PFSs, and presented 44 farmers for depositions in nine different states, culminating in the production of 350,000 pages of farmer documents to Syngenta. Special Master Stack also gave "some increased valuation" for Garrison's hours related to arguments and filings. But he noted that Garrison was not appointed to the PSNC:

> Garrison cannot lay claim to, among other efforts, the significant value created by Clark/Phipps in their settlement work. Nor did Garrison bring to the table two of the four subclasses that were essential to ensuring finality to this litigation. The large disparity in the number of claimants assertedly represented by Clark/Phipps and Garrison . . . and the size of the threat their cases posed to Syngenta further demonstrate the separation between the two applicant firms.

Special Master Stack ultimately suggests awarding Garrison $9,674,066.67 in attorney fees, which amounts to 12.4% of the Illinois pool.

In regard to Eiland, Special Master Stack notes Eiland filed 934 cases in Williamson County, Illinois; assisted lead counsel there with document review and briefing efforts; opted out approximately 1,200 clients from the litigation class certified in 2016; and filed

nine separate lawsuits in Illinois state court. Eiland also developed analyses on the application of the economic loss doctrine in Nebraska and Texas, as well as cross-jurisdictional and intra-jurisdictional class action tolling law. Finally, Eiland worked with regulatory and damages experts and assisted drafting motions and responses, and contributed attorneys to review over 1.2 million pages of documents produced by Syngenta. Special Master Stack suggests awarding Eiland $3,120,666.67, or 4% of the Illinois pool.

As to Demerath, Special Master Stack credits the firms with work performed in Nebraska and "play[ing] a role in this Court." The Report and Recommendation suggests awarding Demerath $1,560,333.33, or 2% of the Illinois pool.

Regarding Onder, the Report and Recommendation recognizes the firm's contribution to the creation of the consolidated actions in this Court; preparation and service of PFSs on Syngenta; and work-up of bellwether trials, which included obtaining and reviewing tens of thousands of documents and millions of pages of client documents. Onder also traveled across the country for client depositions, coordinated with senior litigation partners, crafted pretrial and trial strategies, and prepared substantive materials, motions, and briefs. Special Master Stack suggests awarding Onder $2,028,433.33, or 2.6% of the Illinois pool.

The Report and Recommendation suggests denying Conmy Feste's application because the group did not provide any argument or evidence of a common benefit contribution.

Finally, Special Master Stack reviewed certain fee sharing agreements and found them to be fair and reasonable.

DISCUSSION

Garrison and Onder filed timely objections to the Report and Recommendation (*SDIL Case No. 15-1221*, Docs. 375, 383), which elicited responses from Clark/Phipps (*SDIL Case No. 16-255*, Doc. 315), Demerath (*SDIL Case No. 15-1221*, Doc. 396), Eiland (*Id.* at Doc. 386), and Special Master Stack (*Id.* at Doc. 395).[4] The Court has reviewed the applicants' briefing, Judge Lungstrum's orders, the documents submitted to Special Master Stack, and all other relevant materials. After carefully scrutinizing the record, the Court cannot adopt the Report and Recommendation in its entirety, due to several structural and procedural flaws.

First, the quantitative analysis considers client acquisition costs, which Judge Lungstrum specifically instructed the courts not to consider when allocating fees (Kansas Case, Doc. 3882) ("[T]he courts do not consider work performed in recruiting clients to

---

[4] Special Master Stack understandably defends his novel approach, but strangely, the Court also received a declaration from retired United States District Judge David R. Herndon in support of the Report and Recommendation. Judge Herndon presided over the Syngenta litigation in this Court prior to his retirement and appointed Special Master Stack for fee allocation. Judge Herndon's response adds little substance to the issues at hand and, instead, spends roughly ten pages defending the quantitative analysis and mitigating Garrison's contributions to this litigation. Regardless of the intent, the Court finds the response from Special Master Stack unnecessary and the response from Judge Herndon highly inappropriate, given their purportedly neutral roles in these proceedings. Even if the Court gave the response any weight, which it does not, Judge Herndon's unsolicited opinion is not enough to support a totally unprecedented methodology that runs contrary to common benefit principles and Judge Lungstrum's Fee Allocation Order.

Attorney Christopher Cueto also filed an objection to the Report and Recommendation (*SDIL Case No. 15-1221*, Doc. 377), in which he objects to the entry of a final order regarding fee allocation in this Court before the resolution of a fee dispute involving Clark/Phipps. The Court overrules Mr. Cueto's objection regarding the entry of this Order, but notes that this Order is not dispositive of any issues relating to the fee dispute between Mr. Cueto and Clark/Phipps.

have inured to the common benefit of the settlement class")). The quantitative analysis also puts undue weight on claimant numbers and expenses. These factors are not *per se* improper in the common benefit analysis because they may indicate how invested the firms were in the litigation and, similarly, the degree of risk they carried. *See In re Initial Public Offering Sec. Litig.*, No. 21 MC 92 (SAS), 2011 WL 2732563 (S.D. N.Y. July 8, 2011); (Kansas Case, Doc. 4079). Expenses and claimant numbers do not accurately reflect the work performed on behalf of clients or indicate whether that work benefitted the class. *See In re Vioxx Products Liability Litig.*, 760 F. Supp. 2d 640, 643 n.4 (E.D. La. Oct. 19, 2010) ("[H]aving a large number of cases in the MDL often indicates skill at advertising, but does not guarantee the best lawyering . . ."). Because the Report and Recommendation placed claimant numbers, expenses, and client acquisition costs at an equal footing with the hours actually expended in pursuit of the plaintiffs' cause, the methodology does not accurately display the firms' common benefit value. The methodology also carries the risk of blindly and disproportionately rewarding attorneys for marketing efforts, rather than work performed advocating for the benefit of the plaintiffs. Notably, the Kansas court has implemented a separate process for the reimbursement of expenses (*See* Kansas Case, Docs. 3816 & 3882).

Also, the quantitative analysis does not fairly evaluate the common benefit hours the applicants reported. The Report and Recommendation mistakenly attributed an additional 12,913 hours to Clark/Phipps and further erred by accepting Clark/Phipps' time at face value. Clark/Phipps reported just over 128,000 hours of common benefit work, while the 49 Kansas MDL firms *combined* submitted 142,823.5 hours (Kansas Case,

Doc. 3641, Ex. 1). Moreover, a large portion of Clark/Phipps' time is logged by anonymous employees, and their time summaries are not supported by contemporaneous time records. When assessing common benefit work, district courts do not need to review actual billing records, and are free to rely on time summaries. *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 306-07 (3d Cir. 2005); *see also In re Vioxx*, 760 F. Supp. 2d at 659. But in this instance, the Report and Recommendation erred by not scrutinizing Clark/Phipps' time at all, given the tremendous discrepancy between the number of hours Clark/Phipps submitted and the number of hours the other firms across this litigation submitted. The Court understands that many firms' representation of their clients began on a contingency basis, which may result in the unavailability of detailed time summaries. But this is even more reason to carefully inspect the time submissions.

Also, Judge Lungstrum instructed, "[A]lthough much work may qualify as common benefit work if sufficiently impactful or if on behalf of a large number of plaintiffs, not all common benefit work will be weighed equally in the allocation from the common benefit pools" (Kansas Case, Doc. 3882). The Fee Allocation Order cautioned the courts to be mindful that some work could have been completed by lesser-experienced attorneys, paralegals, or other staff (*Id.*). For example, according to Judge Lungstrum, time spent shepherding clients through the claims process and substantial post-retention communications with clients are not especially valuable to the common benefit of the plaintiffs (*See Id.*). Despite these instructions, the Report and Recommendation does not meaningfully differentiate between the types of work underlying the common benefit hours or who performed the work. For instance, although Clark/Phipps submitted 74%

of all hours submitted for compensation from the Illinois pool, over two-thirds of those hours are attributable to miscellaneous non-attorneys and include a staggering 22,499.80 hours of "assisting clients in perfecting claims in settlement" and 48,221.10 hours of "pre-settlement communication with clients." Ultimately, the Report and Recommendation fails to carefully evaluate the benefit of the work behind the hours, which dilutes the contributions of some applicants while significantly inflating the value of others.

The Report and Recommendation's subjective analysis is also incongruent, in some respects, with Judge Lungstrum's orders. For instance, the Report and Recommendation justified awarding Clark/Phipps nearly 80% of the Illinois pool largely for the firm's work developing cases on behalf of ethanol plaintiffs. The Report spends much time praising Clark/Phipps for "establish[ing] novel litigation theories against Syngenta for ethanol plants and biorefineries" (*SDIL Case No. 15-cv-1221*, Doc. 368). But Judge Lungstrum explained that Clark/Phipps' work on this front was actually harmful to the Illinois plaintiffs: "[M]uch of the work by Clark/Phipps on behalf of ethanol plants and against other members of the grain trade ultimately proved unsuccessful, which defeats bolstered Syngenta's position and thus did not contribute to achievement of the settlement" (Kansas Case, Doc. 3882). Despite Judge Lungstrum's comments, the Report and Recommendation increases Clark/Phipps' common benefit value for their work on behalf of ethanol plaintiffs.

For all of these reasons, the Court cannot adopt the Report and Recommendation in its entirety. The cornerstone of the common benefit analysis is whether a lawyer's work benefited the entire class. Work that benefits a small group of claimants or is too

tenuously related to the advancement of the claimants should not be reimbursed. *See In re Sulzer Hip Prosthesis and Knee Prosthesis Liability Litig.*, 268 F.Supp.2d 907 (N.D. Ohio June 12, 2003). The Report and Recommendation's analysis makes tenuous presumptions about the applicants' contributions based on expenses and claimant numbers, and generally fails to seriously consider whether work actually inured to the benefit of the plaintiffs.

Although ideally the Court would conduct its own scrutiny of the time records, it simply does not have the resources to scour almost 200,000 hours of time entries. And, as already noted, some applicants failed to provide the Court with detailed records. Accordingly, the Court will review the hours the applicants submitted and ensure they comport with the Fee Allocation Order, common benefit principles, *Johnson* factors, and posture of this litigation. Then, the Court will adjust the suggested allocations accordingly.

*Allocation*

### 1. Clark/Phipps

| Description | Attorney Hours | Non-Attorney Hours |
|---|---|---|
| Complaint Drafting | 7186.3 | 2506.6 |
| Dispositive Motion Briefing and Argument | 7497.7 | 28.9 |
| Class Certification Motion Briefing and Argument | 1150.8 | 0 |
| Plaintiff Fact Sheet Preparation and Review | 673.9 | 4539.2 |
| Paper Discovery (Syngenta and Third Parties) | 1232.6 | 0.2 |
| Paper Discovery Against Plaintiffs | 454.2 | 0 |
| Discovery Motion Practice and Communications with Adverse Parties | 1417.3 | 1.4 |
| Fact Depositions (Syngenta and Third Parties) | 33 | 0 |
| Defend Fact Depositions of Plaintiffs | 0 | 0 |
| Discovery File Management | 2333.3 | 18497.7 |
| Plaintiffs' Expert Witness Work | 1566.2 | 273.1 |

| Description | Attorney Hours | Non-Attorney Hours |
|---|---|---|
| Defendant Expert Witness Work | 107.3 | 0 |
| Other Pretrial Motion Practice | 1080.9 | 13.6 |
| Trial Briefing and Jury Instructions | 10 | 0 |
| Post-Trial Briefing | 405.1 | 0 |
| Pre-Settlement Communication with Clients | 822.3 | 47398.80 |
| Settlement Negotiations | 1671.2 | 23.7 |
| Assisting Clients in Perfecting Claims | 915.5 | 21584.30 |
| Preparation of Fee Petition | 635.4 | 6.4 |
| Administrative Work as Court-Appointed Leadership | 197.2 | 0.00 |
| Other | 1936.2 | 2549.40 |
| **Total** | 31326.4 | 97423.3 |

Clark/Phipps claims 128,749.7 hours of common benefit work, consisting of 31,326.4 attorney hours and 97,423.3 non-attorney hours. Pursuant to the Fee Allocation Order, the Court gives little weight to the 22,499.8 hours of assisting clients in perfecting claims and 5,213.1 hours of PFS work. Moreover, the 97,423.3 non-attorney hours (over two-thirds of Clark/Phipps' time) are given significantly less weight than the 31,326.4 attorney hours. Although the Court also gives less weight to Clark/Phipps' 48,221.1 hours of pre-settlement communications with clients, it recognizes that some portion of this time was crucial to the settlement agreement—Syngenta required Clark/Phipps' participation in the settlement as a pre-condition to executing the agreement. Thus, Clark/Phipps spent necessary hours securing the participation of their (roughly) 18,000 claimants, which adds to their common benefit value. Finally, because Clark/Phipps' time appears to be grossly excessive in comparison to all the other firms involved in this litigation, the Court gives their time less weight, overall. *See In re Public Offering Sec. Litig.*, 2011 WL 2732563, at *4 (entirely eliminating or reducing "questionable" hours); *In re*

*Sulzer Hip Prosthesis and Knee Prosthesis Liability Litig.*, 268 F.Supp.2d at 925 (disallowing

fees for time that was "grossly excessive on its face").

When considering Clark/Phipps' contributions, the Court acknowledges Clayton

Clark's appointment to the PNSC and the Illinois settlement committee; these groups

were invaluable in reaching the global settlement. Clark/Phipps has demonstrated a high

level of commitment to this litigation and has expended considerable time and resources

in pursuing a resolution. As Judge Lungstrum noted, Clark/Phipps filed hundreds of

cases in various courts and played an important role in helping to negotiate the settlement

(Kansas Case, Doc. 3882). Special Master Reisman (appointed in the Kansas MDL) also

pointed out that Clark/Phipps initiated 456 discovery requests on Syngenta and, along

with Garrison, worked with a team of expert economists to develop damages models

against Syngenta (Kansas Case, Doc. 3816). Also, Clark/Phipps' efforts on behalf of grain

handling facilities resulted in the creation of one of the four settlement subclasses, which

adds to their common benefit value.

But the Court also must factor in the less-than-favorable results Clark/Phipps

obtained. Clark/Phipps expended a substantial amount of effort prosecuting cases on

behalf of ethanol plants and biorefineries. Although Clark/Phipps developed novel legal

theories that resulted in an ethanol settlement subclasses, this front was largely

unsuccessful and bolstered Syngenta's position. In fact, Judge Lungstrum reduced the fee

allocation to the Illinois pool because of Clark/Phipps' ethanol losses (Kansas Case,

Doc. 3882). Thus, the time and resources Clark/Phipps expended prosecuting the

unavailing ethanol cases did not confer a common benefit on the plaintiffs as a whole.

Also, Clark/Phipps' work in developing cases against grain handlers created obstacles for coordination between the Illinois litigation and the Kansas MDL (*See SDIL Case No. 16-225*, Doc. 58). Clark/Phipps was appointed lead counsel in *Tweet*, a case in this Court in which plaintiffs asserted claims against grain handlers. As a result, *Tweet* created tension with the MDL leadership's position that grain handlers were not liable, and thus impeded discovery coordination. While Clark/Phipps points out that it created more work for Syngenta by not coordinating discovery, the claims against the grain handlers were largely dismissed at the Rule 12(b)(6) stage (*SDIL Case No. 16-cv-255*, Doc. 185) or voluntarily dismissed shortly thereafter (*Id.* at Doc. 199). Thus, Clark/Phipps' time spent in furtherance of claims against grain handlers cannot be considered common benefit hours.

In light of the above, the Report and Recommendation's suggested allocation of should be reduced to account for the non-attorney hours; time spent communicating with clients and guiding them through the claims process; the losing ethanol litigation; the prosecution of claims against grain handling facilities; and the lack of contemporaneous time sheets to support their summaries. In conclusion, the Court awards Clark/Phipps $38,228,166.67, or 49% of the Illinois pool.

### 2. Conmy Feste

| Description | Attorney Hours | Non-Attorney Hours |
|---|---|---|
| Pre-settlement Communication with Clients | 76.8 | 22.3 |
| Assisting Clients in Perfecting Claims in Settlement | 6.0 | 4.4 |
| Other | 89.75 | 11.6 |
| **Total** | 172.55 | 38.3 |

Conmy Feste's hours consist almost entirely of pre-settlement communication with clients and assisting clients in perfecting claims. These hours have little common benefit value, and Conmy Feste did not object to the Report and Recommendation's denial of its fee application. Accordingly, the Court adopts Special Master Stack's recommendation and denies Conmy Feste's application.

### 3. Demerath

| Description | Attorney Hours | Non-Attorney Hours |
|---|---|---|
| Complaint Drafting | 321.5 | 91.5 |
| Pre-settlement Communication with Clients | 5375.5 | 3237 |
| Assisting Clients in Perfecting Claims | 345 | 105 |
| Preparation of Fee Petition | 18 | 12 |
| **Total** | 6060 | 3445.5 |

Demerath claims 9,505.5 hours of common benefit work, consisting of 6,060 attorney hours and 3,445.5 non-attorney hours. Again, the Court affords significantly less weight to the non-attorney hours and little weight to hours recorded as pre-settlement communication with clients and assisting clients in perfecting claims. As to Demerath's contributions, Demerath was responsible for filing some of the first cases in Nebraska before exclusively assisting Clark/Phipps. Demerath's background in farming was clearly beneficial for client acquisition and retention, but it did not benefit the class at large. Thus, the Court reduces Special Master Stack's award to $780,166.67, or 1% of the Illinois pool.

### 4. Eiland

| Description | Attorney Hours | Non-Attorney Hours |
|---|---|---|
| Complaint Drafting | 88 | 0 |
| Class Certification Motion Briefing and Argument | 30 | 0 |
| Plaintiff Fact Sheet Preparation and Review | 815 | 0 |
| Paper Discovery | 320 | 0 |
| Plaintiffs' Expert Witness Work | 26 | 0 |
| Other Pretrial Motion Practice | 4 | 0 |
| Pre-settlement Communication with Clients | 4015 | 0 |
| Assisting Clients in Perfecting Claims | 330 | 330 |
| Preparation of Fee Petition | 150 | 156 |
| Excluding Clients from Class Action | 500 | 0 |
| Illinois Coordinating Counsel Work | 650 | 0 |
| Hearings and Related Travel | 340 | 0 |
| Administrative Work | 0 | 5500 |
| **Total** | 7268 | 5986 |

Eiland claims 13,254 hours of common benefit work, consisting of 7,268 attorney hours and 5,986 non-attorney hours. Again, the Court affords significantly less weight to the non-attorney hours and little weight to the hours recorded as pre-settlement communication with clients (over half of Eiland's estimated attorney hours) and PFS work-related hours. As to their contributions, the Court reiterates Special Master Stack's acknowledgement that Eiland filed many cases in Williamson County, Illinois; assisted with document review and briefing; opted out over one thousand clients from the litigation class certified in 2016; worked with experts; and conducted other discovery. But because the majority of Eiland's hours consist of PFS work, communication with clients, assisting clients with claims, and administrative work, the Court reduces Eiland's award to $2,340,500, or 3% of the Illinois pool.

## 5. Garrison

| Description | Attorney Hours | Non-Attorney Hours |
|---|---|---|
| Complaint Drafting | 615 | 307.8 |
| Dispositive Motion Briefing and Argument | 473.7 | 61.1 |
| Plaintiff Fact Sheet Preparation | 1538.13 | 5839.75 |
| Paper Discovery (Syngenta and Third Parties) | 1282.5 | 890.5 |
| Paper Discovery Against Plaintiffs | 1170.69 | 71.7 |
| Discovery Motion Practice and Communication with Adverse Parties | 432.3 | 0 |
| Fact Depositions (Syngenta and Third Parties) | 1074.3 | 5.5 |
| Defend Fact Depositions (of Plaintiffs) | 823 | 5.8 |
| Discovery File Management | 97.3 | 70.9 |
| Plaintiffs' Expert Witness Work | 116.9 | 0 |
| Defendant Expert Witness Work | 1.7 | 0 |
| Pre-Settlement Communication with Clients | 506.49 | 1541.25 |
| Assisting Clients in Perfecting Claims | 22.5 | 110 |
| Settlement Negotiations | 314.5 | 0 |
| Preparation of Fee Petition | 134 | 19.5 |
| Access, Archive, Track & Review Pleadings, Motions, etc. | 9.3 | 1.4 |
| Administrative Work as Court-Appointed Leadership | 86.3 | 0 |
| Other | 1325.1 | 667.5 |
| **Total** | 10023.71 | 9592.7 |

Garrison submitted 19,616.41 hours, consisting of 10,023.71 attorney hours and 9592.7 non-attorney hours. Again, the Court gives little weight to hours for pre-settlement communication with clients, PFS work, and assisting clients in perfecting claims, and affords significantly less weight to the non-attorney hours compared to the attorney hours. Notably, Garrison provided detailed time sheets describing the attorney or personnel who completed a task, the nature of the task, the date the task was performed, and the amount of time spent on each task (*SDIL Case No. 15-1221*, Doc. 349).

As to Garrison's contributions, the group was at the forefront of the Illinois Syngenta litigation. They were appointed lead counsel in *Poletti*, where they secured important rulings on personal jurisdiction and the economic loss doctrine. Garrison's success benefitted all Illinois plaintiffs—state and federal—as well as plaintiffs in other state courts across the country. Furthermore, Garrison was engaged in a joint-prosecution agreement with the Kansas MDL leadership and assisted them in document review. Additionally, Garrison presented 44 farmers for deposition, produced approximately 350,000 pages of farmer documents, and were engaged in early settlement discussions. Finally, Garrison pursued lines of questioning at depositions that were used at the Kansas class trial where the jury returned a plaintiffs' verdict (Kansas Case, Docs. 3816 & 3312). In consideration of all the relevant factors, the Court awards Garrison $33,859,233.33, or 43.4% of the Illinois pool.

### 6. Onder

| Description | Attorney Hours | Non-Attorney Hours |
|---|---|---|
| Complaint Drafting | 365.8 | 92.3 |
| Plaintiff Fact Sheet Preparation and Review | 570.1 | 310.7 |
| Paper Discovery Against Plaintiffs | 245.4 | 97.5 |
| Discovery Motion Practice and Communication with Adverse Parties | 15 | 12 |
| Defend Fact Depositions | 230.7 | 0 |
| Discovery File Management | 67.8 | 65 |
| Pre-Settlement Communication with Clients | 740.1 | 952.9 |
| Assisting Clients in Perfecting Claims | 113.1 | 202.6 |
| Preparation of Fee Petition | 371.4 | 1106.7 |
| Administrative Management | 630.8 | 267 |
| Access, Archive, Track & Review Pleadings, Motions, etc. | 538.03 | 167.7 |
| Conference Calls with Co-Counsels | 23.1 | 0 |
| **Total** | 3911.33 | 3274.4 |

Onder submitted 7,185.73 hours, consisting of 3,911.33 attorney hours and 3,274.4 non-attorney hours. The Court gives little weight to the hours recorded as pre-settlement communication with clients, PFS preparation and review, and assisting clients in perfecting claims. Also, the Court affords significantly less weight to the non-attorney hours compared to the attorney hours.

As to their contributions, Onder worked closely with Garrison and contributed to the creation of the Illinois front in this Court. Onder also played an important role in coordinating with the MDL leadership to participate in depositions. Further, Onder took part in depositions for its corn producer clients, developed pre-trial and trial strategies, and prepared substantive materials, motions, and briefs, which included arguments on the economic loss doctrine and CAFA jurisdictional issues. Onder's work proved successful in avoiding transfer of cases to the MDL; clearly this success cemented the third front Syngenta could not ignore.

Furthermore, Onder, along with Garrison, contributed to developing 48 claims for potential bellwether trials in *Poletti*.[5] Onder also obtained and reviewed countless documents from Syngenta and its subsidiaries regarding matters such as Syngenta's sales, marketing, purchases, scientific GMO data, and agricultural market data. Therefore, the Court awards Onder $2,808,600.00, or 3.6% of the Illinois pool.

---

[5] In contrast, bellwether work-up never occurred in *Tweet*, the parallel litigation to *Poletti* in the Southern District of Illinois.

CONCLUSION

In conclusion, the Court **ADOPTS in part** and **REJECTS in part** the Report and Recommendation regarding fee allocations (*SDIL Case No. 15-1221*, Doc. 368). The Court adopts the Report and Recommendation to the extent it denies Conmy Feste's application for attorneys' fees. The Court rejects the remaining awards contained in the Report and Recommendation and, instead, awards Clark/Phipps $38,228,166.67, or 49% of the Illinois pool; Demerath $780,166.67, or 1% of the pool; Eiland $2,340,500.00, or 3% of the pool; Garrison $33,859,233.33, or 43.4% of the pool; and Onder $2,808,600.00, or 3.6% of the pool.

This Order is not dispositive of any issues related to the fee dispute at issue in Christopher Cueto's objection to the Report and Recommendation (*SDIL Case No. 15-1221*, Doc. 377), and the Court retains its jurisdiction to resolve fee disputes.

To the extent the objections to the Report and Recommendation do not comport with this Order, they are **OVERRULED**.

**IT IS SO ORDERED.**

**DATED:  August 19, 2019**

**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**